# INDEX OF UNPUBLISHED CASES

# Table of Contents

Braver v NorthStar Alarm Services LLC ............................................................................ 2

Cunningham v Politi .......................................................................................................... 18

Davis v CVS Pharmacy Inc ................................................................................................ 25

Franklin v Upland Software Inc ......................................................................................... 30

Gaker v Q3M Insurance Solutions ..................................................................................... 35

Jackson v Direct Building Supplies LLC ........................................................................... 39

Jones v Blackstone Medical Services LLC ......................................................................... 52

Linlor v Five9 Inc .............................................................................................................. 60

Luckau v Sunrun Inc .......................................................................................................... 65

Moore v Triumph CSR Acquisition LLC ........................................................................... 68

Orsatti v Quicken Loans Inc .............................................................................................. 71

Scruggs v CHW Group Inc ................................................................................................ 78

Sheski v Shopify (USA) Inc ............................................................................................... 89

Shoemaker v Zeitlin .......................................................................................................... 95

Smith v American-Amicable Life Insurance Company of Texas ........................................ 105

Smith v Direct Building Supplies LLC .............................................................................. 108

Worsham v Travel Options Inc .......................................................................................... 112

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 3 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

🚩 KeyCite Yellow Flag

Amended on Denial of Reconsideration by   Braver v. NorthStar Alarm
Services, LLC,   W.D.Okla.,   November 5, 2019

2019 WL 3208651
Only the Westlaw citation is currently available.
United States District Court, W.D. Oklahoma.

Robert H. BRAVER, for himself and all
individuals similarly situated, Plaintiff,

v.

NORTHSTAR ALARM
SERVICES, LLC, et al., Defendants.

Case No. CIV-17-0383-F
|
Signed 07/16/2019

**Attorneys and Law Firms**

David Humphreys, Luke J. Wallace, Paul M. Catalano,
Humphreys Wallace Humphreys PC, Tulsa, OK, Keith J.
Keogh, Pro Hac Vice, Timothy J. Sostrin, Pro Hac Vice,
Keogh Law Ltd., Chicago, IL, for Plaintiff.

Brian R. Matula, Gum Puckett & Mackechnie LLP, D. Kent
Meyers, Mary H. Tolbert, Crowe & Dunlevy, Oklahoma City,
OK, Daniel S. Blynn, Pro Hac Vice, Stephen R. Freeland,
Pro Hac Vice, Venable LLP, Washington, DC, Elizabeth C.
Rinehart, Pro Hac Vice, Venable LLP, Baltimore, MD, Jesse
R. Pierce, Jesse R. Pierce & Associates PC, Nugent D.
Beaty, Jr., Pierce & O'Neill LLP, Houston, TX, for Defendant
Northstar Alarm Services LLC.

Anne E. Zachritz, Resolution Legal Group, Oklahoma City,
OK, Eric S. Allen, Pro Hac Vice, Allen Mitchell & Allen
PLLC, Salt Lake City, UT, for Defendant Yodel Technologies
LLC.

## ORDER

STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE

### I. Introduction

**\*1** In this action, Robert H. Braver alleges, for himself and
on behalf of the class the court has certified under Rule 23,
that Yodel Technologies, LLC, initiated telemarketing calls on

behalf of NorthStar Alarm Services, LLC, in a manner which
violated the Telephone Consumer Protection Act (TCPA) and
regulations implemented thereunder.

Braver appears on his own behalf and on behalf of the class
with respect to count one, and appears on his own behalf with
respect to count three. [1] Yodel is a company which allegedly
provides telemarketing services to its clients. Defendants
describe Yodel's business as "qualifying leads" (prospects)
for its clients. [2] NorthStar is (or was) one of Yodel's clients.
NorthStar provides residential security and home automation
systems to consumers.

Cross-motions for summary judgment are before the court.

Braver moves for summary judgment on his own behalf
and on behalf of the class. [3] He seeks summary judgment
against both defendants "for their violations of the TCPA." [4]
Braver's motion, however, presents no developed argument
with respect to count three. NorthStar filed a response brief. [5]
Braver filed a reply brief. [6]

NorthStar moves for summary judgment on counts one and
three. [7] Braver has responded [8] and NorthStar has replied. [9]

Yodel moves to join NorthStar's motion for summary
judgment. Doc. no. 123. No party responded to Yodel's
motion, which is broadly construed as a motion seeking
leave to join in all of NorthStar's motion papers currently
before the court, specifically, NorthStar's motion for summary
judgment, NorthStar's reply brief, and NorthStar's brief in
response to Braver's motion for summary judgment. The
court construes Yodel's motion in this manner because the
arguments made by NorthStar in all of these papers overlap
and because it appears this was Yodel's intent. The court is
confident, for example, that Yodel did not intend to confess
Braver's motion for summary judgment by failing to respond
to it.

For the reasons stated in this order, Braver's motion for
summary judgment will be granted on count one and
otherwise denied. NorthStar's motion for summary judgment,
joined in by Yodel, will be granted on count three and
otherwise denied.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                1

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 4 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

## II. The Claims

The court previously dismissed any direct liability claims alleged against NorthStar, ruling that any potential liability on NorthStar's part must be based on its alleged vicarious liability for Yodel's acts. [10] At this stage, Braver argues that Yodel has direct liability on both of the remaining counts and that NorthStar has vicarious liability on those counts.

### Count One.

**\*2** Count one alleges that defendants violated the TCPA, specifically 47 U.S.C. § 227(b)(1)(B), and the Federal Communications Commission's implementing regulation at 47 C.F.R. § 64.1200(a)(3).

Section 227(b)(1)(B) provides that it shall be unlawful for any person within the United States:

> to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.... [11]

Regulation 47 C.F.R. § 64.1200(a)(3) limits the application of § 227(b)(1)(B) to telemarketing calls and requires prior express written consent of the called party, providing as follows.

> No person or entity may ... [i]nitiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call ... is not made for a commercial purpose; [or] [i]s made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing....

47 C.F.R. § 64.1200(a)(3)(ii),(iii).

Braver contends that defendants violated these provisions by making telemarketing calls on the residential phone lines of Braver and the class, using soundboard technology to deliver prerecorded messages to persons with whom defendants had no prior relationship and from whom prior consent had not been obtained.

### Count Three.

Count three alleges that defendants violated 47 C.F.R. § 64.1200(d), which provides as follows.

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> ...
>
> (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

Braver contends that defendants violated this regulation in two ways: by initiating calls without first having implemented an effective written policy meeting the regulatory standards, and by failing to provide the called party (Braver) with the required identifying information.

## III. Standards

Under Rule 56, Fed. R. Civ. P., summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 5 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983). A scintilla of evidence is not sufficient to defeat a motion for summary judgment; there must be sufficient evidence on which a jury could reasonably find for the non-moving party. Manders v. State of Oklahoma ex rel. Dept. of Mental Health, 875 F.2d 263, 265 (10th Cir. 1989), superseded by statute on different issue, quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

**\*3** Facts set forth in the statement of the material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the nonmovant using the procedures set forth in the court's local rules. LCvR56.1(e). Those procedures require the nonmovant to cite evidentiary material in support of its position. *Id.* Accordingly, this order sometimes characterizes a fact as undisputed although the nonmovant purports to dispute it. The court only does so if it has found, based on its review of the record, that the nonmovant did not carry its burden to raise a genuine dispute.

## IV. Background Facts

There is no dispute about the following matters. (Additional facts are stated elsewhere in this order.)

### Yodel's Soundboard Technology.

Yodel's automated predictive dialer initiated the calls in question in this action.[12] A computer dialed the telephone number, detected whether it was answered by a potential customer and, if so, transferred[13] the connected call to a soundboard agent who was trained to play prerecorded wav files (audio files) to deliver messages to the called party by pressing buttons.[14]

The soundboard software (referred to by Yodel as "the Yodel Dialer")[15] required Yodel's soundboard agents, located in a call center in India,[16] to follow a script which instructed them to press buttons in a certain order thereby delivering prerecorded audio clips to the called party.[17]

After answering the initial call, the first thing a called person (*i.e.* a lead or a prospect) heard was a prerecorded voice stating: "Hello this is [Amy],[18] I am security advisor, can you hear me okay?"[19] During the course of the telemarketing campaign, there was some variation in how a lead was provided to NorthStar (some leads were handed off as a "warm transfer," meaning with the called person still on the line, and some leads were called back by NorthStar), but every initial call began with the soundboard agent (Yodel's agent) playing the first recording.[20]

### The Class.

On October 15, 2018, the court certified the following class and subclass.[21]

Class: All persons in the Red Dot Data marketing list for whom Yodel's records reflect a telephone call regarding Northstar's home security systems that lasted more than 30 seconds, that was handled by an agent who applied status code 20 or 50 to the call, and that resulted in the normal clearing disposition.

**\*4** Subclass:

All persons in the Red Dot Data marketing list for whom Yodel's records reflect a telephone call regarding Northstar's home security systems that lasted more than 30 seconds, that was handled by an agent who applied status code 50 to the call, and that resulted in the normal clearing disposition.

Excluded from the class are:

Any persons whose contact information is associated with either an IP address or website URL in the Red Dot Data marketing list.

Braver's expert analyzed call records and identified 239,630 persons who meet the class definition and 47,398 persons who

Case 1:25-cv-01083-JPW   Document 20-2   Filed 11/04/25   Page 6 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

meet the subclass definition. In doing so, he removed any call records where there was any possibility that no prerecorded message played. As a result of this approach, the total set of 78 million call records was narrowed to 252,765 calls at issue for the class. [22]

<u>Calls to Braver</u>. [23]

On August 26, 2016, Braver received a telephone call on his residential phone number. The call used the soundboard system. In that call, the soundboard agent pressed buttons which delivered prerecorded voice messages and thus could not answer Mr. Braver's basic questions about who was calling or why Braver's telephone number had been dialed. Prior to receiving the call, Braver had no relationship with NorthStar. Like the other class members, Braver is in the Red Dot Data marketing list which Red Dot Data sold to Yodel.

<u>Matters Expressly Conceded by Defendants</u>. [24]

Defendants concede Yodel initiated the calls to plaintiff and to the class.

Defendants concede Yodel did not obtain consent from the called parties prior to initiating calls to plaintiff and the class.

Defendants concede that the calls constituted telemarketing under the TCPA.

Defendants concede that at least some of the telephone numbers called were residential numbers.

### V. Count One

Given these concessions, defendants raise just two issues with respect to count one. Defendants argue that the calls initiated by Yodel to generate leads as part of the NorthStar telemarketing campaign are not calls which "deliver a message" within the meaning of § 227(b)(1)(B). This issue is addressed in Part A, below. Defendants also argue that NorthStar is not vicariously liable for Yodel's material acts. This issue is addressed in Part B, below.

#### A. Calls Delivered "a Message" Within the Meaning of § 227(b)(1)(B).

As previously stated, § 227(b)(1)(B) provides that it shall be unlawful:

to initiate any [telemarketing] telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.

**\*5** Defendants contend that § 227(b)(1)(B)'s use of the singular in the phrase "to deliver a message," shows the statute does not regulate, and was not intended to regulate, interactive exchanges of information which defendants contend do not deliver "a message" but instead deliver messages - plural. Defendants argue: "Put simply: while soundboard technology may use audio clips containing 'artificial or prerecorded voices,' those clips do not 'deliver a message.' Thus, these calls do not contravene the TCPA's prohibition on using prerecorded voices to deliver a message." [25]

Title 1 U.S.C. § 1 provides that "In determining the meaning of any Act of Congress, unless the context indicates otherwise ... words importing the singular include and apply to several persons, parties, or things...." [26] Nothing about the context of § 227(b)(1)(B) suggests a different result here. [27]

Defendants argue that if Congress had intended § 227(b)(1)(B) to apply to calls which delivered multiple messages, Congress knew how to so provide. Defendants cite restrictions against making "any call ... using any automatic telephone dialing system or an artificial or prerecorded voice" (to a patient room of a hospital) per 47 U.S.C. § 227(b)(1)(A)(ii). Defendants also cite the TCPA's creation of a private right of action under § 227(c)(5) for persons who receive "more than one telephone call within any 12-month period by or on behalf of the same entity" in violation of regulations prescribed under that subsection. These arguments are unpersuasive given the plain language and meaning of § 227(b)(1)(B), together with the principle of statutory construction embodied in 1 U.S.C. § 1.

The court also rejects defendants' argument that the statute's use of the singular shows it was not intended to regulate a soundboard system that involves human interaction. Defendants argue that phrases in the statute such as "initiate any telephone call" and "deliver a message" imply no

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 7 of 120

human interaction in the message-delivery system. As further support, defendants' response brief cites [28] In re TCPA of 1991, 7 FCC Red 2736 (June 25, 1992), which states: "The legislative history of the TCPA also reflects the premise that auto dialer generated calls are more intrusive to the privacy concerns of the called party than live solicitations." [29] Defendants also cite legislative history in their own moving brief. [30]

**\*6** The court notes the statements of congressional purpose relied on by defendants. This legislative history, however, does not limit the plain language of § 227(b)(1)(B), which says nothing about any requirement that there be no human interaction for § 227(b)(1)(B) to apply. Even more fundamentally, the language of § 227(b)(1)(B) is clear, and there is no reason to resort to legislative history to determine its meaning. *See*, Edwards v. Valdez, 789 F.2d 1477, 1481 (10th Cir. 1986) ("When the meaning of a statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent").

Defendants argue that their interpretation of § 227(b)(1) (B) avoids conflict with other provisions of the TCPA. For example, they note that 47 U.S.C. § 227(d)(3)(A) requires callers to include certain identifying information at the beginning of all prerecorded messages. [31] They argue that if soundboard technology is considered to be the delivery of a prerecorded message, then under § 227(d)(3) (A), call recipients would be required to listen to the same identification information before each and every audio clip played during a call, an obviously absurd result. The court rejects this argument as a basis for construing § 227(b)(1)(B). Congress is entitled to some flexibility of language so long as its meaning is clear.

Defendants' other arguments are also unpersuasive. Defendants argue that their interpretation of § 227(b)(1) (B) avoids a conflict with the Federal Trade Commission's Telemarketing Sales Rule's call-abandonment provisions. Braver responds by arguing that defendants misstate the rule. Regardless, this court is not required to ignore the plain meaning of § 227(b)(1)(B) to avoid bumping up against an FTC rule not in dispute in this action. Defendants argue that if § 277(b)(1)(B) is construed to apply to calls that involve human interaction and prerecorded messages, then the statute will apply whenever a prerecorded message is used in an otherwise live call so that common prerecorded messages (such as "this call may be monitored," hold music or hold

messages) will violate § 227(b)(1)(B) when played during these otherwise live calls. Section 227(b)(1)(B), however, applies only to telemarketing calls, a fact which largely answers this argument. Similarly, defendants argue that if § 227(b)(1)(B) is construed as Braver contends, the statute will preclude telemarketing calls placed by a disabled person who uses a voice generator as an "artificial voice." This action involves a "prerecorded voice," not an "artificial voice." Moreover, the bigger point with respect to all of these types of arguments is that they are too remote from the facts of this case to be persuasive.

After careful consideration, the court rejects defendants' argument that the calls initiated by Yodel did not deliver a message within the meaning of § 227(b)(1)(B). [32] This conclusion -- together with the matters which have been expressly conceded by the defendants (Yodel initiated the calls to plaintiff and the class, consent was not obtained, the calls constituted telemarketing calls, and at least some of the telephone numbers called were residential numbers) -- means that liability has been established on the part of Yodel with respect to count one. There is no genuine issue with respect to the fact that Yodel initiated telephone calls to residential telephone lines using a prerecorded voice to deliver a message without the prior express consent of the called party. With respect to the claims alleged against Yodel in count one, Braver and the class are entitled to summary judgment in their favor.

**\*7** NorthStar's potential liability on count one depends on vicarious liability, addressed next.

### B. NorthStar Is Vicariously Liable on Count One.

As recognized by the United States Supreme Court, the Federal Communications Commission has ruled that under federal common-law principles of agency, there may be vicarious liability for TCPA violations. Campbell-Ewald Co. v. Gomez, 84 USLW 4051, 136 S. Ct. 663, 674 (2016), referencing In re Joint Petition Filed by Dish Network, LLC, et al. for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules, 28 F.C.C. Rcd. 6574 (2013), hereafter "May 2013 FCC Ruling." [33] The May 2013 FCC Ruling states: "we clarify that a seller is not directly liable for a violation of the TCPA unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer." May 2013 FCC Ruling at 6582, ¶24. The May 2013 FCC Ruling then sets out three potential agency

theories under which a non-caller (such as NorthStar) may be vicariously liable for the TCPA violations of a direct caller (such as Yodel): actual agency, also referred to as classical agency; apparent authority; and ratification.

The classical definition of agency contemplates the fiduciary relationship which arises [34] when one person (principal) manifests assent to another person (agent) that the agent shall act on the principal's behalf and subject to the principal's control. [35] Plaintiff must show that the principal controlled or had the right to control the purported agent. Restatement (Third) of Agency § 1.01 cmt. f (1) (2006) ("essential element of agency is the principal's right to control the agent's actions"); [36] Mey v. Venture Data, LLC, 245 F.Supp.3d 771, 787 (N.D. W. Va. 2017). The principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority. Restatement (Third) of Agency § 1.01 cmt. f (1). In the TCPA context, some courts have characterized the control necessary to establish agency as control over the manner and means of the agent's calling activities. Mey at 787. Citing Mey, [37] defendants argue that a "manner and means" test applies. Defendants also argue that agency requires more than mere passive permission, as it involves request, instruction or command. [38] The court will presume for purposes of argument that all of these requirements apply.

**\*8** With this understanding of classical agency in mind, the court finds the following facts based on undisputed evidence.

*1. In or around February of 2016, NorthStar hired Yodel to generate qualified leads for NorthStar. This relationship lasted until October 2016.* [39]

*2. NorthStar was involved in determining the script for the prerecorded messages used by Yodel in the calls which Yodel made in order to provide NorthStar with qualified leads.*

--Before calls were placed by Yodel as part of the NorthStar telemarketing campaign, NorthStar listened to prerecorded audio clips and reviewed a sample soundboard script, all of which were provided by Yodel (which had used them for another security company). [40] When NorthStar's witness was asked if Bates No. 107 was the script "that Yodel provided to NorthStar to show what the prerecorded Avatar would be saying," the witness answered "Yes." [41]

--When NorthStar's witness was asked whether NorthStar ultimately approved the script to be used in telephone calls, the witness testified: "We didn't object to them using it, but it wasn't understood that we would have to approve it as far as I know." [42] The questioner then asked, whether, at some point, NorthStar told Yodel to begin making calls, and whether, at that point, "approval was made with the understanding that they [Yodel] would be using this script shown at Bates No. 107," to which the witness answered "correct." [43] Thus, NorthStar told Yodel to begin making calls with the understanding that the script to be used in those calls was a script substantially similar [44] to the script NorthStar had reviewed.

--The script reviewed by NorthStar and ultimately used in the NorthStar campaign was substantially as set out below. [45] Each numbered paragraph reflects a separate, prerecorded wav file to be played by the soundboard agent. [46]

1. Intro: Hello this is [Amy], [47] I am security advisor, can you hear me okay?

2. Purpose: Okay, good, I am with the security help center and the reason why I am calling today is that there have been issues with false alarms, with home security systems in your neighborhood, have you been informed about that?

3. Security Concern: With crime rates and mass shooting on the rise in the US and national security with our borders, you can see having false alarms with home security systems in your area can be a big concern right?

4. My job: So it's my job to make sure that all the homes in your neighborhood are aware of the technologies and security programs available in your area, I just have a couple of questions to see what your home will qualify for. Are you the homeowner? ...

9. ... [T]he system you prequalify for is full color, touch screen, and has the ability to use home automation products like wireless door locks, ... cameras, and thermostats that you can control from your cell phone.

--The script's description of the security system which the called person prequalified for -- a "full color, touch screen" system, with "the ability to use home automation products like wireless door locks," "cameras," "and thermostats that

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 9 of 120

you can control from your cell phone" -- is an accurate description of a system NorthStar provides, [48] further confirming that NorthStar was involved in determining the script.

**\*9** --On at least one occasion Yodel made a change in the script (a correction or fix), in response to an inquiry from NorthStar. Yodel took out a reference to an incorrect area code after NorthStar stated as follows in an email: "We need to follow the script outlined [by Yodel], and I thought we took out the 214 area code scripting. We [NorthStar] use a local touch dialer and it will most likely not be a 214 area code." [49]

*3. NorthStar was aware that Yodel intended to use, and did use, soundboard technology to deliver prerecorded voices in audio clips which were played to the person receiving the call.* [50]

--When the questioner asked Yodel's witness, "So they [NorthStar] understood that a prerecorded voice would be used during calls?" the witness answered (over an objection as to form), "They understood how the sound board technology worked, yes." [51]

*4. Yodel and NorthStar understood that the qualified leads Yodel generated using the prerecorded soundboard system would be provided to NorthStar by one of two means.*

--Called parties were either transferred by Yodel to NorthStar as "warm transfers" which NorthStar accepted to solicit customers for its security systems, or the parties called by Yodel were called back by NorthStar for that purpose. [52]

*5. In their communications with the persons called, both Yodel and NorthStar made statements which identified the initial call as being from the "Security Help Center" (a fictional alias for Yodel and its soundboard agents).*

--NorthStar knew the persons placing the calls for Yodel had identified themselves to the called persons as being with the "Security Help Center." NorthStar, in its follow-up conversations with the persons called, also referred to Yodel as the "Security Help Center." [53] This demonstrates coordination between Yodel and NorthStar. It also shows that NorthStar made statements to the persons called, linking the different stages of the calls in the mind of the called persons.

*6. NorthStar received a few complaints from consumers, which stemmed from calls placed by Yodel.* [54] *NorthStar had a policy for what was supposed to be said when someone complained about the "robocall."* [55]

**\*10** *7. At times, NorthStar caused Yodel to change its procedures.*

--After one complaint received by NorthStar, Yodel investigated, at NorthStar's request, how the complaining person had known that leads were being sent to NorthStar if the complaining person knew only that he or she was receiving a call from the "Security Help Center." A NorthStar email to Yodel stated, "I am feeling exposed, please advise." [56] Yodel responded, "I will look into it. We do not use the term NorthStar to anyone so I will see what happened." Yodel reported back that "our inbound has been giving your [NorthStar's] 877 number as a call back number" but that it was a rare situation, and it "won't happen again." [57] Thus, Yodel corrected its procedure in response to an inquiry from NorthStar about a complaint NorthStar had received from a person called by Yodel.

--At some point [58] NorthStar decided on a transfer procedure rather than having NorthStar simply call back the leads which Yodel had generated with its soundboard calls. [59] NorthStar requested this change because NorthStar believed the transfer model would be more profitable. Yodel implemented the transfer process which NorthStar requested. [60]

--NorthStar gave Yodel information about NorthStar's expectations regarding the rate of transfers, and Yodel acquiesced. In an email of March 11, 2016, NorthStar

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 10 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

requested "Lets [sic] start with 2 transfers per hour during 9-5 m-f," and Yodel acquiesced. [61]  On March 31, 2016, NorthStar emailed Yodel, "would like to pause for now," and again Yodel acquiesced. [62]  On June 2, 2016, NorthStar sent an email to Yodel stating "lets [sic] ramp up the transfers." [63]  In an email of August 26, 2016, Yodel emailed NorthStar, "[P]lease give me a call, volume has greatly increased, want to talk to you before we start reducing, because its [sic] hard to get it back up where its [sic] at." NorthStar emailed Yodel back, "I understand, but we need to keep at 60 for time being." [64]

  **11**  *8. NorthStar had some involvement in determining to which telephone numbers calls would be placed by Yodel.*

--NorthStar gave Yodel a list of the zip codes to which the calls should be made; the listed zip codes were those in which NorthStar did business. [65]  Yodel's witness was asked at his deposition, "So NorthStar provided the list of zip codes, then you used that list of zip codes to obtain the marketing leads from the two marketing companies we discussed; is that right?" The witness answered, "Yes." [66]

--Five different times NorthStar requested that Yodel stop calling certain numbers and asked that Yodel add those telephone numbers to Yodel's internal do not call list, which Yodel did. [67]

--Twice, NorthStar instructed Yodel that some customers were receiving multiple calls, after which Yodel took steps to stop repeating calls. [68]

  *9. NorthStar and Yodel agreed to a change in the compensation structure, which NorthStar hoped would make the campaign financially viable. Approximately one month later NorthStar terminated Yodel's services.*

--In late September 2016, approximately one month before NorthStar terminated Yodel, NorthStar and Yodel executed an insertion order agreement changing the structure by which Yodel would be compensated. [69]  NorthStar's Rule 30(b)(6) witness was asked, "Why was the decision made to enter into a new contract with Yodel at this point?" NorthStar's witness answered, "By changing the compensation structure, we were hopeful that we could make the campaign financially viable." [70]

  *10. NorthStar allowed Yodel to upload consumer lead data directly into NorthStar's telemarketing software which stored all of the data NorthStar used for telemarketing.* [71]

  *11. NorthStar provided regular reports to Yodel about the sales it was making as a result of Yodel's calls.* [72]

* * *

This undisputed evidence establishes that NorthStar's involvement with Yodel's material acts (acts in violation of the TCPA as alleged in count one) was both ongoing and significant. NorthStar was involved in determining what would be said in the prerecorded messages delivered by Yodel's soundboard technology. NorthStar was involved in determining which telephone numbers would or would not be called by Yodel. NorthStar effected changes in Yodel's calling procedures, including but not limited to procedures regarding what should or should not be said in the calls, and procedures governing how leads contacted in the calls would be delivered to NorthStar. In at least one instance, Yodel corrected its procedure in response to an inquiry from NorthStar about a complaint NorthStar had received from a consumer who had been called by Yodel. Yodel acquiesced to NorthStar's instructions and to NorthStar's expectations regarding the rate of transfers. There is no dispute that NorthStar accepted leads generated by Yodel when those leads were transferred to NorthStar, and there is no dispute that NorthStar followed up on some leads generated by Yodel with call-backs.

  **12**  Evidentiary materials in the summary judgment record plainly establish that NorthStar manifested its assent to have Yodel act on NorthStar's behalf, and that NorthStar controlled or had the right to control material aspects of Yodel's performance on behalf of NorthStar. Throughout the relationship, NorthStar retained the capacity to assess Yodel's performance, to provide instructions to Yodel, and to terminate the agency relationship by revoking Yodel's authority to act on NorthStar's behalf. NorthStar had significant and continuing control over the manner and means of Yodel's calling activities. NorthStar gave Yodel more than passive permission to place the calls in question. NorthStar made requests and gave instructions regarding the manner in which the calls in question would be made.

As against this evidence, defendants make several arguments. Defendants argue that Yodel was an independent contractor rather than an agent of NorthStar. But an independent contractor may be an agent, as the terms "agents" and

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 11 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

"independent contractor" are not necessarily mutually exclusive. 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1251 (10th Cir. 2013). The commercial world (not to mention the legal profession) abounds with independent contractor relationships that are also agency relationships.

Defendants also argue that Yodel did not have the power to bind NorthStar in a contractual relationship. One may be an agent of a principal, however, without having authority to bind the principal to a contract with a third party. *Id.* Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf. *Id.* Defendants also argue that they were given assurances by Yodel that the calls NorthStar hired Yodel to make were TCPA-compliant. The court takes it as an established fact that the assurances argued for by NorthStar were given. That said, erroneous assurances by Yodel regarding the reach (or lack of reach) of the TCPA[73] do not eliminate NorthStar's liability for Yodel's illegal acts as an agent.

Defendants also argue that NorthStar was not involved in all aspects of Yodel's material conduct, which is a true statement as far as it goes. For example, there is no evidence that NorthStar had anything to do with Yodel's choice of the voice talent used to prerecord the audio messages or in Yodel's selection of the call center in India to place the calls. But undisputed evidence already reviewed in this order demonstrates that NorthStar had sufficient involvement in material aspects of Yodel's conduct to establish, as a matter of law, that Yodel acted as NorthStar's agent.

Under an actual (classical) agency theory of liability, NorthStar has vicarious liability for Yodel's violations of the TCPA as alleged in count one. Accordingly, Braver and the class are entitled to summary judgment against NorthStar on count one. This conclusion makes it unnecessary to consider Braver's alternative theories of agency. Nevertheless, the court will briefly address those theories as alternative grounds for the same result.

Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal. May 2013 FCC Ruling, 28 FCC Rcd. 6574, 6586-87, ¶ 34. Apparent authority depends on whether a reasonable person would believe that the calling party had the authority to act on behalf of NorthStar. *See*, Kristensen v. Credit Payment Services, 12 F.Supp.3d 1292, 1306 (D. Nev. 2014) ("Apparent authority depends on whether a reasonable person would believe that the sender of the text messages, or the person that caused the text messages to be sent, had authority to act on behalf of Defendants").

*13 Defendants argue that NorthStar's communications with the class do not evince the type of expressive conduct necessary to show that Yodel had the right to act with legal consequences for NorthStar, so that there was no apparent authority. Undisputed evidence, however, shows NorthStar accepted the calls referred to it by Yodel. In doing so, NorthStar demonstrated to the called persons, by both NorthStar's conduct[74] toward the called persons, and by NorthStar's conversations[75] with the called persons, that Yodel (a/k/a the "Security Help Center") had the apparent authority to place the initial calls, triggering follow-up by NorthStar as needed. A reasonable person in the position of a called person could only conclude that Yodel was acting on behalf of NorthStar, within Yodel's apparent authority to do so.

The court's conclusion regarding apparent authority is based on the court's reasoning as stated above. Some additional undisputed facts may further support that conclusion but are not necessary to it. The May 2013 FCC Ruling states that evidence that a seller allows an outside sales entity to enter consumer information into the seller's sales or customer systems may be relevant to a determination of apparent authority. May 2013 FCC Ruling, *supra* at 6592, ¶ 46. It may also be relevant that the seller reviewed the outside entity's telemarketing scripts. *Id.* These facts are established on this record.

As for ratification, a seller may be liable for the acts of another under agency principles if the seller ratifies those acts by knowingly accepting their benefits.[76] May 2013 FCC Ruling, 28 FCC Rcd. 6574, 6586-87, ¶ 34. Such ratification may occur through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences. *Id.* at 6587, ¶ 34. Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority. Restatement (Third) of Agency § 4.01. A person may ratify an act if the actor acted or purported to act as an agent on the person's behalf. *Id.* at § 4.03. Knowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction; this is so even though the person also manifests dissent to becoming bound by the act's legal consequences. *Id.* at § 4.01 cmt. d. A person may ratify an act by receiving

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 12 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

or retaining benefits the act generates if the person has knowledge of material facts and no independent claim to the benefit. *Id.* at § 4.01 cmt. g.

The record establishes ratification. Undisputed evidence shows that NorthStar accepted benefits generated by Yodel's calls made in violation of the TCPA. Undisputed evidence shows that during the NorthStar telemarketing campaign, Yodel made 77,912,856 calls using its soundboard system.[77] From those nearly 78 million calls, Yodel provided NorthStar with 7874 leads and between 5309 and 9196 live call transfers.[78] Most importantly, it is undisputed that Yodel's leads resulted in roughly 150 new NorthStar customers.[79] NorthStar argues that the telemarketing campaign was a "colossal failure," which the court assumes, for present purposes, to be true. But that does not change the fact that NorthStar, with knowledge of Yodel's material acts, accepted the benefits of calls placed by Yodel in violation of the TCPA.

**\*14**  Assuming for the sake of discussion that Braver's actual agency theory is (for some reason not apparent to the court) defective, the court quite readily concludes that Braver and the class are nevertheless entitled to summary judgment against NorthStar based on apparent authority or ratification.

Finally, although not the basis of any of the court's rulings, the court states its view that it only makes sense to hold NorthStar vicariously liable for Yodel's acts where the record conclusively shows, as it does here, that NorthStar authorized Yodel to place the calls in question. *See generally*, May 2013 FCC Ruling, 28 FCC Rcd. 6574, 6593, ¶ 47 ("[W]e see no reason that a seller should not be liable under those provisions [§ 227(b) and (c)] for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.")

In summary, although the court recognizes that issues concerning the existence and scope of an agency are typically for a jury, this record supports but one conclusion: an agency existed which encompassed Yodel's acts taken in violation of § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3). Accordingly, with respect to count one, Braver's motion, brought on his own behalf and on behalf of the class, will be granted against NorthStar, based on NorthStar's vicarious liability for the acts of its agent, Yodel.

As this order has already found Yodel directly liable on count one, Braver and the class are entitled to summary judgment against both defendants on count one.

## VI. Count Three

Defendants move for summary judgment on count three, which alleges that defendants violated 47 C.F.R. § 64.1200(d) by failing to provide identifying information during telemarketing calls, and by initiating calls without having first implemented an effective written policy meeting required minimum standards. Defendants argue that although the complaint alleges 47 C.F.R. § 64.1200(d) was promulgated under 42 U.S.C. § 227(c) (a subsection of the TCPA which provides a private cause of action), § 64.1200(d) was actually promulgated under § 227(d), a subsection of the TCPA which does not provide a private cause of action.

Burdge v. Association Health Care Management, Inc., 2011 WL 379159 (S.D. Ohio Feb. 2, 2011), found that § 64.1200(d) (4) is technical and procedural in nature and was promulgated pursuant to § 227(d) of the TCPA, as NorthStar and Yodel contend. *Id.* at \*4. Like the claims involved in the current action, Burdge included claims that the caller had not given the required identifying information. Burdge noted that § 227(d) provides: "The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone," and "[s]uch standards shall require that ... all artificial or prerecorded telephone messages shall" include certain identifying information about the identity of the business or entity initiating the call. *Id.* at \*3. Burdge concluded that § 64.1200(d)(4), which addresses these same matters, was promulgated under § 227(d), a section which does not provide a private cause of action; accordingly, Burdge dismissed certain claims. *Id.* at \*4. *And see*, Worsham v. Travel Options, Inc., 2016 WL 4592373, \*7 (D. Md. Sept. 1, 2016) (finding Burdge "persuasive").

**\*15**  Braver relies on Charvat v. NMP, LLC, 656 F.3d 440, 448 (6th Cir. 2011), for his contention that § 64.1200(d) was promulgated under § 227(c) rather than § 227(d). While Charvat states as much, it does so without analysis. Furthermore, § 227(c) pertains to the protection of subscriber privacy rights and only provides a cause of action to a person aggrieved "under this subsection." 47 U.S.C. § 227(c)(5).

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 13 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

The court declines to rely on Charvat's statement that § 64.1200(d) was promulgated pursuant to § 227(c) and agrees, instead, with Burdge, Worsham and other decisions that have concluded § 64.1200(d) was promulgated under § 227(d). There is no private right of action for alleged violations of § 64.1200(d), and defendants are therefore entitled to summary judgment in their favor on count three.

## VII. Conclusion

Yodel's motion (doc. no. 123) to join NorthStar's motion for summary judgment is construed as a motion seeking leave to join in all of NorthStar's moving papers currently before the court, including NorthStar's motion for summary judgment, NorthStar's reply brief, and NorthStar's brief filed in response to plaintiff's motion for summary judgment. So construed, the motion is **GRANTED.**

Each of the cross-motions for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, as follows.

Braver's motion for summary judgment (doc. no. 117), brought on Braver's behalf and on behalf of the class, is **GRANTED** on count one. Yodel has direct liability for its actions in violation of 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3), and NorthStar has vicarious liability for Yodel's actions in violation of that statute and regulation. Braver and the class are therefore granted summary judgment

in their favor, against NorthStar and Yodel, on count one. In all other respects Braver's motion for summary judgment is **DENIED.**

NorthStar's motion for summary judgment (doc. no. 120), joined in by Yodel, is **GRANTED** on count three. There is no private right of action for violations of 47 C.F.R. § 64.1200(d). Accordingly, NorthStar and Yodel are entitled to summary judgment in their favor, against Braver, on the claim alleged by Braver in count three. *See*, n. 1, *supra*. In all other respects defendants' motion for summary judgment is **DENIED.**

The court desires to bring this case to a conclusion without undue delay. This case is **SET** for a status conference in chambers (to be attended by lead counsel for all parties) on August 13, 2019 at 8:30 a.m. The purposes of the status conference will include planning for a standardized claims process. To that end, the parties are **DIRECTED** to promptly confer with a view to agreeing on a claims process (at least in broad outline). A notice describing any such agreement shall be filed not later than noon on August 12, 2019. If the parties are unable to agree on a claims process, they shall file their respective proposals not later than noon on August 12, 2019.

IT IS SO ORDERED this 16th day of July, 2019.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3208651

---

### Footnotes

1    After the parties filed a joint stipulation dismissing count two, the First Amended Complaint (doc. no. 7) was deemed amended to delete count two. Doc. no. 54. No motion to certify was filed as to count three, and the deadline for such a motion has passed. Doc. no. 32. Accordingly, the class action allegations in count three are moot.

2    Doc. no. 124, p. 9. Except for depositions, this order cites documents by their ecf page numbers at the top of each as-filed page. Depositions are cited by their original page numbers.

3    Doc. no. 117.

4    Doc. no. 117, p. 6.

5    Doc. no. 124.

6    Doc. no. 130.

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 14 of 120

7     Doc. no. 120.

8     Doc. no. 127.

9     Doc. no. 132.

10     Doc. no. 27, p. 7.

11     Exceptions apply but are not material.

12     Doc. no. 117, p.9, ¶16.

13     Some leads were transferred to NorthStar and some were called back by NorthStar.

14     *Id.* at ¶16.

15     Doc. no. 117-3, p. 97.

16     There is no dispute that Yodel is responsible for the material acts of the soundboard agents who worked at the call center.

17     *Id.* at p. 9, ¶¶13, 16.

18     The name varied. "Amy," "Joe" and "Billy" were also used. Doc. no. 117, p. 9, ¶17, n.1.

19     *Id.* at p. 9, ¶17.

20     *Id.* at p. 9, ¶ 18. Defendants do not dispute the assertions by Braver as set out in ¶ 18 of doc. no. 117, p. 9. *See*, defendants' response to ¶ 18 at doc. no. 124, p. 13. Thus, defendants do not dispute that "every call began with the soundboard agents playing the first recording." Nevertheless, the court notes that elsewhere in the briefing papers, defendants point to testimony by Yodel's Rule 30(b)(6) witness that he had heard that new soundboard agents sometimes made an error and transferred a call without playing a script. Doc. no. 121-4, pp. 57-59. It is not clear whether the witness was speaking of instances specific to the NorthStar campaign. Moreover, this testimony is vaguely sourced (to "reports," "things of that nature," what "we've heard from quality control agents" at pp. 57-58) and is hearsay.

21     Doc. no. 72, pp. 26-27.

22     Doc. no. 117, p. 17, ¶¶ 65-67; doc. no. 124, p. 23, ¶¶ 65-67.

23     For all of the facts stated in this paragraph, *see* doc. no. 117, pp. 17-18, ¶¶ 68-71; doc. no. 124, pp. 23-24, ¶¶ 68-71. Recordings of two calls to Braver are in the record. Doc. nos. 117-11, -12 (audio recordings), doc. no. 119 (notice of conventional filing).

24     For all of these concessions, *see* doc. no. 124, p. 26.

25     Doc. no. 120, p. 11.

26     Title 1 U.S.C. § 1 also provides that "unless the context indicates otherwise ... words importing the plural include the singular." United States v. Foote, 413 F.3d 1240, 1246 (10th Cir. 2005), held that nothing in the plain language of the Counterfeit Trademark Act, which prohibits traffic in "goods," required a defendant to traffic in more than one counterfeit good, citing 1 U.S.C. § 1. *And see*, Schott v. C.I.R., 319 F.3d 1203, 1206 (9th Cir. 2003) ("singulars normally include plurals, just as 'he' normally includes 'she,' " citing 1 U.S.C. § 1).

Case 1:25-cv-01083-JPW  Document 20-2  Filed 11/04/25  Page 15 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

27    The meaning of § 227(b)(1)(B) would be clear even without 1 U.S.C. § 1 based on the common understanding of the English language. For example, if someone asks, "Was there a thunderstorm yesterday?", the answer will be "yes" whether there was one thunderstorm or two. Similarly, if someone asks, "Did that telephone call deliver a prerecorded message?", the answer will be "yes" whether the call delivered one prerecorded message or several.

28    Doc. no. 124, p. 20.

29    *Id.* at 2740, ¶ 25.

30    Doc. no. 120, p. 34, cites S. Rep. 102-178 at 4-5 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972 (1991), as follows.

> These automated calls cannot interact with the customer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party, fill an answering machine tape or voice recording service, and do not disconnect the line even after the customer hangs up the telephone.

Defendants argue that soundboard calls do not offend these congressional concerns. But the undisputed audio recording of the initial Braver call shows that soundboard calls "cannot interact with the customer except in preprogrammed [not to mention meaningless] ways," which is one of the congressional concerns cited above. The following excerpts from the Braver call illustrate the point.

> BRAVER: Okay, and what company did you say you were with?
>
> PRERECORDED VOICE: Are you a US citizen?
>
> BRAVER: Uh yes, what company did you say you were with?
>
> PRERECORDED VOICE: Does your home have at least two bedrooms?
>
> ...
>
> BRAVER: Well I guess I'm still not understanding the issue with false alarms in my neighborhood. What is it about my neighborhood? I'm still not understanding. What is it about my neighborhood that's causing false alarms? I don't have any problems with that. That's why I am all confused here.
>
> PRERECORDED VOICE: That's fine. Oh, and I almost forgot one last question. Now do you currently have a home security system?

Doc. no. 117-11, notice of conventional filing at doc. no. 119.

31    Section 227(d)(3)(A) provides: "[A]ll artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual...."

32    Courts which have ruled in favor of plaintiffs in TCPA cases that involve technology similar to the soundboard technology involved in this case include: Margulis v. Eagle Health Advisors, LLC, 2016 WL 1258640, *3 (E.D. Mo. March 31, 2016) (claim stated under TCPA); Bakov v. Consolidated World Travel, 2019 WL 1294659, * *3, 22 (N.D. Ill. March 21, 2019) (class certified for Illinois residents).

33    The FCC has agreed that guidance in the May 2013 FCC Ruling regarding how common law agency principles may apply to these types of TCPA cases is not binding on courts, is not entitled to Chevron deference, and is

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 16 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

guidance which depends on its power to persuade. Dish Network, LLC v. Federal Communications Com'n, 552 Fed. Appx. 1 (D.C. Cir. 2014).

34   It is not necessary to show a fiduciary relationship to establish that an agency exists; rather, fiduciary duties arise as a result of circumstances establishing the agency relationship. 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1250 (10th Cir. 2013).

35   May 2013 FCC Ruling at 6586, ¶ 34.

36   Federal courts have looked to the Restatement (Third) of Agency (2006) as the source of federal agency principles. Hodgin v. UTC Fire & Security Americas Corp., Inc., 885 F.3d 243, 252 (4th Cir. 2018). The Tenth Circuit cites the Restatement in 1-800 Contacts Inc. v. Lens.com, Inc., 722 F.3d 1229, 1250-51 (10th Cir. 2013). Whenever this order cites the Restatement, it cites the 2006 edition.

37   Doc. no. 124, p. 17, ¶ 32.

38   Doc. no. 120, p. 22.

39   Doc. no. 120, p. 12, ¶¶ 4-5; doc. no. 127, p. 8, ¶¶ 4-5.

40   Doc. no. 117, p. 8, ¶¶ 9-11; doc. no. 124, pp. 10-11, ¶¶ 9-11 (not disputing text of script).

41   Doc. no. 117-1, p. 67 (deposition cited by all parties).

42   Id. at p. 67.

43   Id.

44   Doc. no. 127-3, p. 114 ("substantially similar").

45   The fact that "Amy's" prerecorded pitch is plainly deceptive in some respects (to the point of being predatory when heard by credulous or otherwise vulnerable listeners) is eye-catching, but ultimately immaterial to the court's analysis of the issues addressed in this order.

46   Doc. no. 117, p. 8, ¶ 11; doc. no. 124, p. 11, ¶ 11 (not disputing text of script). The court presumes there were other audio clips but makes no finding as to whether NorthStar reviewed other clips.

47   As previously stated, the fictional name varied.

48   Doc. no. 117, p. 8, ¶ 12; doc. no. 124, p. 11, ¶ 12.

49   Doc. no. 117, p. 13, ¶ 41, citing doc. no. 117-37; doc. no. 124, pp. 19-20, ¶ 41.

50   Doc. no. 117, p. 8, ¶ 10; doc. no. 124, p. 11, ¶ 10.

51   Defendants cite this testimony in their own motion for summary judgment, doc. no. 120, p. 15, ¶ 25, citing doc. no. 121-3, p. 52.

52   Doc. no. 124, p. 10, ¶6.

53   Doc. no. 117, p. 10, ¶¶ 20-21; doc. no. 124, p. 13, ¶¶ 20-21.

54   Defendants contend some of the complaints may have been associated with Yodel's calls for other companies, which the court accepts.

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 17 of 120

Braver v. NorthStar Alarm Services, LLC, Not Reported in Fed. Supp. (2019)

55    Doc. no. 124, pp. 13-14, ¶ 22.

56    NorthStar argues that this comment did not mean NorthStar felt exposed based on Yodel's use of soundboard technology. NorthStar contends that the author of the email felt exposed because the complaining customer was threatening to post negative information about NorthStar which would be damaging to NorthStar's reputation. The court accepts NorthStar's interpretation.

57    Doc. no. 117, p. 11, ¶ 24 citing doc. no. 117-17; doc. no. 124, p. 15, ¶ 24.

58    Defendants contend Yodel began transferring warm calls to NorthStar in late May of 2016. Doc. no. 124, p. 17, ¶ 32. The court accepts that date.

59    Defendants argue that procedures relating to transfers or call-backs are not material as they had nothing to do with the TCPA violations alleged in count one. If the court is incorrect and this type of evidence should not be considered, the result stated in this order (vicarious liability exists) would remain the same.

60    Doc. no. 117, p. 12, ¶¶ 32-33; doc. no. 124, p. 17, ¶¶ 32-33.

61    Doc. no. 117, p. 12, ¶ 34, doc. no. 117-26; doc. no. 124, pp. 17-18, ¶ 34.

62    Doc. no. 117, p. 12, ¶ 36, doc. no. 117-28; doc. no. 124, p. 18, ¶ 36.

63    Doc. no. 117, p. 13, ¶ 37, doc. no. 117-29; doc. no. 124, p. 19, ¶ 37.

64    Doc. no. 117, p. 12, ¶ 35, doc. no. 117-27; doc. no. 124, p. 18, ¶ 35.

65    Doc. no. 117, p. 13, ¶ 38, citing doc. no. 117-1, p.73; doc. no. 124, p. 19, ¶ 38. Defendants' own motion (doc. no. 120, p. 15, ¶ 25) concedes NorthStar provided zip code and demographic information to Yodel.

66    Doc. no. 121-3, p. 139, cited by defendants in doc. no. 120, p. 15, ¶ 25.

67    Doc. no. 117, p. 13, ¶ 39; doc. no. 124, p. 19, ¶ 39.

68    Doc. no. 117, p. 13, ¶ 40; doc. no. 124, p. 19, ¶ 40.

69    Doc. no. 120, pp. 14-15, ¶ 20; doc. no. 127, p. 11, ¶ 20.

70    Doc. no. 120, pp. 14-15, ¶ 20, citing deposition at doc. no. 121-2, p. 181.

71    Doc. no. 117, p. 13, ¶ 43; doc. no. 124, p. 20, ¶ 43.

72    Doc. no. 117, p. 14, ¶ 44; doc. no. 124, p. 20, ¶ 44.

73    To illustrate, one email from Yodel to NorthStar erroneously stated that "The TCPA laws cover cell phones, not land lines." Doc. no. 127-24. (NorthStar's Rule 30(b)(6) witness testified that NorthStar understood the TCPA would apply to Yodel's calls made to the leads. Doc. no. 127-1, p. 91.)

74    NorthStar accepted the transferred call or NorthStar called the person back.

75    NorthStar tried to sell a residential security system to the persons Yodel had qualified as prospects for NorthStar.

76    Defendants argue that a principal-agent relationship is a prerequisite before ratification could potentially occur. Restatement (Third) of Agency § 4.01 cmt. b suggests this is a minority view. It states: "In most jurisdictions, ratification may create a relationship of agency when none existed between the actor and the

ratifier at the time of the act." The court need not resolve this issue but notes that if an agency relationship is required for ratification to occur, that requirement is satisfied.

| 77 | Doc. no. 117, p. 14, ¶ 46. |

| 78 | Doc. no. 117, p. 14, ¶ 47. |

| 79 | Doc. no. 117, p. 14, ¶ 45. |

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 19 of 120

Cunningham v. Politi, Not Reported in Fed. Supp. (2019)

KeyCite Yellow Flag

Distinguished by   Auguston v. National Administrative Service Co., LLC,
E.D.Tex.,  January 11, 2023

2019 WL 2519702

Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Craig CUNNINGHAM, Plaintiff,

v.

Jay POLITI, et al., Defendants.

CIVIL ACTION NO. 4:18-CV-00362-ALM-CAN

|

Signed 04/26/2019

**Attorneys and Law Firms**

Craig Cunningham, Nashville, TN, pro se.

Brian Ignatius Hays, Locke Lord LLP, Chicago, IL, Linda
A. Polley, Haller & Colvin PC, Fort Wayne, IN, Matthew
Brandon Buongiorno, Locke Lord LLP, Dallas, TX, for
Defendants.

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE
JUDGE REGARDING DKT. 50**

Christine A. Nowak, UNITED STATES MAGISTRATE
JUDGE

**\*1**  Pending before the Court is Defendant One
Resource Group Corporation's ("Defendant" or "ORG")
Motion to Dismiss Plaintiff's Amended Complaint [Dkt.
50]. After reviewing the Motion to Dismiss, Plaintiff
Craig Cunningham's ("Plaintiff") Response [Dkt. 60], and
Defendant's Reply [Dkt. 68], and all other relevant filings,
the Court recommends the Motion to Dismiss be **GRANTED**, as
set forth below.

**BACKGROUND**

On September 11, 2018, Plaintiff filed his Amended
Complaint. Therein Plaintiff asserts claims against ORG [1]
for violations of the Telephone Consumer Protection Act
("TCPA"), 47 U.S.C. §§ 227(b) and (c), and also the Texas

Business and Commerce Code § 305.053. [Dkt. 41]. In the
Amended Complaint, Plaintiff alleges "[t]his case involves a
scheme by Defendant [Americo] ... to market their insurance
products through use of pre-recorded messages in violation
of the [TCPA]" and that "[t]he co-defendants made the
autodialed and prerecorded message calls ... 'on behalf' of
Americo." [Dkt. 41 at 3, 6]. To that end, Plaintiff generally
alleges the named Defendants used an "automated telephone
dialing system" ("ATDS") to place calls to his cellphone
for non-emergency purposes without his consent [Dkt. 41 at
13-14]. Plaintiff attests that the characteristics of these calls,
which included "a delay of dead air of several seconds," are
indicative of an ATDS. Plaintiff further avers that Defendants
impermissibly called his cell phone on numerous occasions,
indicating the date and phone number for nine (9) phone calls
[Dkt. 41 at 14-16]. Additionally, Plaintiff alleges Defendants
are liable for failing to maintain an internal do-not-call list and
train their agents on the use of such list, and for placing calls
using pre-recorded messages that do not identify the caller or
seller of goods or services [Dkt. 41 at 21].

On October 25, 2018, ORG filed its Motion to Dismiss
Plaintiff's Amended Complaint [Dkt. 50]. ORG advances
three grounds for the dismissal of Plaintiff's claims: (1)
Plaintiff lacks standing [Dkt. 50 at 7-9]; (2) Plaintiff fails
to state a claim under the TCPA [Dkt. 50 at 9-13]; and (3)
Plaintiff is precluded from asserting a claim under the Texas
Business and Commerce Code because no TCPA violation
exists [Dkt. 50 at 17-18]. [2] Plaintiff filed a response on
November 26, 2018 [Dkt. 60]. [3] ORG filed its reply on
December 10, 2018 [Dkt. 68].

***Plaintiff's Standing***

**\*2**  Standing is a threshold jurisdictional requirement. [4] "To
establish Article III standing, a plaintiff must show: (1) an
injury in fact that is (2) fairly traceable to the defendant's
challenged conduct, and that (3) a favorable judicial decision
will likely redress the injury." *Texas v. United States*, 300 F.
Supp. 3d 810, 826 (N.D. Tex. 2018) (citing *Lujan v. Defs.
of Wildlife*, 504 U.S. 555, 560-61 (1992)). Defendant asserts
that Plaintiff lacks standing to bring his TCPA claims because
Plaintiff has not suffered any actual injury [Dkt. 50 at 7].
Relying on *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp.3d
782 (W.D. Pa. 2016) and similar cases, Defendant asserts
that Plaintiff is a professional TCPA litigant and should
not be afforded the protections provided under the TCPA
[Dkt. 50 at 7-9]. Defendant argues that Plaintiff's injuries are
"manufactured", "wholly contrived for profit", and that "the

Cunningham v. Politi, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 20 of 120

calls he receives are not *unwanted*" [Dkt. 50 at 7-8 (emphasis in original) ]. Thus, the main thrust of Defendant's argument is that Plaintiff does not have a cause of action under the TCPA because his injury falls outside the zone of interest protected by the statute. Plaintiff maintains that he is squarely within the zone of interest and is distinguishable to the Plaintiff in *Stoops*.

Plaintiff's "pursuit of his rights under the [TCPA] in other lawsuits" alone does not "negate the existence" of an otherwise concrete and particularized injury-in-fact based on intrusion upon the litigant's rights to privacy and seclusion. *Abramson v. CWS Apt. Homes, LLC*, No. 16-426, 2016 WL 6236370, at * 3 (W.D. Pa. Oct. 24, 2016) (Kearney, J.); *see also Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d at 1195-96 (rejecting the idea that, "by becoming a so-called 'professional plaintiff,' [the plaintiff] has forfeited [his rights to privacy and seclusion] because the calls alleged were not truly unwanted"); *Evans v. Nat'l Auto Div., L.L.C.*, No. CV 15-8714, 2016 WL 4770033, at *3 (D.N.J. Sept. 13, 2016) ("As a consumer complaining of receiving intrusive telemarketing calls, Plaintiff falls directly within the zone of interests protected by the TCPA"). ORG's reliance on *Stoops* is premature; indeed, *Stoops* is distinguishable from this case given that the plaintiff in that case, *at the summary judgment stage and after discovery*, expressly acknowledged that she only purchased the cell phones at issue for the purpose of receiving automated telemarketing calls and subsequently filing TCPA suits. As Plaintiff points out, "Defendants have presented no evidence that the Plaintiff engages in TCPA litigation as a business, nor anything to contradict the Plaintiff's allegations in the complaint that the calls were unwanted" [Dkt. 60 at 7]. Even if this Court were to adopt the reasoning set forth in *Stoops*, there is no evidence before the Court suggesting Plaintiff obtained the phone numbers at issue solely for TCPA purposes. And to the contrary, Plaintiff avers that he uses his phone numbers for "personal, family, and household use" [Dkt. 41 at 15].[5] While Defendant may ultimately substantiate its contentions regarding Plaintiff's use of his phones, the dismissal of Plaintiff's TCPA claims on this basis, within nothing more, is not proper. *See Cunningham v. Capital Advance Solutions*, LLC, 2018 WL 6061405 (D. New Jersey Nov. 20, 2018); *Abramson v. Oasis Power LLC*, No. 18-0479, 2018 WL 4101857, at *6 (W.D. Pa. July 31, 2018) (finding that *Stoops* failed to justify the dismissal of the plaintiff's TCPA claims, despite Plaintiff having a "prolific history" of filing such lawsuits, because *Stoops* was rendered at "the summary judgment stage after discovery").

**\*3** To reiterate, while it is evident that Plaintiff has pursued a substantial amount of TCPA cases (including here in the Eastern District of Texas), such an assertion standing alone does not raise Plaintiff to the level of "professional plaintiff" as described in *Stoops*, such that he is outside the zone of interest. *See Morris v. Unitedhealthcare Ins. Co.*, No. 4:15-CV-00638-ALM-CAN, 2016 WL 7115973, at *6 (E.D. Tex. Nov. 9, 2016); *Cunningham v. Rapid Response Monitoring Services, Inc.*, 251 F. Supp. 3d 1187, 1197 (M.D. Tenn. 2017) (rejecting the idea that, "by becoming a so-called 'professional plaintiff,' [plaintiff] has forfeited [his right to privacy] because the calls alleged were not truly unwanted"; *Evans*, No. CV 15-8714, 2016 WL 4770033, at *3 ("As a consumer complaining of receiving intrusive telemarketing calls, Plaintiff falls directly within the zone of interests protected by the TCPA"); *Abramson*, No. 2:18-cv-00479, 2018 WL 4101857, at *4 ("the Court rejects any suggestion that [plaintiff's] prolific history of filing TCPA lawsuits distinguishes this case and demonstrates the lack of an injury in fact"); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 783 (N.D.W. Va. 2017) ("It is true that the plaintiff has brought a number of TCPA cases. It is further true that she has telephone answering and recording equipment[, but] [t]his does not deprive the plaintiff of standing any more than the purchase of a burglar alarm would indicate that the homeowner wanted her house to be broken into.").[6]

The Court finds at this early stage in the litigation, that Plaintiff falls within the zone of interest and has standing in this case.[7]

### Rule 12(b)(6) Standard

Defendant next moves to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. A 12(b)(6) motion to dismiss argues that, irrespective of jurisdiction, the complaint fails to assert facts that give rise to legal liability of the defendant. The Federal Rules of Civil Procedure require that each claim in a complaint include "a short and plain statement ... showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The claims must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It follows, that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

**\*4** In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court identifies conclusory allegations and proceeds to disregard them, for they are "not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 681. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *Morgan v. Hubert,* 335 F. App'x 466, 470 (5th Cir. 2009). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. The Court must accept as true all well-pleaded facts contained in Plaintiff's Amended Complaint and view them in the light most favorable to Plaintiff. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir. 1996).

When considering a motion to dismiss, the Court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498-99 (5th Cir. 2000)).

### Failure to State a Claim

#### TCPA Section 227(c)

The TCPA regulates the use of telephone technology and seeks to curb abusive telemarketing practices that threaten the privacy of consumers and businesses. *See Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368 (2012). Plaintiff alleges, in part, that the phone calls by Defendant violated the TCPA pursuant to "47 USC [sic] [§] 227(c)(5) as codified by the FCC's 47 CFR [§] 64.1200(d) [Dkt. 41 at 21]. Section 227(c)(5) of the TCPA allows a private right of action for "a person who has received more than one telephone call within any 12-month period by or on behalf of the same entity" in violation of the prescribed regulations. 47 U.S.C. § 227(c)(5). Plaintiff asks

for a judgment based upon Defendants' "fail[ure] to maintain an internal do not call list and train their agents on the use of it and for placing calls using pre-recorded messages that do not identify the caller or seller of goods or services" [Dkt. 41 at 21-22].

As a threshold issue, Defendant ORG argues that Section 227(c)(5) applies only to residential phones, not cell phones [Dkt. 50 at 12]. The plain language of 47 C.F.R. § 64.1200(d) states that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." The private right of action created by 47 U.S.C. § 227(c)(5) is accordingly limited to redress for violations of the regulations that concern residential telephone subscribers.

Recent courts considering claims asserted by Plaintiff have found § 227(c)(5) does not encompass Plaintiff's cellular phones and have dismissed his claims. *Cunningham v. Sunshine Consulting Group, LLC,* No. 3:16-2921, 2018 WL 3496538, \*6 (M.D. Tenn. July 20, 2018); *Cunningham v. Rapid Capital Funding, LLC,* No. 3:16-02629, 2017 WL 3574451, \*3 (M.D. Tenn. July 27, 2017); *Cunningham v Spectrum Tax Relief, LLC,* No. 3:16-2283, 2017 WL 3222559, \*7 (M.D. Tenn. July 7, 2017); *Cunningham v. Enagic USA, Inc.,* No. 3:15-0847; 2017 WL 2719992, \*5-6 (M.D. Tenn. June 23, 2017). *See also Cunningham v. Rapid Response Monitoring Services, Inc.,* 251 F. Supp. 4 1187, 1195-96 (M.D. Tenn. 2017) (citing *Osorio v. State Farm Bank, F.S.B.,* 746 F.3d 1242, 1250 (11th Cir. 2014) ("To start with, the case concerned 47 U.S.C. § 227(b)(1)(B), which prohibits 'initiat[ing] any [prohibited] telephone call to any residential telephone line....' [T]he telephone number in question here ... is a cell-phone number."); *Bates v. I.C. Sys., Inc.,* No. 09-CV-103A, 2009 WL 3459740, at \*1 (W.D.N.Y. Oct. 19, 2009) ("[T]he TCPA differentiates between calls made to cellular and residential lines.")); *but see Cunningham v. Foresters Financial Services, Inc.,* 300 F. Supp. 3d 1004 (N.D. Ind. 2018). Here too, Plaintiff alleges only the use of his cellular phones.

**\*5** However, even if Plaintiff's cellular phone did fall within the definition of a "residential telephone subscriber" under the TCPA, Plaintiff still has not adequately pleaded his TCPA claim under § 227(c)(5) against ORG. "The regulation relates to a marketer's duty to prepare internal policies to receive and implement affirmative requests not to receive calls." *See*

*Bailey v. Domino's Pizza, LLC*, 867 F. Supp. 2d 835, 842 (E.D. La. 2012) (court granted defendant's motion to dismiss plaintiff's claim because he did not allege that he made an affirmative request to not receive calls). As Defendant points out, Plaintiff does not allege that he made any affirmative request to ORG (or any of the other Defendants) to stop calling him or to put him on a company specific do-not-call list [Dkt. 50]. Plaintiff also did not request a copy of ORG's (or any of the Defendants) do-not-call procedures. It is not clear how the provision was violated. Plaintiff has not provided a sufficient basis in the pleadings to proceed on his TCPA claim under 227(c). *See Cunningham v. TechStorm, LLC*, 2018 WL 31118400, *4 (N.D. Tex. May 29, 2018); *Cunningham v. Professional Education Institute, Inc.*, No. 4:117-CV-894, 2018 WL 6709515 (E.D. Tex. Nov. 5, 2018).

Plaintiff is not entitled to relief under § 227(c)(5). [8]

### TCPA *Section 227(b)*

"Section 227(b) of the TCPA makes it unlawful for any person 'to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service for which the called party is charged for the call,' or 'to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.' " *Cunningham v. TechStorm, LLC*, 3:16-CV-2879-S-BH, 2018 WL 3118400, at *3 (N.D. Tex. May 29, 2018), *report and recommendation adopted*, 3:16-CV-2879-S-BH, 2018 WL 3117529 (N.D. Tex. June 25, 2018) (quoting 47 U.S.C. § 227(b)(1)(A)(iii), (B)). "The TCPA defines 'automatic telephone dialing system' as equipment with the capacity to 'store or produce telephone numbers to be called, using a random or sequential number generator,' and to dial such numbers." *Id.* (quoting 47 U.S.C. § 227(a)(1)). "To state a claim under the TCPA for calls made to a cellular phone, a plaintiff is required to allege that a call was made to a cell or wireless phone by the use of any automatic dialing system or an artificial or prerecorded voice and without prior express consent of the called party." *Id.* (citing 47 U.S.C. § 227(b)(1)(A); *Chambers v. Green Tree Servicing LLC*, No. 3:15-CV-1879-M-BN, 2017 WL 2693565, at *1 (N.D. Tex. June 20, 2017)).

ORG asserts that Plaintiff's claim under § 227(b) "is far from clear and is highly speculative," specifically averring that Plaintiff fails "to coherently specify the time, date, or even the number of calls he allegedly received from ORG" and "[Plaintiff] failed to sufficiently connect a single call to ORG" [Dkt. 50 at 10]. Plaintiff contends that he "has sufficiently stated enough details regarding the calls" consistent with this Court's findings in *Cunningham v. Florio*, No. 4:17-cv-00839-ALM-CAN, 2018 WL 4473792 (E.D. Tex. Aug. 6, 2018) [Dkt. 60 at 8].

**\*6** The Court's decision—and more specifically Plaintiff's pleadings—in *Florio* are distinguishable from the instant case and Plaintiff's allegations against ORG. In *Florio*, defendants similarly asserted that Plaintiff's § 227(b) claim should be dismissed because Plaintiff failed to plead the *exact* number of calls, the dates of those calls, the manner in which *each* call was placed, whether Plaintiff answered the calls, and details about Plaintiff's phone service/data plan. *Florio*, 2018 WL 4473792, at *13. With respect to the request to identify the exact number and/or each call placed, the undersigned found "Plaintiff is expected to plead sufficient facts relating to the calls he claims to have received to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements, such as the amount of calls and the approximate date they were received." In *Florio*, as opposed to the circumstances present here, while Plaintiff did not plead the exact time and date of all calls, he did adequately connect the calls to the defendants, identifying a common message in each call and other facts linking the calls to defendants, such as a contractual agreement. *Id.* at [Dkt. 52 at 3-4].

Thus, while *Florio* stands for the proposition that Plaintiff is not required to plead specific details of every offending call (or facts that may only be obtained through discovery), Plaintiff must plead at least some facts relating to the calls, such as the approximate number or dates received, as well as facts from which the Court could conclude that the named Defendant is liable for the misconduct alleged (i.e. how they are connected to the alleged misconduct). *See, e.g., Cunningham v. Professional Education Institute, Inc.*, No. 4:17-CV-00894-ALM-CAN, 2018 WL 6709515, at *3 (E.D. Tex. Nov. 5, 2018) (concluding Plaintiff had not established a factual basis that any calls made by one defendant (PEI) were made on or behalf of other defendants (Amazology and AMS) as Plaintiff only identified PEI and ID Security, Inc. as being the entities who owned or were associated with the phone numbers that impermissibly called Plaintiff); *Cunningham v. TechStorm LLC*, No. 3:16-cv-2879-M, 2017 WL 721079, at *2 (N.D. Tex. Feb. 23, 2017) (finding where Plaintiff did not plead facts, such as the source of or number making the calls

Cunningham v. Politi, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 23 of 120

or the contents of the calls that could give rise to an inference as to the caller, Plaintiff did not sufficiently plead his claim as he offered no facts to indicate the particular defendant was responsible for the calls).

Plaintiff references ORG only five times in the entirety of his twenty-five (25) page Amended Complaint [Dkt. 41 at 2-3, 15-16]. On page 15 of the Amended Complaint, Plaintiff has a general heading "calls placed by or on behalf of One Resource Group or in the alternative by or on behalf of One Resource Group [Dkt. 41 at 15]. Aside from a statement, under this heading, that "[e]ach and every call as described in paragraph 80 were made directly by or on behalf of [ORG]" [Dkt. 41 at 16], Plaintiff fails to identify a single call directly made by ORG or to provide any non-speculative basis for why he believes ORG made or directed any of the allegedly violative phone calls in paragraph 80. Indeed, the facts alleged by Plaintiff identify the calls in this grouping to have been made by Jasmine Wicks, who Plaintiff alleges is associated with Axis Benefit Solutions or Axis Advisory Group [Dkt. 41 at 15-16]. [9] Plaintiff merely speculates as to ORG's involvement, claiming he received correspondence from counsel for Defendant Americo containing an email address which appears to be related to ORG, which Plaintiff then surmises means Ms. Wicks was really acting on behalf of ORG. This allegation will not support a claim; Plaintiff must do more than create speculation or suspicion of legally cognizable claim. *See Cunningham v. Spectrum Tax Relief, No. 3:16-CV-2283, 2017 WL 3222559 (M.D. Tenn. July 7, 2017).*

**\*7** Because Plaintiff does not identify or allege that ORG made any call to Plaintiff, or establish any factual basis, beyond mere speculation, to support that his contention that calls made by other defendants in this case were made on or behalf of ORG, Plaintiff has not alleged sufficient facts to state a claim under § 227(b) of the TCPA against ORG. *Professional Education Institute,* 2018 WL 6709515, at \*3; *see also Rayz v. Progressive Ad Solutions, LLC,* No. 14-7147, 2015 WL 3555310, at n.1 (E.D. Pa. June 8, 2015) (finding that where neither plaintiff's complaint nor motion for default "set forth any allegation concerning [defendant]," plaintiff had not established a TCPA claim against such defendant); *Drew v. Lexington Consumer Advocacy,* No. 16-cv-00200-LB, 2016 WL 9185292, at \*7 (N.D. Cal. Aug. 11, 2016) (indicating that plaintiff did not adequately plead default for a TCPA violation because plaintiff "did not plausibly allege that [defendant] sent the messages because [plaintiff] did not allege or provide other evidence that [defendant] owned,

licensed, or registered the sending phone numbers"). The Court finds Plaintiff's conclusory allegations against ORG under § 227(b) cannot withstand the instant Rule 12(b)(6) challenge. [10] *See Iqbal,* 556 U.S. at 681 (holding conclusory allegations are "not entitled to the assumption of truth").

### *Texas Business and Commerce Code Section 305.053*

Plaintiff also alleges that Defendant's conduct violated § 305.053 of the Texas Business and Commerce Code [Dkt. 41 at 22-23]. Under § 305.053, a "person who receives a communication that violates [the TCPA] ... may bring an action in this state against the person who originates the communication." TEX. BUS. & COM. § 305.053. Defendant ORG does not dispute, for the purposes of its Motions to Dismiss, that § 305.053 creates a state cause of action for violations of the TCPA. Instead, ORG claims that Plaintiff's state TCPA claim must be dismissed because his (federal) TCPA causes of action are subject to dismissal [Dkt. 50 at 16-18]. *See Cherakaoui v. Santander Consumer USA, Inc., 32 F. Supp. 3d 811, 815 (S.D. Tex. 2014)* ("As Santander did not violate the TCPA, Santander also did not violate related Texas state law arising under the Texas Business and Commercial Code § 305.053 ('Texas TCPA'). The Texas TCPA proscribes only that conduct which is also prohibited by the TCPA. If no violation of the TCPA exists, there is no violation of the Texas TCPA."). Because Plaintiff's underlying (federal) TCPA claims fail, Plaintiff's state TCPA claim under § 305.053 also fails.

### CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends that Defendant One Resource Group Corporation's ("ORG") Motion to Dismiss Plaintiff's Amended Complaint [Dkt. 50] be **GRANTED**; Plaintiff's claims against ORG should be dismissed, with prejudice, for failure to state a claim.

**\*8** Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 24 of 120

**Cunningham v. Politi, Not Reported in Fed. Supp. (2019)**

by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See*

*Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2519702

---

## Footnotes

1    Plaintiff's suit includes additional Defendants. Defendants Americo, Katherine and Bryan Brewer have also moved to dismiss Plaintiff's claims. Defendants Jay Politi, Nicholas Politi, Jasmine Wicks, Moisos Espinosa, Axis Advisory Group, Inc., Axis Benefit Solutions, Inc., and Monument Adjustment Bureau, LLC have failed to appear in this matter and the Clerk of Court has entered default against these Defendants [*see* Dkt. 73].

2    Plaintiff clarifies in his Response that he does not assert claims against ORG for invasion of privacy, extortion, defamation, and intentional infliction of emotional distress [Dkt. 60 at 8]. These claims are asserted only as to the Brewer Defendants and Monument Adjustment Bureau. Defendant ORG advances additional arguments related to Plaintiff's invasion of privacy, extortion, defamation, and intentional infliction of emotional distress claims; however, given that Plaintiff has expressly made clear he is not asserting these claims against ORG, the Court does not address those arguments herein [Dkt. 60 at 4, 8].

3    Defendant argues that the Court should strike Plaintiff's response as untimely under the local rules [Dkts. 68 at 1-2]. The Court declines to strike the response. *See King Aerospace Commercial Corp., Inc. v. Al-Anwa Aviation, Inc.*, No. 3:08-cv-0999-L, 2010 WL 5108721, at *6 (N.D. Tex. Dec. 8, 2010).

4    Defendant has brought a 12(b)(1) challenge in attacking Plaintiff's standing to bring this case.

5    Most courts interpreting *Stoops* appear to have done so narrowly and have not extended its holding to cases where the phone line or numbers at issue were not procured solely to receive telemarketing calls. *Abrahamson v. Oasis Power*, LLC, No. 2:18-cv-00479, 2018 WL 410857, at n. 4 (W.D. Pa. July 31, 2018) (citing *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1139 (D. Minn. 2017) ("Here, by contrast [to Stoops], Greenley attests that he did not purchase the cellular telephone that [defendant] contacted for the sole purpose of initiating TCPA litigation."); *Sandusky Wellness Ctr., LLC v. Med Tox Scientific, Inc.*, 250 F. Supp. 3d 354, 358 (D. Minn. 2017) (same); *Evans v. Nat'l Auto Div., LLC*, Civ. No. 15-8714, 2016 WL 4770033, at *3 (D.N.J. Sep. 13, 2016) ("*Stoops* is distinguishable from this case on the grounds that the plaintiff in that case acknowledged that she only purchased cell phones in order to file TCPA lawsuits.")).

6    The Court previously considered and rejected arguments similar to those asserted herein regarding whether Plaintiff had standing under the TCPA in *Cunningham v. Florio*, Civil Action No. 4:17-cv-00839, 2018 WL 4473792 at *2-5 (E.D. Tex. Aug. 6, 2018) *report and recommendation adopted*, No. 4:17-cv-00839, 2018 WL 4473096 (E.D. Tex. Sept. 18, 2018); *Cunningham v. Mark D. Guidubaldi and Assocs., LLC*, No. 4:18-cv-118-ALM-CAN, 2019 WL 1119365, at *2-5 (E.D. Tex. Jan. 11, 2019) *report and recommendation adopted*, No.

**Cunningham v. Politi, Not Reported in Fed. Supp. (2019)**

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 25 of 120

4:18-cv-118, 2019 WL 1117915 (E.D. Tex. Mar. 11, 2019). The Court has not yet been presented with this issue at summary judgment.

7    Plaintiff alleges in his Amended Complaint that he received over 10 calls from or on behalf of Defendant to his cell phone numbers and specifically identifies the date and call number for nine such calls [Dkt. 41 at 14-16]; and further alleges that the calls were "unwanted automated phone calls" placed to his two cell phones that he uses for personal, family, and household use [Dkt. 41 at 13-15]. Plaintiff's allegations are sufficient (at this juncture) to establish an injury in fact. *See Jamison v. Esurance Ins. Servs., Inc.*, No. 3:15-CV-2484-B, 2016 WL 320646, at *2–3 (N.D. Tex. Jan. 27, 2016) (finding an injury-in-fact at the pleading stage when plaintiff suffered an occupation of his telephone line); *Morris*, 2016 WL 7115973, at *6 (finding an injury-in-fact where Plaintiff was annoyed and harassed by unwanted telemarketing calls); *Rapid Response Monitoring Services, Inc.*, 251 F. Supp. 3d at 1197 (finding an injury-in-fact at the pleading stage when plaintiff alleged harassment and annoyance at receiving telemarketing calls).

8    The Court notes that Plaintiff has brought claims under 227(c)(5) before this Court previously. *See Mark D. Guidubaldi and Assocs., LLC*, 2019 WL 1119365, at *9-10; *Cunningham v. Florio*, No. 4:17-cv-00839-ALM-CAN, 2018 WL 4473792, at *13 (E.D. Tex. Aug. 6, 2018); *Cunningham v. Greenstar Capital Solutions, LLC*, No. 4:18-cv-000161-ALM-CAN, 2018 WL 4572711, at *5 (E.D. Tex. Aug. 1, 2018); *Cunningham v. Crosby Billing Servs., Corp.*, No. 4:18-cv-00043-ALM-CAN, 2018 WL 6424792, at *7 (E.D. Tex. Oct. 14, 2018); *Cunningham v. Professional Education Institute, Inc.*, No. 4:17-cv-00894-ALM-CAN, 2018 WL 6709515, at *6 (E.D. Tex. Nov. 5, 2018). Plaintiff's 227(c)(5) claims in those cases were dismissed for similar reasons—including, that Plaintiff never alleged he made an *affirmative request* to not receive calls. The Court finds it curious that, despite being informed on numerous occasions that Plaintiff cannot sufficiently plead a claim under 227(c)(5) without such affirmative request, Plaintiff continues to fail to allege that he makes such request.

9    The Court notes that Plaintiffs pleads additional factual allegations in his Response not contained within the Amended Complaint [*see generally* Dkt. 60]. Generally, if the Court is presented with matters outside the pleadings in deciding a 12(b)(6) motion and does not exclude them, the motion must be treated as one for summary judgment. Fed. R. Civ. P. 12(d). Because the Court did not give notice that it would consider facts outside of the pleadings, the Court disregards those factual allegations made by Plaintiff in his Response to the extent that they are not in the Amended Complaint.

10    The Court further advises that "[a] complaint does not satisfy the requirements of *Iqbal and Twombly* by lumping together all defendants, while providing no factual basis to distinguish their conduct." *Mendoza v. J.P. Morgan Mortg. N.A.*, No. 7:17-cv-180, 2017 WL 2278250, at *3 (S.D. Tex. June 27, 2017) (internal citation omitted). Plaintiff cannot merely tender naked assertions without any additional factual support to distinguish one defendant's conduct from another. In attempting to identify calls placed by ORG, Plaintiff entitles a section of his Amended Complaint "Calls placed by or behalf of One Resource Group or in the alternative by or on behalf of One Resource Group by VIPCO Advisors Inc. VIPCO Advisors, Inc. [sic], Axis Advisory Group, Inc., Axis Benefit Solutions, Inc., Nick and Jay Politi" [Dkt. 41 at 15]. Plaintiff does not further clarify which of the above named parties made what calls and badly concludes that "[e]ach and every call as described in paragraph 80 were made directly by or on behalf of One Resource Group" without providing any factual basis or support to indicate that ORG owned or operated or was otherwise linked to any of the offending calls that Plaintiff identified [Dkt 41 at 16]. Such allegations are insufficient to distinguish the purportedly offensive conduct as asserted against each defendant.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2491195
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Tallahassee Division.

William DAVIS, Plaintiff,

v.

CVS PHARMACY, INC., Defendant.

Case No. 4:24-cv-477-AW-MAF
|
Signed August 26, 2025

**Synopsis**
**Background:** Cell phone subscriber brought putative
class action against pharmacy under Telephone Consumer
Protection Act (TCPA), alleging pharmacy violated
regulation by sending him unwanted text messages after he
registered on national do-not-call registry. Pharmacy filed
motion to dismiss.

**[Holding:]** The District Court, Allen C. Winsor, Chief Judge,
held that text message was not "telephone call" for purposes
of TCPA provision granting a private cause of action to
persons who "received more than one telephone call" and who
suffered a violation of regulations prescribed under the TCPA,
including regulation that precluded calls to those registered
on national do-not-call registry.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (8)

**[1]** Statutes 🔑 Plain Language; Plain, Ordinary,
or Common Meaning

Courts must interpret every statute in accord with
the ordinary public meaning of its terms at the
time of its enactment.

**[2]** Statutes 🔑 Plain Language; Plain, Ordinary,
or Common Meaning

Statutes 🔑 Plain language; plain, ordinary,
common, or literal meaning

The canons of construction often play a
prominent role in ascertaining the ordinary
public meaning of statutory terms, serving as
useful tools to discern that meaning; but if the
text is clear, the analysis begins and ends there.

1 Case that cites this headnote

**[3]** Telecommunications 🔑 Unsolicited e-mail or
text message

A text message is not a "telephone call"
within meaning of provision of the Telephone
Consumer Protection Act (TCPA) granting a
private cause of action to persons who "received
more than one telephone call" and who suffered
a violation of regulations prescribed under
the TCPA, including regulation that precludes
calls to those registered on national do-not-call
registry. Communications Act of 1934 § 227, 47
U.S.C.A. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

1 Case that cites this headnote

**[4]** Statutes 🔑 Similarity or difference

Courts should presume that, when a statute
uses one term in one place and a distinct term
elsewhere, the difference matters—that is, the
distinct words have different meanings.

**[5]** Action 🔑 Statutory rights of action

In a statute, Congress can provide private rights
of action narrower than its full breadth of
regulation.

**[6]** Statutes 🔑 Language and intent, will,
purpose, or policy

Statutes 🔑 Purpose and intent;
unambiguously expressed intent

In interpreting a statute, the court's role is
not to look beyond clear language to ascertain

Congress's purpose; instead, the best evidence of that purpose is the language of the statute itself.

**[7]    Administrative Law and Procedure** 🔑 **Telecommunications**

**Telecommunications** 🔑 **Telecommunications services**

Even assuming Federal Communications Commission (FCC) order clearly defined "telephone calls," as that term was used in provision of Telephone Consumer Protection Act (TCPA) granting a private cause of action to persons who "received more than one telephone call" and who suffered a violation of regulations prescribed under the TCPA, the requirement that district court give "appropriate respect" for the FCC's conclusion did not require district court to adopt an interpretation that the statutory term "telephone call" included text messages, in cell phone subscriber's action against pharmacy under TCPA arising from his receipt of unwanted text messages from pharmacy; court could provide appropriate respect to the FCC's view without adopting a statutory interpretation that conflicted with ordinary public meaning of clear statutory text. Communications Act of 1934 § 227, 47 U.S.C.A. § 227(c)(5).

1 Case that cites this headnote

**[8]    Federal Courts** 🔑 **Telecommunications**

The Administrative Orders Review Act, or Hobbs Act, under which courts of appeals have exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the Federal Communications Commission (FCC), does not deprive district courts of authority to interpret the Telephone Consumer Protection Act (TCPA) contrary to FCC orders when deciding an actual case or controversy. 28 U.S.C.A. § 2342(1); Communications Act of 1934 § 227, 47 U.S.C.A. § 227.

**Attorneys and Law Firms**

Brittany Nicole Clark, The HQ Firm PC, West Jordan, UT, David Patrick Mitchell, Maney & Gordon PA, Tampa, FL, for Plaintiff.

Jordan Scott Kosches, GrayRobinson PA, Miami, FL, Mark Stephen Eisen, Pro Hac Vice, Benesch Friedlander Coplan & Arnoff, Chicago, IL, for Defendant.

## ORDER OF DISMISSAL

Allen Winsor, Chief United States District Judge

**\*1**  After CVS Pharmacy sent him unwanted text messages, Plaintiff William Davis filed this putative class action under the Telephone Consumer Protection Act (TCPA). ECF No. 1; *see also* 47 U.S.C. § 227(c)(5) (authorizing private right of action). As the parties agree, the statute at issue limits the private cause of action to persons who "received more than one telephone call" and who suffered "a violation of the regulations prescribed under" the statute. 47 U.S.C. § 227(c) (5). Davis alleges CVS violated a regulation that precludes calls to those registered on the Do Not Call Registry. ECF No. 1 ¶ 45 (citing 47 C.F.R. § 64.1200(c)(2)).

At issue now is CVS's motion to dismiss, which presents two issues: Are text messages "telephone calls" for purposes of the statute? And is a cell phone subscriber a "residential telephone subscriber"? As the parties agree, if the answer to either question is "no," Davis cannot succeed.

Having carefully considered the parties' arguments, I conclude the answer to the first question is "no"; a text message is not a "telephone call." That makes it unnecessary to address the separate (and more difficult) question of whether a cell phone subscriber is a "residential telephone subscriber." Either way, CVS is entitled to the dismissal it seeks.

### I.

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). At this stage, the court accepts all well-pleaded facts as true. *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1384 (11th Cir. 2024). Here, the plausibility of Davis's claim turns on the two legal questions set out above. And because a text message is not a "telephone call," Davis has not stated a plausible claim.

## II.

**[1]** **[2]** **[3]** Courts must interpret every statute "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). "The canons of construction often play a prominent role in that endeavor, serving as useful tools to discern that ordinary meaning." *Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022) (cleaned up). But if the text is clear, the analysis begins and ends there. *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 818 (11th Cir. 2020). The statutory text here *is* clear, and a text message is not a "telephone call." As CVS cogently explains,

> No normal person refers to a text message, or thinks of a text message, as a "call." No ordinary user of the English language would write the sentence "John called Sue" intending to mean "John sent a text message to Sue," nor would any ordinary reader interpret the sentence in that manner.

MTD at 9. Certainly, no ordinary person would think of a text message as a "*telephone* call." This conclusion—supported by the ordinary public meaning at the time of the provision's enactment—is enough to end this case.

**\*2** Davis resists this conclusion for several reasons. First, he argues that Supreme Court and Eleventh Circuit opinions concluded that text messages *are* calls under the TCPA. Specifically, he points to *Campbell-Ewald Company v. Gomez*, a Supreme Court case that—in his view—"recognized that a text message to a cellular phone can qualify as a 'call' within the meaning of the TCPA." Resp. at 18 (quoting 577 U.S. 153, 156, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016)). But as CVS points out, the Court assumed, but did not decide, that issue. *See* MTD at 11 n.4; Reply at 7-8. Moreover, that case did not address the statutory term "telephone call" at issue here; it dealt with a broader prohibition on "any call." *See Campbell-Ewald*, 577 U.S. at

156, 136 S.Ct. 663 ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *see also* 47 U.S.C. § 227(b)(1)(A)(iii) (making it unlawful for certain persons "to make any call" to certain lines under certain circumstances). Later, in *Facebook, Inc. v. Duguid*, the Court cited *Campbell-Ewald*, noting that "[n]either party disputes that the TCPA's prohibition also extends to sending unsolicited text messages" but reiterating that the Court "assume[d] that it does without considering or resolving that issue." 592 U.S. 395, 400 n.2, 141 S.Ct. 1163, 209 L.Ed.2d 272 (2021). In short, neither *Campbell-Ewald* nor *Facebook* includes any binding interpretation of the statutory term "telephone call" at issue here.

The Eleventh Circuit cases Davis cites are similarly unhelpful. In *Drazen v. Pinto*, for example, the Court did not interpret the statute at all; it addressed whether an unwanted text message constituted a sufficient injury to confer Article III standing. *See* 74 F.4th 1336, 1345 (11th Cir. 2023). Davis suggests the jurisdictional issue would be irrelevant if the statute did not cover texts, but courts must address jurisdictional issues before considering the merits. *See Mirage Resorts, Inc. v. Quiet Nacelle Corp.*, 206 F.3d 1398, 1400-01 (11th Cir. 2000). The issue in *Salcedo v. Hanna*, which both sides cite, was likewise whether receiving an unwanted text could constitute an Article III injury. *See* 936 F.3d 1162, 1167 (11th Cir. 2019). That case did not address the merits, other than to observe that the statute at issue there was "silent as to text messaging." *Id.* at 1166. Moreover, the statute underlying both *Drazen* and *Salcedo* was the one at issue in *Campbell-Ewald*—not the statute at issue here. *See Drazen*, 74 F.4th at 1340 (citing 47 U.S.C. § 227(b)(1)(A)(iii)); *Salcedo*, 936 F.3d at 1165 (same)). That statute does not include the term "telephone call." In sum, none of these cases holds—or even suggests—that a text message is a "telephone call" for purposes of § 227(c)(5).

Next, Davis points to provisions beyond § 227(c)(5), which creates the private right of action he pursues. He notes that another provision protects consumers' right "to avoid receiving telephone solicitations to which they object," and that yet another provision defines "telephone solicitation" to include "a telephone call or message." Resp. at 14 (quoting § 227(c)(1) and § 227(a)(4)). But however Congress defines "telephone solicitation"—and whatever Congress directed the FCC to do in terms of regulating certain "telephone call[s] or message[s]"—the private right of action Congress created exists only for those who received multiple "telephone calls." 47 U.S.C. § 227(c)(5).

**[4]**  In fact, Congress's use of the phrase "telephone call or message" in a neighboring provision only undermines Davis's position. It shows that Congress does not use the term "telephone call" to encompass all "messages." Although Davis would have me conclude Congress used the term "telephone call" in § 227(c)(5) and the term "telephone call *or message*" in § 227(a)(4) to have identical meanings, courts should "presume that, when a statute uses one term in one place and a distinct term elsewhere, the difference matters— that is, the distinct words have different meanings." *Sunshine State Reg'l Ctr., Inc. v. Dir., U.S. Citizenship & Immigr. Servs.*, 143 F.4th 1331, 1344 (11th Cir. 2025); *accord Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 859 (11th Cir. 2000) ("[W]hen Congress uses different language in similar sections, it intends different meanings.").

**\*3**  **[5]**  Davis argued at the hearing that Congress surely would not regulate text messages and telephone calls while limiting its private right of action to only telephone calls. But Congress can (and does) provide private rights of action narrower than its full breadth of regulation. The very provision at issue (§ 227(c)(5)) proves the point. It limits the private right to those who received two or more unwanted calls, even when a single call would violate the TCPA. Moreover, I reject Davis's suggestion that it would make no sense for Congress to limit the private right to telephone calls while regulating more broadly. Congress could reasonably conclude that unwanted telephone calls are more bothersome and intrusive than unwanted text messages, and it could provide broader protections against the former than the latter. Whatever its reasoning, it clearly limited the private right to those receiving "telephone calls."

**[6]**  Davis next argues that interpreting "telephone call" to exclude text messages would "produce a result which is actually inconsistent with the policies underlying the statute." Resp. at 16 (quoting *Bailey v. USX Corp.*, 850 F.2d 1506, 1509 (11th Cir. 1988)). There are two significant problems with this argument. First, it is not obvious that limiting the private right of action to address a subset of prohibited conduct would contradict the statute's purpose. Regulating callers could serve the purpose of protecting consumers even if Congress created no private right of action at all. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 286-87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy..... Without it, a cause of action does not exist and courts may not create

one, no matter ... how compatible with the statute.") (internal citations omitted). But second—and more importantly—the court's role is not to look beyond clear language to ascertain Congress's purpose. Instead, the best evidence of that purpose is the language of the statute itself. [1] *See United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) ("Where the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress said what it meant and meant what it said."); *United States v. Fisher*, 289 F.3d 1329, 1338 (11th Cir. 2002) ("The plain language is presumed to express congressional intent and will control a court's interpretation."); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) ("When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (cleaned up)). [2]

**\*4**  **[7]**  **[8]**  Last, Davis points to the FCC's 2003 order concluding texts should be considered calls for certain TCPA purposes. Davis misquotes *McLaughlin Chiropractic* to say the FCC conclusion is entitled to "appropriate deference." Resp. at 16 (misquoting *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152, 145 S.Ct. 2006, ––– L.Ed.2d ––– (2025)). *McLaughlin* actually calls for "appropriate respect," not "appropriate deference." *See* 606 U.S. at 168, 145 S.Ct. 2006. And the concepts are different. One can provide "appropriate respect" to an agency's view without adopting a statutory interpretation that conflicts with the ordinary public meaning of clear statutory text. Thus, even assuming the FCC order clearly defined "telephone calls" as that term is used in § 227(c)(5), "appropriate respect" for that conclusion would not require a different outcome here. [3]

\* \* \*

To succeed on his § 227(c)(5), Davis had to allege that he received at least two "telephone calls." He alleged receiving only text messages. And because text messages are not telephone calls, he has not stated a claim. I thus need not address CVS's separate contention that a cellular subscriber is not a "residential subscriber."

The motion to dismiss (ECF No. 22) is GRANTED. The clerk will enter judgment stating, "Plaintiff's claims are dismissed on the merits for failure to state a claim." The clerk will then close the file.

SO ORDERED on August 26, 2025.

**All Citations**

--- F.Supp.3d ----, 2025 WL 2491195

---

### Footnotes

1     As noted above, Davis quoted *Bailey v. USX Corp.*, which held that "[w]hile it is true that the language of a statute should be interpreted according to its ordinary, contemporary and common meaning, this plain-meaning rule should not be applied to produce a result which is actually inconsistent with the policies underlying the statute." 850 F.2d 1506, 1509 (11th Cir. 1988) (citation omitted). To the extent this decision held that concepts of congressional purpose could overcome plain statutory language, it has been abrogated by subsequent Supreme Court and en banc Eleventh Circuit decisions. *See, e.g., Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 970 (11th Cir. 2016) (en banc) ("Elevating general notions of purpose over the plain meaning of the text is inconsistent with our judicial duty to interpret the law as written."); *Kucana v. Holder*, 558 U.S. 233, 252, 130 S.Ct. 827, 175 L.Ed.2d 694 (2010) ("[T]he textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." (quoting *Rapanos v. United States*, 547 U.S. 715, 752, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006))); *United States v. Pate*, 84 F.4th 1196, 1206 (11th Cir. 2023) (en banc) ("Purposes, obvious or otherwise, provide no basis for skirting a statute's plain language. And as the Supreme Court has reminded us, to the extent a statute's purpose is relevant, 'the best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President.' " (quoting *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991))).

2     Davis has not explicitly argued that interpreting "telephone call" to exclude text messages would be absurd. I would have rejected such an argument.

3     Under the Administrative Orders Review Act (or Hobbs Act), 28 U.S.C. § 2342(1), the courts of appeals have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ... all final orders of the Federal Communication Commission." But the Hobbs Act does not deprive district courts of authority to interpret the TCPA contrary to FCC orders when deciding an actual case or controversy. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 168, 145 S.Ct. 2006, —— L.Ed.2d —— (2025). So even if the FCC order were contrary to this court's conclusion, that would not preclude dismissal.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Franklin v. Upland Software, Inc., Not Reported in Fed. Supp. (2019)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 31 of 120

2019 WL 433650
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin Division.

Ricky R. FRANKLIN
v.
UPLAND SOFTWARE, INC.

1-18-CV-00236-LY
|
Signed 02/01/2019

**Attorneys and Law Firms**

Ricky R. Franklin, Stockbride, GA, pro se.

Carlos R. Soltero, Matthew Murrell, Cleveland Terrazas PLLC, Austin, TX, for Upland Sofware, Inc.

**REPORT AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE**

TO: THE HONORABLE LEE YEAKEL UNITED STATES DISTRICT JUDGE

ANDREW W. AUSTIN, UNITED STATES MAGISTRATE JUDGE

**\*1** Before the Court are Plaintiff's Motion for Summary Judgment (Dkt. No. 13), Defendant's Response (Dkt. No. 18), and Plaintiff's Reply (Dkt. No. 20); and Plaintiff's Motion to Dismiss Defendant's Counterclaims (Dkt. No. 15), Defendant's Response (Dkt. No. 17), and Plaintiff's Reply (Dkt. No. 19). The undersigned submits this Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules.

**I. GENERAL BACKGROUND**

Plaintiff Ricky Franklin brings this suit against Upland Software company alleging that Upland Software committed violations of the Telephone Consumer Protection Act (TCPA). Franklin alleges that Upland violated the TCPA and Georgia Code, O.C.G.A. § 46-5-27(i), when it sent a number of unsolicited text messages to his phone. Upland responded by asserting counterclaims against Franklin,

including fraud and fraud by non-disclosure. Franklin then filed both a motion for summary judgment seeking relief on his affirmative claims, and a motion to dismiss attacking Upland's counterclaims.

**II. LEGAL STANDARD**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

Case 1:25-cv-01083-JPW   Document 20-2   Filed 11/04/25   Page 32 of 120

Franklin v. Upland Software, Inc., Not Reported in Fed. Supp. (2019)

**\*2** Rule 12(b)(6) allows for dismissal of an action "for failure to state a claim upon which relief can be granted." While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations in order to avoid dismissal, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also, Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The Supreme Court recently expounded on the *Twombly* standard, explaining that a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion to dismiss, the Court must construe the complaint liberally and accept all of the plaintiff's factual allegations in the complaint as true. *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2009). Finally, although this Court construes the briefs of *pro se* litigants liberally, a *pro se* litigant must still comply with the court rules of procedural and substantive law. *Bird v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981). *See also Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) ("whether the plaintiff is proceeding pro se or is represented by counsel, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.") (internal quotation marks and citations omitted), *cert. denied*, 537 U.S. 1200 (2003).

## III. ANALYSIS

### A. Motion for Summary Judgment

Upland argues that the summary judgment motion should be denied for several reasons, including the fact that Upland did not make or send the texts in question to Franklin because it merely provides software to customers who then "make" or "initiate" calls to consumers, its software does not use an "automatic telephone dialing system" (ATDS) as defined by the TCPA, Upland's software does not use a random number generator, and Upland's customers are only capable of contacting consumers' numbers that have been placed in the software with the consumers' consent.

Franklin appears to be a serial litigator under the TCPA. In one of these suits, filed in Illinois, he also attempted to sue a mobile marketing company that only provided content routing software to its customers and did not send text messages. *Franklin v. Express Text, LLC*, 2017 WL 6540044, at \*2 (N.D. Ill. Aug. 2, 2017).[1] As noted, Upland contends that it too does not send text messages, but rather only provides the platform by which its customers are able to compile phone numbers and send text messages to only those who have consented to receive them. The TCPA provides that:

> It shall be unlawful for any person within the United States ... to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice...to any telephone number assigned to a ... cellular telephone service ... or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b)(1)(A). This prohibition includes sending text messages. *Blow v. Bijora, Inc*, 855 F.3d 793, 798 (7th Cir. 2017).

Some courts have read the TCPA to strictly apply only to the entity making or initiating the call.[2] Other courts have expanded the liability to include both the entity making the calls and the company who hired and directed the entity to make or initiate the calls.[3] Upland argues that its particular situation does not fit within this latter line of cases because it merely provides a platform for others to make or send texts, and urges the Court to follow the reasoning of *Klein v. Commerce Energy, Inc.*, where the court refused to impose a "broad sweeping extension of liability" under the TCPA to any entity involved in the transaction because the statutory text did not impose such a liability and because the court was not persuaded that parties should be held liable "merely because they stand to benefit from a call." *Klein v. Commerce Energy, Inc.*, 256 F.Supp.3d 563, 578 n.7 (W.D. Pa. 2017). The Court agrees. First, Upland

Franklin v. Upland Software, Inc., Not Reported in Fed. Supp. (2019)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 33 of 120

provided a detailed breakdown to the Court of how its cloud-based software platform works. (Dkt. No. 18, Exhibit 1). The platform generally allows a company to capture and store consent records of individuals who have "opted in" to receive text messages from that company. The process "to make" a call or send a text requires no involvement from Upland, but rather requires Upland's customer to log onto its platform and set up a mobile messaging campaign from a list of individuals who have opted into a messaging campaign. After setting up the lists, the customer drafts the content of the text message and then selects the date and time the text message is to be sent, and, after reviewing the content of the message and time to be sent, sends or schedules the text to be sent. In addition, none of the platforms that Upland uses allow for automatic or predictive dialing. The platforms require significant human intervention and sorting on almost all aspects of the text messages and the platforms do not have the capacity to act as an auto dialer. In the Court's examination of the summary judgment evidence, it can find nothing to suggest that Upland initiated the text messages or that an ATDS was used. To the extent that Franklin relies on a theory of vicarious liability, he does not succeed in his motion. Here, as in *Franklin*, the plaintiff has not put forward any evidence to show that Upland has been an agent of the entity that sent the text messages, or vice-versa, and the Court couldn't find anything in the record that even remotely suggested it. And Franklin's reliance on an FCC ruling that gave the term ATDS a broad scope is misplaced, as the D.C. Circuit recently overturned this interpretation, finding it was "utterly unreasonable in the breath of its regulatory inclusion." *ACA In't v. FCC*, 855 F.3d 687, 699 (D.C. Cir. 2018).

**\*3** Finally, Franklin brings a claim for violation of Georgia's No Call Law. The relevant portions of this statute state:

> Any person who has received more than one telephone solicitation within any 12 month period by or on behalf of the same person or entity in violation of subsection (c) or (g) of this Code section may either bring an action to enjoin such violation; bring an action to recover for actual monetary loss from such knowing violation or to receive up to $2,000.00 in damages for each such knowing violation,

whichever is greater; or bring both such actions.

O.C.G.A. § 46-5-27(i).

> No person or entity shall make or cause to be made any telephone solicitation to the telephone line of any residential, mobile, or wireless subscriber in this state **who has given notice to the commission**, in accordance with regulations promulgated under subsection (d) of this Code section, **of such subscriber's objection to receiving telephone solicitations**.

§ 46-5-27(c) (emphasis added).

> Any person or entity who makes a telephone solicitation to the telephone line of any residential, mobile, or wireless subscriber in this state shall, at the beginning of such call, state clearly the identity of the person or entity initiating the call.

§ 46-5-27(g)(1).

No person or entity who makes a telephone solicitation to the telephone line of a residential, mobile, or wireless subscriber in this state shall knowingly utilize any method to block or otherwise circumvent such subscriber's use of a caller identification service.

§ 46-5-27 (g)(2). Franklin does not submit any evidence that would even suggest there has been a violation of § 46-5-27(c). For example, he submits no evidence that he objected and gave notice to the commission of not wanting telephone solicitations. Furthermore, Franklin does not allege that Upland violated any portion of § 46-5-27(g), including evidence that Upland did not identify itself or attempted to circumvent a caller identification service. Notably, Franklin, in his motion for summary judgment, barely addresses the Georgia Law and provides

no argument or case law suggesting that Upland is liable. Perhaps most importantly, Georgia's No Call Law explicitly defines "telephone solicitation" to mean "any *voice communication* over a telephone line for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." [§ 46-5-27(b)(3).](#) Franklin's Complaint is based on unsolicited text messages, not voice communications. Hence, Franklin has failed to demonstrate that he is entitled to judgment as a matter of law as to his Georgia claim.

For the reason set forth above, the undersigned recommends that Franklin's motion for summary judgment be denied.

**B. Motion to Dismiss Upland's Counterclaims**

Upland's answer includes a counterclaim, in which it sues Franklin for common law fraud and fraud by nondisclosure. In short, Upland alleges that Franklin solicited the very texts he now claims in this lawsuit were unsolicited. Franklin argues that Upland's counterclaims should be dismissed in their entirety because Upland can't prove what Franklin did to prompt Upland to contact him on his cell phone, because Upland introduced hearsay, and because the counterclaims are retaliation for Franklin bringing his lawsuit. The Court disagrees. Taking all of Upland's factual allegations as true, as the Court must under Rule 12(b)(6), Upland has pled enough factual content to allow the Court to draw the reasonable inference that Franklin is liable for the misconduct alleged.

**\*4** With regard to the fraud by nondisclosure claim,[4] Upland alleges that Franklin had knowledge by November 2017 at the latest, that someone by the name of Benita Ross had opted in to receive the very text messages at issue at the phone number at issue. Upland alleges that Franklin knew this material fact and that Upland was ignorant of the facts and did not have an equal opportunity to discover the facts. Upland also alleges with specificity that Franklin had intimate knowledge of the TCPA, and therefore, had a duty to speak by opting out of the text messages and failed to do so to induce Upland's client to continue to send Franklin text messages. Upland alleges that it, and more importantly its third-party client, did indeed rely on the failure to disclose and continued to send text messages to the phone number at issue, as Upland took actions pursuant to its contractual obligations. Finally, Upland alleges that it was injured as a result of the nondisclosure and had to incur costs associated with what it views as a spurious and setup lawsuit. These allegations meet

of Rule 12(b)(6) and state a claim for relief that is plausible on its face.

Upland also brings a common-law fraud claim.[5] Here too, Upland's counterclaim has pled sufficient facts to survive a motion to dismiss. Again, accepting Upland's factual allegations as true, Upland contends that Franklin knew prior to his demand letter and the filing of the present suit that Franklin or Ms. Ross had affirmatively given Upland or third parties consent to receive text messages from Upland's third party providers at the phone number at issue. Upland pleads that Franklin knew the representations he made to the contrary were false and he intended Upland to rely on Franklin's representation so that Upland would be required to fulfill its contractual obligations with third parties who would then send Franklin text messages that they believed had been requested by Franklin. Upland contends that it suffered an injury by having to spend both employee time and resources to fulfill its contractual obligations based on Franklin's representations. This is enough to state a claim to relief that is plausible on its face.

## IV. RECOMMENDATION

Based on the preceding discussion, the undersigned Magistrate Judge **RECOMMENDS** that the District Judge **DENY** Plaintiff's Motion for Summary Judgment (Dkt. No. 13) and **DENY** Plaintiff's Motion to Dismiss Defendant's Counterclaims (Dkt. No. 15).

## V. WARNINGS

**\*5** The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(c);

Franklin v. Upland Software, Inc., Not Reported in Fed. Supp. (2019)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 35 of 120

*Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 433650

---

### Footnotes

1    *See also* the six cases cited in Upland's counterclaim, Dkt. No. 12 at ¶ 3.

2    *See Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 771 (N.D. Ill. 2014); *Golan v. Veritas Entm't, LLC*, 2014 WL 2095310, at *4 (E.D. Mo. May 20, 2014).

3    *See Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014) (allowing defendant to be held vicariously liable under the TCPA where there is an agency relationship); *Hartley-Culp v. Green Tree Servicing, LLC*, 52 F.Supp.3d 700, 703 (M.D. Pa. 2014) (TCPA can impose liability vicariously upon any entity on whose behalf a third party places a call); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 WL 1154206, at *4 (N.D. Ill. Mar. 19, 2013) (TCPA creates vicarious liability against entity when it sends unsolicited communications on another party's behalf); *Accounting Outsourcing, LLC v. Verizon Wireless Personal Communications*, 329 F.Supp.2d 789, 805-06 (M.D. La. 2004); *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F.Supp.3d 765, 774 (N.D. Ill. 2014) (same).

4    Under Texas law, the elements of fraud by nondisclosure are: (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge. *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.–Dallas 2013).

5    The elements of a common-law fraud claim are: (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation: and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011).

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Declined to Follow by   Hudson v. Palm Beach Tan, Inc.,   M.D.N.C.,
August 12, 2024

2023 WL 2472649
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Charlotte Division.

Heather GAKER, individually and on behalf
of all others similarly situated, Plaintiff,

v.

Q3M INSURANCE SOLUTIONS d/b/a Final Expense
Assistant and TZ Insurance Solutions LLC, Defendants.

CIVIL ACTION NO. 3:22-CV-00296-RJC-DSC
|
Signed February 7, 2023
|
Filed February 8, 2023

**Attorneys and Law Firms**

Christopher E. Roberts, Pro Hac Vice, Butsch Roberts &
Associates LLC, Clayton, MO, Jacob U. Ginsburg, Pro Hac
Vice, Kimmel & Silverman, P.C., Ambler, PA, Mitchel Erik
Luxenburg, Luxenburg & Levin, LLC, Beachwood, OH, for
Plaintiff.

Lauri A. Mazzuchetti, Whitney Morgan Smith, Pro Hac Vice,
Kelley Drye & Warren, LLP, Parsippany, NJ, Thomas G.
Hooper, Nelson Mullins Riley & Scarborough LLP, Charlotte,
NC, for Defendants.

## MEMORANDUM AND RECOMMENDATION

David S. Cayer, United States Magistrate Judge

**\*1  THIS MATTER** is before the Court on Defendants'
"Motion to Dismiss or, in the Alternative, Motion to Strike,"
Doc. No. 19, filed November 8, 2022.

The Motion has been referred to the undersigned Magistrate
Judge pursuant to 28 U.S.C. § 636(b)(1) and is now ripe for
consideration.

Having fully considered the arguments, the record, and
the applicable authority, the undersigned respectfully

recommends that Defendants' Motion to Dismiss be
**GRANTED** and the Motion to Strike be **DENIED**.

## I. FACTUAL BACKGROUND

Accepting the factual allegations in the Complaint as true,
Plaintiff is a former schoolteacher and pharmacy technician
residing in Palm Beach County, Florida. Defendant Q3M
Insurance Solutions is a telemarketer that sells burial
insurance on behalf of insurers. Defendant TZ Insurance
Solutions is an insurance broker that sells life insurance
and burial insurance. It primarily relies on telemarketers to
generate business.

Plaintiff has a personal cell phone which she registered on
the National Do Not Call Registry on November 15, 2019, to
avoid unwanted telemarketing calls. Doc. No. 16, at ¶¶ 21–22.
After her name and phone number were purportedly entered
into a "sweepstakes" in January 2020, she began receiving
unsolicited telemarketing calls. [1] Id. at ¶¶ 27–28. In the early
months of 2020, Plaintiff received six calls where a live agent
attempted to sell her "final expense insurance." Id. at ¶¶ 28–
31. During several of those calls, Plaintiff stayed on the line
and engaged with the caller to ascertain who originated the
calls. Id. at ¶ 31. During one of those calls, Defendant Q3M
transferred her to Defendant TZ, who attempted to sell final
expense insurance policies. Id.

Plaintiff brings a cause of action under the Telephone
Consumer Protection Act, 47 U.S.C. § 227(c) and 47 C.F.R.
§ 64.1200(c)(2). She seeks to hold Defendant TZ vicariously
liable as an agent of Defendant Q3M.

## II. DISCUSSION

**1. 12(b)(6) Standard of Review**

In reviewing a Rule 12(b)(6) motion, "the court should accept
as true all well-pleaded allegations and should view the
complaint in a light most favorable to the plaintiff." Mylan
Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The
plaintiff's "[f]actual allegations must be enough to raise a right
of relief above the speculative level." Bell Atlantic Corp. v.
Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has
been stated adequately, it may be supported by showing any
set of facts consistent with the allegations in the complaint."
Id. at 563. A complaint attacked by a Rule 12(b)(6) motion
to dismiss will survive if it contains enough facts to "state a

Case 1:25-cv-01083-JPW     Document 20-2     Filed 11/04/25     Page 37 of 120

Gaker v. QSM Insurance Solutions, Not Reported in Fed. Supp. (2023)

claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**\*2** In *Iqbal,* the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555) (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[ ] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a Plaintiff armed with nothing more than conclusions." *Id. at 678–79.*

Second, to the extent there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief 'will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]' 'that the pleader is entitled to relief,' " and therefore should be dismissed. *Id.* (quoting *Fed. R. Civ. P. 8(a)(2)).*

The sufficiency of the factual allegations aside, "Rule 12(b) (6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Sons of Confederate Veterans v. City of Lexington,* 722 F.3d 224, 228 (4th Cir. 2013) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989)). Indeed, where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed." *Neitzke,* 490 U.S. at 328; *see Stratton v. Mecklenburg Cnty. Dept. of Soc. Servs.,* 521 F. App'x 278, 293 (4th Cir. 2013). The court must not "accept as true a legal conclusion couched as a factual allegation."

*Anand v. Ocwen Loan Servicing, LLC,* 754 F.3d 195, 198 (4th Cir. 2014).

### a. TCPA Claim

Section 227(c) of the TCPA and the corresponding regulations prohibit businesses from placing "telephone solicitation" calls to a "residential telephone subscriber" who has placed her phone number on the National Do Not Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). A person who receives more than one call within a twelve-month period that violates those regulations may bring a private cause of action under section 227(c). 47 U.S.C. § 227(c)(5). Defendants argue the TCPA applies only to residential telephones and based upon the statutory language and structure, does not extend to cell phones.

In 2003, the Federal Communications Commission interpreted "residential subscribers" to include those who register their cell phone numbers on the NDNCR. See *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C. Rcd. 14014 (2003). The FCC concluded that "[t]he rules set forth in section[ ] 64.1200(c) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers...." *Id. at 14148.*

The Fourth Circuit has not addressed whether cell phone owners are considered "residential telephone subscribers." Courts that have addressed the issue are split as to whether the TCPA extends to wireless telephone numbers. Compare *Boger v. Citrix Sys., Inc.,* No. 8:19-cv-01234-PX, 2020 WL 1939702, at \*4 (D. Md. Mar. 3, 2020) ("[T]he Complaint does not foreclose that [the plaintiff's] cell phone functioned as a residential telephone number for the purposes of the statute."), with *Cunningham v. Politi,* No. 4:18-cv-362, 2019 WL 2526536, at \*4 (E.D. Tex. Apr. 26, 2019) ("Recent courts considering [similar] claims ... have found [the TCPA] does not encompass ... cellular phones." (collecting cases)).

**\*3** The FCC's interpretation at issue does not preclude this Court from applying the clear text of the TCPA. "[T]he judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws." *Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92, 119 (2015) (Thomas, J., concurring); *see also Gorss Motels, Inc. v. Safemark Sys., LP,* 931 F.3d 1094, 1106 (11th Cir. 2019) (Pryor, J., concurring) ("The Hobbs Act, correctly construed, does not require district courts adjudicating cases within their ordinary jurisdiction

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 38 of 120

Gaker v. QSM Insurance Solutions, Not Reported in Fed. Supp. (2023)

to treat agency orders that interpret federal statutes as binding precedent."). The structure and language of the TCPA controvert coverage of cell phones.

The FCC's rulemaking authority under section 227(c) extends only to unwanted telephone solicitations directed at "residential telephone subscribers." 47 U.S.C. § 227(c)(1). "[T]he language of the TCPA specifically provides that the regulations implemented pursuant to Subsection 227(c) concern only 'the need to protect residential telephone subscribers' privacy rights.'" Cunningham v. Sunshine Consulting Grp., LLC, No. 3:16-cv-2921, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018) (quoting 47 U.S.C. § 227(c)(1)). "Residential" is defined as " 'used as a residence or by residents,' and 'resident' is defined as 'living in a place for some length of time,' or 'one who resides in a place.' " Shelton v. Fast Advance Funding, LLC, 378 F. Supp. 3d 356, 363 n.7 (E.D. Pa. 2019) (quoting Residential, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/residential; Resident, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/residents).

Notably, Congress referenced "cellular telephone" in other provisions of the statute. See 47 U.S.C. § 227(b)(1)(A)(3); 47 U.S.C. § 227(b)(2)(C); 47 U.S.C. § 227(b)(2)(H). "[T]he TCPA specifically mentions 'cellular telephone service' in § 227(b) and § 64.1200(a)(1)(iii), evidencing that both Congress and the FCC were aware of the distinction between a cellular telephone and a residential telephone and purposely protected only 'residential telephone subscribers' under § 227(c), § 64.1200(c) and (d)." Shelton, 378 F. Supp. 3d at 363 n. 7. "[E]xpressing one item of [an] associated group or series excludes another left unmentioned." United States v. Vonn, 535 U.S. 55, 65 (2002). "The expressio unius canon applies only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded.'" N.L.R.B. v. SW General, Inc., 580 U.S. 288 (2017) (quoting Chevron U.S.A., Inc. v. Echazabal, 536 U.S. 73, 81 (2002)).

Cell phones do not present the same concerns as residential telephones. The Eleventh Circuit noted the distinctions between a cell phone and residential phone in accordance with the statutory purpose of the TCPA. "[T]he findings in the TCPA show a concern for privacy within the sanctity of the home ... cell phones are often taken outside of the home and often have their ringers silenced, presenting less potential

for nuisance and home intrusion." Salcedo v. Hanna, 936 F.3d 1162, 1168–69 (11th Cir. 2019). Cell phones' mobility and functionality to silence or decline calls alleviate the concerns inherent with a home telephone. Plaintiff alleges no facts showing where she was when she received the calls or whether her phone was on silent. She did not answer four of the six calls she allegedly received, thus diminishing any claim that such calls invaded her privacy. In sum, the authority rests with Congress to amend the TCPA and bring cell phones within its protections.

**\*4** For those reasons, the undersigned respectfully recommends that Defendants' Motion to Dismiss be granted.

## III. RECOMMENDATION

FOR THE FOREGOING REASONS, the undersigned respectfully recommends that Defendants' Motion to Dismiss be **GRANTED** and that Defendants' Motion to Strike be **DENIED**.

## IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen days after service of the same. Failure to file objections to this Memorandum with the Court constitutes a waiver of the right of de novo review by the District Judge. Diamond v. Colonial Life, 416 F.3d 310, 315–16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140, 147 (1985); Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Wells, 109 F.3d at 201; Wright v. Collins, 766 F.2d 841, 845–46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2472649

## Footnotes

1    Plaintiff asserts she does not recall entering a sweepstakes.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 184449
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Gerard JACKSON, Plaintiff,

v.

DIRECT BUILDING SUPPLIES LLC, Defendant.

No. 4:23-CV-01569
|
Signed January 17, 2024

**Attorneys and Law Firms**

Anthony I. Paronich, Broderick Law, P.C., Hingham, MA, Jeffrey M. Bower, Bower Law Associates, PLLC, State College, PA, for Plaintiff.

Brian J. Murren, Kevin L. Hall, Tucker Arensberg, P.C., Camp Hill, PA, for Defendant.

**MEMORANDUM OPINION**

Matthew W. Brann, Chief United States District Judge

**I. BACKGROUND**

**\*1** In October 2023, Plaintiff, Gerard Jackson, filed a one-count amended complaint against Defendant, Direct Building Supplies, doing business as Renu Solar. [1] In November 2023, Direct Building Supplies filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. [2] It also moves to strike Jackson's class allegations pursuant to Federal Rule of Civil Procedure 12(f). [3] The motion is now ripe for disposition; for the reasons that follow, it is denied.

**II. DISCUSSION**

**A. Motion to Dismiss Standard**

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly* [4] and *Ashcroft v. Iqbal*, [5] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " [6] The United States Court of Appeals for the

Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[ ] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief." [7]

When deciding a motion to dismiss, a court generally considers only the allegations in the complaint, exhibits attached thereto, and facts of public record. [8] Normally, to go consider anything beyond those sources, a motion to dismiss must be converted to a motion for summary judgment. [9] But consideration of materials outside the complaint is not completely barred on a 12(b)(6) motion. Courts may consider any documents that are integral or explicitly relied upon in the complaint. [10] "However, before materials outside the record may become the basis for a dismissal, several conditions must be met." [11] "For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." [12] It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document. [13]

**\*2** In this matter, Direct Building Services has attached an email described in the Amended Complaint to its Reply Brief to substantiate its allegations that Jackson may actually have solicited Direct Building Services' call. [14] But while Jackson references this email in his amended complaint, [15] this Court cannot find that it is "integral" to the amended complaint. This email only adds context to support the plausibility that Jackson received calls from Direct Building Services, and is not actually necessary to establishing his TCPA claims. Jackson does not reference the contents of this email; he references the simple fact that Direct Building Services' employee emailed him, in support of his allegation that Direct Building Services contacted him to solicit the sale of solar panels. [16] Nor does this proposition hinge solely upon the email; Jackson also alleges that the number from which he received a prior call was advertised as Direct Building Services' phone number. [17]

Direct Building Services also inspects various TCPA lawsuits filed by Jackson which it asserts were filed with different

phone numbers listed for Jackson. [18] Direct Building Services points to the suit against it in the Court of Common Pleas of Centre County, alleging calls to (814) 238-5007; this lawsuit, alleging calls to (814) 876-XXXX; and three separate class actions filed before this Court in 2020, 2021, and 2023, alleging calls to (814) 238-XXXX, (814) 876-XXXX, and (814) 238-XXXX. [19] Direct Building Services contends that these "inconsistencies" concerning which telephone constitutes Jackson's residential number make Jackson an inadequate class representative. [20]

However, Direct Building Services' attempt to insert new factual matter into the amended complaint is inconsistent with the purpose of a motion to dismiss, which inspects the adequacy of the *pleadings*. While the Court recognizes that Direct Building Services has based its argument solely on Court filings, only one of these filings relates to the allegations in Jackson's amended complaint at all. [21] And this filing is not "integral" to the complaint, which is based on the calls placed *after* Jackson filed his initial lawsuit against Direct Building Services; it only contextualizes and supports the plausibility of Jackson's assertion that he received unsolicited calls from Direct Building Services. Some courts have found at summary judgment that a TCPA plaintiff who owns multiple cellphones specifically for the purpose of orchestrating TCPA litigation do not have standing to sue, but such a finding is only appropriate after discovery. [22] Even considering Jackson's prior filing against Direct Building Services, all it shows is that Jackson has had two cellphone numbers at different points in time. This Court must still assume the truth of Jackson's allegation that the cellphone number specified in this complaint is his actual residential phone number.

Believing it has laid the groundwork to cast doubt upon whether Jackson's phone number is in fact residential, Direct Building Services disputes Jackson's allegation that his phone bill proves the residential character of his cellphone number. [23] As Jackson alleges this fact without attaching the phone bill, Direct Building Services "requests that this Court require Plaintiff provide his phone bill to substantiate his otherwise bald allegations concerning the residential nature of the phone number (814) 876-XXXX as part of its consideration of the instant Motion." [24] But Jackson's phone bill is also not integral to his complaint, and the Court may take his assertion about the phone bill to be true for purposes of dismissal.

Finally, based on an audio recording of Jackson's call which is purportedly in its possession, Direct Building Services states that Jackson gave express written consent to receive its calls under the false name "Barry Johnson." [25] These allegations are based upon evidence outside the scope of the complaint and fall far outside of the scope of dismissal. If true, Direct Building Services' allegations are significant to its affirmative defense, but that affirmative defense is irrelevant here. A motion to dismiss evaluates the sufficiency of the *plaintiff's* allegations, and no defense of consent is apparent from the face of Jackson's complaint. [26]

**\*3** All the documents referenced by Direct Building Services' Reply Brief are only tangentially related to Jackson's amended complaint. Therefore, this Court will not consider the attached email, referenced court filings or the allegations which Direct Building Services' bases upon its supposed recording of Jackson's call.

### B. Facts Alleged in the Amended Complaint
The facts alleged in the amended complaint, which this Court must accept as true for the purposes of this motion, are as follows.

Gerard Jackson, a Pennsylvania resident, placed his number on the National Do Not Call Registry. [27] Jackson alleges that his telephone number is residential, used for personal calls only, and not associated with a business or registered to a business. [28] He further alleges that the telephone bill for this number only lists his own name. [29]

Direct Building Services offers solar services, [30] and makes telemarketing calls to consumers to generate leads. [31] Because Jackson received telemarketing calls from Direct Building Services despite placing his name on the Do Not Call Registry, he filed suit against it in early 2021. [32] But this only marked the beginning of this dispute. Direct Building Services placed five more telemarketing calls to Jackson from August 9, 2021, through September 28, 2021. [33] Each call which was answered followed a similar script: the caller advertised residential solar electric product and installation services offered by Direct Building Services. [34]

Jackson highlights a particular call in his amended complaint. [35] According to Jackson, a September 2, 2021 call using a "spoofed Caller ID" began with a similar

telemarketing pitch, from someone identifying himself as "Edmund." [36] After Jackson answered Edmund's questions, he was transferred to someone identifying himself as "Jacob." [37] This person continued to discuss the sale of solar panels with Jackson until the phone disconnected. [38] Jacob then immediately called Jackson back that same day, which transmitted Direct Building Services' advertised telephone number to Jackson. [39] Jackson then received an email from the telemarketer, "Jacob Dimpsey," which confirmed that the call was attributable to Direct Building Services. [40]

Jackson again filed suit. [41] Yet still, he received four more calls from Direct Building Services on July 5, July 19, August 1, and September 8, 2023. [42] These calls, like the previous ones, followed a similar script advertising Direct Building Services' solar products. [43] Jackson states that "the calls were clearly sent by the Defendant promoting their goods as counsel for the Defendant provided a recording of the final call to counsel for the Plaintiff." [44] Jackson alleges that he never consented to any of these calls. [45]

Based on these facts, Jackson brings a class action suit against Direct Building Services for violations of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. [46] He seeks to represent a class tentatively defined as follows:

> All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing calls from or on behalf of the Defendant (3) within a 12-month period, (4) from four years prior the filing of the Complaint. [47]

### C. Analysis

**\*4** Direct Building Services argues that claims under TCPA section 227(c)'s private right of action are statutorily unavailable for calls placed to cellphones, and that in any case

Jackson has failed to plausibly allege a violation of the TCPA. This Court rejects both arguments.

The TCPA sought to curb the invasion of privacy caused by abusive telemarketing practices. [48] One of the TCPA's reforms provides for the Do Not Call registry, a "consumer-driven process" to limiting telemarketing calls. [49] Any "residential telephone subscriber" may place his name on the National Do Not Call Registry, and placing a call to any "residential telephone subscriber" whose name is on the National Do Not Call registry is an abusive telemarketing act. [50] Consumers may then bring suit through 47 U.S.C. § 227(c)'s private right of action if two telemarketing calls are made within a twelve-month period. [51]

In support of its motion to dismiss, Direct Building Services argues that cellphone numbers are not "residential." [52] But while our Court of Appeals has not expressly decided this issue, it is far from a novel question. The weight of existing authority indicates that cellphone users may be considered residential telephone subscribers, although whether a cellphone is used for residential purposes involves a more fact-intensive question. In addition to this persuasive authority, subsection 227(c) and the TCPA's text, structure, and purpose all belie Direct Building Services' reading.

The Eastern District of Pennsylvania has recently opined that "[t]he consensus in this Circuit is that Do Not Call claims may apply to cell phones." [53] This consensus is well-founded. Regulations implemented shortly after the TCPA was passed further define residential subscribers to include a "subscriber to a telephone exchange service that is not a business subscriber," a definition which plainly does not distinguish between cellphones and landline phones. [54] Therefore, the Federal Communications Commission, which was empowered to implement the TCPA's Do Not Call provisions through administrative rulemaking, [55] has explicitly noted that because "it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections ... wireless subscribers may participate in the national do-not-call list." [56]

**\*5** The United States Court of Appeals for the Fourth Circuit has applied the logical next step from this rulemaking decision: a number placed on the Do Not Call Registry is presumptively residential for purposes of section 227(c)'s private right of action, else it would not have been registered

in the first place. [57] The United States Court of Appeals for the First Circuit has likewise opined: "[the] argument that cell phone users are not 'residential telephone subscribers' runs headlong into the FCC's express statements to the contrary." [58] Other courts have found similarly. [59]

The contrary authority cited by Direct Building Services relies on two ill-founded textual arguments. In *Shelton v. Fast Advance Funding, LLC*, which predated *Dudley v. Vision Solar*, the Eastern District of Pennsylvania opined on the term "residential telephone" in dicta. [60] It first noted that "residential" means "used as a residence or by residents," and "resident" means "living in a place for some length of time," or "one who resides in a place." [61] Therefore, that court stated that the "plain language" of the term "residential telephone" limits that term to phones exclusively used in a residence, and therefore excludes "a cellular telephone, which can be used anywhere." [62] However, "plain language" is not a magical incantation. A statute's "plain language" is indeed decisive, but only when that language is susceptible to just one meaning—that is what makes the language "plain." Otherwise, appealing to plain language when attempting to define ambiguous terms takes the conclusion for granted.

"Slicing a statute into phrases while ignoring their contexts" is a "formula for disaster" [63] because "[t]he full body of a text contains implications that can alter the literal meaning of individual terms." [64] *Shelton v. Fast Advance Funding, LLC*, articulates a wooden reading of the TCPA's text which obscures its ambiguity by fixating on the word "residential" alone, rather than placing it in semantic context. Section 227(c)(1) does not merely use the term "residential" or "residential telephone;" in describing the Do Not Call registry, it refers to a "residential telephone subscriber." [65] While this language is facially ambiguous, the best reading of the word "residential" is not that it modifies the "telephone," but rather that "residential" and "telephone" *both* modify the "subscriber." So instead of describing a "subscriber" who owns a "residential telephone," Section 227(c)(1) describes a "telephone subscriber" who has subscribed for "residential," *i.e.*, personal, purposes. [66] "Residential" is therefore used in the broader sense of "relating to a resident" to distinguish such a subscriber from a business or commercial telephone subscriber, who cannot be added to the Do Not Call registry.

**\*6** The structure of subsection 227(c) itself supports the point. The subsection never references any such thing as

a "residential telephone;" only "telephone subscribers" and "residential subscribers." [67] When Congress authorizes the F.C.C. to create the Do Not Call registry in section 227(c)(3), it describes a list of "telephone numbers" held by "residential subscribers:" "a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations." [68] Congress again refers to "residential subscribers" rather than "residential telephones" in section 227(c)(3)(E). Finally, in a subsequent amendment which seems to endorse the F.C.C.'s understanding of a "residential subscriber" as a non-business subscriber rather than defying that distinction, section 227(a)(1)(2)(A) distinguishes between a "business subscriber" and a "residential subscriber." [69]

Contrary to *Shelton*'s reasoning, the TCPA's broader structure supports rather than undermines this reading of the term "residential telephone subscriber." *Shelton*'s second textual argument relies on the *expressio unius* canon, which reasons that the expression of one thing implies the exclusion of others. The fact that the TCPA references "cellular telephone service" in the prior subsection supposedly "evidenc[es] that both Congress and the FCC were aware of the distinction between a cellular telephone and a residential telephone and purposely provided only 'residential telephone subscribers' under § 227(c)." [70] But "[t]he *expressio unius* canon applies only when 'circumstances support a sensible inference that the term left out must have been meant to be excluded.' " [71] As Congress also referred to a "residential telephone *line*" in section 227(b), [72] this same logic can be turned on its head. Had Congress wished to limit section 227(c) to specified telephone technologies rather than specified telephone subscribers, it would have indicated somewhere in that section that the registry is limited to a "residential telephone *line*," as Congress used that term in the preceding subsection. [73]

**\*7** Section 227(c)'s focus on the telephone subscriber demonstrates that the term "residential" is a "functional term not tethered to a particular technology," [74] focusing instead on the subscriber's privacy rights. This is in stark contrast to other sections of the statute, describing technology such as a "telephone facsimile machine," a "cellular telephone service," and indeed, a "residential telephone *line*." [75] Section 227(c)'s focus on the "telephone subscriber" who uses his telephone for "residential" purposes is underscored by the full context of section 227(c)(1), which draws attention

to the subscriber's privacy rights rather than his telephone's technological capabilities. "The Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." [76]

This reading is confirmed by the only reference to "residential telephone subscribers" in the TCPA's Congressional findings, which speaks broadly to privacy interests: "evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." [77] As was true in 1991 and as is more true today, cellphones are often used in the residence for personal purposes as well as in other locations, and indeed many exclusively use cellphones in their residence and do not own landline phones. [78] If anything, telemarketing calls to personal cellphones pose a *greater* invasion of privacy to telephone subscribers than do telemarketing calls to landline phones, because they can invade one's privacy at any time and in any place.

"The TCPA cannot be read to regulate unsolicited telemarketing only when it affects the home." [79] As the Third Circuit has instructed, "because the TCPA is a remedial statute, it should be construed to benefit consumers." [80] Indeed the Third Circuit has stated in a different context that "[a]lthough it is true that the TCPA placed particular emphasis on intrusions upon the privacy of the home in 1991, this expression of particular concern for residential calls does not limit—either expressly or by implication—the statute's application to cell phone calls." [81]

Because of the F.C.C. contrary regulations, *Shelton*'s burden was not to offer the best interpretive argument, but to offer section 227(c)'s only plausible construction. Yet the statute's language is ambiguous at best, and therefore the F.C.C.'s interpretation is at least a "permissible construction of the statute." [82] There is little reason to doubt the interpretation adopted by the majority of courts and the F.C.C. In light of contrary regulations, the statutory argument proffered by Direct Building Services has been rightly maligned as relying on "isolated authority" contrary to "common sense." [83]

**\*8** Direct Building Services' remaining arguments against Jackson hinge on whether he has plausibly alleged himself to be a residential telephone subscriber. These arguments can be dismissed in short order because they all demand more from Jackson's amended pleading than is appropriate at the dismissal stage. Ironically, Direct Building Services' assertion that Jackson's status as a residential telephone subscriber is "unsupported" and "conclusory" [84] is itself unsupported and conclusory. Jackson's allegations that his cellphone is for personal use, and that it is registered on the Do Not Call Registry, are presumptively sufficient for his allegation to be plausible. [85] It is not clear what else Direct Building Services would require of Jackson's complaint for it to survive dismissal.

### D. Motion to Strike Analysis

#### 1. Law

When pleadings contain "redundant, immaterial, impertinent, or scandalous matter," a party may move to strike under Federal Rule of Civil Procedure 12(f). [86] The narrow purpose of a motion to strike is to "clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." [87] District Courts have broad discretion in granting a Rule 12(f) motion to strike. [88] However, striking pleadings is a "drastic remedy" to be used "sparingly." [89]

"District courts within the Third Circuit typically conclude that motions to strike class action allegations filed before plaintiffs move for class certification are premature." [90] Because "the shape and form of a class action evolves only through the process of discovery," [91] "courts rarely grant motions to strike under Rule [12(f) or Rule] 23(d)(1)(D) prior to class discovery, doing so only where '[n]o amount of additional class discovery will alter th[e] conclusion' that the class is not maintainable." [92]

#### 2. Fail-Safe Class

One rare instance in which courts do grant motions to strike prior to class discovery is where a plaintiff has alleged a "fail-safe class." "A fail-safe class is one that defines its members by the plaintiff's liability – all individuals wronged by the defendant, in the classic formulation." [93] "[S]uch a class impermissibly skirts the bar of *res judicata*" because "either the class members win or, if the defense prevails, no

Case 1:25-cv-01083-JPW   Document 20-2   Filed 11/04/25   Page 45 of 120

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

class exists, and the putative class members, unbound by any judgment, are free to pursue individual claims." [94]

**\*9** Direct Building Services states that Jackson's class depends on whether someone received a "telemarketing or 'solicitation call,' " and points out that "telephone solicitation" is statutorily defined to include only persons who received such calls without consent. [95] But Direct Building Services is mistaken. The term "solicitation" does not appear anywhere within Jackson's class definition. [96] As Jackson points out in his Brief in Opposition, he intentionally used the term "telemarketing" to ensure that no analysis of consent was contained within his class definition. [97] Instead, he intended telemarketing to "mean what it says, which is 'selling or advertising by telephone.' " [98] So there is no basis to claim that he has proffered a fail-safe class.

As Jackson notes, his case is then indistinguishable from *Jackson v. Meadowbrook Financial Mortgage Bankers Corp.* [99] In *Jackson v. Meadowbrook*, I refused to strike an identical TCPA class definition offered by this same plaintiff alleging this same cause of action. [100] Therefore, minimal analysis is required; as many courts within this Circuit have found, Jackson has avoided the fail-safe concerns posed by *Zarichny v. Complete Payment Recovery Services* by defining his class without reference to whether the class members first consented to be called. [101]

### 3. Class Action Requirements

Even if a class is not fail-safe, class allegations may be struck where "no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23." [102] To be certified, a class must satisfy predominance and superiority under Rule 23(b)(3). This requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods of fairly and efficiently adjudicating the controversy." [103] A successful class must also meet the following four prerequisites:

(1) the class is so numerous that joinder of all members is impracticable [numerosity];

(2) there are questions of law or fact common to the class [commonality];

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and

(4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation]. [104]

But again, "a motion for class certification is a more appropriate vehicle for arguments about class propriety." [105] Here, Direct Building Services contests the commonality and numerosity requirements.

Direct Building Services first argues that Jackson "has not alleged that these calls were placed at the same time, by the same caller, or featured the same conversation." [106] Somehow, counsel has made the same argument, in the exact same language, that I already rejected in *Jackson v. Meadowbrook*. [107] I reject it here for the same reasons; issues concerning the relationship between an alleged telemarketer and putative class members are "difficult to resolve without discovery," and it is too early in the litigation to make any such judgment. [108] Moreover, "[c]ommonality does not require an identity of claims or facts among class members; instead, the commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." [109]

**\*10** Direct Building Services also argues that Jackson's pleadings cannot possibly satisfy the numerosity requirement, which is generally satisfied when at least 40 class members are present, [110] because the "[t]he Complaint is devoid of any other allegations of unwanted calls being made to anyone other than plaintiff." [111] *Jackson v. Meadowbrook* also rejected this argument. [112] Once again, discovery is needed. The mere fact that a plaintiff received an unsolicited telemarketing call renders plausible the assertion that at least 40 other individuals did as well. [113] Requiring Jackson to list other class members who Direct Building Services called *before* he has access to such names, which are currently within the exclusive possession of Direct Building Services, would likely result in nearly all class actions being stricken before discovery.

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 46 of 120

### 4. Individualized Fact Finding

Direct Building Services' last argument concerns individualized fact-finding. As our Court of Appeals has explained, class certification is inappropriate where a class cannot be ascertained "without extensive and individualized fact-finding or 'mini-trials.' " [114] Direct Building Services argues that extensive individualized fact-finding would be required to determine whether an individual received more than one telemarketing call. [115] But this twisted logic would mean that TCPA class actions can never be brought. "Had Congress wanted to preclude aggregation of individual TCPA claims, it could have so provided in the TCPA itself or in CAFA [Class Action Fairness Act]." [116] Nor does it appear difficult to determine how many telemarketing calls were placed to class members, assuming Direct Building Services keeps records of its business calls; this fact can easily be ascertained through a company database. [117]

Direct Building Services also points to Jackson's inclusion of persons called by its agents or third parties as requiring

individualized fact-finding. [118] But this is as simple as the fact-finding involved in determining whether someone has received more than one telemarketing call from Direct Building Services itself. Such class members are likely ascertainable from the company databases of any agents or third parties advertising for Direct Building Services, which can be obtained during discovery, [119] and otherwise involves the same or similar claims under the TCPA. That is sufficient for the class to remain intact at this point in the litigation.

## III. CONCLUSION

Defendant's motion to dismiss pursuant to Rule 12(b)(6), and Defendant's motion to strike pursuant to Rule 12(f), are denied.

An appropriate Order follows.

## All Citations

Not Reported in Fed. Supp., 2024 WL 184449

---

## Footnotes

1    Doc. 20.

2    Doc. 22.

3    *Id.* at 5-6.

4    550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

5    556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

6    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

7    *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

8    *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

9    *See* Fed. R. Civ. P. 12(d).

10    *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

11    *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

12    *Id.*; *see also Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

13    *Faulkner*, 463 F.3d at 134.

14    Doc. 24-1.

15    Doc. 20 ¶32.

16    *Id.* ¶¶24-32.

17    *Id.*¶31.

18    Doc. 25 at 3-5.

19    *Id.*

20    *Id.* at 5.

21    *Id.* at 2.

22    *Stoops v. Wells Fargo Bank, N.A.*, 197 F.Supp. 782, 800 (W.D. Pa. 2016).

23    Doc. 25 at 6.

24    *Id.* at 7.

25    Doc. 25 at 3 ("To the extent any call was placed to Plaintiff to (814) 476-XXXX, it was made after Defendant received express written consent for contact from an individual named "Barry Johnson" to contact that number ... it would appear 'Barry Johnson,' is in fact the Plaintiff in this matter. From these facts and inferences that can be deduced therefrom, Plaintiff cannot adequately represent his proposed putative class.").

26    *See Rosenberg v. LoanDepot.com LLC*, 435 F.Supp. 3d 308, 318 (D. Mass. 2020); *see also Bethel v. Jendoco Constr. Corp.*, 570 F.3d 1168, 1175 (explaining that affirmative defenses such as a statute of limitations may only be considered on a motion to dismiss if the bar is "apparent on the face of the complaint.").

27    Doc. 20 ¶¶6, 18.

28    *Id.* ¶19-21.

29    *Id.* ¶22.

30    *Id.* ¶15.

31    *Id.* ¶16.

32    *Id.* ¶23.

33    *Id.* ¶24

34    *Id.* ¶¶25-26.

35    *Id.* ¶¶27-31.

36    *Id.* ¶27.

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 48 of 120

37    *Id.* ¶28.

38    *Id.* ¶29.

39    *Id.* ¶31.

40    *Id.* ¶32.

41    *Id.* ¶33.

42    *Id.* ¶¶33-35.

43    *Id.* ¶¶36-37.

44    *Id.* ¶38.

45    *Id.* ¶40.

46    *Id.* at 10.

47    *Id.* ¶43.

48    *Barr v. Am. Ass'n of Political Consultants*, —— U.S. ——, 140 S.Ct. 2335, 2343, 207 L.Ed.2d 784 (2020); *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012).

49    *Krakauer v. D.I.S.H. Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

50    47 U.S.C. § 227(c)(3); 47 C.F.R. §§ 64.1200(c)(2).

51    47 U.S.C. § 227(c)(5).

52    Doc. 23 at 16.

53    *Dudley v. Vision Solar, LLC*, No. 21-659, 2021 WL 3077557 at *——, 2021 U.S. Dist. LEXIS 135608 at *13 (E.D. Pa. July 21, 2021); *see also Atkinson v. Choice Home Warranty*, No. 22-04464, 2023 WL 166168 at *——, 2023 U.S. Dist. LEXIS 5570 at *12-13 (D.N.J. Jan. 11, 2023).

54    47 C.F.R. § 64.2305(d).

55    47 U.S.C. § 227(c)(1).

56    *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd. 14014, at *63-64 (F.C.C. July 3, 2003); *see also Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("considerable weight should be accorded" to an agency's "construction of a statutory scheme it is entitled to administer").

57    *Krakauer*, 925 F.3d 643, 657 (4th Cir. 2019).

58    *Murray v. Grocery Delivery E-Servs.*, 55 F.4th 340, 348 (1st Cir. 2022).

59    *See, e.g., Chennette v. Porch.com, Inc.*, 40 F.4th 1217, 1223-24 (9th Cir. 2022) (finding that cellphone used for both business and personal purposes was not residential, but noting that "During oral argument, defendants conceded that cell phones can be 'residential' for purposes of § 277(c)"); *Strange v. ABC Co.*, No. CV 19-1361, 2021 WL 798870 at *——, 2021 U.S. Dist. LEXIS 38882 at *10-11 (W.D. La. Mar. 1, 2021).

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 49 of 120

60    *See Shelton v. Fast Advance Funding, LLC*, 378 F.Supp. 3d 356, 362 n.7 (E.D. Pa. 2019), *aff'd*, No. 19-2265, 2020 WL 1027802, 2020 U.S. App. LEXIS 6676 (3d Cir. Mar. 3, 2020). Other decisions have relied upon the same "plain language" interpretation in *Shelton*. *See Gaker v. Q3M Ins. Sols.*, No. 3:22-CV-00296-RJC-DSC, 2023 U.S. Dist. LEXIS 44919, at *6-7 (W.D.N.C. Feb. 7, 2023) (Cayer, M.J.) (citing *Shelton* for its interpretation of this language); *Cunningham v. Politi*, No. 4:18-CV-00362-ALM-CAN, 2019 U.S. Dist. LEXIS 102447, at *10-11 (E.D. Tex. Apr. 30, 2019) (Nowak, M.J.), *report and recommendation adopted*, 2019 U.S. Dist. LEXIS 102050 (E.D. Tex. Apr. 30, 2019); *Cunningham v. Briteral Mgmt.*, No. 4:20-cv-144-SDJ-KPJ, 2020 WL 7391693 at *——, 2020 U.S. Dist. LEXIS 236135 at *16-17 (E.D. Tex. Nov. 20, 2020) (Johnson, M.J.), *report and recommendation adopted*, 2020 U.S. Dist. LEXIS 235956 (Dec. 16, 2020).

61    *Id.* (citing *Residential*, https://www.merriam-webster.com/dictionary/residential *and Resident*, https://www.merriam-webster.com/dictionary/resident).

62    *Id.*

63    *Hermann v. Cencom Cable Assocs.*, 978 F.2d 979, 982 (7th Cir. 1992) (Easterbrook, J.).

64    ANTONIN SCALIA & BRIAN A. GARNER, READING LAW 356. *See also Yates v. United States*, 574 U.S. 528, 536, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (Ginsburg, J.).

65    47 U.S.C. § 227(c)(1).

66    *See Mantha v. Quotewizard.com, LLC*, No. 19-12235-LTS, 2022 WL 325722 at *——, 2022 U.S. Dist. LEXIS 19502 at *13 (D. Mass. Feb. 3, 2022) ("[T]he inquiry to determine whether a phone number qualifies as a 'residential telephone subscriber' focuses on whether the subscriber has and uses the phone for residential purposes.").

67    47 U.S.C. §§ 227(c)(2) ("telephone subscribers"), 227(c)(3) ("residential subscribers"), 227(c)(3)(E) ("residential subscriber"), 227(c)(3)(C) ("telephone subscriber"). The broader term "telephone subscriber" is never used to describe the persons placed on the Do Not Call registry, but instead is used when describing notice and comment procedures for the F.C.C.'s administrative rulemaking.

68    47 U.S.C. § 227(c)(3).

69    47 U.S.C. § 227(a)(2)(A) ("The term 'established business relationship' ... shall include a relationship between a person or entity and a business subscriber subject to the same terms applicable under such section to a relationship between a person or entity and a residential subscriber."). Although this subsection explicitly notes that it applies "for purposes only of subsection (b)(1)(C)(i)," it nevertheless demonstrates Congress' ratification of the F.C.C.'s residential subscriber—business subscriber dichotomy. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 78, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (Scalia, J., Concurring) (opining that while Title IX's implied private right of action may not have originally permitted monetary damages, subsequent legislation demonstrated Congress's understanding of this reading and therefore ratified it).

70    *Shelton*, 378 F.Supp. 3d at 363 n.7; *Gaker*, 2023 U.S. Dist. LEXIS 44919, at *6-7; *Cunningham v. Briteral Mgmt.*, 2020 U.S. Dist. LEXIS 236135, at *16-17; 47 U.S.C. § 227(b)(1)(A)(iii)., (b)(2)(C), (b)(2)(H).

71    *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 137 S.Ct. 929, 197 L.Ed.2d 263 (2017).

72    47 U.S.C. § 227(b)(1)(B) (emphasis added).

73    Alternatively, one district court reads the term "residential" to describe a subscriber's "telephone" but concludes that "residential" telephones, rather than standing in contrast to cellular telephones, are a broad category that subsumes the term. *See Tessu v. AdaptHealth, LLC*, No. SAG-23-0364, 2023 WL 5337121,

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 50 of 120

2023 U.S. Dist. LEXIS 145211 (D. Md. Aug. 17, 2023) ("[The TCPA does not] draw an express distinction between a residential telephone and a cellular telephone. It simply makes reference at different points to each, but does not provide that one could not be subsumed within the other.").

74    *Mantha*, 2022 U.S. Dist. LEXIS 19502, at *8-9.

75    *Id.* at 8-9 (citing 47 U.S.C. §§ 227(d)(2), (b)(2)(c)); 47 U.S.C. § 227(b)(1)(B).

76    47 U.S.C. § 227(c)(1).

77    Act Dec. 20, 1991, Pub. L. 102-243, § 2, 105 Stat. 2394.

78    *See In re Rules*, 18 F.C.C. Rcd. at 14038-39 ("wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones"); *Klassen v. Solid Quote LLC*, No. 23-cv-00318-GPG-NRN, 2023 WL 7544185 at *——, 2023 U.S. Dist. LEXIS 203237 at *5-6 (D. Colo. Nov. 14, 2023) ("By the end of 2022, over seventy percent of adults [were] estimated to reside in wireless-only households") (citing STEPHEN J. BLUMBERG AND JULIAN V. LAKE, NATIONAL CENTER FOR HEALTH STATISTICS, WIRELESS SUBSTITUTION: EARLY RELEASE OF ESTIMATES FROM THE NATIONAL HEALTH INTERVIEW SURVEY, JANUARY-JUNE 2022, at 1 (2022)).

79    *Cranor v. 5 Star Nutrition*, 998 F.3d 686, 691 (5th Cir. 2021) (ruling upon section 227(b)).

80    *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013).

81    *Susinno v. Work Out World Inc.*, 862 F.3d 346 (3d Cir. 2017).

82    *See Chevron*, 467 U.S. at 843, 104 S.Ct. 2778; 47 U.S.C. § 227(c)(2) (authorizing the Federal Communications Commission to prescribe regulations "to implement methods and procedures for protecting the privacy rights described"); 47 C.F.R. § 64.2305(d) (defining "residential telephone subscribers").

83    *Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 131 (N.D. Tex. 2020). Even if this Court were to accept this statutory interpretation argument, Direct Building Services has not explained why the F.C.C.'s ruling would not prohibit such a holding. *See Tessu*, 2023 U.S. Dist. LEXIS 145211, at *10-13.

84    Doc. 23 at 15.

85    *In re Rules*, 18 F.C.C. Rcd. at 14038-39; *Krakauer*, 925 F.3d at 649-50; *Barton v. Temescal Wellness*, LLC, No. 4:20-cv-40114-TSH, 525 F.Supp.3d 195, 2021 WL 858402 at *——, 2021 U.S. Dist. LEXIS 42211 at *13-14 (D. Mass. Mar. 8, 2021).

86    Federal Rule of Civil Procedure 23(d)(1)(D) also authorizes courts to strike pleadings relating to class actions by stating that in evaluating class actions, the court may issue orders that "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly.").

87    *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F.Supp.2d 393, 402 (E.D. Pa. 2002).

88    *Wirt v. Bon-Ton Stores, Inc.*, 134 F.Supp.3d 852, 857 (M.D. Pa. 2015).

89    *Dann v. Lincoln Nat'l Corp.*, 274 F.R.D. 139, 142 (E.D. Pa. 2011).

90    *Reed v. Friendly's Ice Cream, LLC*, No. 15-0298, 2015 WL 7941217, 2016 U.S. Dist. LEXIS 62197, at * (M.D. Pa. May 11, 2016).

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 51 of 120

Jackson v. Direct Building Supplies LLC, Not Reported in Fed. Supp. (2024)

91   *Abdallah v. The Coca-Cola Co.*, No. 1:98-CV-3679, 1999 U.S. Dist. LEXIS 23211, at *6 (N.D. Ga. July 19, 1999).

92   *Goode v. LexisNexis Risk & Info. Analytics*, 284 F.R.D. 238, 244 (E.D. Pa. 2012) (citing *P.V. ex rel. Valentin v. Sch. Dist. of Phila.*, No. 2:11-CV-04027, 2011 U.S. Dist. LEXIS 125370, at *12 (E.D. Pa. Oct. 31, 2011) *and Thompson v. Merck & Co., Inc.*, Nos. 01-1328, 01-3011, 2004 WL 62710 at *——, 2004 U.S. Dist. LEXIS 540 at *9 (E.D. Pa. Jan. 6, 2004)).

93   *Zarichny v. Complete Payment Recovery Servs.*, 80 F.Supp. 3d 610, 624 (E.D. Pa. 2015).

94   *Id.*

95   Doc. 34 at 13 (citing 47 U.S.C. § 227(a)(4)).

96   *See* Doc. 20 ¶43.

97   Doc. 24 at 14-15.

98   *Id.* at 15-16.

99   No. 4:22-CV-01659, , 2023 WL 2472606, 2023 U.S. Dist. LEXIS 41211 (M.D. Pa. Mar. 10, 2023).

100  *Compare* Complaint, Doc. 1 ¶31, *Jackson v. Meadowbrook Fin. Mortg. Bank*, No. 4:22-CV-01659 (M.D. Pa.), *with* Doc. 20 ¶43.

101  *See Abella v. Student Aid Center*, No. 15-3067, 2015 U.S. Dist. LEXIS 147299, at *12 (E.D. Pa. Oct. 30, 2015); *Johnson v. Ally Financial Inc.*, No. 1:16-CV-1100, 2017 WL 3433689, 2017 U.S. Dist. LEXIS 126817 (M.D. Pa.), *O.P. Schuman & Sons, Inc. v. DJM Advisory Grp., LLC*, No. 16-3563, 2017 WL 634069 at *——, 2017 U.S. Dist. LEXIS 22402 at *13, (E.D. Pa. Feb. 16, 2017).

102  *Luciano v. Teachers' Ins. and Annuity Ass'n of Am. – Coll. Ret. Equities Fund*, No. 15-6726 (ZNQ) (DEA), 2022 WL 1044969 at *——, 2022 U.S. Dist. LEXIS 64671 at *3 (D.N.J. Apr. 7, 2022).

103  Fed. R. Civ. P. 23(b)(3).

104  Fed. R. Civ. P. 23(a).

105  *Luciano*, 2022 U.S. Dist. LEXIS 64671, at *3.

106  Doc. 23 at 10.

107  2023 U.S. Dist. LEXIS 41211, at *16 ("Meadowbrook contends that Jackson's class allegations do not satisfy the typicality requirement because although he alleges that Meadowbrook 'made potentially thousands of separate calls to separate potential class members,' he 'has not alleged that these calls were placed at the same time, by the same caller, or featured the same conversation.' ").

108  *Id.* at *17 (quoting *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 93-94 (3d Cir. 2011), *opinion reinstated*, Nos. 09-3105/09-3532/09-3793, 2012 U.S. App. LEXIS 11946 (3d Cir. Apr. 17, 2012)).

109  *Jackson v. Locust Med., LLC*, No. 4:22-CV-00424, 2022 WL 16540675 at *——, 2022 U.S. Dist. LEXIS 197057 at *5 (M.D. Pa. Oct. 28, 2022) (quoting *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001)).

110    *In re NFL Players Concussion Injury Litig.*, 821 F.3d 430, 427 (3d Cir. 2016) ("There is no magic number of class members needed for a suit to proceed as a class action. We have set a rough guidepost in our precedents, however, and stated that numerosity is generally satisfied if there are more than 40 class members.").

111    Doc. 23 at 11.

112    *Jackson v. Meadowbrook Fin. Mortg. Bank*, 2023 U.S. Dist. LEXIS 41211, at *17 n.76.

113    *See id.* ("his factual allegations—namely, that he received three telemarketing calls on the same day, all of which followed a script, al of which came after his attorney sent Meadowbrook a cease-and-desist letter, 'make clear [the] *en masse* nature of the calling.' ") (citations omitted).

114    *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

115    Doc. 23 at 12.

116    *Landsman*, 640 F.3d at 95.

117    *See Marcus*, 687 F.3d at 593 (collecting cases requiring proposed classes to be ascertainable from a company database).

118    Doc. 23 at 9; *see Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd*, 577 U.S. 153, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016).

119    *See, e.g.*, *Jackson v. Aragon Adver., LLC*, No. 4:23-MC-00812, 2023 WL 7413332, 2023 U.S. Dist. LEXIS 201988 (M.D. Pa. Nov. 9, 2023).

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🏴 KeyCite Blue-Striped Flag

Appeal Filed by   Seth Steidinger, et al v. Blackstone Medical Services,   7th
Cir.,   August 12, 2025

2025 WL 2042764
Only the Westlaw citation is currently available.
United States District Court, C.D. Illinois,
Peoria Division.

Joseph JONES, Seth Steidinger, and
Natasha Koller, on behalf of themselves
and all others similarly situated, Plaintiffs,

v.

BLACKSTONE MEDICAL
SERVICES, LLC, Defendant.

Case No. 1:24-cv-01074-JEH-RLH
|
Signed July 21, 2025

**Synopsis**
**Background:** Consumers filed putative class action claiming
that Florida-based company that sold home sleep tests
violated Telephone Consumer Protection Act (TCPA) and
Florida Telephone Solicitation Act (FTSA) by allegedly
repeatedly sending unsolicited telemarketing text messages
and calls to consumers' telephones, including numbers
on National Do-Not-Call Registry, and after consumers
requested company to stop. Company moved to dismiss for
failure to state TCPA claims.

**Holdings:** The District Court, Jonathan E. Hawley, J., held
that:

[1] TCPA provision under which claims were brought did not
prohibit text messages, and

[2] supplemental jurisdiction would not be exercised over
FTSA claim.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (9)

**[1]    Statutes** 🔑 Plain Language;  Plain, Ordinary,
or Common Meaning

Under the principles of statutory interpretation,
a court must start with the text of the statute to
ascertain its plain meaning.

**[2]    Statutes** 🔑 Undefined terms

Unless words in a statute are otherwise defined,
they will be interpreted as taking their ordinary,
contemporary, common meaning.

**[3]    Telecommunications** 🔑 Unsolicited e-mail or
text message

Company that sold home sleep tests repeatedly
sent unsolicited telemarketing text messages and
short message service (SMS) calls to consumers'
telephones, including numbers on National
Do-Not-Call Registry, that did not constitute
prohibited "telephone call," within meaning of
Telephone Consumer Protection Act (TCPA),
providing private right of action by person who
received more than one telephone call within
any 12-month period by or on behalf of same
entity in violation of implementing regulations
prohibiting telephone solicitation to residential
telephone subscriber registered on national do-
not-call registry and prohibiting any unsolicited
artificial or prerecorded-voice telephone call or
call for telemarketing purposes, since TCPA did
not define telephone call to include text and/or
SMS messages. Communications Act of 1934
§ 227,  47 U.S.C.A. § 227(c)(5);  47 C.F.R. §§
64.1200(c)(2), 64.1200(d).

**[4]    Statutes** 🔑 Plain Language;  Plain, Ordinary,
or Common Meaning

A statute's words are given their common
meaning as of the time the statute was enacted.

**[5]    Statutes** 👉 **Construction**

In the business of statutory interpretation, if an interpretation is not the best, it is not permissible.

**[6]    Statutes** 👉 **Plain Language; Plain, Ordinary, or Common Meaning**

The ordinary principle of statutory interpretation, namely, to start with the text of the statute to ascertain its plain meaning, provides the answer.

**[7]    Constitutional Law** 👉 **Making, Interpretation, and Application of Statutes**

**Constitutional Law** 👉 **Encroachment on Executive**

Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch; to the extent that Congress and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute.

**[8]    Constitutional Law** 👉 **Making, Interpretation, and Application of Statutes**

In interpreting a statute, district court confines itself to its assigned role which does not include legislating.

**[9]    Federal Courts** 👉 **Effect of dismissal or other elimination of federal claims**

District court would decline to exercise supplemental jurisdiction over consumers' claim against company that sold home sleep tests, allegedly in violation of Florida Telephone Solicitation Act (FTSA), by allegedly repeatedly sending unsolicited telemarketing text messages and calls to consumers' telephones, including numbers on National Do-Not-Call Registry, and after consumers requested company to stop, since court had dismissed consumers' federal claims for violating Telephone Consumer Protection Act (TCPA). 28 U.S.C.A. § 1367(a);

Communications Act of 1934 § 227, 47 U.S.C.A. § 227(c)(5); Fla. Stat. Ann. § 501.059(5).

More cases on this issue

**Attorneys and Law Firms**

Kimberly Wochholz, The Consumer Rights Law Group, Sun City Center, FL, Stephen F. Taylor, Sergei Lemberg, Lemberg Law LLC, Wilton, CT, Abbas Kazerounian, Kazerouni Law Group, APC, Costa Mesa, CA, for Plaintiffs.

John P. Heil, Jr., Samuel J. Perkins, Heyl Royster Voelker & Allen, Peoria, IL, for Defendant.

**Order**

Jonathan E. Hawley, UNITED STATES DISTRICT JUDGE

**\*1**  Now before the Court is Defendant Blackstone Medical Services, LLC's Motion to Dismiss Counts I-IV of the Consolidated Class Action Complaint (D. 32).[1] For the reasons set forth, *infra*, the Motion is GRANTED.

**I**

On April 14, 2025, Plaintiffs Joseph Jones, Seth Steidinger, and Natasha Koller filed their Consolidated Class Action Complaint (D. 29) against Blackstone Medical Services, LLC (Blackstone) alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, (Counts I-IV) and the Florida Telephone Solicitation Act (FTSA), FLA. STAT. § 501.059(5) (2023) (Count V). The individually named Plaintiffs are consumers who received telemarketing text messages and calls to their telephones from Blackstone. Defendant Blackstone is a Florida-based company that sells home sleep tests. The Plaintiffs brought their class action as representatives/members of the following classes:

**Internal Do Not Call List Class** (Jones, Steidinger, and Koller): All persons within the United States who, within the time frame(s) relevant to this action, (1) received two or more text messages from Blackstone or anyone acting on Blackstone's behalf, (2) within any 12-month period, (3) for the purpose of selling Blackstone's products and/or services, and (4) including at least one of those text

messages being placed more than 30 days after such person requested that Blackstone stop calling and/or texting.

**Do Not Call Registry Class** (Steidinger): All persons in the United States who from four years prior to the filing of this action (1) were sent text messages and/or telephone calls by or on behalf of Defendant; (2) more than one time within any 12-month period; (3) where the person's telephone number had been listed on the National Do Not Call Registry for at least thirty days; (4) for the purpose of encouraging the purchase or rental of Defendant's products and/or services; and (5) where either (a) Defendant did not obtain prior express written consent to message the person or (b) the called person previously advised Defendant to "STOP" messaging them.

**FTSA Class** (Jones and Koller): All persons within the State of Florida who, (1) were sent a text message from Blackstone or anyone acting on Blackstone's behalf; (2) for the purpose of soliciting Defendant's goods and/or services, and (2) [sic] had previously communicated to Blackstone that they did not wish to receive Defendant's text messages.

(D. 29 at ECF pp. 3-4). Collectively, the Plaintiffs request the three putative classes receive monetary, injunctive, and declaratory relief for the alleged violations of the TCPA and FTSA.

Specifically, the Plaintiffs allege [2] Defendant Blackstone operates an aggressive telemarketing campaign where it repeatedly sends text messages and telephone calls to telephone numbers that have been placed on the National Do-Not-Call Registry for at least 30 days and over the messaged party's objections in order to sell home sleep tests. Plaintiff Steidinger is an Illinois resident who registered his residential cellular telephone number with the National Do-Not-Call Registry on April 18, 2018. He began receiving telephone calls and text messages to his telephone number after discussing potentially taking a home sleep test with his healthcare provider. During his first and only live conversation with Blackstone, the Plaintiff replied he was not interested in the home sleep test. After Plaintiff Steidinger's telephone number was added to the National Do-Not-Call Registry and after he advised the Defendant he was not interested in its home sleep tests and repeatedly messaged Blackstone to "STOP", the Defendant continued to place repeated telemarketing text messages. Plaintiff Koller is a Florida resident whose cellular telephone number, upon information and belief, Blackstone obtained from Koller's doctor; Koller did not give her doctor permission to convey

to Blackstone her consent to its calls. Koller repeatedly requested Blackstone to "STOP" sending her its solicitation text messages but the Defendant continued to place repeated telemarketing text messages to her cellular telephone which she used as her residential telephone line. Plaintiff Jones, a Florida resident, received a barrage of text messages on his cellular telephone, which he used for personal and residential purposes, beginning in or around September 2022 despite never having given consent to be contacted and requesting the Defendant stop multiple times. In Yelp reviews, other consumers complain about the Defendant's aggressive telemarketing and failure to abide by "stop" requests.

## II

**\*2** Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of claims for "failure to state a claim upon which relief can be granted". A court may grant a Rule 12(b)(6) motion to dismiss only if a complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint sufficient on its face need not give "detailed factual allegations," but it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 555, 127 S.Ct. 1955. The Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

### A

Defendant Blackstone seeks the dismissal of Counts I-IV of the Consolidated Class Action Complaint (CAC), arguing the provision of the TCPA pursuant to which the Plaintiffs bring their claims, 47 U.S.C. § 227(c), does not prohibit text messages. The Plaintiffs bring Counts I and II pursuant to "47 U.S.C. § 227(c)(5), and 47 C.F.R. § 64.1200(c)(2)" and Counts III and IV pursuant to "47 U.S.C. § 227, et seq." and "47 C.F.R. § 64.1200(d) et seq." Pls.' CAC (D. 29 at ECF pp. 30, 32, 33, 35).

1

"Voluminous consumer complaints about abuses of telephone technology ... prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012). Thus, under 47 U.S.C. § 227(b), it is "unlawful for any person ... to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice" to several specified types of telephones including, among others, emergency telephone lines and telephone numbers assigned to a cellular telephone service. 47 U.S.C. § 227(b)(1)(A)(i)-(iii). The TCPA directs the Federal Communications Commission (FCC) "to prescribe regulations to implement the requirements of [Section 227(b)]." 47 U.S.C. § 227(b)(2). Section 227(b)(3) provides for a private right of action based on a violation of Section 227(b) or the regulations prescribed under it. 47 U.S.C. § 227(b)(3).

Title 47 U.S.C. § 227(c), meanwhile, directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Pursuant to its authority to prescribe regulations to implement methods and procedures for protecting those privacy rights, 47 U.S.C. § 227(c)(2), the FCC established a National "Do Not Call" Registry. *See* 47 U.S.C. § 227(c)(3) ("The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase."). Section 227(c)'s implementing regulation, 47 C.F.R. § 64.1200(c), provides in relevant part:

> No person or entity shall initiate any telephone solicitation to [ ] A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

47 C.F.R. § 64.1200(c)(2). Another implementing regulation, 47 C.F.R. § 64.1200(d), provides in relevant part:

> No person or entity shall initiate any artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity.

**\*3** 47 C.F.R. § 64.1200(d).

Section 227(c)(5) provides for a private right of action by "A person who has received more than one *telephone call* within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under [Section 227(c)] ...." 47 U.S.C. § 227(c)(5) (emphasis added).

### 2

Defendant Blackstone argues that the phrases "text message" and "SMS message" are wholly absent from Section 227(c)(5) and its implementing regulations, 47 C.F.R. § 64.1200(c) and (d). Indeed, only "call", "telephone call", and "artificial or prerecorded-voice telephone call" appear in Section 227(c) and its implementing regulations. 47 U.S.C. § 227(c)(1)(D), (c)(5); 47 C.F.R. § 64.1200(c)(2)(iii), (d). The Defendant notes that the FCC clearly indicated its intent to regulate text messages or SMS messages under 47 C.F.R. § 64.1200(a) which was implemented under Section 227(b) only. [3] Section 64.1200(a)(9) states, "As used in this paragraph (a)(9), the term 'call' includes a text message, including a short message service (SMS) call." 47 C.F.R. § 64.1200(a)(9). In their CAC and Response (D. 36) to the Motion to Dismiss, the Plaintiffs rely upon the FCC's Report and Order, CG Docket No. 02-278, FCC 03-153, *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991* (2003 Order), wherein the FCC stated:

> We affirm that under the TCPA, it is unlawful to make *any call* using an automatic telephone dialing system or an artificial or prerecorded message to any wireless

telephone number. Both the statute and our rules[ ] prohibit these calls, with limited exceptions, "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged." [ ] This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service.

18 FCC Rcd. 14014, 14116 para. 165 (2003) (emphasis in original). They say the 2003 Order, along with later FCC Orders, case law, and public policy make clear that "calls" encompass text messages.

The Supreme Court very recently explained:

> In an enforcement proceeding, a district court must independently determine for itself whether the agency's interpretation of a statute is correct. District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation.

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, —— U.S. ——, 145 S. Ct. 2006, 2015, —— L.Ed.2d —— (2025) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024)). [4] Pursuant to *McLaughlin* and *Loper Bright*, the Court agrees with the Defendant that based on a plain reading of the TCPA and its implementing regulations, Section 227(c)(5) does not apply to text messages.

**\*4** **[1]** **[2]** **[3]** Under the principles of statutory interpretation, a court must start with the text of the statute to ascertain its plain meaning. *U.S. v. Melvin*, 948 F.3d 848, 851 (7th Cir. 2020). "Unless words are otherwise defined, they 'will be interpreted as taking their ordinary, contemporary, common meaning.' " *Id.* at 852 (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227, 134 S.Ct. 870, 187 L.Ed.2d 729 (2014)). Section 227(c)(5) simultaneously explicitly refers to a "telephone call", a term not defined

in the statute itself, and remains silent as to its application to text messages. Text messaging was not an available technology in 1991, and thus "telephone call" would not have included text messages or SMS messages. *See id.* ("We find words' ordinary, contemporary, common meaning by looking at what they meant when the statute was enacted ...."); Alex Fitzpatrick, *How Text Messages Are Being Killed and Replaced*, TIME (Dec. 3, 2014), https://time.com/3612277/text-message-history-future/ ("The world's very first text message, sent Dec. 3, 1992, was a cheerful, if early, holiday greeting: 'Merry Christmas,' it read, short and sweet."). Moreover, in today's American parlance, "telephone call" means something entirely different from "text message". Thus, under a plain reading, Section 227(c)(5) of the TCPA does not regulate text messages. *See West v. Hoy*, 126 F.4th 567, 575 (7th Cir. 2025) (stating a court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous.") (quoting *BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004)); *Melvin*, 948 F.3d at 852 ("If the statutory language's plain meaning is unambiguous, [the court's] inquiry ends there.").

**[4]** The fact that "telephone solicitation" appears in Section 227(c) and is defined earlier in Section 227(a) to mean "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person" does not change the plain meaning analysis. 47 U.S.C. § 227(a)(4). Section 227(a)(4) does not refer to "text message"; "telephone call or message" could not be interpreted in 1991 to telephone call or *text* message, contrary to the Plaintiffs' footnoted suggestion. Again, a statute's words are given their common meaning as of the time the statute was enacted. *Melvin*, 948 F.3d at 852.

As for the Plaintiffs' reliance upon the FCC's 2003 Order to bring "text message" within the purview of Section 227(c)(5), within the relied upon Paragraph 165, the FCC explicitly mentions "automatic telephone dialing system", "artificial or prerecorded message", and "automated or prerecorded telephone calls". 18 FCC Rcd. 14014, 14116 para. 165. In footnotes appearing within Paragraph 165, only 47 U.S.C. § 227(b) of the TCPA is cited along with 47 C.F.R. § 64.1200(a). Section 227(b), *not* 227(c), addresses restrictions on the use of "an automatic telephone dialing system or an artificial or prerecorded message", and, as already discussed, 47 C.F.R. § 64.1200(a) is the implementing regulation for Section 227(b), not Section 227(c). As the Defendant argues, the 2003 Order was only addressing text messages sent using

an automatic telephone dialing system or an artificial or prerecorded message, and, thus, the 2003 Order does not even address the specific provisions of the TCPA and its regulations at issue in this case.

The Plaintiffs cobble together the FCC's 2003 Order and several later FCC Orders (dated 2012, 2015, 2016), which they describe as "unambiguous", together with 47 C.F.R. § 64.1200(e) in an effort to establish that text messages apply under Section 227(c) of the TCPA. *In re Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1832 para. 4 (2012); *In re Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 8016 para. 107 (2015); *In re Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 31 FCC Rcd. 9074, 9092 para. 40 (2016). The Plaintiffs' approach is problematic. First, on its face and as just detailed, the 2003 Order explicitly references only Section 227(b). Second, the portions of the FCC's later Orders the Plaintiffs discuss refer back to the 2003 Order which cites only Section 227(b) and themselves fail to include citation to Section 227(c). The 2016 Order merely speaks of "covered text messages" without any reference to Section 227(c). 2016 Order, 31 FCC Rcd. 9074, 9092 para. 40. Third, 47 C.F.R. § 64.1200(e) incorporates the 2003 Order:

**\*5** The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers *to the extent described in* the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

47 C.F.R. § 64.1200(e) (emphasis added). Again, the 2003 Order addressed only Section 227(b). By limiting Section 64.1200(e)'s application in such a manner, the FCC presents a complicated rather than simplified legal interpretation of "telephone call" for purposes of Section 227(c)(5).

The Court understands the FCC has a level of expertise as to the various forms of communication existing at the time of the TCPA's enactment as well as now. *See Loper Bright*, 603 U.S. at 402, 144 S.Ct. 2244 ("[An agency's] expertise has always been one of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control.' ") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). While

the Court affords a certain amount of respect to the FCC's interpretation of the terms used in the TCPA, the fact remains that Section 227(c)(5) of the TCPA includes "telephone call" and does not mention text messages or SMS messages, and nowhere does the TCPA define "telephone call" to include text and/or SMS messages. As illustrated above, the FCC's interpretation of call to include text messages is a complicated one, and potentially does not even apply to Section 227(c)(5).

**[5]  [6]  [7]  [8]** The Plaintiffs' position – that text messages are calls as the latter term is used in the TCPA – is an eminently reasonable one, particularly given the TCPA's purpose and the prevalence of text messaging in the U.S. today. Nevertheless, "[i]n the business of statutory interpretation, if [an interpretation] is not the best, it is not permissible." *Loper Bright*, 603 U.S. at 400, 144 S.Ct. 2244. The "ordinary" principle of statutory interpretation – to start with the text of the statute to ascertain its plain meaning – provides the answer. *See id.* at 392, 144 S.Ct. 2244 ("Under the [Administrative Procedure Act], it thus 'remains the responsibility of the court to decide whether the law means what the agency says.' ") (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109, 135 S.Ct. 1199, 191 L.Ed.2d 186 (2015) (Scalia, J., concurring in judgment)). It is not for a court to legislate by reading into the TCPA something that is not there [5] :

> The better presumption is therefore that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch. And to the extent that Congress and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute.

*See Loper Bright*, 603 U.S. at 403, 144 S.Ct. 2244. It is for Congress to respond to the issues presented in this case and to address the realities of today's technology (and the intrusions caused therefrom) which is commonplace in American life in 2025. The Court confines itself to its assigned role which does not include legislating.

**\*6** The Court finds that the Plaintiffs have failed to state claims for violations of Section 227(c) of the TCPA, 47 C.F.R. § 64.1200(c), and 47 C.F.R. § 64.1200(d) given that allegedly "violative text messages" stand "at the core of Plaintiffs' factual allegations". Pls.' Resp. (D. 36 at ECF p. 2 n.1). Indeed, the Plaintiffs' reference to receipt of telephone calls in violation of the TCPA are few compared to their reference to text messages and inclusion of text message screenshots; the crux of the CAC is that their receipt of repetitive text messages prompted them to seek relief pursuant to the TCPA. The Court's finding is fatal to the Plaintiffs' requests for injunctive and declaratory relief, and the Defendant's argument that the Court has no jurisdiction to entertain those requests is therefore moot.

**B**

**[9]**  Because of the Court's finding that the Plaintiffs' TCPA claims must be dismissed, no federal claims remain in this case. Only Count V pursuant to Florida law remains. "A district court has 'supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.' " *West*, 126 F.4th at 575 (quoting 28 U.S.C. § 1367(a)). However, a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) [of Section 1367] if ... the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). The Court declines to exercise supplemental jurisdiction over the Plaintiffs' remaining claim under the FTSA.

**III**

For the reasons set forth, *supra*, Defendant Blackstone Medical Services, LLC's Motion to Dismiss Counts I-IV of the Consolidated Class Action Complaint (D. 32) is GRANTED. The entirety of the Plaintiffs' Consolidated Class Action Complaint (D. 29) is DISMISSED WITHOUT PREJUDICE. If the Plaintiffs choose to file an amended consolidated class action complaint, they must do so within 21 days of the date of this Order.

*It is so ordered.*

**All Citations**

--- F.Supp.3d ----, 2025 WL 2042764

---

**Footnotes**

1    Citations to the electronic docket are abbreviated as "D. ____ at ECF p. ____."

2    When ruling on a motion to dismiss, the court must take all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Indep. Truck Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012).

3    The Defendant states that 47 C.F.R. § 64.1200(a) is implemented under Section 227(b) only, *not* Section 227(c). The Plaintiffs do not contest that.

4    The Supreme Court's opinion in *McLaughlin Chiropractic* was issued after the parties had already briefed the Motion to Dismiss in this case. Relevant to the parties' positions in this case, *McLaughlin Chiropractic* held the Administrative Orders Review Act (or Hobbs Act), 28 U.S.C. § 2342, "does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct." 145 S. Ct. at 2013.

5    For these reasons, the Court need not delve into the cases the Plaintiffs discuss as support for their position that text messages are calls within the TCPA. The Court also notes that the cases included in their CAC are not binding on this Court. *See OSF Healthcare Sys. v. Insperity Grp. Health Plan*, 82 F. Supp. 3d 860,

865 (C.D. Ill. 2015) (quoting *U.S. v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994)) (providing that out-of-circuit precedent is not binding, though it is entitled to "respectful consideration[ ]"). The Plaintiffs' cited cases, *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099 (W.D. Mo. 2020), and *Doohan v. CTB Invs., LLC*, 427 F. Supp. 3d 1034 (W.D. Mo. 2019), do not persuade the Court to find as Plaintiffs argue.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2972447
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

James LINLOR, Plaintiff,
v.
FIVE9, INC., Defendant.

Case No.: 17CV218-MMA (BLM)
|
Signed July 11, 2017
|
Filed 07/12/2017

**Attorneys and Law Firms**

James Linlor, Encinitas, CA, pro se.

Lee S. Brenner, Kelley Drye and Warren LLP, Los Angeles, CA, Steven Spencer Elg, Kelley Drye & Warren, Washington, DC, for Defendant.

**ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS; AND**

**GRANTING PLAINTIFF'S
MOTION FOR LEAVE TO AMEND**

Hon. Michael M. Anello, United States District Judge

 **\*1** On February 3, 2017, Defendant Five9, Inc. removed this action from the Superior Court of California, County of San Diego. *See* Doc. No. 1. In the First Amended Complaint ("FAC"), Plaintiff James Linlor, proceeding *pro se*, alleges Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"). *See* Doc. No. 1. Defendant moves to dismiss Plaintiff's FAC under Federal Rule of Civil Procedure 12(b)(6). *See* Doc. No. 10. Plaintiff has also filed a "motion to substitute," in which Plaintiff requests leave to amend the FAC to add a new defendant. *See* Doc. No. 12. The Court found these matters suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons set forth below, the Court **GRANTS** Defendant's motion to dismiss, Doc. No. 10, and **GRANTS** Plaintiff's motion for leave to amend the FAC, Doc. No. 12.

**BACKGROUND** [1]

The FAC asserts claims for violations of the TCPA against Defendant Five9, Inc. ("Defendant Five9") and other unnamed defendants, whom Plaintiff refers to as "John Does #1-#9." Plaintiff alleges Defendant Five9 "is in the business of providing customer contact center solutions, including, but not limited to, predictive and autodialers, and inbound call management." *See* FAC, p. 3. Plaintiff alleges the unnamed defendants are "customers, employees, contractors, or agents working with or for or in some manner in partnership or as purchasers of [Defendant Five9's] services or products, or using [Defendant Five9's] customer contact services in any existing or novel way." *See* FAC, p. 4.

Plaintiff alleges that in approximately October 2016, "Plaintiff began receiving SMS texts to the Plaintiff's cellular telephone from the Defendants." *See* FAC, p. 2. Specifically, Plaintiff alleges he received "[a]t least five (5) text messages ... during 2016 and January 2017." *See* FAC, p. 5. Plaintiff alleges that the "repetitive nature of the text messages indicate that the Defendants' messages were made using an 'automatic telephone dialing system,' as defined by 47 U.S.C. § 227(a)(1)." *See* FAC, p. 5. The FAC states that Defendant Five9 "was identified as the teleco operator/ agent responsible for an outbound # 855-790-6802 identified in SMS messages sent to the Plaintiff's cell phone." *See* FAC, p. 3. Plaintiff alleges he does not have a relationship with Defendants, did not provide his cellular telephone number to Defendants, and did not consent to be contacted.

Regarding Defendant Five9's liability, Plaintiff contends Defendant is vicariously liable for violating the TCPA because Defendant provides "the capacity for (and use of) an autodialing function" "as a feature of [Defendant Five9's] software," and provided such software to the unnamed defendants "who appear to have put together the text messages to the Plaintiff's cellphone, including a phone # serviced by [Defendant Five9] for the resulting (hoped for) inbound calls in response to the marketing campaign, and for [Defendant Five9] to profit from the use of [its] software in creating the text messages." *See* FAC, p. 6. Plaintiff emphasizes that the unnamed defendants "initiated the text message 'calls' ... to the Plaintiff's cellphone." *See* FAC, p. 6. Plaintiff contends that Defendant Five9 "manage[d]" the "toll-free number inbound calls" and "profit[ed] from the toll charges and software licensing fees associated with the use of [its] inbound call system, as a precursor to generating sales for

the [unnamed defendants, as] recipients of the toll-free calls processed by" Defendant Five9. *See* FAC, p. 7.

**\*2** Defendant moves to dismiss the FAC, arguing Plaintiff fails to sufficiently plead vicarious liability or a predicate TCPA violation, and that Defendant is immune from liability as a common carrier. Plaintiff moves for leave to amend to add a defendant, Futero, Inc., which Plaintiff believes is liable for violating the TCPA.

## LEGAL STANDARD

### A. Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed. R. Civ. P. 8(a)(2). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, the pleadings must contain factual allegations "plausibly suggesting (not merely consistent with)" a right to relief. *Twombly*, 550 U.S. at 545. The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not take legal conclusions as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). However, a *pro se* plaintiff's complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L.Ed. 2d 1081 (2007). Courts must construe such pleadings liberally. *Id.*

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.*; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects in the pleading. *See Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

### B. Rule 15

Rule 15(a)(2) supplies the standard for amending pleadings within the scheduling order deadlines. [2] *See* Fed. R. Civ. P. 15(a)(2). Pursuant to Rule 15(a)(2), "a party may amend its pleading [ ] with the opposing party's written consent or the court's leave," which should be freely given "when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). The United States Supreme Court has stated:

> **\*3** If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

*Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-04000 SC, 2013 WL 1739451, at *3 (N.D. Cal. Apr. 22, 2013) (stating "the Ninth Circuit has stressed Rule 15's policy of favoring amendments").

## DISCUSSION

### A. Motion to Dismiss

Defendant moves to dismiss the FAC with prejudice on three grounds. First, Defendant argues the FAC fails to sufficiently allege facts in support of Plaintiff's theory that Defendant is vicariously liable for allegedly unlawful text messages. Second, Defendant argues the FAC establishes that Defendant is "a common carrier caught in the crosshairs," and is accordingly immune from liability for violations of the TCPA. *See* Doc. No. 10. Third, Defendant contends the FAC insufficiently alleges a violation of the TCPA. After reviewing Defendant's arguments in support of its motion, and Plaintiff's arguments in response, the Court finds dismissal is proper for the reasons set forth below.

### i. Vicarious Liability

In the FAC, Plaintiff does not allege Defendant is directly liable for violating the TCPA, as Plaintiff admits Defendant did not send the text messages at issue. Rather, Plaintiff asserts Defendant is vicariously liable for TCPA violations. The Court agrees with Defendant that Plaintiff fails to allege facts to support a theory of vicarious liability.

The Ninth Circuit has assumed that "Congress intended to apply" "ordinary tort-related vicarious liability rules" to TCPA claims. *See Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877 (9th Cir. 2014), *aff'd*, 136 S. Ct. 663, 193 L.Ed. 2d 571 (2016), *as revised* (Feb. 9, 2016) (deferring also to the Federal Communications Commission's ruling that there may be vicarious liability for TCPA violations under federal common law agency principles). In other words, a defendant may be vicariously liable for a third-party caller's TCPA violations where the plaintiff demonstrates an agency relationship between the defendant and the third-party caller. *Id.* Under traditional agency principles, "[a]n entity may be liable for actions it did not itself take when the unlawful acts were performed by an agent of the entity." *Henderson v. United Student Aid Funds, Inc.*, No. 13CV1845 JLS (BLM), 2017 WL 766548, at *6 (S.D. Cal. Feb. 28, 2017). "An agency relationship forms 'when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.' " *Trenz v. Sirius Xm Radio, Inc.*, No. 15CV0044 AJB (NLS), 2015 WL 11658715, at *2 (S.D. Cal. July 13, 2015) (quoting

*France Telecom S.A. v. Marvell Semiconductor Inc.*, No. 12-cv-04967-WHO, 2015 WL 925892, at *4 (N.D. Cal. Mar. 2, 2015)) (citing Restatement (Third) of Agency § 1.01 (2006)).

Here, Plaintiff does not allege a traditional agency relationship between Defendant and the unidentified entity or entities responsible for the text messages. The FAC does not allege Defendant had any control over any entity responsible for sending the text messages, nor that any entity acted in any way on Defendant's behalf. In order to allege a traditional agency relationship, Plaintiff would have to allege Defendant "controlled or had the right to control [the entity responsible for the text messages] and, more specifically, the manner and means of the text message campaign they conducted." *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1085 (C.D. Cal. 2012), *aff'd*, 582 Fed.Appx. 678 (9th Cir. 2014). "Agency means more than mere passive permission; it involves request, instruction, or command." *Id.* (quoting *Klee v. United States*, 53 F.2d 58, 61 (9th Cir. 1931)). Plaintiff merely alleges Defendant sold software to the entity responsible for sending the messages, and provided the entity with a toll free number with which to receive responses to the messages. Thus, Plaintiff does not allege Defendant had express or actual authority over the entity that sent the alleged text messages.

**\*4** Further, Plaintiff fails to allege either apparent authority or ratification, which may also give rise to vicarious liability. *See id.*; *Thomas*, 879 F. Supp. 2d at 1085; *Thomas v. Taco Bell Corp.*, 582 Fed.Appx. 678, 679 (9th Cir. 2014). Apparent authority "can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied' " to the plaintiff's detriment. *Thomas*, 582 Fed.Appx. at 679. Plaintiff does not allege that he "reasonably relied, much less to [his] detriment, on any apparent authority with which [Defendant] allegedly cloaked" the entity responsible for creating and sending the text messages. *See id.* at 679–80. Finally, Plaintiff fails to allege ratification. A principal may be liable "when it ratifies an originally unauthorized tort," but "the principal-agent relationship is still a requisite, and ratification can have no meaning without it." *See id.* at 680 (quoting *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003)). Plaintiff does not allege the existence of a principal-agent relationship, nor does Plaintiff allege Defendant somehow approved of another entity's violations of the TCPA.

Linlor v. Fives, Inc., Not Reported in Fed. Supp. (2017)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 64 of 120

In sum, the FAC fails to sufficiently allege Defendant is vicariously liable for allegedly unlawful text messages created and sent by an unnamed third party.

### ii. Common Carrier

Second, Defendant argues the FAC establishes that it is a common carrier exempt from TCPA liability. Generally, "users of [telecommunications] services, not the carriers providing the services, [are] held liable" under the TCPA. *Kauffman v. CallFire, Inc.*, 141 F. Supp. 3d 1044, 1047 (S.D. Cal. 2015) (quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8776 n.83 (1992)). "Common carriers are not liable under the TCPA absent a 'high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions.' " *Rinky Dink, Inc. v. Elec. Merch. Sys.*, No. C13-1347-JCC, 2015 WL 778065, at *4 (W.D. Wash. Feb. 24, 2015). To determine whether an entity is a common carrier, courts inquire: "(1) Does the entity hold itself out indifferently to all potential users or, if serving a legally-defined class, hold itself out indiscriminately to serve all within that class; and (2) Does the entity allow customers to transmit messages of their own design and choosing?" *Id.* at *5.

However, based solely on the FAC, the Court is unable to make these determinations. The Court, like other district courts have done in analogous cases, declines to find as a matter of law, at the pleadings stage, that Defendant is a common carrier exempt from liability under the TCPA. *See, e.g.*, *Couser v. Pre-paid Legal Servs., Inc.*, 994 F. Supp. 2d 1100, 1104–05 (S.D. Cal. 2014) ("[W]ith only pleadings to go on and no discovery as to the precise relationship between CallFire and Legal Shield, it is simply too early in this litigation for the Court to affirmatively conclude that CallFire is the middleman it claims."); *Luna v. Shac, LLC*, No. C14-00607 HRL, 2014 WL 5324291, at *2 (N.D. Cal. Oct. 17, 2014); *Kauffman v. CallFire, Inc.*, No. 3:14-CV-1333-H-DHB, 2015 WL 11237468, at *1 (S.D. Cal. July 22, 2015) (stating that "whether CallFire is a common carrier is a factual issue better suited for resolution at summary judgment").

Accordingly, the Court finds Defendant's second grounds for dismissal unpersuasive at this stage in the proceedings.

### iii. Predicate TCPA Violation

Lastly, Defendant contends Plaintiff fails to sufficiently allege a violation of the TCPA. The TCPA makes it unlawful "for any person ... to make any call ... using any automatic telephone dialing system or an artificial or prerecorded voice" to "a cellular telephone service" or "any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A). Under the TCPA, the term "call" encompasses "both voice calls and text messages." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 949 (9th Cir. 2009). An automatic telephone dialing system ("ATDS") is defined as "equipment which has the capacity ... (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). "In reviewing the adequacy of ATDS allegations, courts consider whether, read as a whole, the complaint contains sufficient facts to show that it is plausible that [the] [d]efendants used an ATDS." *Vaccaro v. CVS Pharmacy*, Inc., 2013 WL 3776927, at *2 (S.D. Cal. 2013) (internal quotations and alterations omitted) (citing *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1171 (N.D. Cal. 2010)).

**\*5** Here, the FAC does not allege the text messages were sent using an ATDS, but rather, states that the "repetitive nature of the text messages *indicate* that the Defendants' messages were made using an 'automatic telephone dialing system,' as defined by 47 U.S.C. § 227(a)(1)." *See* FAC, p. 5. However, the allegation that Plaintiff received five text messages within the span of several months, on its own, is insufficient to allege the entity responsible for sending the text messages was using a device with the capacity to "store or produce telephone numbers to be called, using a random or sequential number generator," and dial those numbers. *See* 47 U.S.C. § 227(a)(1). In other words, "Plaintiff fails to allege 'factual content that allows the court to draw the reasonable inference that the defendant' used a machine capable of random or sequential number generation, and the Court cannot fill the gap with speculation." *See Flores v. Adir Int'l, LLC*, No. CV1500076ABPLAX, 2015 WL 12806476, at *4 (C.D. Cal. May 8, 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Without more, Plaintiff fails to state a plausible claim for violation of the TCPA, even construing Plaintiff's pleadings liberally.

### B. Motion for Leave to Amend to Add New Defendant

Plaintiff requests leave to add Futero, Inc. as a Defendant in this action. *See* Doc. No. 12. Defendant does not oppose Plaintiff's request. At this early stage in the proceedings, courts must liberally grant leave to amend under Rule 15. *See* Fed. R. Civ. P. 15. Accordingly, the Court **GRANTS**

Plaintiff's request for leave to amend the FAC to add Futero, Inc. as a Defendant. Plaintiff may not add additional parties without leave of Court.

### **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant's motion to dismiss, and **DISMISSES** Plaintiff's TCPA claims without prejudice and with leave to amend. *See* Doc. No. 10.

The Court **GRANTS** Plaintiff's motion for leave to amend the FAC to add Futero, Inc. as a defendant to this action. *See* Doc. No. 12. The Court further **ORDERS** that Plaintiff must file the Second Amended Complaint on or before **July 28, 2017**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2972447

---

## Footnotes

1    Because this matter is before the Court in part on a 12(b)(6) motion to dismiss, the Court must accept as true the allegations set forth in the operative complaint. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976).

2    Neither the undersigned nor the assigned magistrate judge has issued a scheduling order in this case.

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2780784

Only the Westlaw citation is currently available.

United States District Court, N.D. California.

Jeremy LUCKAU, Plaintiff,

v.

SUNRUN, INC., et al., Defendants.

Case No. 25-cv-01661-JST

|

Signed September 30, 2025

**Attorneys and Law Firms**

Alexander P. Hood, Pro Hac Vice, The HQ Firm, P.C., West Jordan, UT, Andrew Joseph Gramajo, Ajg Law Group, PC, Pleasant Hill, CA, for Plaintiff.

Glenn T. Graham, Lauri Anne Mazzuchetti, Pro Hac Vice, Kelley Drye & Warren LLP, Madison, NJ, Rachael Hiatt, Kelley Drye & Warren LLP, Los Angeles, CA, for Defendant Sunrun, Inc.

**ORDER GRANTING MOTION TO DISMISS**

Re: ECF No. 42

JON S. TIGAR, United States District Judge

**\*1** Before the Court is a motion to dismiss brought by Defendants Sunrun Inc. and Clean Energy Experts, LLC. ECF No. 42. Defendants seek to dismiss Plaintiff Jeremy Luckau's second claim for relief for violation of 47 C.F.R. § 64.1200(d)(4), a regulation promulgated under the Telephone Consumer Protection Act of 1991 ("TCPA").

The Court previously held that Luckau sufficiently alleged a concrete injury—receiving unsolicited telemarking phone calls—but stated the Court's inclination to dismiss the challenged claim on grounds that the alleged injury was not fairly traceable to Defendants' alleged violation of Section 64.1200(d)(4). ECF No. 48 at 2–4; *see Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (explaining that standing requires the plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision"). The Court explained:

Neither party considers that the requirement to identify "the name of the person or entity on whose behalf the call is being made," 47 C.F.R. § 64.1200(d)(4), is part of the TCPA's requirement to maintain an internal do-not-call list. Section 64.1200(d) provides, "No person or entity shall initiate ... any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d). The identification requirement is one of the "minimum standards" that the instituted procedures must satisfy. *Id.*

Luckau does not allege that he ever requested to be placed on Defendants' internal do-not-call list. He therefore appears to lack standing to assert a claim for violation of Section 64.1200(d)(4) because "even if Defendants had complied with the TCPA and maintained an internal do-not-call list [that complied with all of the regulatory requirements], their compliance would not have prevented a call to [Luckau] because he would not have been on that list." *Perrong v. S. Bay Energy Corp.*, No. 2:20-cv-5781-JDW, 2021 WL 1387506, at *3 (E.D. Pa. Apr. 13, 2021) ....

.... Luckau's alleged harm stems from receiving unsolicited phone calls. As the *Perrong* court concluded, that harm might be traceable to a different section of the TCPA, 64.1200(c)(2), which bars calls to numbers listed on the National Do Not Call Registry, but it cannot be traced to Section 64.1200(d).

ECF No. 48 at 3–4 (alterations in original). "Because the parties' briefing did not analyze traceability in the above manner and did not address some of the authority cited" by the Court, the Court allowed the parties an opportunity to file supplemental briefing. *Id.* at 4–5. The parties timely filed supplemental briefs. ECF Nos. 50, 52.

Having reviewed the parties' additional arguments, the Court continues to conclude that Luckau lacks standing to make a claim under Section 64.1200(d)(4).[1] Luckau's additional arguments are not persuasive. First, Luckau argues, "Courts have recognized at least five" "concrete injuries that are independent of any stop request or future calls": "(1) Inability to pre-select to whom the consumer wishes to speak, (2) Inability to evaluate the content and veracity of the message, (3) Inability to determine the purpose of the call, (4) Inability to possibly make a do not call request, and (5) Inability to monitor compliance with the law." ECF No. 50 at 2.

However, with one exception, the authorities cited to support that argument did not discuss whether any of the listed wrongs constitutes an Article III injury. *See Maryland v. Universal Elections, Inc.,* 729 F.3d 370, 377 (4th Cir. 2013) (discussing government interests in determining constitutionality of the TCPA); *FTC v. Mainstream Mktg. Servs., Inc.,* 345 F.3d 850, 855 (10th Cir. 2003) (same, as to FTC's rule creating a national do-not-call list); *Nat'l Fed'n of the Blind v. FTC,* 420 F.3d 331, 342–43 (4th Cir. 2005) (same, following *Mainstream Mktg.*). The exception is *Robison v. 7PN, LLC,* 569 F. Supp. 3d 1175, 1185 (D. Utah 2021), the reasoning of which the Court considered and rejected in its prior order. ECF No. 48 at 4. Moreover, Luckau has not persuaded the Court that the allegations in this case implicate the above issues, even if any of them constituted Article III injuries in fact. Luckau alleges that the messages included a company name and phone number, which he alleges is the number Sunrun instructs consumers to call if they want to opt out from marketing calls, and the messages also indicated that the call was "responding to your request for information on solar energy for your home." ECF No. 29 ¶¶ 24, 53. As the Court previously observed, "this is not a case where alleged noncompliance with Section 64.1200(d)(4) would have left [Luckau] unable to determine how to make a stop request." ECF No. 48 at 4.

**\*2** Second, Luckau argues that the cases relied on by the Court in its prior order are distinguishable because those cases alleged violations of Section 64.1200(d)(1)–(3), whereas he alleges a violation of Section 64.1200(d)(4). Relatedly, he argues that Section 64.1200(d)(4) "is not merely a subsidiary detail of the company-specific do-not-call regime; it is an alternative, standalone protection Congress envisioned." ECF No. 50 at 5. Luckau is correct that the cases cited by the Court did not consider standing under Section 64.1200(d)(4), though one court did consider an overarching claim, encompassing all of Section 64.1200(d). *See Thompson v. Vintage Stock, Inc.,* No. 4:23-cv-00042-SRC, 2024 WL 492052, at \*7 (E.D. Mo. Feb. 8, 2024), *reconsideration granted on other grounds,* 2024 WL 1636705 (E.D. Mo. Apr. 16, 2024) (finding no standing for claims that the defendant failed to "(1) institute procedures for maintaining a list of persons who request not to be called [Section 64.1200(d)]; (2) have a written policy, available upon demand, for maintaining a do-not-call list [Section 64.1200(d)(1)]; and (3) train and inform its personnel engaged in any aspect of telemarketing of the existence and use of the do-not-call list [Section 64.1200(d)(2)]" (citation modified)); *Doane v. Benefytt Techs., Inc.,* Civ. Action No. 22-10510-FDS, 2023 WL 2465628, at \*7 & n.2 (D. Mass. Mar. 10, 2023) (finding no standing for claims under Sections 64.1200(d)(1) and (d)(3), and noting that the defendant did not move to dismiss for lack of standing the plaintiff's claim under Section 64.1200(d)(4)); *Perrong,* 2021 WL 1387506, at \*2–3 (E.D. Pa. Apr. 13, 2021) (finding no standing for claim under Section 64.1200(d)(1)). But even if, as Luckau asserts, Congress might have envisioned some separate "standalone protection" for caller identification requirements, Luckau brought a claim under Section 64.1200(d)(4)—a requirement that applies only as part of an entity's minimum procedures for maintaining an internal do-not-call list. The TCPA's structure differs from the state laws that Luckau attempts to analogize, which Luckau contends include "disclosure requirements [that] are *completely separate* from the requirement that telemarketers maintain an internal do not call list." ECF No. 50 at 4 (emphasis added). Here, the disclosure requirement relied on by Luckau is part of the procedural requirements for maintaining an internal do-not-call list, not a standalone requirement, and the Court does not find Luckau's injury to be fairly traceable to the alleged violation of Section 64.1200(d)(4).

The Court instructed Luckau to discuss in his supplemental brief "what allegations, if any, [he] would add to the complaint if the Court were to dismiss his second claim for lack of standing for leave to amend." ECF No. 48 at 5. Luckau states that he would add allegations that Defendants' conduct "prevented [him] from determining the purpose of the call, evaluating the content and truthfulness of the message, and deciding whether it was somebody he wished to call back." ECF No. 50 at 2–3. As discussed above, Luckau has not persuaded the Court that these additions would sufficiently allege Article III standing given the facts of this case. The Court therefore denies leave to amend.

For the above reasons, and those included in the Court's prior order, the Court grants Defendants' motion to dismiss Luckau's second claim for relief without leave to amend.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2780784

**Footnotes**

1    The Court therefore does not address the parties' arguments regarding whether a private right of action exists to enforce this section.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 69 of 120

Moore v. Triumph CSR Acquisition, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 8601528
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Innazia MOORE, individually and on behalf
of all others similarly situated, Plaintiff,
v.
TRIUMPH CSR ACQUISITION, LLC, Defendant.

Case No. 23-cv-4659
|
Signed December 12, 2023

**Attorneys and Law Firms**

Avi Robert Kaufman, Kaufman P.A., Coral Gables, FL,
Juneitha S. Shambee, Shambee Law Office, Ltd., Evanston,
IL, for Plaintiff.

Ollie A. Cleveland, III, Pro Hac Vice, Maynard Nexsen PC,
Birmingham, AL, David E. Morrison, Goldberg Kohn Ltd.,
Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Steven C. Seeger, United States District Judge

 **\*1**  Unwanted robocalls are the technological equivalent of a
pesky fly at a picnic. They buzz around, drive people nuts, and
won't seem to go away despite everyone's best efforts. That's
why Congress handed a fly swatter to recipients of unsolicited
calls in the form of the Telephone Consumer Protection Act.
Both the swatter and the statute have a way of leveling the
playing field.

Plaintiff Innazia Moore had trouble shooing away calls from
Defendant Triumph CSR Acquisition LLC, a culinary arts
school. She received dozens of unwanted, prerecorded calls to
her cell phone without her consent, and she now seeks to swat
the defendant under the Telephone Consumer Protection Act.
Triumph CSR Acquisition LLC, in turn, moved to dismiss.
The motion to dismiss (Dckt. No. [8]) is hereby granted in
part and denied in part.

The case is about dozens of telephone calls that Moore
received from May to July 2023 from phone numbers
associated with Auguste Escoffier (that's the d/b/a of Triumph
CSR Acquisition LLC). The claim is that Auguste Escoffier

kept calling and calling Moore's personal cell phone to entice
her to sign up for culinary arts classes.

According to the complaint, Moore originally received a call
from an Auguste Escoffier employee in March 2023 about
signing up for culinary arts school. *See* Cplt. at ¶ 23. Maybe
Moore is already a good cook, or maybe she doesn't like
cooking. Maybe the cooking classes were too expensive, or
maybe there was some other reason why she had no appetite
for cooking classes. Whatever the reason, Moore responded
that she was not interested in signing up, and she asked the
calls to stop. *Id.* at ¶ 24. She even asked that the company
place her on a do-not-call list. *Id.*

That request fell on deaf ears. But Moore received an
earful. In the months that followed, Moore received over 30
unsolicited calls to her cell phone from Auguste Escoffier.
*Id.* at ¶ 25. The majority of the calls were received as "pre-
recorded voicemails," many of which left "incomplete and
identical voicemails." *Id.* at ¶ 26.

"Plaintiff Moore believes the voicemails were pre-recorded
because the messages sound identical with the same voice,
same words, same intonation and the same speech pattern.
In addition, many were incomplete, either containing the last
segment of a message, as per the above screenshots, or the
messages are cut off at the end in the middle of a sentence."
*Id.* at ¶ 27.

Unhappy with the calls, Moore turned the tables and started
calling the shots by suing Triumph CSR Acquisition. She
originally brought two claims under the Telephone Consumer
Protection Act, but she later dropped Count II (meaning the
do-not-call claim under 47 U.S.C. § 227(c)(5)). *See* Plaintiff's
Notice of Voluntary Dismissal of Count II Only (Dckt. No.
[12]). She brings the case on her own behalf, and on behalf
of a putative class.

The only remaining claim is Count I. Plaintiff alleges that
Triumph CSR Acquisition violated § 227(b)(1)(A)(iii) and
§ 227(b)(1)(B) of the TCPA by making unwanted calls and
leaving prerecorded messages on her cell phone.

 **\*2**  Defendant, in turn, moved to dismiss on two grounds.

First, Triumph CSR Acquisition argues that Moore has no
claim under subsection 227(b)(1)(B) based on calls to her cell
phone, because that provision applies only to a "residential
telephone line." That provision prohibits making a call to "any

residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." *See* 47 U.S.C. § 227(b)(1)(B).

A neighboring provision, subsection 227(b)(1)(A)(iii), expressly covers "cellular telephone service," but subsection 227(b)(1)(B) does not. The fact that the statute uses "residential telephone line" and "cellular telephone service" in close proximity is a strong clue that the two terms do not mean the same thing. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (applying the "usual rule against ascribing to one word a meaning so broad that it assumes the same meaning as another statutory term"); *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) ("[W]hen we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning."). The text and structure of the statute suggest that the different terms have different meanings.

A cellular phone and a residential phone are not the same thing. The Supreme Court took that distinction as a given in *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335 (2020). That case involved robocalls to a cell phone in violation of subsection 227(b)(1)(A)(iii) of the TCPA, meaning the same provision at issue here. The Supreme Court noted that a different provision governs calls to residential phones. *Id.* at 2345 n.3 ("Plaintiffs have not challenged the TCPA's separate restriction on robocalls to home phones. *See* 47 U.S.C. § 227(b)(1)(B).").

Courts widely hold that a cell phone is not a "residential telephone line" within the meaning of subsection 227(b)(1)(B). *See, e.g., Morris v. Lincare, Inc.*, 2023 WL 5336780, at *4 (M.D. Fla. 2023) ("It is worth noting that courts use 'home phone' and 'residential telephone' to refer to the TCPA's language 'residential telephone line.' While these terms are used by courts interchangeably, they are distinct from cell phones."); *Morgan v. U.S. Xpress, Inc.*, 2018 WL 3580775, at *1 (W.D. Va. 2018) ("[T]he structure and language of the TCPA demonstrate that calls made to a cell phone are not calls made to a 'residential telephone line.' "); *Worley v. Municipal Collections of America, Inc.*, 2015 WL 890878, at *3 (N.D. Ill. 2015) ("One provision of the TCPA prohibits certain calls to cell phones, see 47 U.S.C. § 227(b)(1)(A)(iii), and another provision prohibits certain calls to residential phone lines, see 47 U.S.C. § 227(b)(1)(B).").

Some people live on their phones. (Take a look at the nearest teenager.) Some people practically take up residence on their cell phones. But even the strongest addiction to a cell phone cannot transform it into a residential phone. A residential phone is a home phone that is hard-wired into the building. It means a land-line. It is *residential* in a very literal sense.

 **\*3** The text of the statute reflects common parlance and natural usage. A cell phone is not a residential phone. So any calls to a cell phone cannot violate subsection 227(b)(1)(B). Count I is dismissed to the extent that it alleges that any calls to Plaintiff's cell phone violated the prohibition about residential phones under subsection 227(b)(1)(B).

Second, Triumph CSR Acquisition contends that the complaint does not plausibly allege that the calls were prerecorded. Defendant points out that the complaint identifies 38 calls, but offers content from the voicemails of only 3 of the 38 calls. Triumph CSR Acquisition also believes that there is reason to doubt that the calls were prerecorded. For example, some of the calls came from different states, and in Defendant's book, the geography "undermines Plaintiff's theory" that the calls had the same voice. *See* Mtn. to Dismiss, at 9 (Dckt. No. [8]).

The complaint offers more than enough, and then some, to state a plausible claim that Defendant received unwanted prerecorded calls. To wit: (1) the messages sounded identical, (2) had the same voice, (3) used same words, (4) had the same intonation, (5) had the same speech pattern, (6) were commercial, (7) were generic (*e.g.*, didn't identify Plaintiff by name), (8) were unsolicited, (9) were incessant, and (10) continued despite Plaintiff's express request that the calls stop. *See* Cplt., at ¶¶ 26–28, 30–31. That's a lot of reasons to think that the calls were prerecorded.

Maybe Triumph CSR Acquisition can point to facts that undermine Moore's theory of the case. And maybe the calls weren't robocalls at all. But that's the stuff of a motion for summary judgment, not a motion to dismiss.

In sum, the motion to dismiss is granted in part and denied in part. The motion is granted to the extent that Plaintiff purported to bring a claim about calls to her cell phone under the provision about residential phones, meaning subsection 227(b)(1)(B). The motion to dismiss is denied to the extent that the complaint brings a claim under subsection 227(b)(1)(A)(iii).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8601528

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 72 of 120

Orsatti v. Quicken Loans, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7650574
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Julie ORSATTI
v.
QUICKEN LOANS, INC.

Case No. 2:15–cv–09380–SVW–AGR
|
Signed 09/12/2016

**Attorneys and Law Firms**

Adrian Robert Bacon, Todd M. Friedman, Law Offices of Todd Friedman PC, Woodland Hills, CA, for Julie Orsatti.

Brooks R. Brown, Goodwin Procter LLP, Los Angeles, CA, William K. Tayman, Pro Hac Vice, Goodwin Procter LLP, Washington, DC, for Quicken Loans, Inc.

**Proceedings:** IN CHAMBERS ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [17]

STEPHEN V. WILSON, U.S. DISTRICT JUDGE

### I. Introduction

**\*1** Plaintiff Julie Orsatti, individually and on behalf of all others similarly situated, brings this action against Defendant Quicken Loans, Inc. ("Quicken Loans" or "Defendant"), for negligent and willful violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"). First Amended Complaint, ¶¶ 34–41 ("FAC"). The Plaintiff claims that the Defendant used an "automatic telephone dialing system" ("ATDS"), to place calls to her residential phone line for solicitation purposes, without the Plaintiff's express written consent, and despite the fact that the Ms. Orsatti had previously placed herself on the national Do–No–Call registry, all in violation of the TCPA. Id. at ¶¶ 6–16.

Presently before the Court is Defendant's Motion to Dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. 17. For the reasons stated below, the Motion to Dismiss is GRANTED with respect to the Plaintiff's claims based on 47 U.S.C. § 227(b)(1) and 47 CFR § 64.1200(d), and DENIED with respect to the Plaintiff's

claims based on 47 U.S.C. § 227(c) and 47 CFR § 64.1200(c)(2).

### II. Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. See Fed. R. Civ. Proc. 12(b)(6). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Id.; see also Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) (citing Iqbal, 556 U.S. at 678).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am., 768 F. 3d 938, 945 (9th Cir. 2014). Thus, "[w]hile legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume then veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

**\*2** Where a complaint is dismissed, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.' " DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' " Foman v. Davis, 371 U.S. 178, 182 (1962); see also Sharkey v. O'Neal, 778 F. 3d 767, 774 (9th Cir. 2015) (abuse of discretion to not apply Foman factors).

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 73 of 120

Orsatti v. Quicken Loans, Inc., Not Reported in Fed. Supp. (2016)

### III. Factual and Procedural Background

On March 4, 2015, the Plaintiff filed a complaint against the Defendant, contending that the Defendant made an unspecified number of calls to her residential phone line beginning in June of 2015. On February 11, 2016, the Defendant filed a motion to dismiss based on a failure to state a claim upon which relief could be granted under Rule 12(b)(6). Specifically, the initial Motion to Dismiss argued that the Plaintiff's Complaint did not properly allege all of the elements required to sustain a TCPA claim under 47 U.S.C. § 227. Before the Court could rule on the motion, the Plaintiff filed a First Amended Complaint ("FAC") on February 18, 2016. The Defendant filed a Motion to Dismiss the FAC on March 7, 2016. That motion is presently before the Court.

#### i. First Amended Complaint

Plaintiff asserts that her home telephone number was added to the National Do–Not–Call Registry in October, 2011. *Id.* at ¶ 9. While Plaintiff concedes that she "partially filled out a form at a website" around June 2015, she contends that she did not "send, submit, or supply" Defendant with any information that could be used to contact her. *Id.* at ¶ 10. Plaintiff maintains that she was uncomfortable completing the online form when it requested her social security number, and thus did not follow through with the application. *Id.*

Plaintiff does not specify the nature of this online form, but contends that she is not a customer of Defendant's services, has never provided Defendant with any personal information, including her telephone number, and has never purchased or used any services offered by Defendant. *Id.* at ¶ 11. Plaintiff further alleges that she did not give Defendant prior express written consent to call Plaintiff's home telephone. *Id.* at ¶ 12. Plaintiff claims that after Defendant's first telephone call to Plaintiff's residence soliciting her business, Plaintiff demanded that Defendant stop calling her. *Id.* at ¶ 13–14. Although she does not allege specifics, Plaintiff contends that Defendant's agents then continued to call to solicit her business using an automatic telephone dialing system ("ATDS"). *Id.*

Plaintiff seeks to represent two proposed classes of persons affected by Defendant's alleged TCPA violations. The first class (the "ATDS Class") purports to represent all persons who "within four years prior to the filing of this Complaint, received any sales or solicitation calls from Defendants to said person's telephone who had [ ] revoked consent to be contacted using an automated telephone dialing system." *Id.*

at ¶ 18. The second class (the "DNC Class") purports to represent all persons who "registered on the National Do–Not–Call Registry for at least 30 days, who received more than one call made by or on behalf of Defendant that promoted Defendant's products or services, within any twelve-month period, within in for years prior to the filing of this Complaint." *Id.* at ¶ 19.

**\*3** Plaintiff alleges two causes of action, both under 47 U.S.C. § 227. The first is for negligent violations of the TCPA and the second is for willful and/or knowing violations of the TCPA. *Id.* at ¶ 35–40. Plaintiff seeks an award of $1,500 in statutory damages per violation. Plaintiff particularly relies on 47 C.F.R. § 64.1200(c), which prohibits telephone solicitation to a residential telephone subscriber who has registered their number on the national Do–Not–Call Registry. Dkt. 19 ("Opp.") at 1.

### IV. Analysis

#### i. Defendant's Motion to Dismiss

Defendant contends that Plaintiff's complaint fails to state a recognizable claim under the TCPA. Dkt. 17, 1. Although it did not file a request for judicial notice, Defendant attached an exhibit to its motion purporting to be the online form from LowerMyBills.com that Plaintiff references in the FAC. *Id.* at Exh. A., 18–21. Defendant alleges the form was filled out on June 16, 2015 with information about Ms. Orsatti and her existing mortgage loan, and contained express consent for Defendants to contact her. In its reply to Plaintiff's opposition, Defendant attached a declaration that purports to authenticate the online form. Dkt. 20, Kearns Decl.

#### ii. ATDS Class

Plaintiff has not alleged sufficient facts to support a TCPA violation in regards to Defendant's use of an automatic telephone dialing system ("ATDS"). Defendant first challenges the "ATDS" allegations under the TCPA. Dkt. 17, 5. Defendant contends that the ATDS language in 47 U.S.C. § 227(b)(1)(a) does not encompass the challenged calls at issue. *Id.* Further, Defendant argues that Plaintiff has failed to provide factual support about the alleged calls that is required to state a claim under the TCPA, such as the number of calls made, the dates or participants in any of the calls, the date she requested Defendant cease calling, the circumstances under which she made the request, and to whom the request was made. *Id.*

Under § 227(b)(1)(A), it is unlawful to make any call using an automatic telephone dialing system or a pre-recorded/artificial voice to (1) any emergency phone line; (2) to the telephone line of any guest or patient room of a hospital or similar care facility; or (3) to any telephone number assigned to a *paging service, cellular telephone service,* or *similar common carrier service* (emphasis added). Under § 227(b)(1)(B), it is unlawful to make a call to any residential telephone line using an *artificial or pre-recorded voice* to deliver a message without the prior express consent of the called party (emphasis added). [1] Only § 227(b)(1)(A) prohibits the use of an ATDS, while § 227(b)(1)(B) merely prohibits an artificial or pre-recorded voice. Both sections of the statute provide an exception when the called party has given express written consent to make the call.

Plaintiff alleges that Defendant utilized an ATDS in its calls to Plaintiff on her residential telephone line. FAC at ¶ 6, ¶ 15. As a matter of law, the ATDS prohibition under § 227 applies to cellular phones, emergency lines, or special care facilities, not residential phone lines. Further, "at a minimum, Plaintiff must allege some indirect facts to suggest that Defendant's system is capable of acting as an ATDS," and these indirect facts are not alleged in either the Plaintiff's FAC or Opposition. *Flores v. Adir Int'l, LLC,* 2015 WL 4340020, at *5 (C.D. Cal. July 15, 2015); *see also Knutson v. ReplyA, Inc.,* 2011 WL 291076, at *2 (S.D. Cal. January 27, 2011). Additionally, § 227(b)(1)(B), which applies to calls made to residential phone lines, does not prohibit ATDS calls. Instead, the section prohibits calls to residential telephone lines only if they are made by automated or prerecorded voices, and the Plaintiff does not allege that she was contacted by an automated or prerecorded voice. Accordingly, the Plaintiff's claims under both § 227(b)(1)(A) or § 227(b)(1)(B) fail as a matter of law, as Plaintiff has not alleged any artificial or pre-recorded voice associated with the call to her residential line, or any ATDS call to a cellular device. Thus, Defendants motion to dismiss any claim under § 227(b) is GRANTED.

**\*4** Further, as the Plaintiff's initial complaint contained the same pleading deficiencies, which were highlighted by the Defendant's first Motion to Dismiss, this claim is dismissed *with prejudice.* The Plaintiff's complaint makes clear that the calls from the Defendant were made by a live person to her residential telephone line. Therefore, the Plaintiff cannot possibly satisfy the requirements of either § 227(b)(1)(A) or § 227(b)(1)(B) for the reasons stated above, and the opportunity to amend would be futile. Thus, this claim is

properly dismissed with prejudice. *See Foman,* 371 U.S. at 182.

### iii. DNC Class

#### a. The Plaintiff's Do–Not–Call Registry Claim Under 47 CFR § 64.1200(c)(2)

Plaintiff contends that she has plausibly pled a TCPA claim under 47 U.S.C. § 227(c), which empowers the Federal Communications Commission ("FCC") to further regulate telemarketing calls to protect subscriber privacy rights. 47 U.S.C. § 227(c)(1) ("[T]he Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."). In 47 CFR § 64.1200(c), the FCC issued a regulation that prohibits telephone solicitation to a residential telephone subscriber who has registered his or her number on the National Do–Not–Call Registry. Under § 64.1200(c)(2)(h), there is an exemption relieving the caller of liability if it obtained the residential telephone subscriber's express invitation or permission, evidenced by a written agreement which states the consumer agrees to be contacted and includes the telephone number to which the calls may be placed. *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C. Rcd. 14014, 14043 (2003). [2]

Plaintiff alleges that she was added to the National Do–Not–Call Registry on or about October 7, 2011. FAC at ¶ 9. In both her FAC and Opposition, Plaintiff states that the Defendant did not have proper written consent to call her. *Id.* at ¶ 12–14, 27–29; *see also* Opp. at 1–2, 7–9. Further, the Plaintiff states that she does not have a prior business relationship with the Defendant, evidenced by the facts that she is not a Quicken Loans customer, has never given them her home telephone number, and has never used any services offered by them. FAC at ¶ 8; *see also* Opp. at 11.

Taking all factual allegations by Plaintiff as true, Plaintiff has alleged sufficient facts to support a TCPA claim based on her national Do–Not–Call Registry theory under § 227(c) and § 64.1200(c). Plaintiff sufficiently alleges she is registered on the National Do–Not–Call list and that Defendant's call was solicitation-oriented. FAC at ¶ 9, 12. Further, § 227(c)(5) provides a private right of action for a "person who has received more than one telephone call within any 12–month period by or on behalf of the same entity in violation of

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 75 of 120

Orsatti v. Quicken Loans, Inc., Not Reported in Fed. Supp. (2016)

the regulations prescribed under this subsection." *Roylance v. ALG Real Estate Servs., Inc.*, 2015 WL 1522244, at *3 (N.D. Cal. Mar. 16, 2015), *report and recommendation adopted as modified*, 2015 WL 1544229 (N.D. Cal. Apr. 3, 2015). Plaintiff sufficiently alleges she was on the Do–Not–Call Registry, that the calls were for solicitation purposes, and that she received at least two calls within a 12–month period. FAC at ¶ 7–9, 13–14. Taking these pleadings as true. Plaintiff has sufficiently alleged a claim under § 64.1200(c)(2). [3]

**\*5** In support of its Motion to Dismiss, Defendant attached screenshots of the online form that purportedly evidences Plaintiff's prior express consent. Dkt. 17, Exh. A. Prior written consent would negate the Plaintiff's claim, as § 64.1200(c) (2)(ii) provides that a defendant will not be liable for its calls under the FCC regulations if it received prior consent to receive the calls. In its reply to Plaintiff's opposition to Defendant's motion to dismiss, Defendant attached a declaration allegedly authenticating this online form. Dkt. 20, Exh. 1. As a result, the Court must determine whether Defendant's exhibit may be properly considered by the Court at this stage of pleading. If the form constitutes Plaintiff's express written consent to be contacted by Defendant, then she does not have a claim under 47 U.S.C. § 227(c) or 47 C.F.R. § 64.1200(c)(2).

### i. Consideration of Defendant's Exhibit A

When ruling on a 12(b)(6) motion, ordinarily a court may look only at the face of the complaint to decide a motion to dismiss. *Van Buskirk v. Cable News Network, Inc.*, 284 F. 3d 977, 980 (9th Cir. 2002). However, the Ninth Circuit has recognized an "incorporation by reference" rule that allows a court to look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment. *Id.* If a document is not attached to the complaint, but the "plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim," then it may be incorporated by reference into the complaint, the defendant can offer the document, and the court may assume its truth for the purposes of a 12(b)(6) motion to dismiss. *United States v. Ritchie*, 342 F. 3d 903, 908 (9th Cir. 2003). "This incorporation doctrine is permitted to prevent plaintiffs 'from surviving a Rule 12(b) (6) motion by deliberately omitting references to documents upon which their claims are based.' " *NYC Topanga, LLC v. Bank of Am.*, 2015 WL 4075844, at *2 (C.D. Cal. July 2, 2015).

Although "[o]rdinarily affirmative defenses may not be raised by motion to dismiss," they may be raised when "the defense raises no disputed issues of fact." *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984). For example, a motion to dismiss may be granted based on an affirmative defense where the allegations in a complaint are contradicted by matters properly subject to judicial notice. *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F. 3d 992, 998 (9th Cir. 2010). In addition, a motion to dismiss may be granted based upon an affirmative defense where the complaint's allegations, with all inferences drawn in Plaintiff's favor, nonetheless show that the affirmative defense "is apparent on the face of the complaint." *Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*, 2012 WL 1698368, at *6 (C.D. Cal. May 15, 2012) (citing *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F. 3d 954, 969 (9th Cir. 2010).

In response to the exhibit attached by Defendant in its motion to dismiss, Plaintiff argues (1) that the document was not accompanied by a declaration supporting its authenticity and thus she has no means to determine its authenticity; (2) that the document relates to an element of an affirmative defense that Defendant could raise, not a *prima facie* element of her claim; and (3) that she only referred to the online form once in her FAC and only to the extent that she did not complete it. *See* Opp. at 3–5.

In its reply, Defendant asserts that under the incorporation by reference rule, it is not required to authenticate the online form it attached to its motion to dismiss. Dkt. 20 at 1. However, Defendant attached a declaration authenticating the form regardless and also maintains that because Plaintiff is the individual who accessed and filled out the form, she has personal knowledge of it. *Id.* Defendant further contends that Plaintiff's FAC specifically references the form, and that her Opposition concedes that the TCPA claim is "predicated" on the contents of the form. *Id.* at 5–6.

**\*6** In response to the affirmative defense argument, Defendant argues that the Ninth Circuit has stated that consent is an element of a TCPA claim. *Id.* at 6. Defendant contends that because Plaintiff relies on the partial completion of the form in support of the claim Defendant lacked consent to call her, "applicable law and fundamental fairness" permits the Defendant to complete the story and the Court to consider the form. *Id.* at 6–7. Finally, Defendant contends that since affirmative defenses may be raised when "the defense raises no dispute of fact," and Plaintiff does not challenge the contents of the form, refuting the allegation of lack of consent,

it is proper for the Court to take notice of the form. *Id.* at 7 (citing *Scott*, 746 F. 2d 1377 at 1378).

Both parties cite to *NYC Topanga, LLC v. Bank of Am.* in support of their respective arguments regarding whether the online form should be considered by the Court. *See* 2015 WL 4075844, at *2–3 (C.D. Cal. July 2, 2015) ("A document... may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim. ... This incorporation doctrine is permitted to prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which then claims are based.") (internal quotations and citations omitted). The Defendant argues that under the reasoning in *Topanga*, the online form should be considered because the Plaintiff referred extensively to it in her Complaint. The Plaintiff, on the other hand, argues that the plaintiff's claim in *Topanga* relied on a breach of contract issue and thus necessarily was based on the document the court admitted. *Id.* Additionally, the Plaintiff argues that the present case is more similar to *U.S. v. Ritchie*, a Ninth Circuit case cited in *Topanga*. In *Ritchie*, the court found that Plaintiff's mention of a petition to the DEA only once in her complaint did not make it "integral to [her] claim." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Further, Plaintiff's TCPA claim is based on Defendant not having consent to call Plaintiff, and thus not predicated solely on the contents of a form. It is the Defendant who must rely on the form to demonstrate consent.

The Court finds that the Defendant's Exhibit A is not properly before the Court at the current stage of the proceedings, and therefore will not consider it in analyzing the present Motion to Dismiss. The Court agrees with the Plaintiff that the online form does not form the basis of her § 64.1200(c) claim. She has sufficiently pled that she did not giant consent to the Defendant to contact her, and the form is necessary only to refute that claim. Therefore, the form is actually relevant to the Defendant's affirmative defense, not as the basis for the Plaintiff's claim. Additionally, the Plaintiff's reference to the form in her FAC does not rise to the level of "extensive" as illustrated by *Topanga* and *Ritchie*. The Plaintiff has alleged that she did not consent to the calls because she did not completely fill out the form, which is the only possible method of consent from the Plaintiff put forth by the parties. Thus, the Plaintiff has properly alleged her lack of consent as required by the TCPA, and the Defendant's attempts to refute that claim are properly addressed in a motion for summary judgment, not a motion to dismiss.

Further, while there appears to be no dispute of fact that the online form submitted by the Defendant is the one referenced by the Plaintiff in her FAC, there is a clear dispute of fact regarding the Plaintiff's actions with that form. She admits to partially filling out the form, but disputes that she ever submitted her personal information or consented to be contacted by the Defendant. Therefore, the submission of this form, how far in the process of submitting the form the Plaintiff progressed, and the implications of that progress on the Plaintiff's written consent to be contacted by the Defendant are all contested by the parties. Consequently, the exhibit submitted by the Defendant is not appropriate for judicial notice, and a motion to dismiss is not the proper forum to resolve these disputed issues.

**\*7** Because the Court will not consider the online form and the element of a lack of consent has been properly pled, the Court finds that the Plaintiff's FAC is sufficient to establish the elements of a TCPA claim under 47 U.S.C. § 227(c) and 47 CFR § 64.1200(c)(2). She has stated that she registered her residential telephone number on the Do–Not–Call Registry at the time in question, the Defendant called her twice within a 12–month period for the purposes of solicitation, and she had not provided written consent for such calls. Finally, the Defendant's claim that the Plaintiff had in fact provided express written consent is not apparent on the face of the complaint. The factual merits of these claims may be contested in a motion for summary judgment. Consequently, the Motion to Dismiss the Plaintiff's claims under 47 U.S.C. § 227(c) and 47 CFR § 64.1200(c)(2) is DENIED.

### b. The Plaintiff's Internal Do–Not–Call Claim Under 47 CFR § 64.1200(d)

While Plaintiff did not explicitly allege an internal Do–Not–Call claim, her argument that she revoked her consent to contact her residence during the Defendant's first call to the Plaintiff constitutes such a claim as described in § 64.1200(d). The FCC regulation contained in § 64.1200(d)[4] prescribes regulations and procedures for maintaining internal do-not-call lists for entities that place telemarketing calls. In particular, § 64.1200(d)(3) provides that an entity making calls to a residential phone for telemarketing purposes "must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such

Orsatti v. Quicken Loans, Inc., Not Reported in Fed. Supp. (2016)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 77 of 120

request." Defendant argues that since Plaintiff's FAC has limited its allegations to calls made in or around June 2015, that even if Plaintiff did request Defendant not call again during the first call, a subsequent call in June would be within the 30 day safe harbor the statute enunciates. Dkt. 20, 10.

The Court agrees with the Defendant. Taking the Plaintiff's allegations as true, she asked to be put on the Defendant's internal Do–Not–Call registry during the first phone call with the Defendant, which occurred in June of 2015, according to the FAC. FAC, ¶ 6. At this point, the Defendant was required to honor this request, per 47 CFR § 64.1200(d)(3). However, that section allows the Defendant a reasonable tune to honor the request, not to exceed 30 days. The only other call the Plaintiff allegedly received from the Defendant also occurred in June of 2015. Therefore, such a call would be covered by the safe harbor provision of the FCC regulation and would not constitute a cause of action. To the extent that the Plaintiff received other calls from the Defendant outside of the 30 day window, she has not alleged such calls in her Complaint. Therefore, the Plaintiff fails to properly state a claim upon which relief can be granted under 47 CFR § 64.1200(d), and any claims based on that provision must be dismissed. As the Plaintiff has not yet had a chance to amend her complaint with regards to this cause of action, the Court GRANTS the Motion to Dismiss *without* prejudice. If the Plaintiff wishes to allege that she received calls from the Defendant more than thirty days after her request to be placed on the Defendant's internal Do–Not–Call list, she must amend her complaint within 21 days.

### V. Order

For the aforementioned reasons, the Motion to Dismiss is GRANTED in part and DENIED in part. The Court GRANTS the Defendants' Motion to Dismiss the Plaintiff's claims that are based on § 227(b) of the TCPA *with prejudice.* It DENIES the Motion to Dismiss the Plaintiff's claims that are based on § 227(c) of the TCPA and 47 CFR § 64.1200(c)(2). Finally, the Court GRANTS the Motion to Dismiss the Plaintiff's claims that are based on § 227(c) of the TCPA and 47 CFR § 64.1200(d) *without prejudice.* The Plaintiff may amend her complaint within 21 days in order to properly allege a violation of § 64.1200(d).

**\*8** IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 7650574

---

### Footnotes

1    Both § 227(b)(1)(A) and § 227(b)(1)(B) are subject to further limitations not applicable to the case at hand. 47 U.S.C. § 227.

2    "For purposes of this exemption, the term "signed" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal or state contract law." In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. at 14159 (2003).

3    The Defendant also argues that the Plaintiff has not sufficiently pled that she is the residential telephone subscriber of the telephone number in question because she merely states that the telephone number was "hers." Dkt. 17, 8. The Court finds this pleading sufficient, as the FAC establishes that the telephone number in question belonged to the Plaintiff and was her home phone number, and thus qualified her as the residential telephone subscriber for the purposes of this motion.

4    As with the Plaintiff's previous claim under 47 CFR § 64.1200(c)(2), the FCC regulations in 47 CFR § 64.1200(d) have the power of law because of the grant of rulemaking authority to the FCC contained in § 227(c) of the TCPA.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Bryant v. Byron Udell & Associates Inc.,   E.D.Va.,
August 11, 2023

2020 WL 9348208
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Norfolk Division.

Jim SCRUGGS, Plaintiff,

v.

CHW GROUP, INC., and Home Warranty
Administrators, Inc., Defendants.

Action No. 2:20cv48
|
Signed 11/12/2020

**Attorneys and Law Firms**

Craig Carley Marchiando, Consumer Litigation Associates,
Newport News, VA, Kevin Anthony Dillon, Consumer
Litigation Associates, Richmond, VA, for Plaintiff.

Andrew Zimmitti, John William McGuinness, Pro Hac Vice,
Manatt Phelps & Phillips, LLP, Washington, DC, Aaron
Heeringa, Pro Hac Vice, Manatt, Phelps & Phillips LLP,
Chicago, IL, for Defendants.

### UNITED STATE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Robert J. Krask, United States Magistrate Judge

**\*1** On July 14, 2020, the defendant, CHW Group, Inc.
("CHW"), filed a motion to dismiss the first amended
complaint pursuant to Federal Rules of Civil Procedure 12(b)
(1) and 12(b)(6). ECF No. 27. The motion was referred to
the undersigned United States Magistrate Judge on September
2, 2020, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal
Rule of Civil Procedure 72(b). ECF No. 34. For the reasons
discussed below, the undersigned **RECOMMENDS** that the
motion to dismiss be **GRANTED**.

### I. PROCEDURAL HISTORY

On June 30, 2020, plaintiff, Jim Scruggs ("Scruggs"), filed
a two-count amended complaint against defendant, CHW. [1]
Pl.'s First Am. Compl., ECF. No. 22. In count one, Scruggs
alleges that CHW made repeated unwanted telemarketing
calls in violation of the Telephone Consumer Protection
Act ("TCPA"), 47 U.S.C. § 227(c). Id. ¶¶ 32–40. In count
two, Scruggs alleges that CHW made repeated unwanted
telephone solicitation calls in violation of the Virginia
Telephone Privacy Protection Act ("VTPPA"), Va. Code Ann.
§ 59.1-514. Id. ¶¶ 41–47.

On July 14, 2020, CHW filed a motion to dismiss both counts
in the first amended complaint for lack of subject matter
jurisdiction pursuant to Rule 12(b)(1) and for failure to state
claims pursuant to Rule 12(b)(6). ECF No. 27. On August
11, 2020, Scruggs filed a response in opposition to CHW's
motion to dismiss. ECF No. 32. CHW filed a reply to Scruggs'
opposition on August 31, 2020. ECF No. 33. After review of
the parties' submissions, the Court concludes that a hearing is
unnecessary, and this matter is ready for a decision. See Local
Civil Rule 7(J).

### II. FACTUAL BACKGROUND [2]

On or around August 19, 2004, Scruggs registered his
cellphone number ending in 3953 ("the phone number") on
the national do-not-call registry. Pl.'s First Am. Compl. ¶ 12.
He has continuously owned the phone number, and he has
never changed the number, nor removed his number from the
registry list. Id. Scruggs does not own a landline telephone
and uses his cellphone for residential purposes. Id. 13.

On January 24, 2019, Scruggs received three unwanted phone
calls on his cellphone. Id. ¶¶ 14–17. During each call,
"the caller identified himself as associated with CHW and
attempted to sell Mr. Scruggs a home warranty" and "Scruggs
informed CHW that he did not want CHW to contact him
further." Id.

Scruggs also received three unwanted calls on his cellphone
the next day, January 25, 2019; an additional call on January
30, 2019; and another on January 31, 2019. Id. ¶¶ 18–22. Each
time "the caller identified himself as associated with CHW
and again attempted to sell a home warranty to Mr. Scruggs."
Id. And, each time "Mr. Scruggs answered and again told the
caller to stop contacting him." Id.

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 80 of 120

Scruggs v. CHW Group, Inc., Not Reported in Fed. Supp. (2020)

**\*2** Scruggs asserts that "[d]iscovery will confirm that CHW, or someone acting on CHW's behalf, initiated the above calls to Mr. Scruggs." *Id.* ¶ 23.

As a result of the eight calls, Scruggs experienced "anxiety and emotional distress." *Id.* ¶ 24. He "expended considerable time and energy to try to get CHW to stop calling him," and the calls "interrupted [his] life, harassed him, and caused him to unnecessarily expend time dealing with calls he reasonably expected would stop when he repeatedly instructed CHW's representatives to stop calling him." *Id.* ¶¶ 25–26.

CHW acted willfully in committing these acts in violation of the TCPA and the VTPPA. *Id.* ¶¶ 27–31. Specifically, CHW has had three decades, as well as the means and resources, to come into compliance with the TCPA, which was enacted in 1991. *Id.* ¶¶ 28–30.

### III. LEGAL STANDARDS

**A. Standards applicable to a motion to dismiss for failure to state a claim.**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) should be granted if a complaint fails to allege "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

Accordingly, when reviewing a motion to dismiss, a court must "assume all [well-pled facts] to be true" and "draw all reasonable inferences in favor of the plaintiff," but it need not "accept the legal conclusions drawn from the facts, and [ ] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citations and internal quotation marks omitted). In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

**B. Standards applicable to a motion to dismiss for lack of subject matter jurisdiction.**

Rule 12(b)(1) permits a defendant to move for dismissal of a claim based on a court's lack of subject-matter jurisdiction. *A. W. ex rel. Wilson v. Fairfax Cty. Sch. Bd.*, 548 F. Supp. 2d 219, 221 (E.D. Va. 2008). Specifically, "[a] defendant may challenge the court's subject matter jurisdiction in one of two ways: (1) the defendant may raise a 'facial challenge' by arguing that the facts alleged in a complaint are not sufficient to confer subject matter jurisdiction on the court or (2) the defendant may raise a 'factual challenge' by arguing that the jurisdictional allegations made in the complaint are not true." *Brunelle v. Norfolk S. Ry. Co.*, No. 2:18cv290, 2018 WL 4690904, at \*2 (E.D. Va. Sept. 28, 2018) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). "In a facial challenge, the court evaluates the facts in a complaint using the same standard used for a Rule 12(b)(6) motion to dismiss,"—namely, "all alleged facts are taken as true and the motion must be denied if the complaint alleges facts that, if proven, would be sufficient to sustain jurisdiction." *Id.* (citing *Kerns*, 485 F.3d at 192). As noted above, however, such allegations are not taken as true with respect to legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

**\*3** In this case, the Court concludes that CHW has raised a facial challenge to subject matter jurisdiction. CHW raises its challenge to Scruggs' complaint pursuant to Rule 12(b)(1) by relying only on the allegations noted on the face of the complaint. *See* ECF No. 27 at 29 ("The Court should also dismiss the [first amended complaint] pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiff still *fails to plead sufficient facts* demonstrating the essential Article III standing elements of causation or redressability ...." (emphasis added)). Accordingly, aside from "mere conclusory statements" supporting a cause of action's elements or legal conclusions, *Iqbal*, 556 U.S. at 678, the Court "will accept as true all facts alleged in [Scruggs' first amended complaint] for the purposes of determining whether the court has subject matter jurisdiction over this claim," *Brunelle*, 2018 WL 4690904, at \*2.

### IV. DISCUSSION

Case 1:25-cv-01083-JPW   Document 20-2   Filed 11/04/25   Page 81 of 120

Scruggs v. CHW Group, Inc., Not Reported in Fed. Supp. (2020)

**A. Count one warrants dismissal pursuant to Rule 12(b)
(1) for lack of subject matter jurisdiction and, in the
alternative, Rule 12(b)(6) for failure to state a claim.**

In count one, Scruggs alleges that CHW violated the TCPA,
47 U.S.C. § 227(c)(5). Pl.'s First Am. Compl. ¶¶ 32–40.
Specifically, Scruggs alleges that CHW "made repeated
telemarketing calls to Mr. Scruggs' residential phone despite
Mr. Scruggs having registered the number on the National
Do Not Call List"; continued to make such calls "after he
informed CHW ... to stop contacting him"; "made
these repeated calls without instituting procedures to maintain a
do not call list in violation of 47 C.F.R. § 64.1200(d)";
"made [the calls] without Mr. Scruggs['] authorization[;] and
disregarded Mr. Scruggs' designation of the Phone Number
on the National Do Not Call List ... [in] violation of 47 C.F.R.
§ 64.1200(c)(2)." *Id.* ¶¶ 33–36. Scruggs asserts that violation
of these regulations "constitute[s] violations of the TCPA."
*Id.* ¶ 37 (citing 47 U.S.C. § 227(c)(5)). Further, he alleges that
CHW acted "willfully and/or knowingly [in] violat[ing] these
regulations," *id.* ¶ 38, which merits treble damages, *id.* ¶ 40
(citing 47 U.S.C. § 227(c)(5) (providing a right to receive up
to $500.00 in damages for each violation and up to three times
that amount "[i]f the court finds [in its discretion] that the
defendant willfully or knowingly violated the regulations")).

Defendant seeks to dismiss the claim under Federal Rule
of Civil Procedure 12(b)(1) for lack of subject matter
jurisdiction and Rule 12(b)(6) for failure to state a claim.
ECF No. 27 at 9. To support the former, defendant argues
that Scruggs lacks standing to bring this suit, because the
at-issue calls are not "fairly traceable" to CHW and cannot
be redressed by CHW. *Id.* at 29–30. To support the latter,
defendant advances three main arguments: (1) Scruggs has
not pled facts supporting direct TCPA liability, (2) Scruggs
has not pled facts supporting vicarious TCPA liability, and (3)
the facts, as pled, do not amount to a violation of TCPA's do-
not-call rules. *Id.* at 15–26.

Because standing is a "threshold question in every federal
case," the Court begins its review of defendant's arguments
there. *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

**1. This Court lacks subject matter jurisdiction over
count one, because plaintiff lacks Article III standing.**
Rule 3(b)(1) permits a defendant to move for dismissal of a
claim based on a court's lack of subject-matter jurisdiction.
*Fairfax Cty. Sch. Bd.*, 548 F. Supp. 2d at 221. As provided
by Article III of the Constitution, federal courts have subject-

matter jurisdiction over justiciable cases or controversies.
*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992).
The doctrine of standing is one component of justiciability,
"serv[ing] to identify those disputes which are appropriately
resolved through the judicial process." *Id.* at 560 (citing
*Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The
standing issue—that is, "whether the plaintiff has 'alleged
such a personal stake in the outcome of the controversy' as
to warrant his invocation of federal-court jurisdiction and to
justify exercise of the court's remedial powers on his behalf,"
*Warth*, 422 U.S. at 498-99 (quoting *Baker v. Carr*, 369 U.S.
186, 204 (1962))—presents "a threshold question in every
federal case," *id.* at 498.

> **\*4** In order to satisfy the standing
> requirements of Article III of
> the Constitution, a plaintiff must
> demonstrate that: (1) [he] has suffered
> an injury in fact; (2) the asserted
> injury in fact is fairly traceable to, or
> caused by, the challenged action of the
> defendant; and (3) it is likely rather
> than just conjectural that the asserted
> injury in fact will be redressed by a
> decision in the plaintiffs favor.

*Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480
(4th Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw
Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)).

CHW does not contest that Scruggs adequately pled the first
requirement, that is, that he "suffered an injury in fact" related
to harms from eight unwanted phone calls, but instead argues
that Scruggs has failed to adequately plead the second and
third requirements. *See* ECF No. 27 at 39–30.

**a. The plaintiff's injury is not fairly
traceable to the defendant's conduct.**

The purpose of "[t]he 'fairly traceable' requirement [is to]
ensure[ ] that there is a genuine nexus between a plaintiff's
injury and a defendant's alleged illegal conduct." *Friends
of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204
F.3d 149, 161 (4th Cir. 2000) (citing *Lujan*, 504 U.S. at
560). This "standard is 'not equivalent to a requirement of
tort causation.' " *Id.* (quoting *Pub. Int. Rsch. Grp. v. Powell*

Scruggs v. CHW Group, Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 82 of 120

*Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3rd Cir. 1990)). Nor do plaintiffs need to demonstrate causation with "scientific certainty." *Id.* (quoting *Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992)). On the other hand, "[i]f 'the line of causation ... is too attenuated' or 'highly indirect,' the plaintiff's injury is not 'fairly traceable' to the defendant and the plaintiff will not have standing." *Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.*, No. JFM-08-62, 2011 WL 1557759, at *2 (D. Md. April 22, 2011) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). In addition, this "element of standing does not require the challenged action to be the sole or even immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). The alleged conduct, however, cannot be wholly "the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

Consistent with the *Iqbal* pleading standards, courts have found that unwanted calls in the TCPA context were "fairly traceable" to defendants where the plaintiff alleged some factual context surrounding the contested calls that supported an inference that the defendant or its agent had made the call. For instance, in *Cordoba v. DIRECTV, LLC*, the complaint alleged that DIRECTV hired Telecel to make marketing calls; that Telecel placed numerous calls on behalf of DIRECTV to the named plaintiff Cordoba, who was listed on the national do-not-call registry; that Cordoba "repeatedly told Telecel that he did not want to be called," that "Telecel admitted that the company did not maintain an internal do-not-call list"; that Cordoba "wr[ote] to DIRECTV and request[ed] that they cease calling him"; that "DIRECTV responded and promised that they would no longer contact him"; and that "the calls continued." 942 F.3d 1259, 1265–66 (11th Cir. 2019). The Eleventh Circuit observed, "Cordoba, as the named plaintiff, has no problem meeting the traceability requirement: the complaint squarely alleges that he repeatedly asked Telecel and DIRECTV to stop calling him, Telecel didn't keep a list of all those who asked not to receive calls, and he later suffered the injury of receiving many phone calls, which would not have happened if Telecel had maintained an internal do-not-call list and abided by it." *Id.* at 1271. Therefore, pleading not only that defendant hired an agent who called the plaintiff, but also facts suggesting the defendant acknowledged making the call—here, by DIRECTV in writing—are contextual factors that might support a finding that a call was fairly traceable to the defendant.

**\*5** Similarly, in *Hurley v. Messer*, the plaintiff identified the specific phone numbers used to make the contested calls in the complaint and alleged that the phone numbers belonged to two defendant service providers. No. 3:16-9949, 2018 WL 4854082, at *4 (S.D.W. Va. Oct. 4, 2018). The court found that the contested calls were fairly traceable to the voice-over-internet service providers who were alleged to have "kn[own] about the illegal conduct, had a right to control the conduct but, nevertheless, permitted the robocalls to be broadcast through their assigned telephone numbers." *Id.* Therefore, allegations of control over the calls, knowledge of the calls, and ownership of the assigned telephone numbers are additional contextual factors that might contribute to a finding that the conduct is fairly traceable to the defendant.

On the other hand, courts have found that contested phone calls were not fairly traceable to a defendant where plaintiffs have failed to allege non-conclusory facts that support an inference linking the defendant to the calls. For example, in *Barker v. Sunrun Inc.*, the plaintiff alleged that the defendant "had an agency relationship with the individuals or entities who actually made the offending phone calls." No. CV 18-855 KG/LF, 2019 WL 1983291, at *3 (D.N.M. April 29, 2019). The court was unpersuaded. *Id.* It observed, "this allegation constitutes a legal conclusion, and so it is not entitled to a presumption of truth." *Id.* (citing *Iqbal*, 556 U.S. at 678). In addition, the plaintiff "state[d] he ha[d] sworn statements that connect the actions to [the defendant]," but this was insufficient as well, as those statements were not included in or attached to the complaint. *Id.* Ultimately, the court found standing lacking, noting that aside from these conclusory statements, "Plaintiff did not make factual allegations ... connecting the actions to [the defendant]." *Id.*

CHW argues that Scruggs's alleged injury is not fairly traceable to CHW. CHW states, "Plaintiff fails to allege sufficient non-conclusory facts by which one could trace his purported injury to CHW." ECF No. 27 at 29. Specifically, CHW observes that "Plaintiff ... provides virtually no detail about the calls at issue, let alone the identity of the caller(s), the duration, the number(s) from which they originated, the substance of the calls, or more importantly who *physically* placed any of the calls—*i.e.*, CHW or some third party who merely stated they were 'associated with' CHW somehow." *Id.* at 17. Further, CHW notes that Scruggs concedes this point in his first amended complaint by requiring discovery on the issue. *Id.* (citing Pl.'s First Am. Compl. ¶ 23 ("Discovery will confirm that CHW, or someone acting on CHW's behalf, initiated the [contested] calls to Mr. Scruggs.")).

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 83 of 120

Scruggs v. CHW Group, Inc., Not Reported in Fed. Supp. (2020)

Scruggs asserts that he has pled sufficient facts to show the unwanted calls are fairly traceable to CHW. ECF No. 32 at 7. He argues, "Mr. Scruggs has clearly pleaded that he received a series of phone calls from Defendant, and the callers identified themselves with Defendant and tried to sell Mr. Scruggs[ ] Defendant's product." *Id.* In short, he notes that "Mr. Scruggs has demonstrated that the offending conduct in his complaint is traceable to Defendant by alleging that Defendant is the one who called him. Nothing more is needed." *Id.* The Court disagrees.

Viewed in the light most favorable to Scruggs, the alleged facts are insufficient to show that the contested calls are "fairly traceable" to CHW for two principal reasons: (1) the conclusory statements in the first amended complaint do not provide a factual basis to trace the contested phone calls to CHW; and (2) the alleged conduct could be attributed to an unrelated third party not before the Court.

**\*6** As a preliminary matter, Scruggs mischaracterizes the factual allegations set forth in the first amended complaint. First, Scruggs now argues in his opposition to the motion to dismiss "that he received a series of phone calls from Defendant," and that "Defendant is the one who called him." *Id.* But the amended complaint does not reflect that. Instead, the facts section of the amended complaint notes that on eight occasions, "Scruggs received a phone call in which *the caller* identified himself *as associated with* CHW," and that "[d]iscovery will confirm that CHW, or someone acting on CHW's behalf, initiated the [eight contested] calls to Mr. Scruggs." Pl.'s First Am. Compl. ¶¶ 14, 16–23 (emphasis added). Although Scruggs indicates later in the "counts" section of the complaint that "CHW made repeated telemarketing calls to Mr. Scruggs' residential phone," *e.g., id.* ¶ 33, this type of threadbare recitation of an element of a cause of action is not an alleged fact that the court need accept as true, *see Iqbal*, 556 U.S. at 678, and, indeed, it is inconsistent with his factual assertion that he needs discovery to confirm who called him and how that person is related to CHW, Pl.'s First Am. Compl. ¶ 23. Contrary to his opposition memorandum, Scruggs did not plead that "Defendant is the one who called him," but rather suggested he does not know who called him and that he needs discovery on the issue. ECF No. 32 at 7. Second, Scruggs now argues that "the callers ... tried to sell Mr. Scruggs[ ] Defendant's product." *Id.* But nowhere in the amended complaint does Scruggs state that the alleged product being sold—"a home warranty"—is defendant's product. *See* Pl.'s First Am. Compl. ¶¶ 14, 16–23.

Instead, the allegations in the complaint are largely conclusory and the descriptions of the contested calls are devoid of context. With respect to the content of the calls, Scruggs states, "the caller identified himself as associated with CHW and attempted to sell Mr. Scruggs a home warranty," and Scruggs told the caller that "he did not want CHW to contact him further." *E.g., id.* ¶¶ 14–15. The solitary fact proffered to connect the call to CHW is that "the caller identified himself as associated with CHW." *E.g., id.* ¶ 14. But Scruggs was a party to the phone calls and should be able to provide greater detail. For instance, he might include the name of the caller or details of the sales pitch for the home warranty being sold. Or as in *Hurley*, he could have identified the phone numbers used to call him and allege those phone numbers belong to CHW. *See* 2018 WL 4854082, at \*4. Scruggs states that "he repeatedly instructed CHW's representatives to stop calling him," and notes in his description of each call that he "told the caller to stop contacting him," but he does not describe how CHW responded to his requests. Pl.'s First Am. Compl. ¶¶ 15–22, 26. For instance, unlike in *Cordoba*, Scruggs did not allege that CHW has acknowledged making the calls. 942 F.3d at 1266.

These sample contextual factors—the defendant's acknowledgement of a call, the defendant's ownership of the phone number used to make the call, details of the specific content of calls—are not required in every case to support a finding that the alleged conduct is fairly traceable to the defendant, but they are illustrative of the types of factual allegations courts have found sufficient under the *Iqbal* pleading standards when conducting a standing analysis. *See Cordoba*, 942 F.3d at 1271; *Hurley*, 2018 WL 4854082, at \*4; *see also Drake v. Firstkey Homes, LLC*, 439 F. Supp. 3d 1313, 1315–16, 1323–24 (N.D. Ga. 2020) (finding that an injury related to unwanted phone call was fairly traceable to a defendant where the defendant *admitted making the call* even though a third party gave the defendant consent to contact the plaintiff). Here, Scruggs' allegations remain conclusory and lack the necessary factual context to support an inference linking the calls to CHW. In short, more is needed to render the calls "fairly traceable" to CHW.

Further, as pled, the injury here could be wholly "the result of the independent action of some third party not before the court," which is fatal to satisfying the traceability prong of a standing analysis. *Bennett*, 520 U.S. at 167; *see also Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755–56 (4th Cir.

Scruggs v. CHW Group, Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 84 of 120

2013). Again, Scruggs states, "the caller identified himself as associated with CHW and attempted to sell Mr. Scruggs a home warranty." Pl.'s First Am. Compl. ¶¶ 14, 16–22. Taken as true, as the Court must, this statement does not foreclose the possibility that a third party wholly unrelated to CHW made the call. The statement does not expressly state that CHW made the call and the complaint otherwise does not allege facts that would support an agency relationship between CHW and the caller. *See id.* ¶¶ 12–31.

**\*7** Rather than plead non-conclusory facts supporting an inference that CHW was responsible for the contested phone calls, Scruggs requests discovery on the matter. He states, "Discovery will confirm that CHW, or someone acting on CHW's behalf, initiated the [eight contested phone] calls to Mr. Scruggs." *Id.* ¶ 23. The caller said they were "associated with CHW," so Scruggs' logic is that CHW or its agent made the call. *See id.* ¶¶ 14, 23. Absent additional non-conclusory facts that link CHW to the call, however, "this assertion is speculative, and discovery to support it would amount to no more than a 'fishing expedition in hopes of discovering some basis of jurisdiction.' " *Gillison v. Lead Express, Inc.*, No. 3:16cv41, 2017 WL 1197821, at \*15 (E.D. Va. Mar. 30, 2017) (quoting *Base Metal Trading, Ltd. v. Ojsc Novokuznetsky Aluminum Factory*, 283 F.3d 208, 216 n.3 (4th Cir. 2002)).

Because Scruggs failed to plead non-conclusory facts linking CHW to his purported injury and because a third party not before the court could be responsible for such conduct, the Court finds that the plaintiff's injury is not "fairly traceable" to the defendant, as is required for Article III standing.

### b. The plaintiff's injury is not redressable.

The purpose of the redressability prong of a standing inquiry is to determine whether "a plaintiff 'personally would benefit in a tangible way from the court's intervention.' " *Friends of the Earth, Inc.*, 204 F.3d at 162 (quoting *Warth*, 422 U.S. at 508). This question is linked to the traceability inquiry, because for the Court to be able to redress the injury, that injury "must result from the actions of the [defendant], not from the actions of a third party beyond the Court's control." *Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 226 (4th Cir. 2009).

Having found that Scruggs failed to adequately allege facts that fairly trace his injury to CHW, the Court also finds that

his injury is not redressable, because the conduct could have been caused by a third party not before the Court.

Because Scruggs' injury is not fairly traceable to CHW or redressable, the Court finds that Scruggs does not have Article III standing to bring this claim. Therefore, this Court lacks subject matter jurisdiction over this matter, and, accordingly, the Court **RECOMMENDS** that defendant's motion to dismiss count one be **GRANTED**.

### 2. Dismissal of count one is also appropriate, because plaintiff fails to state a claim upon which relief can be granted. [3]

CHW also moves to dismiss count one under Rule 12(b)(6) for failure to state a claim by arguing that Scruggs has not pled facts supporting direct or vicarious TCPA liability. [4] ECF No. 27 at 16–22. To the extent Scruggs asserts that CHW is directly liable under the TCPA, CHW argues that "federal courts have routinely dismissed conclusory direct TCPA liability claims that, like Plaintiff's, lack sufficient factual allegations demonstrating that the defendant actually 'initiated' the phone calls at issue in the sense of 'tak[ing] the steps necessary to physically place' a call." *Id.* at 16 (quoting *Sheski v. Shopify (USA) Inc.*, 2020 WL 2474421, at \*2 (N.D. Cal. May 13, 2020)). To the extent Scruggs asserts that CHW is vicariously liable under the TCPA, CHW argues that Scruggs has not pled sufficient facts to support the finding of an agency relationship between CHW and the caller at issue or to support a finding that CHW exercised control over the caller, which is required for a finding of vicarious liability. *Id.* at 19–22.

**\*8** Scruggs counters that "[r]egardless of whether CHW is directly or vicariously liable, Mr. Scruggs has sufficiently pleaded liability." ECF No. 32 at 13. He argues that "it is nearly impossible for Mr. Scruggs to at this point know precisely what entity actually initiated the calls to him," and that "it is enough for Plaintiff to allege that either the Defendant or someone acting on its behalf placed the calls to Plaintiff to survive Defendant['s] Motion [to Dismiss]." *Id.* at 13– 14. Specifically, he notes that "Mr. Scruggs need only allege facts which, when taken as true, indicate that it[']s plausible that Defendant made the unlawful calls," which he asserts is the case here. *Id.* at 15–16.

Having found that the contested calls are not fairly traceable to CHW in the context of standing, the Court also finds that Scruggs has not adequately pled facts under the *Iqbal*

pleading standards supporting direct or vicarious liability under the TCPA.

The telemarketing regulations under the TCPA are fairly straightforward. "If a person wishes to no longer receive telephone solicitations, he can add his number to the [do-not-call registry]," and "[t]he TCPA then restricts the telephone solicitations that can be made to that number." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019) (citing 47 C.F.R. § 64.1200(c)(2)). Specifically, the statute provides a private right of action for those who suffer telemarketing calls in violation of regulations promulgated under subsection (c) of the act, namely:

> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may ... bring ... an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation.

47 U.S.C. § 227(c)(5). In addition, a defendant to such a claim may be liable under "theories of direct or vicarious liability." *Aaronson v. CHW Grp., Inc.*, No. 1:18cv1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019).

Scruggs alleges that CHW violated two provisions that may provide him relief, each of which requires CHW or its agent to have *made* or *initiated* phone calls to Scruggs. First, Scruggs alleges that CHW violated 47 C.F.R. § 64.1200(c)(2), which generally forbids a telemarketer from contacting persons who have registered on the national do-not-call registry. Pl.'s First Am. Compl. ¶ 36. That regulation provides that

> (c) No person or entity shall *initiate* any telephone solicitation to:
>
> ...
>
> (2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

47 C.F.R. § 64.1200(c)(2) (emphasis added). Second, Scruggs alleges that CHW violated 47 C.F.R. § 64.1200(d), which in general terms, requires persons making telemarketing calls to maintain an internal do-not-call list and honor requests to be placed on such a list. Pl.'s First Am. Compl. ¶ 35. The provision states:

> If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities *making* calls for telemarketing purposes (or on whose behalf such calls are *made*) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request.

**\*9** 47 C.F.R. § 64.1200(d) (emphasis added). [5] Therefore, as a threshold matter and consistent with the *Iqbal* pleading standards, Scruggs must plead non-conclusory facts that indicate that CHW or its agent "initiate[d]" or "made" calls to Scruggs. 47 C.F.R. §§ 64.1200(c)(2), 64.1200(d).

Accordingly, to establish direct liability under the TCPA, "courts have concluded that the plaintiff must show that the defendant actually, physically initiated the telephone call at issue." *Aaronson*, 2019 WL 8953349, at *2. Therefore, "at the pleadings stage, plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff['s] cellular phone." *Id.* For instance, in *Aaronson v. CHW Grp., Inc.*, the court found that the "plaintiff fail[ed] to support his conclusory allegation that defendant called plaintiff['s] cellular phone." *Id.* Specifically, "[t]he lone *fact* marshalled in the Complaint that even c[ame] close to supporting plaintiff['s] conclusion that defendant was the party that called his cellular telephone is the

allegation that one of the calls made to plaintiff was from a telephone number that, according to the Complaint, 'is one of the Defendant's many telephone numbers.' " *Id.* (citation omitted). Accordingly, the court found that the allegations there lacked sufficient factual context to support an inference that the defendant made the contested phone calls. *Id.*

To establish vicarious liability under the TCPA, "courts have held that a plaintiff must show that the defendant would be vicariously liable under common law principles of agency." *Id.* at *3. Those principles provide that an agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006). Therefore, "at the pleadings stage, plaintiff 'must allege some facts regarding the relationship between an alleged principal and agent' that show defendant had the right to control the party making the calls; plaintiff 'cannot simply allege general control in a vacuum.' " *Aaronson*, 2019 WL 8953349, at *3 (quoting *Melito v. Am. Eagle Outfitters, Inc.*, 2015 WL 7736547, at *7 (S.D.N.Y. Nov. 30, 2015)). For instance, the court in *Aaronson* found that a "conclusory, boilerplate allegation" that "defendant 'acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers,' " was insufficient to show defendant was vicariously liable for contested calls. *Id.* The court there suggested that additional facts, such as "how the caller identified itself (*e.g.*, as defendant's employee), the substance of the call (*e.g.* a statement by the caller that he or she was marketing defendant's goods or services), or any other details from the telephone calls that would tend to demonstrate an agreement between the caller and defendant that the caller would act on the principal's behalf and subject to the principal's control" might change the calculus. *Id.*

 **\*10** This case is similar to *Aaronson*, as the alleged facts surrounding the contested calls are sparse. As noted earlier, Scruggs described each of the eight calls at issue in the following manner: "the caller identified himself as associated with CHW and attempted to sell a home warranty to Mr. Scruggs," and Scruggs "told the caller to stop contacting him." Pl.'s First Am. Compl. ¶¶ 14–22. That is the extent of the description of the content of the calls.

Scruggs is correct that he need not know for certain whether CHW or its agent placed the call, but there must still be

sufficient, non-conclusory factual allegations linking the calls to CHW to render it liable under the TCPA. For instance, in *Desai v. ADT Sec. Servs., Inc.*, the court held that the "alleg[ation] that at-issue calls were made 'by or on behalf of ADT, and/or with ADT's knowledge, consent, approval and/or acquiescence," was sufficient at the pleadings stage. No. 11-c-1925, 2011 WL 2837435, at *1 (N.D. Ill. July 18, 2011). Importantly, however, the allegations there provided sufficient factual context to allow for an inference linking the defendant to the call. For instance, the plaintiffs described the content of the calls, "alleging that they received unsolicited pre-recorded telephone calls promoting ADT's products." *Id.* In other words, although a plaintiff need not always allege specifically whether they seek to hold the defendant accountable under a direct or vicarious liability theory at the pleadings stage, he must allege sufficient non-conclusory facts surrounding the context of the calls that support an inference of direct or vicarious liability.

The amended complaint fails to provide such a factual context. For instance, although he was a party to the eight contested phone calls, Scruggs did not allege facts indicating which phone numbers the caller used, details of the marketing pitch the caller made regarding the home warranty, or how CHW representatives reacted to Scruggs' request to not be contacted. *See* Pl.'s First Am. Compl. ¶¶ 12–31. The sole factual allegation linking CHW to the calls is that the caller identified himself as "associated with CHW." *Id.* ¶¶ 14, 16–22. That lone link to the defendant is insufficient under the *Iqbal* pleading standards. *See Aaronson*, 2019 WL 8953349, at *2; *see also Johnson v. Am. Towers, LLC*, 781 F.3d 693, 709 (4th Cir. 2015) ("[A] complaint must include 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.' " (quoting *Iqbal*, 556 U.S. at 678)). Allowing the TCPA claim to proceed beyond this stage would constitute an impermissible fishing expedition to determine if a factual basis exists to assert the claim against CHW. For these reasons and for the same reasons that the amended complaint failed to satisfy the traceability requirements explored in Part IV(A)(1)(a), the allegations of CHW's direct or vicarious liability under the TCPA are insufficient.

Because the amended complaint does not adequately allege direct or vicarious liability for CHW under the TCPA, the Court also finds that Scruggs has failed to state a claim upon which relief may be granted. Therefore, the Court **RECOMMENDS** that CHW's motion to dismiss count one be **GRANTED** on this alternative basis.

**B. Scruggs' state-law claim in count two should be dismissed without prejudice.**

In count two, Scruggs alleges that the same eight, telemarketing phone calls discussed above also violated the VTPPA—specifically, Va. Code Ann. § 59.1-514(A), and (B). Pl.'s First Am. Compl. ¶¶ 41–44. Further, he alleges that "[a]s a result of these unwanted telephone solicitation calls, Mr. Scruggs suffered actual damages including frustration, anger, stress, and other emotional and mental distress," and "[h]e was also forced to spend time and resources to try to stop CHW from contacting him." *Id.* ¶ 46. Scruggs asserts that "[he] is entitled to recover for $1,500 in statutory damages for each call in violation of the VTPPA, as well as reasonable attorney's fees and costs." *Id.* ¶ 47 (citing § 59.1-515).

**\*11** CHW moves to dismiss Scruggs' VTPPA claim on three grounds: (1) "Plaintiff's VTPPA claim is based on the very same threadbare and conclusory allegations lacking in supporting facts as his TCPA claim, [and] ... should also be dismissed under Rule 12(b)(6) for not meeting federal pleading standards"; (2) plaintiff may not obtain double recovery for the same injury under different legal theories; and (3) CHW has an affirmative defense to the claim by virtue of its "reasonable practices and procedures to effectively prevent telephone solicitation calls," pursuant to Va. Code Ann. § 59.1-514(C). ECF No. 27 at 26-28.

"Because the Court has dismissed [Scrugg's TCPA claim] for lack of standing—the only claim within this Court's original jurisdiction—the Court declines to address [his] state law claim at this time ...." *Judson v. Bd. of Supervisors of Mathews Cty.*, No. 4:18cv121, 2019 WL 2558243, at \*11 (E.D. Va. June 20, 2019). At the time of the filing of Scruggs' amended complaint, this Court had original, federal question jurisdiction over Scruggs' claim under 47 U.S.C. § 227(c)(5) (count one) as a "civil action[ ] arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (2018). This Court also had supplemental jurisdiction over plaintiff's state-law claim for repeated unwanted telephone solicitation calls under Va. Code Ann. § 59.1-514 (count two), because the claim was "so related" to the federal question claim "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a) (2018). Indeed, both counts involved allegations related to the same eight telemarketing phone calls to the plaintiff. Pl.'s First Am. Compl. ¶¶ 32–47.

Notably, "[t]his supplemental jurisdiction [is] not lost when the federal-law claims [are] dismissed." *Johansson v. Prince*

*George's Cnty. Pub. Schs.*, No. CBD-13-2171, 2014 WL 7014430, at \*2 (D. Md. Dec. 10, 2014). Instead, "this Court 'may' decline to exercise supplemental jurisdiction now that it 'has dismissed all claims over which it has original jurisdiction,' but it is not required to do so." *Id.* (citing 28 U.S.C. § 1367(c)); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is *purely discretionary.*" (emphasis added)). Because this case was originally brought in federal court, the Court does not have the option of remanding the remaining claims to state court, leaving it only two options: hear the claims or dismiss the claims. *See* 14C Charles Alan Wright et al., Federal Practice and Procedure § 3739 (Rev. 4th ed. 2020) ("[F]ederal courts cannot remand an action that was originally filed in federal court." (citing *Wittner v. Banner Health*, 720 F.3d 770 (10th Cir. 2013))).

Dismissal of the claims without prejudice is appropriate in this case. As the Supreme Court has observed, "district courts [should] deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997). Here, "[i]t is early in the pre-trial period, therefore, the court is less concerned with fairness and judicial economy." *Village Builders on the Bay, Inc., v. Cowling*, 321 F. Supp. 3d 624, 630 (E.D. Va. 2018). In addition, "[t]he parties and the court have yet to expend significant resources on this case," mitigating any inconvenience caused by dismissal of the state-law claims without prejudice to refile in state court. *Id.* With respect to comity, "Virginia courts are better positioned to evaluate causes of action based upon Virginia law.... [as] 'the primary responsibility for developing and applying state law rests with state courts.' " *Id.* (citing *Dunlevy v. Coughlin*, No. 2:15cv347, 2016 WL 595300, at \*4 (E.D. Va. Feb. 10, 2016)).

**\*12** Accordingly, the Court **RECOMMENDS** that defendant's motion to dismiss count two be **GRANTED** without prejudice to proceeding in state court.

## V. RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that defendant's motion to dismiss, ECF No. 27, be **GRANTED** as follows:

Scruggs v. CHW Group, Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 88 of 120

(1) Defendant's motion to dismiss plaintiff's TCPA claim in count one should be **GRANTED** and count one should be **DISMISSED WITHOUT PREJUDICE**; and

(2) Defendant's motion to dismiss plaintiff's VTPPA claim in count two should be **GRANTED** and count two should be **DISMISSED WITHOUT PREJUDICE** pursuant to the Court's discretion under 28 U.S.C. § 1367(c). [6]

## VI. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Carr v. Hutto,* 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce,* 727 F.2d 91 (4th Cir. 1984).

## All Citations

Not Reported in Fed. Supp., 2020 WL 9348208

---

## Footnotes

1    Home Warranty Administrators, Inc., is no longer a party in this matter. On May 8, 2020, Scruggs filed a notice of dismissal of claims against Home Warranty Administrators, Inc., ECF No. 11, and Scruggs did not bring claims against Home Warranty Administrators, Inc., in his first amended complaint, ECF No. 22.

2    The facts detailed below are set forth in the first amended complaint. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (observing that when addressing a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint").

3    Should the District Judge find that standing is lacking in this matter, then the Court would lack jurisdiction to analyze the merits of defendant's Rule 12(b)(6) arguments. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,* 713 F.3d 175, 185 (4th Cir. 2013) ("[A] court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits."). For the purposes of this report and recommendation, however, the undersigned addresses defendant's Rule 12(b)(6) motion to aid the District Judge should she find that standing is present.

4    Because the Court agrees with defendant that plaintiff has not pled direct or vicarious TCPA liability, the Court finds it unnecessary to address the defendant's third argument contending that "Plaintiff ... fails to plead sufficient facts indicating a violation of the TCPA's [do-not-call] rules." ECF No. 27 at 22.

5    The parties dispute whether the private cause of action created by 47 U.S.C. § 227(c)(5) extends to the provisions of 47 C.F.R. § 64.1200(d). *See* ECF No. 27 at 23 (discussing cases that have recognized violations of § 64.1200(d) do not give rise to a private cause of action); ECF No. 32 at 20-22 (discussing cases that

**Scruggs v. CHW Group, Inc., Not Reported in Fed. Supp. (2020)**

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 89 of 120

have recognized a private cause of action for violations of 47 C.F.R. § 64.1200(d)); ECF No. 33 at 20–22. Recently, courts in the Fourth Circuit have found that the TCPA does not provide a private right of action for violations of 47 C.F.R. § 64.1200(d). *See Wilson v. PL Phase One Operations L. P.*, 422 F. Supp. 3d 971, 981–82 (D. Md. 2019) (observing that "the Fourth Circuit has not addressed whether 47 C.F.R. § 64.1200(d) provides a private right of action," but concluding that the section "appears to fall within subsection *d*'s scope, which does not provide a private right of action"); *Worsham v. Travel Options, Inc.*, No. JKB-14-2749, 2016 WL 4592373, at *4 (D. Md. Sept. 2, 2016), *aff'd*, 678 F. App'x 165 (4th Cir. 2017) (observing that 47 C.F.R. § 64.1200(d) "appear[s] to fall under the aegis of subsection *d* of the TCPA" rather than under subsections *b* and *c*, which create private rights of action). The Court need not decide the issue, however, because Scruggs has not pled sufficient facts to allege that CHW is liable for the calls in question.

6    The Court declines to consider Scruggs' request for leave to amend his complaint should the Court grant the defendant's motion to dismiss. ECF No. 32 at 29. In general, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). In order "to determine whether 'justice so requires,' " however, "the court must have before it the substance of the proposed amendment." *Roskam Baking Co., Inc. v. Lanham Machinery Co., Inc.*, 288 F.3d 895, 906 (6th Cir. 2002). Because Scruggs has not yet provided the Court with his proposed amendment(s), deciding his request at this stage would be premature. In order for the Court to consider such a request, Scruggs must file a motion seeking leave to amend the complaint with the proposed amendments attached.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    11

KeyCite Yellow Flag

Declined to Extend by Abramson v. AP Gas & Electric (PA), LLC, W.D.Pa., February 6, 2023

2020 WL 2474421
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

David SHESKI, Plaintiff,
v.
SHOPIFY (USA) INC., et al., Defendants.

Case No. 19-cv-06858-HSG
|
Signed 05/13/2020

**Attorneys and Law Firms**

Jason Matthew Wucetich, Dimitrios Vasiliou Korovilas, Wucetich & Korovilas LLP, El Segundo, CA, for Plaintiff.

Christine Marie Reilly, Kristin Emily Haule, Manatt Phelps & Phillips LLP, Los Angeles, CA, John William McGuinness, Manatt, Phelps & Phillips, LLP, Washington, DC, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

Re: Dkt. No. 15

HAYWOOD S. GILLIAM, JR., United States District Judge

**\*1** Pending before the Court is Defendants' motion to dismiss Plaintiff's class action complaint, for which briefing is complete. Dkt. No. 15 ("Mot."), 21 ("Opp."), 22 ("Reply"). For the reasons articulated below, the Court **GRANTS** Defendants' motion to dismiss, **WITH LEAVE TO AMEND**.

**I. BACKGROUND**

On October 21, 2019, Plaintiff David Sheski filed a class action complaint on behalf of a putative nationwide class, alleging violations of the Telephone Consumer Protection Act ("TCPA"), and three state common law claims: negligence, invasion of privacy, and unlawful intrusion. Dkt. No. 1 ("Compl."). Plaintiff's claims are based on Defendant Shopify

(USA) Inc. and Defendant Shopify Inc.'s (collectively, "Shopify" or "Defendants") alleged "unlawful practice of making, facilitating, and participating in unauthorized text message marketing campaigns en masse to consumers' cellular telephones." *Id.* ¶ 1. Shopify is an e-commerce company that "provides the infrastructure and software for online retailers to build their online presence, including their point-of-sale systems and specifically the tools to structure retailers' checkout webpages to collect consumers' personal identification information, including their cellular numbers." *Id.* ¶ 2.

Plaintiff purchased a product from the retailer Masorini, an online clothing store with no physical locations, whose website is "maintain[ed], operate[d], direct[ed] and/or otherwise control[led]" by Shopify. *Id.* ¶ 30. When processing the purchase on the website, Plaintiff used the online checkout form which "specifically brands it as a Shopify platform, labeling the online order form 'Shopify Checkout.' " *Id.* ¶ 30. It additionally included "a line item input field for consumers to provide their telephone number," where the form "indicates the telephone number is '(For shipping updates).' " *Id.* Specifically, "[t]here [was] no line item check-box on the checkout page for consumers to click to indicate their prior express written consent to have their phone number used for text advertisements." *Id.* After completing the purchase, Plaintiff "received two text messages to his cell phone," on or about November 26, 2018. *Id.* ¶ 31. Both messages read "Masorini: Hey David. Cyber Monday! 30% OFF – Code: "CM30" Shop here! [sic] – STOP 17908 to opt-out." *Id.* ¶¶ 31–32.

**II. LEGAL STANDARD**

Federal Rule of Civil Procedure ("Rule") 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 91 of 120

**Sheski v. Shopify (USA) Inc., Not Reported in Fed. Supp. (2020)**

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**\*2** In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). The Court also need not accept as true allegations that contradict matter properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint. *Sprewell*, 266 F.3d at 988.

If the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal citations and quotation marks omitted).

## III. ANALYSIS

Defendants argue that Plaintiff fails to state a TCPA claim since the complaint fails to sufficiently allege that Defendants were "directly involved" with, or vicariously liable for, placing the texts at issue. Mot. at 6–16. Defendants also argue that Plaintiff fails to state a claim for the three common law claims. *Id.* at 18–21. The Court addresses each argument in turn below.

### A. TCPA

The TCPA makes it unlawful

> to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service ... or any

> service for which the called party is charged for the call....

47 U.S.C. § 227(b)(1)(A)(iii). To state a claim under the TCPA, a Plaintiff must allege that "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system ["ATDS"]; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012); *see also* 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). A text message constitutes a "call" for purposes of the TCPA. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2012).

#### i. Direct Liability

Defendants first argue that Plaintiff has failed to plead sufficient facts to establish that Shopify sent or was directly involved with sending the text messages at issue. Defendants point to the FCC's guidance in a 2015 order to argue that they do not qualify as having made a call under the TCPA and therefore cannot be liable for any TCPA violation. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7980–84 (2015) (hereinafter, "2015 TCPA Declaratory Ruling"), *set aside in part by ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. Mar. 16, 2018).

The TCPA and its implementing regulations do not define the term "make a call" to determine who may be liable under the statute. The FCC has concluded that "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." *In the Matter of the Joint Petition filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6583 ¶ 26 (2013). As for whether entities that provide software applications or platforms that facilitate calling can be liable, the FCC explained that it "look[s] to the totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call

as to be deemed to have initiated it, considering the goals and purposes of the TCPA." 2015 TCPA Declaratory Ruling, 30 FCC Rcd. at 7980. Applying this standard, the FCC determined that the maker of an app called TextMe did not make or initiate calls when its app users used the TextMe app to send invitational text messages; rather it was the app user that initiated the text messages through "affirmative choices." *Id.* at 7983. Specifically, the FCC found it significant that the "app user [had to]: (1) tap a button that reads 'invite your friends'; (2) choose whether to 'invite all their friends or [ ] individually select contacts'; and (3) choose to send the invitational text message by selecting another button." *Id.* at 7983–84.

 **\*3** Defendants argue that similar to TextMe, they only provide a platform that third-party retailers use to send text messages to consumers. Shopify points to numerous cases in support of its position, primarily relying on *Meeks v. Buffalo Wild Wings, Inc.*, No. 17-cv-07129-YGR, 2018 WL 1524067 (N.D. Cal. Mar. 28, 2018) and *Frank v. Cannabis & Glass, LLC*, No. 19-cv-00250-SAB, 2019 WL 4855378 (E.D. Wash. Oct. 1, 2019). In *Meeks*, the plaintiff provided his cellphone number to a restaurant hostess so he could be notified when his table was ready, and later received texts from the restaurant that included links to the website of platform provider Yelp. 2018 WL 1524067 at *1–2. The *Meeks* court held that "[w]hile plaintiff allege[d] that the restaurants use Yelp's 'platform' to send the offending text messages ... he d[id] not allege that Yelp decided whether, when, or to whom to send the messages." *Id.* at *5. Instead, "his allegations regarding Yelp pertain[ed] to its purported business model and the general advertising and analytics services Yelp provides to restaurants." *Id.* Somewhat similarly, in *Frank* the court dismissed the complaint, finding "no allegations that Defendant Springbig exercised any discernible involvement in deciding whether, when, or to whom the text message is sent, or what the text message said." 2019 WL 4855378 at *2. Here, Defendants argue that Plaintiff fails to provide any factual allegations that Defendants "exerted any control over the recipient lists, timing, or content of the texts sent by the users of the Shopify platform." Mot. at 12.

In response, Plaintiff argues that none of Defendants' cited cases are on point based on the allegations in the Complaint. Opp. at 14–15. For example, unlike the platform providers at issue in the other cases, Plaintiff alleges that "Shopify continues to be actively involved in its retailers' businesses both directly and indirectly" even after the retailers select their platform package, by providing "the creation of an online store, 24/7 support from dedicated Shopify employees, ongoing business counseling services, shipping services, and the creation of a point-of-sale software system, among other things." Compl. ¶ 18. Additionally, Plaintiff points to (1) Shopify's receipt of a percentage of retailers' revenues, *id.* ¶ 25, (2) the use of the same SMS short code by different retailers as evidence of "a common Shopify or Shopify-approved source," *id.* ¶ 26, (3) Shopify's awareness, "based on its participation in the creation and maintenance of retailers' checkout pages, whether a particular retailer has obtained express written consent form a consumer to use the consumer's cellular telephone number for text message marketing campaigns," *id.* ¶ 23, and (4) Shopify's "counsel[ to retailers] on best practices with respect to data collections and text message marketing, including the content and timing of te[x]t message marketing campaigns," *id.* ¶ 22.

Importantly, however, these allegations do not lead to the inference that Shopify sent or was directly involved in sending the text messages at issue in this case. That Shopify provides the template for the checkout form, offers a suite of apps (including texting apps) that can integrate into its platform, provides counseling on best practices for marketing, and takes a percentage of the retailer's revenue, does not indicate that Shopify has any control over a retailer's actual text marketing campaigns. Further, much like Yelp's platform in *Meeks* or the TextMe application in the 2015 TCPA Declaratory Ruling, the fact that Shopify provides a platform to send the text messages such that the SMS short code is the same for all of the retailers does not lead to the inference that Shopify, rather than the individual retailer identified in the text itself, controlled the content of and sent the message. Here, Plaintiff received only two text messages, which specifically identified Masorini as the sender. *See* Compl. at ¶ 26. [1]

 **\*4** Thus, even making all inferences in Plaintiff's favor, the allegations provide no factual basis to establish that Shopify was directly involved in the procurement of consumers' phone numbers, stores those numbers, transfers the numbers to texting apps, or approves the messages to be sent to those numbers. While Shopify might provide additional resources beyond those provided by the platform provider in *Meeks*, these resources and features do not suggest that Shopify has any control over any individual retailer's marketing campaigns. Instead, the factual allegations suggest that Shopify provides a platform with a suite of capabilities and options for the retailer, which then sends text messages

Sheski v. Shopify (USA) Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 93 of 120

to numbers obtained when processing a direct sale to a consumer, such as Plaintiff. [2]

Because Plaintiff fails to plead sufficient facts to show that Defendant sent the text messages, the Court **GRANTS** Defendant's motion to dismiss Plaintiff's TCPA claim.

### ii. Vicarious Liability

Defendants next argue that Plaintiff fails to state a claim for vicarious liability under the TCPA. "[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd*, 136 S. Ct. 663 (2016), as revised (Feb. 9, 2016). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (quoting Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006)). "For an agency relationship to exist, an agent must have authority to act on behalf of the principal and '[t]he person represented [must have] a right to control the actions of the agent.' " *Id.* (quoting Restatement (Third) of Agency § 1.01 cmt. c).

Here, Plaintiff simply points to Shopify's relationship with its retailers as evidence of an agency relationship via explicit and implicit authorization. Opp. at 17–18. This is insufficient. There are no factual allegations that support any sort agency relationship outside of Plaintiff's conclusory statement that "Defendants and their agents transmit text messages." Compl. at ¶ 37. Instead, it appears (accepting the well-pleaded factual allegations as true, as the Court must at this stage) that Defendants provide a suite of software options for retailers, who then determine which options to utilize. "In order to allege a traditional agency relationship, Plaintiff would have to allege Defendant controlled or had the right to control [the entity responsible for the text messages] and, more specifically, the manner and means of the text message campaign they conducted." *Linlor v. Five9, Inc.*, No. 17-cv-218-MMA (BLM), 2017 WL 2972447, at *3 (S.D. Cal. July 12, 2017) (quotations omitted). The only semblance of an allegation suggesting that Masorini acted on Defendants' behalf is the claim that Defendants receive a percentage of

retail sales by each retailer (ranging from 2% to 0.5% of sales depending on the plan selected). *See id.* at ¶ 18. But this in no way supports an inference that retailers act on Defendants' behalf or that Defendants have any sort of control over third-party retailers. The Complaint entirely fails to plausibly plead any sort of agency relationship.

**\*5** Accordingly, Plaintiff's vicarious liability claim is also **DISMISSED**.

### B. Common Law Claims

Defendants also argue that Plaintiff fails to state a claim for negligence, invasion of privacy or unlawful intrusion. Mot. at 18–21.

### i. Negligence

"Under California law, "[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." " *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (quoting *McGarry v. Sax*, 70 Cal. Rptr. 3d 519 (Cal. Ct. App. 2008)). Defendants argue that Plaintiff failed to allege any duty owed by Defendants to consumers, any breach of a general duty of care (since no specific duty is alleged), or any actual damages, even if breach was alleged. Mot. at 18–19. The Court agrees.

"[T]here is generally no duty to protect others from the conduct of third parties." *Regents of Univ. of California v. Superior Court*, 413 P.3d 656, 669 (Cal. 2018). "[P]laintiffs alleging a defendant had a duty to protect them must establish: (1) that an exception to the general no-duty-to-protect rule applies and (2) that the *Rowland* factors support the imposition of the duty." *Brown v. USA Taekwondo*, 253 Cal. Rptr. 3d 708, 723 (Cal. Ct. App. 2019), *as modified on denial of reh'g* (Nov. 6, 2019) (citing *Rowland v. Christian*, 443 P.2d 561 (Cal. 1968)). The *Rowland* factors include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of

imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Regents*, 413 P.3d at 670 (quoting *Rowland*, 443 F.2d at 564).

Plaintiff fails to establish that Defendants' owe any duty to Masorini's customers. Plaintiff alleges that Defendants "failed to comply with third-party vendor rules, which require Defendants to have consumers' prior express written consent prior to sharing their personal identification information with the vendors," suggesting that these rules created a duty owed to Plaintiff and other consumers. Compl. at ¶ 52. Plaintiff provides no further allegations. [3] This vague reference to third-party vendor rules does not establish that an exception to the general rule applies, or that any duty should be imposed under *Rowland*. Moreover, for the same reasons discussed above, Plaintiff has failed to adequately plead that Defendants themselves sent the texts. As pled, Plaintiff's negligence claim thus fails.

**\*6** Plaintiff further fails to allege any damages in this case. The TCPA provides specific statutory damages for unconsented marketing calls precisely because proving damages from a marketing phone call or a text is particularly difficult. Here, Plaintiff entered his phone number into the retail checkout and received two marketing texts afterwards. Plaintiff has not even alleged that he was charged for those texts or that he received other texts due the dissemination of the phone number outside of the retailer such that the conduct was particularly oppressive or a nuisance.

Because Plaintiff fails to adequately plead duty or damages, the Court dismisses the negligence cause of action for failure to state a claim.

### ii. Invasion of Privacy or Unlawful Intrusion

As Defendants note, it is not entirely clear what claim Plaintiff is attempting to state under the third and forth causes of action. "At common law there are four kinds of invasion of privacy actions which sound in tort ... (1) unreasonable intrusion upon solitude; (2) appropriation of name or likeness; (3) unreasonable publicity given to private life; and (4) publicity that unreasonably places one in a false light." *Alim v. Superior Court*, 229 Cal. Rptr. 599 (Cal. Ct. App. 1986). Plaintiff's third purported cause of action is invasion of privacy and his fourth purported cause of action is unlawful intrusion, but

unlawful intrusion is simply one alternative means of stating an invasion of privacy claim. So the Court assumes that Plaintiff is claiming unreasonable intrusion upon solitude.

That tort subjects to liability "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns ..., if the intrusion would be highly offensive to a reasonable person." *Taus v. Loftus*, 151 P.3d 1185, 1212 (Cal. 2007). Plaintiff does not allege any facts sufficient to support such a claim here. Even accepting Plaintiff's factual allegations, he voluntarily entered his phone number into the form, and even if he provided the number solely for "shipping updates," as a matter of law using that phone number to send two texts for other purposes related to the retailer does not rise to the level of being "highly offensive to a reasonable person." *See Folgelstrom v. Lamps Plus, Inc.*, 125 Cal. Rptr. 3d 260, 266 (Cal. Ct. App. 2011), *as modified* (June 7, 2011) (holding that defendant's "conduct of obtaining his ZIP code under false pretenses and using it for its own marketing purposes ... [did] not meet the standard of 'highly offensive.' "); *see also Marseglia v. JP Morgan Chase Bank*, 750 F. Supp. 2d 1171, 1178 (S.D. Cal. 2010) (dismissing an invasion of privacy claim where defendant placed 50 calls to plaintiff, but "there [were] no facts alleged upon which this Court could infer plaintiffs ever answered any of these calls or defendant ever made any direct contact with plaintiffs that might be construed as annoying or harassing conduct.").

Accordingly, the Court dismisses Plaintiff's third and fourth causes of action for failure to state a claim.

### IV. CONCLUSION

For the reasons noted above, the Court **GRANTS** Defendants' motion to dismiss Plaintiff's Class Action Complaint for failure to state a claim **WITH LEAVE TO AMEND**. [4] Any amended complaint must be filed within twenty-eight (28) days of the date of this order, and Plaintiff may not add any new claims or defendants in any such complaint.

**\*7 IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2020 WL 2474421

Sheski v. Shopify (USA) Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 95 of 120

## Footnotes

1       The timing of the texts further belies Plaintiff's allegation that Defendant sent the text messages at issue. Similar to *Meeks*, the texts were sent after Plaintiff interacted with the retailer, providing his number for "shipping updates." *See* 2018 WL 1524067 at *4 ("[T]he complaint indicates that the timing of the text messages was linked to information in the [retailer's], not [Defendants'] possession.").

2       In his Opposition to Defendant's motion to dismiss, Plaintiff references facts not in the Complaint to support his argument that Defendant was directly involved in sending the text messages. *See* Opp. at 7–9. However, "[a] Complaint cannot be amended through allegations made in an opposition to a motion to dismiss." *Remington v. Mathson*, 42 F. Supp. 3d 1256, 1278 n.3 (N.D. Cal. 2012), *aff'd*, 575 F. App'x 808 (9th Cir. 2014). Accordingly, the Court does not consider these new facts. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

3       Again, Plaintiff attempts to add facts in his Opposition that are not in the Complaint to support its argument that Defendants owed a duty of care. *See* Opp. at 18–19. The Court will not consider these new allegations.

4       The Court need not address Defendants' motion to strike and it is **DENIED AS MOOT**. Depending on the nature of an amended complaint, if any, Defendants may raise the argument again.

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3826460
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Joseph SHOEMAKER, Richard Gindin,
Demya Johnson, Kimberly Starling, and
Matthew McCormick, individually and on
behalf of all others similarly situated, Plaintiffs

v.

Richard ZEITLIN, American Technology Services,
LLC, Unified Data Services, LLC, Compliance
Consultants, LLC, and John Does 1-10, corporate
entities and individuals presently unknown, Defendants

CIVIL ACTION NO. 1:21-CV-1668
|
Signed June 5, 2023

**Attorneys and Law Firms**

David S. Senoff, First Law Strategy Group, LLC,
Philadelphia, PA, Eric H. Weitz, Max Morgan, The Weitz
Firm, LLC, Philadelphia, PA, for Plaintiffs.

Daniel J. Treuden, Pro Hac Vice, The Bernhoft Law Firm,
S.C., Austin, TX, Patrick T. Kane, Pro Hac Vice, Robert
G. Bernhoft, Austin, TX, Thomas Kimble, Pro Hac Vice,
Arlington, TX, James N. Clymer, Clymer & Musser PC,
Lancaster, PA, for Defendants Richard Zeitlin, American
Technology Services, LLC, Unified Data Services, LLC,
Compliance Consultants, LLC.


## MEMORANDUM

Christopher C. Conner, United States District Judge

 **\*1** Named plaintiffs bring this putative class action against
defendants Richard Zeitlin and various entities associated
with Zeitlin, asserting claims for violation of Section 227(b)
(1)(A)(iii) of the Telephone Consumer Protection Act, 47
U.S.C. § 227, and unjust enrichment under Pennsylvania law.
Defendants move to dismiss plaintiffs' amended class action
complaint pursuant to Federal Rules of Civil Procedure 12(b)
(1), 12(b)(2), and 12(b)(6). Defendants also move to strike a
portion of plaintiffs' class allegations under Rule 12(f). We
will partially grant defendants' motion to dismiss, and we will
deny their motion to strike.

## I. Factual Background & Procedural History

Defendants are a telemarketing entrepreneur, Zeitlin, and
a collection of entities he uses to conduct various
telemarketing endeavors—American Technology Services,
LLC ("ATS"); Unified Data Services, LLC ("UDS");
Compliance Consultants, LLC ("CC"). (See Doc. 33 ¶¶
3-4 & n.1, 42, 44, 76-85, 107). Zeitlin is a resident of
Nevada; ATS, UDS, and CC are Delaware limited liability
companies with principal places of business in Nevada. (See
id. ¶¶ 76, 78, 80, 82). Named plaintiffs Joseph Shoemaker,
Richard Gindin, DeMya Johnson, Kimberly Starling, and
Matthew McCormick are five individuals residing variously
in Pennsylvania, Texas, and Sweden who allege defendants
initiated robocalls to their cell phones without their prior
consent on various dates between April 26, 2018, and August
2, 2021. (See id. ¶¶ 64-75, 85; see generally id. ¶¶ 112-203).
The prerecorded voice on each of these calls solicited
donations on behalf of a political action committee ("PAC")
purporting to support law enforcement, and one of the calls
successfully obtained a donation from plaintiff Shoemaker.
(See id. ¶¶ 114, 119, 121, 138, 145, 166, 179, 190).

Plaintiffs' allegations, however, go beyond accusing
defendants of engaging in robocalls: plaintiffs allege Zeitlin
is the key figure in a "scheme" to solicit donations for PACs
secretly controlled by Zeitlin or individuals in league with
Zeitlin and whose sole *raison d'être* is to funnel donated
money to Zeitlin and his companies. (See id. ¶¶ 5-6, 29-32,
42). Plaintiffs provide a lengthy list of PACs they claim
are "scams" orchestrated by or in collusion with Zeitlin,
two of which feature prominently in the alleged events
underlying the matter *sub judice*: Honoring American Law
Enforcement PAC ("HALE") and the Police Officers Defense
Alliance LLC ("PODA"). (See e.g., id. ¶¶ 29, 114, 138, 166,
179). Plaintiffs assert the PACs on their list share numerous
officers, some of whom are business associates or friends
of Zeitlin. According to the complaint, these PACs have no
genuine interest in or intention of meaningfully advancing
the causes they claim to support. (See id. ¶¶ 4-6, 33-41,
50, 126-127). Plaintiffs allege Zeitlin and his companies
partner with these PACs and then make millions of robocalls
soliciting donations on their behalf. (See id. ¶¶ 3-4, 42). The
calls result in hundreds of thousands—if not millions—of
dollars in donations to the PACs annually. (See id. ¶¶ 1, 5, 58;
see also id. ¶¶ 125, 149). The PACs supposedly then transfer
the lion's share of the money raised through these donations
to Zeitlin and his companies "through an array of bogus and
inflated overhead expenditures." (See id. ¶¶ 5, 42, 46, 48, 58,
149-156, 177).

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 97 of 120

Shoemaker v. Zeitlin, Not Reported in Fed. Supp. (2023)

**\*2**  According to plaintiffs, Zeitlin and his companies have been the subject of journalistic investigations detailing the scheme. (See id. ¶¶ 30 & n.5, 32 n.7, 58). They also claim the passthrough nature of these PACs can be seen by examining the PACs' filings with the Federal Election Commission ("FEC"). (See id. ¶¶ 45-46; see generally id. ¶¶ 125-197). [1] Namely, they claim the reports show the PACs in question pay out an overwhelming preponderance of their income to entities owned or controlled by Zeitlin. (See Doc. 33 ¶¶ 45-46, 48, 58; see generally id. ¶¶ 125-197). These filings also purportedly show the PACs spend comparatively miniscule amounts on activities plausibly connected to their purported political or social objectives. (See id. ¶¶ 4-6, 126-127). To conceal the relationship between the PACs, Zeitlin, and Zeitlin-controlled companies, plaintiffs allege Zeitlin utilizes a "vast web of inextricably intertwined corporate entities" whose identities he obscures by employing unregistered fictious names, UPS Store mailboxes in far-flung states, and mail-forwarding services. (See id. ¶¶ 51-57, 99, 106, 154-164). Plaintiffs also allege Zeitlin operates his "vast web" of telemarketing companies as "alter egos of one another" constituting "a single economic enterprise." (See id. ¶¶ 99-106).

Plaintiffs initiated this putative class action against defendants on behalf of themselves and others similarly situated. The action is now proceeding pursuant to plaintiffs' amended complaint (Doc. 33). Defendants move to dismiss plaintiffs' amended complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), and partially strike their class allegations under Rule 12(f). The motions are fully briefed and ripe for disposition.

## II. Legal Standards

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides a court may dismiss a claim for lack of subject matter jurisdiction. See FED. R. CIV. P. 12(b)(1). Such jurisdictional challenges take one of two forms: (1) parties may levy a "factual" attack, arguing one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues a claim is not within the court's jurisdiction. Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)). In either instance, it is

the plaintiff's burden to establish jurisdiction. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). Courts may grant a Rule 12(b)(1) motion based on the legal insufficiency of a claim only when it appears with certainty assertion of jurisdiction would be improper. See Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).

### B. Rule 12(b)(2)

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may move to dismiss a complaint for lack of personal jurisdiction. See FED. R. CIV. P. 12(b)(2). In ruling on a Rule 12(b)(2) motion, the court must accept the allegations in the complaint as true and draw all reasonable inferences supported by the well-pleaded factual allegations in the plaintiff's favor. See Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002); Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992). The court's review is not limited to the face of the pleadings, as consideration of affidavits submitted by the parties is both appropriate and required. See Carteret Sav. Bank, 954 F.2d at 146.

Although the plaintiff bears the ultimate burden of proving personal jurisdiction over a defendant, see Mellon Bank (East) PSFS Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992), the plaintiff need not make such a showing at the pleading stage of litigation, see Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009). To survive a motion to dismiss, the plaintiff must merely allege sufficient facts to establish a *prima facie* case of jurisdiction over the defendant. See id.; Carteret Sav. Bank, 954 F.2d at 142 n.1. When claims of jurisdiction are not clearly frivolous, courts ordinarily allow jurisdictional discovery. See Metcalfe, 566 F.3d at 335-36 (citing Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances, 723 F.2d 357, 362 (3d Cir. 1983)).

### C. Rule 12(b)(6)

**\*3**  Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints which fail to state a claim upon which relief may be granted. See FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker, 292 F.3d at 374 n.7). In addition

to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the ... claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' " Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679, 129 S.Ct. 1937 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955); Twombly, 550 U.S. at 556, 127 S.Ct. 1955. A claim is facially plausible when the plaintiff pleads facts "that allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

### D. Rule 12(f)

Under Federal Rule of Civil Procedure 12(f), the court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." See FED. R. CIV. P. 12(f). District courts have "considerable discretion" in resolving a Rule 12(f) motion. See Krisa v. Equitable Life Assurance Soc'y, 109 F. Supp. 2d 316, 319 (M.D. Pa. 2000) (quoting N. Penn. Transfer, Inc. v. Victaulic Co. of Am., 859 F. Supp. 154, 158 (E.D. Pa. 1994)). In general, such a motion will be denied unless the allegations are severely prejudicial to one of the parties and unrelated to the plaintiff's claims. See id.; see also 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1382 (3d ed. 2016). A party is prejudiced when the challenged pleading "confuses the issues" or places an undue burden on the responding party. Karpov v. Karpov, 307 F.R.D. 345, 348 (D. Del. 2015).

### III. Discussion

Plaintiffs advance two causes of action: they claim defendants violated Section 227(b)(1)(A)(iii) of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by initiating illegal robocalls to their cell phones, and they claim defendants are liable to them for unjust enrichment under Pennsylvania common law. (See Doc. 33 ¶¶ 228-39). Plaintiffs also seek certification of a class comprising roughly "[a]ll persons and entities throughout the United States" who received an illegal robocall initiated by defendants between "September 27, 2017 through the date of class certification." (See id. ¶ 211).

*4 Defendants advance four challenges to plaintiffs' amended complaint. They argue plaintiffs' amended complaint should be dismissed in part or in toto for lack of subject matter jurisdiction, lack of personal jurisdiction, and for failure to state a claim. They also contend plaintiffs' class allegations should be partially stricken for lack of subject matter jurisdiction on the ground the particular provision of the TCPA under which plaintiffs bring this action was a constitutional nullity during a portion of the proposed class period. We will begin with defendants' two arguments related to subject matter jurisdiction.

### A. Subject Matter Jurisdiction

Plaintiffs assert we have subject matter jurisdiction over the above-captioned action because they bring their primary claim under 47 U.S.C. § 227(b)(3). (See Doc. 33 ¶ 59). Section 227(b)(3) creates a private cause of action against violators of the TCPA, see Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 374-75, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012) (quoting 47 U.S.C. § 227(b)(3)), and plaintiffs allege defendants violated Section 227(b)(1)(A)(iii) of the TCPA, (see Doc. 33 ¶¶ 228-234). Because the TCPA is a federal law, federal courts have federal question jurisdiction over claims brought under Section 227(b)(3). See Mims, 565 U.S. at 372, 386-87, 132 S.Ct. 740. Nonetheless, defendants contend we lack subject matter jurisdiction over some of plaintiffs' claims because the United States Supreme Court's decision in Barr v. American Ass'n of Political Consultants ("AAPC"), 591 U. S. ——, 140 S. Ct. 2335, 207 L.Ed.2d 784 (2020), purportedly rendered Section 227(b)(1)(A)(iii) an unenforceable nullity from November 2, 2015 (when Congress amended the TCPA to include the provision AAPC deemed unconstitutional) through the issuance of AAPC on July 6, 2020. (See Doc. 39 at 3, 47-52); see also Bipartisan Budget Act of 2015, Pub. L.

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 99 of 120

Shoemaker v. Zeitlin, Not Reported in Fed. Supp. (2023)

No. 114-74, § 301, 129 Stat. 584, 588 (codified as amended at 47 U.S.C. § 227).

As a threshold matter, we must decide whether defendants' arguments related to the enforceability of Section 227(b)(1)(A)(iii) in the relevant time period are best considered under Rule 12(b)(1) or Rule 12(b)(6). The absence of a constitutionally valid statute under which to bring a claim "does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citations omitted). Consequently, district courts possess jurisdiction over a claim so long as the constitutional validity of the cause of action is arguable. See id. Only when the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous" is dismissal under Rule 12(b)(1) appropriate. See id. (quoting Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). Our court of appeals likewise advises "[w]hen disposing of a claim brought under an unconstitutional statute, courts ordinarily deny the claim on the merits, on the ground that the statute under which relief is sought is unconstitutional, rather than for lack of subject matter jurisdiction." Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 82 (3d Cir. 2003) (citing, *inter alia*, Martin v. United Way of Erie Cnty., 829 F.2d 445, 447 (3d Cir. 1987); Kulick v. Pocono Downs Racing Ass'n, 816 F.2d 895, 898 (3d Cir. 1987)).

Defendants are not the first to raise a jurisdictional challenge regarding enforceability of the TCPA between 2015 and July 6, 2020. Many courts, including some in our circuit, have addressed these arguments under Rule 12(b)(1) because they attack the constitutional validity of Section 227(b)(1)(A)(iii) during the stated time period. See, e.g., Morales v. Sunpath Ltd., No. 1:20-CV-1376, 2022 WL 610766, at *4 (D. Del. Feb. 1, 2022) (citations omitted); Cunningham v. Matrix Fin. Servs., LLC, 531 F. Supp. 3d 1164, 1181 (E.D. Tex. 2021); Hussain v. Sullivan Buick-Cadillac-GMC Truck, Inc., 506 F. Supp. 3d 1242, 1245 (M.D. Fla. 2020); Creasy v. Charter Commc'ns, Inc., 489 F. Supp. 3d 499, 504-05 (E.D. La. 2020). Others have found enforceability, even if raised under Rule 12(b)(1), to be more appropriately considered under Rule 12(b)(6) because the analysis hinges on how the court construes the anti-robocall provision in light of AAPC. See, e.g., Lindenbaum v. Realgy, LLC, 13 F.4th 524, 527-28 (6th Cir. 2021), *cert. denied*, 4—— U.S. ——, 142 S. Ct. 1362 (2022); Pavelka v. Charter Commc'ns, Inc., No. 3:20-

CV-1557, 2021 WL 5566390, at *3 (D. Conn. Nov. 29, 2021); Williamson v. Irving K Motor Co., No. 3:21-CV-1599, 2022 WL 2053179, at *4 (N.D. Tex. June 7, 2022).

**\*5** We find the reasoning and case law supporting the latter view more persuasive. Defendants concede their position on Section 227(b)(1)(A)(iii) is "controversial." (See Doc. 39 at 3). As we will discuss *infra*, the effect of AAPC on Section 227(b)(1)(A)(iii) is amenable to multiple reasonable constructions. The success of defendants' argument depends entirely on which construction we adopt. See Steel Co., 523 U.S. at 89, 118 S.Ct. 1003 (quoting Bell, 327 U.S. at 689, 66 S.Ct. 785). Moreover, even if we were to adopt defendants' proffered construction, their reading would defeat only a portion of the claims advanced in the amended complaint —some plaintiffs will still theoretically be entitled to relief. See Lindenbaum, 13 F.4th at 527. Plaintiffs' claims under Section 227(b)(1)(A)(iii) are not wholly insubstantial or frivolous; see Steel Co., 523 U.S. at 89, 118 S.Ct. 1003; they are substantial and colorable. We will therefore consider defendants' arguments regarding enforceability under Rule 12(b)(6) rather than Rule 12(b)(1).

### B. Personal Jurisdiction

Section 227 of the TCPA does not authorize nationwide service of process. See 47 U.S.C. § 227; Mims, 565 U.S. at 381 n.11, 132 S.Ct. 740. Thus, we may exercise personal jurisdiction over a nonresident of the forum state only to the extent authorized by the law of the forum. See FED. R. CIV. P. 4(e), (k)(1); Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 297 (3d Cir. 1985); see also Fischer v. FedEx, 42 F.4th 366, 382 (3d Cir. 2022) (citing Max Daetwyler, 762 F.2d at 297), *cert. denied*, —— U.S. ——, 143 S. Ct. 1001 (2023). Pennsylvania's long-arm statute grants jurisdiction coextensive with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001) (citing 42 PA. CONS. STAT. § 5322(b)). Our constitutional inquiry is guided by the "minimum contacts" test established in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Under this test, plaintiff must show the nonresident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." See id. at 316, 66 S.Ct. 154 (internal quotation marks and citations omitted); see also Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007) (citation omitted). The focus of the minimum contacts analysis is "the relationship among the defendant, the forum, and the litigation," Shaffer v. Heitner,

433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), with the focus on whether the defendant has fair warning they may be subject to suit in the forum, see Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001) (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)); Marten, 499 F.3d at 296. "[T]he mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." World-Wide Volkswagen, 444 U.S. at 298, 100 S.Ct. 580 (internal quotation marks and citation omitted).

Federal courts must possess one of two forms of personal jurisdiction to comport with these principles. See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). General jurisdiction allows a court to exercise jurisdiction over all claims against a party possessing contacts with the forum state so " 'continuous and systematic' as to render them essentially at home" there. Daimler AG v. Bauman, 571 U.S. 117, 127, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) (citing Helicopteros, 466 U.S. at 414 n.9, 104 S.Ct. 1868)); Chavez v. Dole Food Co., 836 F.3d 205, 223 (3d Cir. 2016) (en banc). Specific jurisdiction, on the other hand, allows the court to hear only claims arising out of or relating to the defendant's contacts with the forum state. Helicopteros, 466 U.S. at 414 n.8, 104 S.Ct. 1868; Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006).

**\*6** Plaintiffs proceed solely on a theory of specific jurisdiction. (See Doc. 46 at 20-21). Specific jurisdiction usually is assessed on a claim-by-claim basis. O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 n.3 (3d Cir. 2007) (citing Remick, 238 F.3d at 255-56). This is true even when, like here, plaintiffs bring a putative class action because, to paraphrase our court of appeals, a named plaintiff cannot accomplish as a representative of a class what they cannot achieve on their own. See Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 734 (3d Cir. 1970); see also Fischer, 42 F.4th at 375. Specific jurisdiction requires each named plaintiff to "establish with reasonable particularity" (1) defendants directed their activities at the forum state, (2) each claim arises out of defendants' activities in Pennsylvania, and (3) exercising personal jurisdiction in Pennsylvania will not offend traditional notions of fair play and substantial justice. [2] See Danziger & De Llano, LLP v. Morgan Verkamp LLC,

948 F.3d 124, 129-30 (3d Cir. 2020) (citations and internal quotation marks omitted).

Defendants contest the merits of Shoemaker and Gindin's claims but do not contest our specific jurisdiction over those claims. (See Doc. 39 at 38-45; Doc. 50 at 14, 18). Nor could they. Shoemaker and Gindin are residents of Pennsylvania and they allege defendants placed or directed illegal robocalls to their cell phones, both of which bear Pennsylvania area codes. (See Doc. 33 ¶¶ 61, 64, 66, 114, 138). We reasonably may infer plaintiffs' injuries—the phone calls they received— occurred in Pennsylvania. See Shelton v. Nat'l Gas & Elec., LLC, No. 17-4063, 2019 WL 1506378, at \*7 (E.D. Pa. Apr. 5, 2019). By directing calls to Pennsylvania residents possessing Pennsylvania phone numbers, defendants purposely availed themselves of Pennsylvania and its laws. See Grand Ent. Grp., Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction." (citations omitted)); see also Abramson v. CWS Apartment Homes, LLC, No. 16-426, 2016 WL 6236370, at \*4 & n.47 (W.D. Pa. Oct. 24, 2016) (collecting cases). We possess specific jurisdiction over the claims brought by Shoemaker and Gindin against all defendants. [3]

**\*7** Johnson, Starling, and McCormick, however, are not residents of Pennsylvania. Johnson was a resident of Alabama at the time of his call and currently resides in Sweden. (See Doc. 33 ¶¶ 69-70). Starling and McCormick are residents of Texas. (See id. ¶¶ 72, 74). None of the three allege they received their calls while in Pennsylvania or attribute a Pennsylvania phone number to their cell phones. Insofar as can be reasonably inferred from plaintiffs' amended complaint, it is entirely possible Johnson, Starling, and McCormick have never set foot in Pennsylvania. We simply cannot say defendants' alleged conduct toward these three plaintiffs was directed at the Commonwealth of Pennsylvania. See Danziger, 948 F.3d at 129-30. We will dismiss Johnson's, Starling's, and McCormick's as named plaintiffs without prejudice. [4]

### C. Failure to State a Claim

#### 1. *TCPA*

Plaintiffs' TCPA claims are grounded in defendants' alleged violations of Section 227(b)(1)(A)(iii). Consequently, we must address defendants' threshold assertion that the TCPA's

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01083-JPW   Document 20-2   Filed 11/04/25   Page 101 of 120

Shoemaker v. Zeitlin, Not Reported in Fed. Supp. (2023)

prohibition on robocalls was unenforceable during part of the time period relevant to plaintiffs' claims.

### a. Enforceability

The TCPA prohibits certain undesirable telemarketing practices. See Facebook, Inc. v. Duguid, 593 U.S. ——, 141 S. Ct. 1163, 1167-68, 209 L.Ed.2d 272 (2021); AAPC, 140 S. Ct. at 2343-44 & n.1. Section 227(b) of the TCPA specifically prohibits initiating a robocall to a cell phone unless the call is made for "emergency purposes," the recipient has given their prior express consent, or the call falls within an exemption created by the Federal Communications Commission. See 47 U.S.C. § 227(b)(1)(A)(iii), (2)(C); see also AAPC, 140 S. Ct. at 2344-45 (citing 47 U.S.C. § 227(b)(1)(A)(iii)). The TCPA also provides a private cause of action against violators of its provisions. See 47 U.S.C. § 227(b)(3). Violators of Section 227(b)(1)(A)(iii) are liable for the plaintiff's actual damages or statutory damages of $500, whichever is greater; for willful or knowing violations, damages are trebled. See id. § 227(b)(3); see also AAPC, 140 S. Ct. at 2345 (citing 47 U.S.C. § 227(b)(3)).

Congress enacted Section 227(b)(1)(A) in 1991. See AAPC, 140 S. Ct. at 2344. Originally, Section 227(b)(1)(A) prohibited, in relevant part, " 'any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using ... an artificial or prerecorded voice' to 'any telephone number assigned to a ... cellular telephone service.' " See id. (quoting Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 3, 105 Stat. 2394, 2395-96) (codified at 47 U.S.C. § 227)) (emphasis omitted). Congress amended Section 227(b)(1)(A) in 2015 to include an exception for calls "made solely to collect a debt owed to or guaranteed by the United States." See id. at 2344-45 (citation omitted). The Supreme Court struck down this exception on July 6, 2020, in its plurality opinion in AAPC. See generally id.

 **\*8** Most relevant to defendants' arguments, six Justices agreed the exception for government debt collectors "impermissibly favored debt-collection speech ... in violation of the First Amendment," although they differed significantly as to how they arrived at this conclusion. See id. at 2343 (plurality opinion). Seven Justices then agreed the unconstitutional provision was severable from Section 227(b)(1)(A)(iii) and, accordingly, invalidated the government-debt exception but left in place "the longstanding robocall

restriction." See id. at 2355. The justices, however, failed to specify whether they intended the severance to apply only prospectively or retroactively. Justice Kavanaugh, writing for himself, the Chief Justice, and Justice Alito, addressed the implications of severance in footnote 12:

> [A]lthough our decision means the end of the government-debt exception, no one should be penalized or held liable for making robocalls to collect government debt after the effective date of the 2015 government-debt exception and before the entry of final judgment by the District Court on remand in this case .... On the other side of the ledger, our decision today does not negate the liability of parties who made robocalls covered by the robocall restriction.

Id. at 2355 n.12. Justice Gorsuch, dissenting on the question of severance, took issue with this footnote. See id. at 2366 (Gorsuch, J., concurring in the judgment in part and dissenting in part). Joined by Justice Thomas, Justice Gorsuch observed the logic of footnote 12 "shields *only* government-debt collection callers from past liability ... [and] endors[es] the very same kind of content discrimination we say we are seeking to eliminate." Id.

Highlighting the tension between the AAPC plurality and Justice Gorsuch's partial concurrence, defendants present two arguments against the validity of some of plaintiffs' TCPA claims and the scope of plaintiffs' class allegations. First, they argue severance applies prospectively only, leaving Section 227(b)(1)(A)(iii) unenforceable between its enactment in 2015 and the Supreme Court's decision in AAPC. (See Doc. 39 at 51). Second, even if severance does apply retroactively, they argue—as Justice Gorsuch suggested—footnote 12 operates to create a new content-based restriction on speech, once again rendering Section 227(b)(1)(A)(iii) unenforceable between 2015 and issuance of AAPC. (See id. at 51-52).

Our court of appeals has not yet had occasion to consider these questions. In the immediate wake of AAPC, a handful of district courts determined the decision rendered Section 227(b)(1)(A)(iii) retroactively unenforceable. See,

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 102 of 120

Shoemaker v. Zeitlin, Not Reported in Fed. Supp. (2023)

e.g., Creasy, 489 F. Supp. at 503; Cunningham, 531 F. Supp. 3d 1164 (citing Creasy, 489 F. Supp. 3d 499); Hussain, 506 F. Supp. 3d at 1244-45 (same); Lindenbaum v. Realgy, LLC, 497 F. Supp. 3d 290 (N.D. Ohio 2020) (same), rev'd, 13 F.4th 524 (6th Cir. 2021). As the dust has settled, however, a strong majority—including several courts in this circuit—has coalesced around the opposite view, that Section 227(b)(1)(A)(iii) is fully enforceable as to robocalls predating AAPC. See, e.g., Morales, 2022 WL 610766, at *6 & n.78 (collecting cases); Franklin v. Navient, Inc., 534 F. Supp. 3d 341, 346-47 (D. Del. 2021); Williamson, 2022 WL 2053179, at *6 (citations omitted); see also Boisvert v. Carnival Corp., No. 8:20-CV-2076, 2021 WL 1329079, at *2 (M.D. Fla. Mar. 12, 2021) (judge who decided Hussain reversing course and adopting emerging majority view). Most significantly, the Court of Appeals for the Sixth Circuit reversed the district court's decision in Lindenbaum and rejected the positions now advanced by defendants regarding retroactivity and the First Amendment. See Lindenbaum, 13 F.4th at 528-30. The Sixth Circuit reasoned that severance, at least in this context, was an act of constitutional interpretation capable of applying retroactively. See id. at 529-30. The court explained: AAPC "recognized only that the Constitution had 'automatically displace[d]' the government-debt-collector exception from the start, then interpreted what the statute has always meant in its absence." Id. at 530 (quoting Collins v. Yellen, 594 U.S. ——, 141 S. Ct. 1761, 1788-89, 210 L.Ed.2d 432 (2021)) (alteration in original). The court also squarely rejected the notion applying the anti-robocall provision to telemarketers not seeking to collect government-related debt during the retroactive period created a "First Amendment problem." See id.

**\*9** Adding to the persuasive weight of the Sixth Circuit's decision in Lindenbaum are two district court cases from our own circuit. See Morales, 2022 WL 610766, at *7-8; Franklin, 534 F. Supp. 3d at 345-47. In Franklin, Judge Bibas, sitting with the district court by designation, cast footnote 12 as mere *dictum* that does not, in and of itself, exculpate from liability under Section 227(b)(1)(A)(iii) robocallers who sought to collect government-related debts between 2015 and AAPC. See Franklin, 534 F. Supp. 3d at 347 (citing AAPC, 140 S. Ct. at 2355 n.12 (plurality opinion)); see also Morales, 2022 WL 610766, at *4 n.63 (collecting cases observing similarly). Judge Bibas also concluded Section 227(b)(1)(A)(iii) does not create a content-based disparity because it subjects all robocallers to the same degree of civil liability for conduct within the retrospective time frame.[5] See Franklin, 534 F. Supp. 3d at 346-47, 349.

We find the reasoning laid out by the Sixth Circuit, Judge Bibas, and other courts rejecting defendants' arguments to be persuasive.[6] We conclude Section 227(b)(1)(A)(iii) was enforceable throughout the period relevant to the matter *sub judice* and creates no conflict with the First Amendment. We will deny defendants' motion to dismiss claims and to strike class allegations related to calls initiated prior to July 6, 2020.

### b. **Sufficiency**

We now turn to the sufficiency of the remaining plaintiffs' claims. Courts weighing the plausibility of TCPA claims generally require plaintiffs to aver facts supporting three elements: (1) the defendant or their agent initiated a call to a cell phone number belonging to the plaintiff, (2) using a prerecorded or artificial voice, and (3) without obtaining the plaintiff's prior consent. See, e.g., Smith v. Direct Bldg. Supplies, LLC, No. 20-3583, 2021 WL 4623275, at *2 (E.D. Pa. Oct. 7, 2021) (citation omitted); Smith v. Vision Solar LLC, No. 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020) (same); Aaronson v. CHW Grp., Inc., No. 1:18-CV-1533, 2019 WL 8953349, at *1 (E.D. Va. Apr. 15, 2019). The first element—which is the only element defendants dispute, (see Doc. 39 at 18-37)—requires a plaintiff to plead facts supporting "the defendant actually, physically initiated the telephone call at issue," see Aaronson, 2019 WL 8953349, at *2 (citing Childress v. Liberty Mut. Ins. Co., No. 17-CV-1051, 2018 WL 4684209, at *3 (D.N.M. Sept. 28, 2018)); accord Direct Bldg. Supplies, 2021 WL 4623275, at *3. What this usually requires in practice is pleading facts tracing the call to the defendant or their agent. See Direct Bldg. Supplies, 2021 WL 4623275, at *3; Scruggs v. CHW Grp., Inc., No. 2:20-CV-48, 2020 WL 9348208, at *9 (E.D. Va. Nov. 12, 2020).

The gravamen of plaintiffs' pleadings is the alleged arrangement between Zeitlin, his companies, and an assortment of PACs to robocall thousands of people, solicit donations, and divide the proceeds. (See, e.g., Doc. 33 ¶¶ 29-58). We find this "scheme" sufficiently connects the calls identified by the remaining plaintiffs (Shoemaker and Gindin) to the defendants via a two-link chain of plausible inferences.

**\*10** The first link is the connection between the PACs and the calls. Shoemaker and Gindin claim the voices on their calls purported to solicit donations on behalf of two PACs—respectively, PODA and HALE. (See Doc. 33 ¶¶ 114, 138).

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 103 of 120

Shoemaker v. Zeitlin, Not Reported in Fed. Supp. (2023)

The factual allegation that the callers identified themselves as calling on behalf of these PACs creates the plausible inference the calls were in fact made on their behalf. PODA's FEC filings document PODA receiving an "itemized individual contribution" from Shoemaker for $300 on April 26, 2018—the day of the alleged call to Shoemaker. (See id. ¶¶ 114, 119; PODA 2018 FEC Report). Had the caller been a prankster or fraudster merely pretending to represent PODA as defendants suggest, (see Doc. 39 at 29-31), Shoemaker's donation never would have made it to PODA.

The next link is the connection between the PACs and defendants. Plaintiffs plead the existence of a dubious hand-in-glove relationship between the PACs in question and Zeitlin and his companies. PODA reported to the FEC raising $624,367.22 in 2018, the year of the call to Shoemaker. (See Doc. 33 ¶¶ 114, 125; see also PODA 2018 FEC Report). PODA spent $496,484.02 the same year (an election year) on operating expenditures compared to $20,000 on identifiable political activities. (See Doc. 39 ¶ 126; see also PODA 2018 FEC Report). Of those operating expenses, PODA paid 88.6% to defendants. (See Doc. 33 ¶¶ 125-132; see also PODA 2018 FEC Report). The year of Gindin's call, HALE took in $5,647,945.22 and spent $4,844,861.94 with 83.8% of those outlays going to what are alleged to be Zeitlin-affiliated entities. (See Doc. 33 ¶¶ 56, 81, 149-64; see also HALE 2021-22 FEC Report). Few of HALE's payments to defendants and none of PODA's are coded as something plausibly related to telemarketing expenses, but plaintiffs allege the labels given to the payments "were coded in such a way to conceal the illegal telemarketing operation that was taking place." (See HALE 2021-22 FEC Report; PODA 2018 FEC Report; Doc. 33 ¶¶ 134-136).

The extensive outlays to Zeitlin-affiliated companies—whose line of business is alleged to be telemarketing—gives rise to the plausible inference all or most of PODA's and HALE's fundraising activity is conducted by those entities. [7] In other words, the facts pled are sufficient to support the notion that defendants, along with other Zeitlin-affiliated entities, were PODA's and HALE's predominate fundraisers. When this inference is combined with the inference the calls came from legitimate representatives of PODA and HALE, we find plaintiffs plausibly plead traceability, i.e., one of the Zeitlin-affiliated entities, either directly or through one of

their agents, initiated the calls to Shoemaker and Gindin. [8] The amended complaint only names ATS, UDS, and CC as defendants, but all three received payments from PODA and HALE raising a plausible claim each may have initiated the calls in question. Plaintiffs also plead facts supporting the conclusion these entities, along with the others named in the complaint, are essentially shells used to obscure a singular telemarketing enterprise orchestrated by Zeitlin. (See Doc. 33 ¶¶ 51-57, 99-106). Zeitlin's role at the center of the alleged scheme, considering the broad range of agency theories incorporated into the TCPA, gives rise to a plausible claim he too may be liable as an initiator of the calls. [9] With facts pled supporting traceability of the calls to defendants we will deny defendants' motion to dismiss Shoemaker's and Gindin's TCPA claims.

### 2. *Unjust Enrichment*

**\*11** Defendants argue plaintiffs' unjust enrichment claims must fail because plaintiffs do not plead facts supporting defendants received a benefit from their alleged TCPA violations. (See Doc. 39 at 46-47). Plaintiffs offer neither argument nor legal authority in answer to defendants' challenge to their unjust enrichment claim. We deem plaintiffs' failure to respond to this dispositive legal argument an abandonment of their claims. See Brice v. City of York, 528 F. Supp. 2d 504, 516 n.19 (M.D. Pa. 2007) (Conner, J.) (citing D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999)); Brown v. Pa. State Dep't of Health, 514 F. Supp. 2d 675, 678 n.7 (M.D. Pa. 2007) (Conner, J.) (same); see also Levy-Tatum v. Navient Sols., Inc., 183 F. Supp. 3d 701, 712 (E.D. Pa. 2016) (collecting cases). We will dismiss plaintiffs' unjust enrichment claims without prejudice.

### IV. Conclusion
We will grant in part and deny in part defendants' motion to dismiss. We will also deny their motion to strike. An appropriate order shall issue.

### All Citations

Not Reported in Fed. Supp., 2023 WL 3826460

---

## Footnotes

1    See also 2018 Financial Summary for Police Officers Defense Alliance LLC, FED. ELECTION COMM'N, https://www.fec.gov/data/committee/C00667865/?cycle=2018 (last visited Mar. 23, 2023) ("PODA 2018 FEC Report"); 2021-22 Financial Summary for Honoring American Law Enforcement PAC, FED. ELECTION COMM'N, https://www.fec.gov/data/committee/C00710178/ (last visited Mar. 23, 2023) ("HALE 2021-22 FEC Report").

2    Plaintiffs' TCPA and unjust enrichment claims arise from phone calls defendants allegedly placed or directed to plaintiffs. (See Doc. 33 ¶¶ 228-239; see also Doc. 46 at 2-4 (describing plaintiffs' unjust enrichment claims as being "concomitant" with TCPA claims)). Hence, we may consider the two substantive claims together when ascertaining the presence of contacts necessary to support specific jurisdiction. See O'Connor, 496 F.3d at 318 n.3.

3    Defendants argue the claims against Zeitlin should be dismissed for lack of personal jurisdiction because he purportedly has no connection to ATS, UDS, CC, or any of the other named entities in the amended complaint. (See Doc. 39 at 43-44). In support of this argument, defendants submit an affidavit from Zeitlin averring he is "neither an owner nor an officer" of any of the named entities and does "not ... operate, control or have the right and ability to supervise, direct or control" any of the entities. (See Doc. 40). Defendants also argue we lack personal jurisdiction over Gindin's claim because ATS, UDS, and CC were all dissolved by the time Gindin received his call on July 14, 2021. (See Doc. 39 at 11, 44). Defendants submit Delaware public records purporting to demonstrate the claimed dissolution. (See Docs. 39-3, 39-4, 39-5). Plaintiffs dispute the accuracy of these records and point to other records indicating the entities were still operating after the date claimed by defendants. (See Doc. 46 at 5-8). Zeitlin's true relationship with the entities named in the amended complaint and the legal status of those entities throughout the period of time relevant to this action are disputes of fact reserved for resolution by the trier of fact. See Carteret Sav. Bank, 954 F.2d at 148. Plaintiffs plead sufficient facts supporting specific jurisdiction over Zeitlin, ATS, UDS, and CC to survive a motion to dismiss under Rule 12(b)(2). See Metcalfe, 566 F.3d at 330; Carteret Sav. Bank, 954 F.2d at 142 n.1.

4    District courts cannot dismiss a claim for lack of personal jurisdiction without first considering transferring the claim to a more appropriate forum under 28 U.S.C. § 1631. See Danziger, 948 F.3d at 132. Section 1631 provides the original court "shall, if it is in the interest of justice, transfer such action ... to any other such court" in which the case could have been brought when it was filed. See 28 U.S.C. § 1631. The court may transfer the entire action or a portion of the action. See D'Jamoos, 566 F.3d at 110. The amended complaint is silent with respect to where Johnson, Starling, and McCormick received the calls at issue, and it does not specify an area code associated with any of their cell phones; it is thus unclear in which court their claims could have been brought. Accordingly, we will dismiss Johnson, Starling, and McCormick as named plaintiffs, without prejudice to their ability to participate in this lawsuit as putative class members or to bring their individual claims in an appropriate forum.

5    Judge Bibas ultimately concludes punitive damages are unavailable against defendants who sought to collect government-related debt between 2015 and July 6, 2020, because of due process issues. See Franklin, 534 F. Supp. 3d at 349.

6    Even if footnote 12 were binding precedent, the plurality disclaims the very position defendants ask us to adopt. The plurality explicitly insists "our decision today does not negate the liability of parties who made robocalls covered by the robocall restriction." See AAPC, 140 S. Ct. at 2355 n.12 (plurality opinion). The use

---

of the past tense "covered" makes clear the plurality intends for past violators of Section 227(b)(1)(A)(iii) to remain liable. It would be nonsensical to adopt the first sentence as binding but not the second.

7    Defendants contend a large portion of HALE's disbursements were paid to entities not named as defendants. (See Doc. 39 at 28). This may well be true. But the entities receiving those disbursements are alleged to be controlled by Zeitlin, (see Doc. 33 ¶¶ 151-164), and we view them as potentially incorporated into plaintiffs' lawsuit as defendants through John Doe entities 1-10.

8    Defendants admit the TCPA allows for direct and vicarious liability. (See Doc. 39 at 19, 23-24). The consensus among federal courts is the TCPA incorporates the full range of vicarious-liability theories grounded in federal common-law agency principles. See, e.g., Henderson v. United Student Aid Funds, Inc., 918 F.3d 1068, 1072 (9th Cir. 2019) (citation omitted); Hodgin v. UTC Fire & Sec. Americas Corp., 885 F.3d 243, 251-52 (4th Cir. 2018) (citation omitted). However, our court of appeals has expressed skepticism as to the availability of personal-participation liability against corporate officers under the TCPA. See City Select Auto Sales Inc. v. David Randall Assocs., Inc., 885 F.3d 154, 159-60 (3d Cir. 2018).

9    Defendants deny plaintiffs' allegation that Zeitlin owns or controls the entity defendants, (see Doc. 39 at 43-44), but we must take their allegation to be true for purposes of this motion.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 106 of 120

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

🚩 KeyCite Yellow Flag

Distinguished by    Marks v. Unique Lifestyle Vacations, LLC,    E.D.Pa.,
May 5, 2023

2022 WL 1003762
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Stewart SMITH, individually and on
behalf of all others similarly situated

v.

AMERICAN-AMICABLE LIFE
INSURANCE COMPANY OF TEXAS

CIVIL ACTION NO. 22-333
|
Filed 04/04/2022

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA,
Jeremy C. Jackson, Bower Law Associates, PLLC, State
College, PA, for Stewart Smith.

Frederick P. Santarelli, Steven C. Tolliver, Jr., Elliott
Greenleaf, P.C., Blue Bell, PA, for American-Amicable Life
Insurance Company of Texas.

**MEMORANDUM RE: DEFENDANT'S
MOTION TO DISMISS**

Baylson, District Judge

**I. Introduction**

 **\*1**  Defendant American-Amicable Life Insurance Company
of Texas has filed a Motion to Dismiss (ECF 7) in this case
arising from alleged calls made by Defendant to Plaintiff
Stewart Smith. Plaintiff alleges that these calls invaded his
privacy and violated his rights under the Telephone Consumer
Protection Act.

**II. Background and Factual Allegations**

Smith is a resident of Pennsylvania whose phone number is
on the National Do Not Call Registry. American-Amicable is
a life insurance company based in Texas. (Compl. ¶¶ 6–7, 26.)
As alleged by Plaintiff, the events giving rise to this case are
as follows.

On June 7, 2021, Smith received a phone call that he
alleges began with a prerecorded message regarding available
insurance benefits. Smith was informed that he was speaking
with American-Amicable and was given a callback number.
Smith was not interested and ended the call. (Id. ¶¶ 30–35.)

Smith then received another call on June 9, 2021, that
again began with a prerecorded message regarding available
insurance benefits and on which he was again informed that
he was speaking with American-Amicable. Smith informed
the caller that he would contact them if he was interested. (Id.
¶¶ 36–42.) Following these two phone calls, Smith received
two live calls regarding American-Amicable products from
the callback number he was given on the June 7 phone call.
(Id. ¶¶ 43–44.)

Plaintiff brought a putative class action against Defendant,
alleging that the calls violated the TCPA, 47 U.S.C. §
227, et seq. Plaintiff brings two Counts. Count I alleges
that American-Amicable violated the TCPA by making
prerecorded, non-emergency calls to Smith. (Id. ¶¶ 59–63).
Count II alleges that American-Amicable violated the TCPA
and its implementing regulations by, directly or though an
agent, making multiple telemarketing calls within a 12-month
period to a phone number registered in the National Do Not
Call Registry. (Id. ¶¶ 64–66.)

Plaintiff seeks to certify and represent a separate class for
each Count. The Count I class would consist of all people
in the United States who, within the last four years, received
a pre-recorded call on their cell phone from or on behalf of
American-Amicable. The Count II class would consist of all
people in the United States who, within the last four years,
received two or more telemarketing calls on their residential
landline from or on behalf of American-Amicable and to a
telephone number that had been registered in the National Do
Not Call Registry for more than thirty days at the time of the
call. (Id. ¶ 49.)

Defendant seeks dismissal of both Counts. Plaintiff filed a
Response (ECF 9), and Defendant filed a Reply (ECF 10).

**III. Legal Standard**

In considering a motion to dismiss under Rule 12(b)(6),
the Court must "accept all factual allegations as true [and]
construe the complaint in the light most favorable to the
plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84
(3d Cir. 2011) (quoting Pinker v. Roche Holdings Ltd., 292

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 107 of 120

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

F.3d 361, 374 n.7 (3d Cir. 2002)). To survive the motion, a plaintiff must "plead 'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for misconduct alleged.' " Id. (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). Importantly, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## IV. Discussion

### a. Traceability of Calls to Defendant

**\*2**  In a TCPA action, the "plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff's ... phone." Smith v. Direct Building Supplies, LLC, No. CV 20-3583, 2021 WL 4623275, at \*3 (E.D. Pa. Oct. 7, 2021) (Schiller, J.) (quoting Scruggs v. CHW Grp., Inc., No. CV 20-48, 2020 WL 9348208, at \*9 (E.D. Va. Nov. 12, 2020)). Defendant contends that Plaintiff has failed to plead facts sufficient to establish that the prerecorded calls are traceable to American-Amicable. (MtD 7–15.)

In support of his conclusion that the prerecorded calls were made by or on behalf of American-Amicable, Plaintiff alleges that he was informed on both the prerecorded calls and the subsequent live calls that he was "speaking with American-Amicable," and he was directed to American-Amicable's website during the second prerecorded call. (Compl. ¶¶ 31–39.) Plaintiff further alleges that he was given a callback number with a Texas area code during the first prerecorded call, suggesting, in Plaintiff's view, a connection to the Texas-based American-Amicable. (Compl. ¶¶ 31–33.)

The Court finds that, if true, Plaintiff's allegation that he was informed during both prerecorded calls that he was speaking with American-Amicable supports a plausible inference that Smith was indeed called by or on behalf of American-Amicable. This inference is also supported by the allegation that both calls concerned insurance benefits—American-Amicable's area of business. See Direct Building Supplies, 2021 WL 4623275, at \*3 (discussing how "details specifying how [the plaintiff] knew that [the defendant] in fact placed these calls" may include that "the persons with whom [the plaintiff] spoke identified themselves as representatives of [the defendant], or the services these persons attempted to sell were" the defendant's services).

### b. Pre-Recorded Message Claim

The TCPA provides in relevant part that it is unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A). Defendant argues that Plaintiff has failed to plead sufficient facts to establish that the allegedly prerecorded calls he received were, in fact, prerecorded. (MtD 16–18.) Plaintiff counters that his Complaint addresses the "tenor, nature, or circumstances" of the call such as to give rise to a plausible inference that the calls were prerecorded. (MtD Resp. 9–10.)

Allegations that may support an inference that a call was prerecorded may include 1) a delay before hearing the message, 2) calls ending with a beep, 3) instructions to call a 1-800 number, 4) an unusual phone number or short code instead, 5) a robotic voice on the other end, or 6) the absence of anything specific to the person being called. Smith v. Pro Custom Solar LLC, No. CV1920673KMESK, 2021 WL 141336, at \*2–3 (D.N.J. Jan. 15, 2021); see also Johansen v. Vivant, Inc., No. 12 C 7159, 2012 WL 6590551, at \*3 (N.D. Ill. Dec. 18, 2012) (discussing how "[a] TCPA plaintiff could describe the robotic sound of the voice on the other line, the lack of human response when he attempted to have a conversation with the 'person' calling him, [or] the generic content of the message he received").

**\*3**  Plaintiff's allegations regarding the allegedly prerecorded calls are very thin. Plaintiff alleges that the caller ID for both calls was "spoofed" to make them falsely appear to be coming from a local number, which Plaintiff characterizes as "further indication of the *en masse* nature of the calling." (Compl. ¶¶ 28–29.) This allegation is itself conclusory, as Plaintiff does not aver his basis for concluding that the caller ID was "spoofed." Nor does Plaintiff cite any support for the premise that a "spoofed" caller ID is distinct to prerecorded calls.

Plaintiff provides no further allegations to support his conclusion that the June 7 and June 9 calls were prerecorded. To the contrary, Plaintiff describes the substance of the allegedly prerecorded calls as essentially the same as the alleged live calls he received, even alleging that he was informed on both a prerecorded call and the live calls that he was speaking with a person named "Isaac." (Id. ¶¶ 30–44.) See Trumper v. GE Cap. Retail Bank, 79 F. Supp. 3d 511, 513 (D.N.J. 2014) (dismissing a TCPA claim in which

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 108 of 120

Smith v. American-Amicable Life Insurance Company of Texas, Not Reported in Fed....

the plaintiff "provide[d] no factual allegations suggesting that that the voice on the other end of the line was prerecorded").

Because Plaintiff's allegations do not provide the basis for a plausible inference that the allegedly prerecorded calls he received were actually prerecorded, the Court will dismiss Count I without prejudice and with leave to amend. Should Plaintiff choose to amend his Complaint, he must do more than "merely proffer[ ] the content of the message[s] and conclusory allege[ ] that Defendant utilized a pre-recorded message," as "[s]uch bare-bones, conclusory allegations are insufficient to survive a motion to dismiss." Manopla v. Sansone Jr.'s 66 Automall, No. CV1716522FLWLHG, 2020 WL 1975834, at *2 (D.N.J. Jan. 10, 2020).

### c. National Do Not Call Registry Claim

The TCPA, in conjunction with it implementing regulations, prohibits an entity, or those acting on its behalf, from initiating multiple telemarketing calls in a twelve-month period to a "residential telephone subscriber who has registered his or her telephone number" in the National Do Not Call Registry. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c).

Plaintiff does not plead in his Complaint that the cell phone on which he received the alleged calls is his residential phone. See Smith v. Vision Solar LLC, No. CV 20-2185, 2020 WL 5632653, at *3 (E.D. Pa. Sept. 21, 2020) (Baylson, J.) (dismissing a similar TCPA claim because "[p]laintiffs never pleaded that Smith's cell phone line in question is his residential phone, as required"). Although Plaintiff contends

in his Response that he "clearly alleges that his cellular telephone is his residential telephone line," (MtD Resp. 10), he must make this factual allegation in his Complaint if he wishes the Court to consider it. See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)).

Accordingly, the court will dismiss Count II without prejudice and with leave to amend. Additionally, although the Court is not ruling at this stage on whether to certify Plaintiff's proposed Count II class, the Court notes that Plaintiff is not a member of his proposed class as the Complaint currently stands; the proposed class consists of people who received telemarketing calls on their residential landline, whereas Plaintiff alleges only that he received telemarketing calls on his cell phone. See Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 360 (3d Cir. 2013) ("It is axiomatic that the lead plaintiff must fit the class definition.").

### V. Conclusion

**\*4** For the foregoing reasons, the Court will dismiss Plaintiff's Complaint without prejudice and with leave to amend. An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2022 WL 1003762

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 109 of 120

Smith v. Direct Building Supplies, LLC, Not Reported in Fed. Supp. (2021)

🚩 KeyCite Yellow Flag

Declined to Extend by    Abramson v. AP Gas & Electric (PA), LLC,
W.D.Pa.,   February 6, 2023

2021 WL 4623275
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Stewart SMITH, individually and on behalf
of all others similarly situated, Plaintiff,
v.
DIRECT BUILDING SUPPLIES, LLC and Does 1
through 10, inclusive, and each of them, Defendants.

CIVIL ACTION No. 20-3583
|
Filed 10/07/2021

**Attorneys and Law Firms**

Cynthia Z. Levin, Law Offices of Todd M. Friedman PC, King
of Prussia, PA, for Plaintiff.

Brian J. Murren, Kevin L. Hall, Tucker Arensberg, P.C.,
Lemoyne, PA, for Defendant Direct Building Supplies LLC.

## MEMORANDUM

Schiller, District Judge

**\*1**  Stewart Smith alleges that Direct Building Supplies,
LLC, its subsidiaries, and its agents (collectively, "Direct
Building Supplies"[1]) violated the Telephone Consumer
Protection Act ("TCPA"), 47 U.S.C. § 227, by unlawfully
contacting Smith and purported class members to solicit
them to purchase Direct Building Supplies' services without
their consent and while they were on the National Do-
Not-Call ("DNC") Registry. Before the Court is Direct
Building Supplies' Motion to Dismiss Smith's First Amended
Complaint ("FAC"), in which Direct Building Supplies
contends that Smith's factual allegations fail to state a claim
pursuant to Fed. R. Civ. P. 12(b)(6). Direct Building Supplies
also maintains that Smith's class allegations and definitions
are deficient as a matter of law and thus should be stricken
pursuant to Fed. R. Civ. P. 12(f).

This is not Smith's first trip to the courthouse alleging
violations of the TCPA. For example, in May 2020, Smith

filed a TCPA lawsuit in this District against renewable
energy company Vision Solar. Smith's claims here echo
his allegations against Vision Solar and the several other
companies he has sued. For its part, several portions of Direct
Building Supplies' Motion to Dismiss are virtually identical
to the defendant's motion to dismiss in the Vision Solar action.
It is as if the Court is receiving one of the robocalls Smith
disdains.

Nevertheless, the Court finds that the FAC's factual
allegations fail to state a claim under the TCPA. Accordingly,
the Court will grant Direct Building Supplies' Motion to
Dismiss without prejudice, and will also grant Smith leave to
file a second amended complaint.

## I. FACTUAL BACKGROUND

Direct Building Supplies is a construction and home
contracting company. (FAC ¶ 5.) Smith alleges that Direct
Building Supplies called Smith's cellular phone number
ending in -6860 five times within a four-month span at the
end of 2019 and beginning of 2020: on or around October
4, 2019; October 6, 2019; November 1, 2019; January 17,
2020; and January 21, 2020. (Id. ¶¶ 8-10.) During each of
these calls, there was a "noticeable pause and delay before
Defendant came on the line" and attempted to sell its services
to Smith. (Id. ¶¶ 8-9, 19.) The calls were of an "impersonal
nature." (Id. ¶¶ 9, 11.)

Smith never provided his consent to Direct Building Supplies
to receive calls on his cellular phone that were made using an
automatic telephone dialing system ("ATDS") or an artificial
or prerecorded voice. (Id. ¶ 13.) Smith and Direct Building
Supplies had no relationship prior to the October 4 call. (Id.
¶ 9.) Smith's cellular phone number ending in -6860 was
registered on the National DNC Registry on June 11, 2010.
(Id. ¶ 15.)

The FAC seeks to certify two classes. The first is the "ATDS
Class," defined as "[a]ll persons within the United States
who received any solicitation/telemarketing telephone calls
from Defendant or its agent to said person's cellular telephone
for whom Defendant has no record of prior express consent
for such calls within the four years prior to the filing of
this Complaint." (Id. ¶ 24.) The second is the "DNC Class,"
defined as "[a]ll persons within the United States registered
on the National Do-Not-Call Registry for at least 30 days
who received more than one call made by or on behalf of
Defendant that promoted Defendant's products or services,

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 110 of 120

Smith v. Direct Building Supplies, LLC, Not Reported in Fed. Supp. (2021)

within any twelve-month period, within four years prior to the filing of the complaint." (*Id.* ¶ 25.)

**\*2** The FAC contains four counts. Counts I and II, brought by Smith on behalf of the ATDS Class, allege that Direct Building Supplies violated TCPA § 227(b) by placing calls using an ATDS or pre-recorded voice without the class members' prior express consent. Counts III and IV, brought by Smith on behalf of the DNC class, allege that Direct Building Supplies violated TCPA § 227(c)(5) and related regulations by placing multiple calls to class members' phones registered on the National DNC Registry within a twelve-month span.

Direct Building Supplies moved to dismiss all counts on November 25, 2020. Smith filed a timely response in opposition on December 8, 2020. Smith also requested leave to amend his pleadings to address, *inter alia*, any "lack of sufficient allegations" in the event the Court granted Direct Building Supplies' Motion to Dismiss. (Pl.'s Opp'n to Def.'s Mot. to Dismiss ["Pl.'s Opp'n"] at 10.)

On March 15, 2021, counsel for Smith wrote a letter to the Court directing its attention to *Smith v. Vision Solar LLC*, Civ. A. No. 20-2185, 2020 WL 7230975 (E.D. Pa. Dec. 8, 2020) ("*Vision Solar II*"), an opinion in another TCPA case filed by Smith and a co-plaintiff in this District. Smith's counsel wrote that in *Vision Solar II*, "the Honorable Judge Michael Baylson issued an order denying in full that Motion to Dismiss on which [Direct Building Supplies' motion] is based" in this action. Counsel for Smith further pointed out that Direct Building Supplies' "Motion was an almost verbatim copy of a Motion to Dismiss filed and pending in" the Vision Solar action, written by attorneys at a different law firm.[2]

*Vision Solar II* came three months after *Smith v. Vision Solar LLC*, Civ. A. No. 20-2185, 2020 WL 5632653 (E.D. Pa. Sept. 21, 2020) ("*Vision Solar I*"), in which Judge Baylson dismissed Smith and his co-plaintiff's First Amended Complaint for failure to state a claim. Judge Baylson also granted Smith and his co-plaintiff leave to amend the first amended complaint to address deficiencies both in their factual and class allegations, culminating in *Vision Solar II*.

## II. STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and make all reasonable inferences in favor of the non-moving

party. *Bd. of Trustees of Bricklayers & Allied Craftsmen Loc. 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 272 (3d Cir. 2001). Fed. R. Civ. P. 8(a)(2) provides that "a pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." This claim for relief must be "plausible on its face," containing "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* In other words, a complaint must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

## III. DISCUSSION

### A. Counts I and II: The ATDS Claims

To state a claim under TCPA § 227(b), a plaintiff must allege: "(1) the defendant called a cellular telephone number; (2) using an [ATDS or prerecorded or artificial voice]; (3) without the recipient's prior express consent." *Zemel v. CSC Holdings LLC*, Civ. A. No. 18-2340, 2018 WL 6242484, at \*3 (D.N.J. Nov. 29, 2018). Direct Building Supplies argues that the FAC does not state a cause of action under TCPA § 227(b) because it does not contain facts that support a finding that Direct Building Supplies called Smith using an ATDS. Direct Building Supplies also argues that the FAC does not include any factual allegations that plausibly suggest that Direct Building Supplies placed phone calls to Smith in the first instance, since it is bereft of allegations concerning the names and identities of the persons with whom Smith allegedly spoke on the phone, as well as the substance of his conversations with those persons.

**\*3** An ATDS is a piece of equipment with the capacity to "either to store a telephone number using a random or sequential number generator, or to produce a telephone number using a random or sequential number generator," and to dial such numbers. *Facebook, Inc. v. Duguid*, ––– U.S. ––––, 141 S. Ct. 1163, 1167, 209 L.Ed.2d 272 (2021). A plaintiff must provide "at least some [ ] detail regarding the content of the messages or calls, thereby rending the claim that an ATDS was used more plausible." *Camunas v. Nat'l Republican Senatorial Comm.*, Civ. A. No. 21-1005, 2021 WL 2144671 (E.D. Pa. 2021) (quoting *Zemel*, 2018 WL 6242484, at \*3). "[C]ourts in this district continue to find that an allegation of a brief pause at the beginning of a call is sufficient to plead the ATDS element." *Hazan v. Wells Fargo*

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 111 of 120

Smith v. Direct Building Supplies, LLC, Not Reported in Fed. Supp. (2021)

*Home Mortg.*, Civ. A. No. 18-10228, 2020 WL 919183, at *3 (D.N.J. Feb. 26, 2020); *see also Vision Solar II*, 2020 WL 7230975, at *4 ("For Rule 12 purposes, the distinctive pause at the beginning of repeated marketing calls allows an inference that the caller was using an ATDS.")

Further, "at the pleadings stage, plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff's cellular phone." *Scruggs v. CHW Grp., Inc.*, Civ. A. No. 20-418, 2020 WL 9348208, at *10 (E.D. Va. Nov. 12, 2020); *see also Vision Solar I*, 2020 WL 5632653, at *3 (quoting *Aaronson v. CHW Group, Inc.*, Civ. A. No. 18-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019)) ("[W]ithout any facts to explain why plaintiff believes the identified phone number is owned by defendant, ... plaintiff has failed to plead facts sufficient to support a theory of direct liability under the TCPA because plaintiff's allegations do not show plausibly that defendant actually, physically initiated the telephone calls at issue.").

The Court finds that the FAC has sufficiently alleged the use of an ATDS by Direct Building Supplies, as it alleges that there was a "noticeable pause and delay before Defendant came on the line" during each of the five offending calls, as well as that Smith had no prior relationship with Direct Building Supplies prior to the October 4 call. (FAC ¶ 9.)

However, Smith has not pleaded facts sufficient to identify Direct Building Supplies as the initiator of the offending calls. The FAC merely states that "Defendant contacted Plaintiff on Plaintiff's cellular telephone number ending in -6860, in an attempt to solicit Plaintiff to purchase Defendant's services," "Defendant [ ] called Plaintiff," and that "Defendant placed multiple calls soliciting its business to Plaintiff." (*Id.* ¶¶ 8, 10, 18.) The FAC, however, provides no details specifying how Smith knew that Direct Building Supplies in fact placed these calls, such as that Direct Building Supplies' name appeared in the caller ID on Smith's cellular phone, the persons with whom Smith spoke identified themselves as representatives of Direct Building Supplies, or the services these persons attempted to sell were construction or home contracting services. Smith's opposition does not address Direct Building Supplies' arguments on this point; it merely puts forth that "Defendant sought to solicit its services to Plaintiff and thus the calls were solicitation calls" and that "[t]hese calls were from Defendant." (Pl.'s Opp'n at 7-10.) These circular, conclusory allegations constitute the "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" that do not pass muster under the *Iqbal* pleading standard.

Further, Smith's allegations regarding the identity of the initiator of the calls are even more barren than those provided in *Vision Solar I*, *Aaronson*, and *Scruggs*, all of which featured TCPA claims that were dismissed because of a failure to plead details sufficient to identify the caller. *See Vision Solar I*, 2020 WL 5631653, at *3 (finding that plaintiffs did not sufficiently plead that the calls in question came from defendant when they only alleged that "Defendant contacted or attempted to contact [one of the Plaintiffs] from multiple telephone numbers confirmed to belong to Defendant"); *Scruggs*, 2020 WL 9348208, at *10 ("The sole factual allegation linking [Defendant] to the calls is that the caller identified himself as 'associated with [Defendant]' " which is "insufficient under the *Iqbal* pleading standards"); *Aaronson*, 2019 WL 8953349, at *2 ("The lone fact marshalled in the Complaint that even comes close to supporting plaintiff's conclusion that defendant was the party that called his cellular telephone is the allegation that one of the calls made to plaintiff was from a telephone number that, according to the Complaint, 'is one of the Defendant's many telephone numbers.' But without any facts to explain why plaintiff believes the identified phone number is owned by defendant, this allegation amounts to nothing more than another conclusory allegation that defendant made the calls to plaintiff's cellular phone.").

**\*4** Smith has therefore failed to plausibly allege that the five calls in question came from Direct Building Supplies, as TCPA § 227(b) claims require. The Court will dismiss the ATDS claims without prejudice and will permit Smith to amend the complaint to provide further relevant information.

### B. Counts III and IV: DNC Claims

To establish a DNC claim under TCPA § 227(c)(5) and related regulations, a plaintiff must plead facts that plausibly demonstrate: (1) they received multiple calls within twelve months, (2) from the same entity, (3) to a phone number registered on the National DNC Registry. *See Huber v. Pro Custom Solar, LLC*, Civ. A. No. 19-1090, 2020 WL 2525971, at *2 (M.D. Pa. May 18, 2020) (citing 47 C.F.R. § 64.1200(c) (2)). Here too the Court agrees with Direct Building Supplies that Smith's DNC claims fail because the FAC does not contain facts sufficient to establish that Direct Building Supplies placed the offending phone calls. The Court will thus dismiss the DNC claims without prejudice and will permit Smith to amend the complaint to provide further relevant information.

Smith v. Direct Building Supplies, LLC, Not Reported in Fed. Supp. (2021)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 112 of 120

**IV. CONCLUSION**

For the reasons set forth above, Direct Building Supplies' Motion to Dismiss is granted, but Smith may file an amended complaint. Direct Building Supplies' Motion to Strike is denied as moot. An Order consistent with this Memorandum will be docketed separately.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4623275

---

**Footnotes**

1    Smith brings the FAC against Direct Building Supplies, LLC and ten unidentified Doe defendants, whom he alleges constitute Direct Building Supplies, LLC's subsidiaries and agents.

2    In the future, counsel would be wise to not lift much of the language in its papers word-for-word from other attorneys.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   4

Worsham v. Travel Options, Inc., Not Reported in Fed. Supp. (2016)

KeyCite Yellow Flag

Disagreed With by  Newell v. JR Capital, LLC,  E.D.Pa.,   July 16, 2025

2016 WL 4592373
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Michael C. WORSHAM, Plaintiff

v.

TRAVEL OPTIONS, INC., et al., Defendants.

CIVIL NO. JKB-14-2749
|
Signed September 1, 2016
|
Filed 09/02/2016

**Attorneys and Law Firms**

Michael C. Worsham, Forest Hill, MD, pro se.

## MEMORANDUM

James K. Bredar, United States District Judge

**\*1**  Plaintiff Michael C. Worsham filed this lawsuit
against Travel Options, Inc., and Clifford Shannon, alleging
violations of the Telephone Consumer Protection Act of 1991
("TCPA"), codified at  47 U.S.C. § 227, and the Maryland
Telephone Consumer Protection Act ("MTCPA"), codified
at  Md. Code Ann., Com. Law §§ 14-3201 and  14-3202
(LexisNexis 2013). (Compl., ECF No. 1.) He asked for total
damages of $64,000 and injunctive relief. Service was made
on the two Defendants (ECF No. 6), but neither one appeared
or filed an answer. At Worsham's request, the Clerk entered
defaults against both Defendants. (ECF Nos. 9, 10.) Now
pending before the Court is Worsham's motion for default
judgment. (ECF Nos. 18, 19.) In his motion, Worsham asks
for total statutory damages of $18,000 ($8,000 under the
TCPA and $10,000 under the MTCPA) to be awarded jointly
and severally against both Defendants and for injunctive
relief. [1]  As will be explained below, default judgment will be
entered against Travel Options, Inc., only; judgment will be
entered for Defendant Shannon.

## I. Standard for Default Judgment

The Supreme Court has opined that a default judgment may
be lawfully entered only "according to what is proper to
be decreed upon the statements of the bill, assumed to be
true."  Thomson v. Wooster, 114 U.S. 104, 113 (1884). "
'The defendant, by his default, admits the plaintiff's well
pleaded allegations of fact, is concluded on those facts by
the judgment, and is barred from contesting on appeal the
facts thus established....The defendant is not held...to admit
conclusions of law.' "  Ryan v. Homecomings Fin. Network,
253 F.3d 778, 780 (4th Cir. 2001) (quoting Nishimatsu Constr.
Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir.
1975)). It is the court's task, therefore, to "determine whether
the well-pleaded allegations in [plaintiff's] complaint support
the relief sought...."  Ryan, 253 F.3d at 780. Mere default
"does not in itself warrant the court in entering a default
judgment. There must be a sufficient basis in the pleadings
for the judgment entered."  Nishimatsu, 515 F.2d at 1206; see
also  DirecTV, Inc. v. Pernites, 200 Fed.Appx. 257, 258 (4th
Cir. 2006) (per curiam).

The Court surmises that "well-pleaded allegations of fact"
sufficient to support a default judgment are equal in quality
and character to those factual allegations sufficient for
a complaint to survive a motion to dismiss under Federal Rule
of Civil Procedure 12(b)(6). Compare Ryan, 253 F.3d at 780
("well-pleaded allegations" in complaint must support relief
sought), with  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)
("When there are well-pleaded factual allegations, a court
should assume their veracity and then determine whether they
plausibly give rise to an entitlement to relief."). Under Rule
8(a)(2), a plaintiff must "show" he is entitled to relief, and
that "requires more than labels and conclusions"; "a formulaic
recitation of the elements of a cause of action will not do."
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). See also
Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements
of a cause of action, supported by mere conclusory statements,
do not suffice."). The principle that a court must accept as
true all of the complaint's allegations only applies to factual
allegations; legal conclusions couched as factual allegations
need not be accepted as binding.  Iqbal, 556 U.S. at 678.
Further, a court need not accept "unwarranted inferences,
unreasonable conclusions, or arguments."  United States ex
rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d
131, 136 (4th Cir. 2014).

## II. Allegations of the Complaint

**\*2**  Worsham alleges he resides in Harford County,
Maryland, and that he "has continuously subscribed to and
used his phone number 410-557-6192, which has been on

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 114 of 120

Worsham v. Travel Options, Inc., Not Reported in Fed. Supp. (2016)

the National Do Not Call list over 8 years since July 15, 2006, and is a Verizon Wireless cell phone number." (Compl. ¶ 1.) The two Defendants are Travel Options, Inc., which "is a Florida for-profit corporation incorporated in October 2010 with an address" in Boca Raton, Florida, and Clifford Shannon, described by Worsham as "an individual who lives in Florida, and who has been President and registered agent for Travel Options, Inc. at all times relevant to this suit." (*Id.* ¶¶ 2, 3.)

Through the use of "Caller ID," Worsham identified four calls to his number from the same Florida number, 954-656-4091, which were made July 16-18, 2014. (*Id.* ¶ 9.) During the first three calls, no message was left. (*Id.* ¶ 10.) It is reasonable to infer that the first three calls went to an answering machine or to voicemail in Worsham's home, although he does not so state, and that the caller hung up without leaving a message. Worsham says he answered the fourth call and spoke with a man who said he was Jim Allison with Travel Options. (*Id.* ¶ 11.) Allison allegedly told Worsham that he had an unused travel credit of $750 from attending a timeshare presentation in either Florida or Las Vegas in the preceding two to four years, and then Allison offered to sell a travel package to Worsham that would incorporate the unused travel credit. (*Id.*) Allison indicated the travel package had a Florida part, a Las Vegas part, and a cruise, all of which was worth over $4,000, but Worsham's cost after applying the credit would only be $697 if he agreed to participate in a ninety-minute timeshare presentation. (*Id.*) Allison further indicated the travel package was essentially a tax write-off for the timeshare companies "and a way to keep rooms occupied that would otherwise be empty." (*Id.*) Worsham did not attend a timeshare presentation anywhere in the two to four years preceding the telephone conversation. (*Id.* ¶ 13.) Additionally, Worsham has no business relationship of any kind with Defendant, its affiliates, agents, contractors, or partners, and he never gave any prior permission for any of them to call him. (*Id.* ¶ 24.)

Worsham makes many other allegations, but these amount to his conclusions with no supporting factual basis. For example, he alleges Shannon exercised decision-making control over Travel Options's policies, procedures, and business practices and, as well, Shannon made the decisions causing the calls and violations. (*Id.* ¶ 16.) He also alleges the name of the telemarketer is available for transmission via Caller ID by Defendants' carrier. (*Id.* ¶¶ 22, 23.) In addition, Worsham alleges Travel Options has no policy or procedures pertaining to the Do Not Call ("DNC") registry, as required by the TCPA

and by rules promulgated by the Federal Communications Commission ("FCC"). (*Id.* ¶ 27.) Also, Worsham alleges "Defendants' calls used an '*automatic telephone dialing system*' (ATDS) as defined by 47 U.S.C. § 227(a)(1) and 47 C.F.R. § 64.1200(f)(2)." (*Id.* ¶ 29.) He further alleges, "Defendants are all aware and know about, and approve of, the telemarketing calling patterns and practices used in their calling centers and/or used by of [*sic*] their agents or contractors" (*id.* ¶ 38), "Defendants all ratified the acts and conduct of all person [*sic*] involve [*sic*] in the Scam..." (*id.* ¶ 40), and "Defendants failed to pay the annual fee for access to telephone numbers within Plaintiff's area code 410 that are included on the National DNC list registry maintained by the FTC" (*id.* ¶ 44). None of these additional allegations rests on facts logically within the knowledge of Worsham, and he provides no supporting factual allegations for them.

**\*3** Worsham's complaint includes twenty-four counts based on alleged violations of the TCPA, FCC rules, Federal Trade Commission ("FTC") rules, and the MTCPA:

- Count 1: Each call violated the TCPA's and FCC's prohibition on initiating calls to a telephone number on the DNC list.

- Count 2: Each call violated the TCPA's and FCC's prohibition on initiating any telephone call using an automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a cellular telephone service.

- Count 3: Each call violated the TCPA's and FCC's requirement to identify the caller, the person or entity on behalf of whom the call is made, and a telephone number or address at which the person or entity may be contacted.

- Count 4: Each call violated the TCPA's and FCC's requirement to transmit caller identification and to include the calling number and the name of the telemarketer if the name is available by the telemarketer's carrier.

- Count 5: The TCPA and/or FCC rule violation in Count 1 violated the MTCPA.

- Count 6: The TCPA and/or FCC rule violation in Count 2 violated the MTCPA.

- Count 7: The TCPA and/or FCC rule violation in Count 3 violated the MTCPA.

Worsham v. Travel Options, Inc., Not Reported in Fed. Supp. (2016)

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 115 of 120

• Count 8: The TCPA and/or FCC rule violation in Count 4 violated the MTCPA.

• Counts 9 through 12: The four calls violated the FTC's Telemarketing Sales Rule and, therefore, also violate the MTCPA.

• Counts 13 through 16: The four calls violated the FTC regulation mandating that a telemarketer pay an annual fee for access to telephone numbers on the DNC list and, therefore, violated the MTCPA.

• Counts 17 through 20: The four calls violated the FTC regulation requiring that a telemarketer disclose the seller's identity, the call's purpose to sell goods or services, and the nature of the goods or services and, therefore, violated the MTCPA.

• Counts 21 through 24: The four calls violated the FTC regulation prohibiting a failure to transmit or cause to transmit the telephone number and, when made available by the telemarketer's carrier, the telemarketer's name to any caller identification service used by the call's recipient and, therefore, violated the MTCPA.

### III. Applicable Law

The TCPA was passed in response to numerous complaints from both consumers and businesses about telemarketing calls, *i.e.*, telephone calls to market goods and services. Pub. L. 102-243, § 2. The Act is codified in section 227, Title 47, United States Code. The TCPA "was enacted to protect consumer privacy interests" and "seeks primarily to protect subscribers from unrestricted commercial telemarketing calls." Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991, 68 Fed. Reg. 44,144, 44,150, 44,165 (July 25, 2003). Relevant to the instant case, subsection *b* prohibits unconsented-to, nonemergency calls using any automatic telephone dialing system or an artificial or prerecorded voice to certain telephone lines, including any telephone number assigned to a cellular service; subsection *c* directed the FCC to promulgate regulations aimed at establishment and operation of a national database of telephone numbers of residential subscribers who object to receiving telephone solicitations and, further, permitted the FCC to prohibit telephone solicitations to any number in the database; and subsection *d* makes it unlawful, *inter alia*, for anyone to make a telephone call using an automatic telephone dialing system that does not comply with the technical and procedural standards prescribed by the FCC.

**\*4**  The TCPA permits a person to institute a private action based on a violation of subsection *b* and the regulations prescribed under that subsection "to enjoin such violation [and/or] ...to receive $500 in damages for each such violation," § 227(b)(3); as well, subsection *c* grants a right of private action to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under [subsection *c*]...to enjoin such violation [and/or]...to receive up to $500 in damages for each such violation," § 227(c)(5). No private right of action is granted under any other subsection of § 227.

The FCC is charged with the responsibility of prescribing regulations to implement the requirements of the TCPA's various subsections and, accordingly, has promulgated regulations codified at 47 C.F.R. § 64.1200. The FCC has addressed the specific concerns expressed in subsection *b* within § 64.1200(a), and it has addressed those expressed in subsection *c* within § 64.1200(c). What the FCC has prescribed in § 64.1200(b) implements subsection *d* of the TCPA, which mandates regulations for technical and procedural standards for telephone calls initiated by an automatic telephone dialing system or calls using an artificial or prerecorded voice system; likewise, the requirements of § 64.1200(d) set forth the procedural standards for telemarketers to maintain their own, company-specific, do-not-call lists and, consequently, appear to fall under the aegis of subsection *d* of the TCPA.

The regulations published by the FCC as §§ 64.1600 through 64.1605, referred to in Worsham's motion for default judgment, p. 10, are mostly in furtherance of the FCC's duty to regulate services of telephone carriers, in particular, "to establish federal policies and rules governing calling number identification service (caller ID) on an interstate basis" made necessary by new telephone switching technology that "has fostered new telephone services for both business and residential use." Calling Number Identification, 56 Fed. Reg. 57,300 (Nov. 8, 1991). *See also* Calling Number Identification, 59 Fed. Reg. 18,318 (Apr. 18, 1994) (publishing final rule pertaining to Caller ID services; noting addition of new Subpart P to Part 64 of Title 47, Code of Federal Regulations). In recognition of the role played by Caller ID in helping consumers avoid unwanted calls, and in conjunction with other amendments to its TCPA regulations in § 64.1200 *et seq.*, the FCC specifically amended this set of regulations in 2003 by adding §

64.1601(e), which requires telemarketers to transmit caller identification information, including either calling party number ("CPN") or automatic number identification of the calling party's billing number ("ANI") and, when available by the telemarketer's carrier, the telemarketer's name; this regulation also prohibited telemarketers from blocking the transmission of caller identification information. Rules and Regulations Implementing...(TCPA), 68 Fed. Reg. at 44,179. However, it is not clear whether § 64.1601(e) is promulgated under either subsection *b* or subsection *c* of the TCPA. Caller ID technology does not fit neatly into the focus of either subsection, neither of which requires the use of such technology to accomplish their respective purposes. Thus, it is also not clear whether a violation of § 64.1601(e) falls within the private right of action granted by subsection *b* or subsection *c*. It seems just as likely that the FCC may have only intended to ensure consistency between its preexisting Caller ID regulations and its revised TCPA regulations and/ or the FTC's regulations pertaining to telemarketing when the FCC promulgated § 64.1601(e); those efforts all occurred at the same time, in 2003. Additionally, the FCC said, "Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers." 68 Fed. Reg. at 44,156. Therefore, the FCC's rule in § 64.1601(e) appears to *support* consumers' enforcement efforts under the TCPA's subsection *c*, rather than to *create* a separate mechanism upon which a consumer can make an actionable claim.

**\*5** The FTC has enacted its Telemarketing Sales Rule ("TSR") in Title 16, Part 310, of the Code of Federal Regulations pursuant to its responsibilities mandated in 15 U.S.C. § 6102. Telemarketing Sales Rule, 68 Fed. Reg. 4580 (Jan. 29, 2003). Worsham's complaint relies upon § 310.4(a)(8), § 310.4(b)(1)(iii)(B), § 310.4(d)(1),[2] and § 310.8a. Section 310.4(a)(8) prohibits abusive conduct in telemarketing by the caller's "[f]ailing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call."[3] Section 310.4(b)(1)(iii) (B) prohibits initiation of a telemarketing call to a person when that person's telephone number is on the DNC list. Section 310.4(d)(1) prohibits a telemarketer's failure "to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call...[t]he identity of the seller." Last, § 310.8(a) prohibits any seller from initiating or causing a telemarketer to initiate a call "to any person whose telephone number is within a given area code" unless the

seller, directly or indirectly, "first has paid the annual fee" for access to numbers within that area code that are included in the DNC list.

Under the MTCPA, a violation of either the Telemarketing and Consumer Fraud and Abuse Prevention Act, as implemented by the FTC's Telemarketing Sales Rule, or the TCPA, as implemented by 47 U.S.C. § 64.1200, is also considered an unfair or deceptive trade practice under Maryland statutory law. Md. Code Ann., Com. Law § 14-3202(a). However, only a violation of the TCPA that is subject to a private right of action, *i.e.*, one arising under either 47 U.S.C. § 227(b) or (c), is actionable under the MTCPA. Worsham v. Ehrlich, 957 A.2d 161, 171-72 (Md. Ct. Spec. App. 2008). *See also* Worsham v. Accts. Receivable Mgmt., Inc., 497 Fed.Appx. 274, 278 (4th Cir. 2012) (*per curiam*) (agreeing with holding in *Worsham v. Ehrlich* that violation of 47 C.F.R. § 64.1200(b) did not state claim under MTCPA).

### IV. Analysis

Preliminarily, the Court addresses the issue of vicarious liability, which seems to be the basis for Worsham's suit against Clifford Shannon, the president and registered agent of Defendant Travel Options. The FCC has ruled that vicarious liability for TCPA violations may exist under federal common-law principles of agency. In re DISH Network, LLC, 28 FCC Rcd. 6574 (2013). *See also* Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 674 (2016) (finding "no cause to question" FCC's ruling on vicarious liability under TCPA). However, "in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." Meyer v. Holley, 537 U.S. 280, 286 (2003) (applying trust principle of vicarious liability to violation of Fair Housing Act). Under general rules of agency law, a corporate officer or director's personal liability "must be 'founded upon specific acts by the individual director or officer.' " Roylance v. ALG Real Estate Servs., Inc., Case No. 5:14-cv-02445-PSG, 2015 U.S. Dist. LEXIS 44930, at \*19, 2015 WL 1522244 (N.D. Cal. Mar. 16, 2015) (citation omitted), *report and recommendation modified in part on other grounds and adopted as modified by* 2015 U.S. Dist. LEXIS 44933, 2015 WL 1544229 (N.D. Cal. Apr. 3, 2015). Thus, " 'courts have declined to find personal liability [when] there has been little evidence of the corporate officer's direct participation in the wrongdoing.' " *Id.* (alteration in original) (citation omitted) (declining to recommend the entry of default judgment against corporate officer under TCPA because

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 117 of 120

Worsham v. Travel Options, Inc., Not Reported in Fed. Supp. (2016)

of inadequate factual allegations). Worsham's complaint makes "naked assertion[s]," *see Twombly*, 550 U.S. at 557, regarding Shannon, but those conclusions, couched as factual allegations, are insufficient to nudge the complaint against Shannon "across the line from conceivable to plausible," *id.* at 570. Consequently, the Court will enter judgment for Shannon.

### A. Count 1

**\*6** In § 64.1200(c), the FCC prohibited the initiation of any telephone solicitation to a residential telephone subscriber who has registered his telephone number on the national DNC registry. Further, in § 64.1200(e), the FCC applied the prohibition in § 64.1200(c) to wireless telephone numbers. As earlier noted, Worsham has alleged that his cellular telephone number has been listed on the DNC registry since 2006, well before the four calls from Travel Options in 2014. In addition, Worsham has made factual allegations regarding the content of the fourth call that clearly lead to the conclusion that the calls were made for telemarketing purposes. Those allegations are sufficient to establish Worsham's entitlement to statutory damages under the TCPA of $500 per call. *See Dores v. One Main Financial*, Civ. No. 1:15-cv-1609-LO-MSN, 2016 U.S. Dist. LEXIS 81913, at \*5, 2016 WL 3511744 (E.D. Va. June 1, 2016) (agreeing with courts holding "that each call made in contravention of the TCPA constitutes an independent violation entitling the plaintiff to statutory damages"), *report and recommendation adopted by* 2016 U.S. Dist. LEXIS 81348, 2016 WL 3538370 (E.D. Va. June 21, 2016).

### B. Count 2

As it pertains to Worsham's case, the TCPA, in 47 U.S.C. § 227(b)(1)(A)(iii), prohibits any person from making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system...to any telephone number assigned to a...cellular telephone service." Thus, the elements of this TCPA violation, as alleged in Count 2, are (1) a call (other than one made for emergency purposes or made with the called party's prior express consent), (2) using any automatic telephone dialing system, and (3) to any telephone number assigned to a cellular telephone service.

Worsham's complaint suffices as to the first and third elements; he has provided sufficient factual basis as to the four telephone calls (the first element) and as to his telephone number being assigned to a cellular telephone

service (the third element). However, he has not provided "well pleaded factual allegations" as to the second element. He has, instead, made bare, conclusory allegations: the calls were made "using an automatic telephone dialing system (ATDS)" (Compl. ¶ 5); "Defendants used an ATDS to call Plaintiff's number, using a predictive dialer" (*id.* ¶ 6); "Defendants initiated and conspired to initiate at least 4 telephone solicitation calls using an automatic telephone dialing system (ATDS)" (*id.* ¶ 9); and Defendants' calls used an '*automatic telephone dialing system*' (ATDS) as defined by 47 U.S.C. § 227(a)(1) and 47 C.F.R. § 64.1200(f)(2)" (*id.* ¶ 29). These allegations are nothing more than "a formulaic recitation" of the second element of his cause of action in Count 2. "[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Iqbal*, 556 U.S. at 686. *See also Dominguez v. Yahoo, Inc.*, 629 Fed.Appx. 369, 373 (3d Cir. 2015) (unpublished) (finding assertion in affidavit that merely restated TCPA's statutory definition of automatic telephone dialing system "nothing more than a legal conclusion couched as a factual assertion"); *Williams v. T-Mobile USA, Inc.*, Case No. 15-cv-03384-JSW, 2015 U.S. Dist. LEXIS 140077, at \*4-5, 2015 WL 5962270 (N.D. Cal. Oct. 14, 2015) (plaintiff's allegations as to ATDS "no more than legal conclusions couched as fact"). As a result, Worsham has failed to show an entitlement to relief in Count 2. [4]

### C. Count 3

**\*7** Worsham alleges in Count 3 that the four calls violated 47 C.F.R. § 64.1200(d)(4), which requires a telemarketer "to provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted." As the Court earlier observed, § 64.1200(d)(4) is more appropriately viewed as setting procedural standards and, therefore, within the realm of the TCPA's subsection *d*, for which no private right of action exists. The Court has considered the analysis on this point in the case of *Burdge v. Assn. Health Care Mgmt., Inc.*, No. 1:10-CV-00100, 2011 U.S. Dist. LEXIS 9879, at \*7-10, 2011 WL 379159 (S.D. Ohio Feb. 2, 2011), and has found it persuasive; thus, the Court concludes Worsham does not possess a private right of action as to an alleged violation of 47 C.F.R. § 64.1200(d)(4). *See also Nat'l Fed'n of the Blind v. FTC*, 303 F. Supp. 2d 707, 718 (D. Md. 2004) (noting § 64.1200(d)(4) included in TCPA rules by FCC to ensure that commercial entities, including those outside FTC's jurisdiction, are similarly regulated as to provisions

**Worsham v. Travel Options, Inc., Not Reported in Fed. Supp. (2016)**

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 118 of 120

included in FTC's Telemarketing Sales Rule), *aff'd*, 420 F.3d 331 (4th Cir. 2005). *But see Charvat v. NMP, LLC,* 656 F.3d 440, 448 (6th Cir. 2011) (indicating, without analysis, that TCPA's subsection *c* was implemented in 47 C.F.R. § 64.1200(d)); *Drew v. Lexington Consumer Advocacy, LLC,* Case No. 16-cv-00200-LB, 2016 U.S. Dist. LEXIS 52385, at *16, 2016 WL 1559717 (N.D. Cal. Apr. 18, 2016) (same). Consequently, Count 3 fails to state a claim for relief.

#### D. Count 4

Worsham's next count asserts a violation of the TCPA by a violation of 47 C.F.R. § 64.1601(e)(1), based on a failure to transmit certain information via Caller ID. He additionally says the conduct of Travel Options violates the FTC's similar provision at 16 C.F.R. § 310(a)(7). A violation of the latter provision, of course, would not be considered a violation of the TCPA. Any cognizable violation of § 310(a)(7) would only be remediable, in this case, under the MTCPA; Worsham has made no claim under federal law on this point. The MTCPA counts are pled later in the complaint.

As previously concluded, an asserted violation of 47 C.F.R. § 64.1601(e)(1) is not properly brought under either the TCPA's subsection *b* or subsection *c*. Any violation of § 64.1601(e) (1) is a violation of technical and procedural standards under subsection *d*, and as earlier noted, no private right of action exists under the latter subsection of the TCPA. Count 4, consequently, fails to state a claim for relief.

#### E. Count 5

In the next count, Worsham claims the violation of the TCPA in Count 1 is also a violation of the MTCPA. The conduct at issue, making four calls to a telephone number on the DNC list, constitutes four, separate violations of the TCPA's subsection *b* and, therefore, constitutes four, separate violations of the MTCPA. As a result, Worsham has established his entitlement to $500 per call in statutory damages. Md. Code Ann., Com. L. § 14-3202(b)(2)(i), (c).

#### F. Count 6

In this count, Worsham seeks MTCPA damages based on the violation of 47 U.S.C. § 227(b)(1)(A)(iii), as asserted in Count 1, for using an automatic telephone dialing system to make the four calls. Having previously found that Worsham has failed to provide well-pleaded allegations of fact in support of Count 1, the Court concludes Count 6 fails to state a claim for relief.

#### G. Count 7

Next, Worsham seeks statutory MTCPA damages for the conduct on which Count 3 was based, that is, a violation of 47 C.F.R. § 64.1200(d)(4). The Court previously determined that Count 3 failed to state a claim for relief. For the same reason, Count 7 fails to state a claim for relief.

#### H. Count 8

This count under the MTCPA is premised upon the conduct alleged in Count 4 to have been in violation of 47 C.F.R. § 64.1601(e)(1). Because Count 4 was found deficient for the reason that a violation of that regulation may not be asserted in a private right of action, Count 8 is similarly deficient. An additional reason for denying relief on this count is that § 64.1601(e) is in Subpart P of Part 64, and the MTCPA only permits statutory damages for actions claiming violations of Subpart L of Part 64. Md. Code Ann., Com. L. § 14-3201(2).

#### I. Count 9 through Count 12

**\*8** Worsham has pleaded each of the four calls in separate counts as violations of the FTC's TSR rule prohibiting initiation of a telephone call to a person whose telephone number is on the DNC registry. He seeks statutory damages under the MTCPA for each call. His complaint adequately sets forth a claim for relief in these four counts, and Worsham will be awarded $500 per count.

#### J. Count 13 through Count 16

These four counts, seeking damages under the MTCPA, are based upon each of the four calls allegedly violating 16 C.F.R. § 310.8(a), prohibiting a telemarketing call to anyone within a given area code unless the seller has first paid the annual fee for access to the DNC list for that area code. Worsham's allegation that Travel Options did not pay the required annual fee is a bald conclusion with no supporting, well-pleaded factual allegations. Counts 13 through 16 fail to state a claim for relief.

#### K. Count 17 through Count 20

Each of these four counts asking for MTCPA statutory damages is premised upon an alleged failure to comply with 16 C.F.R. § 310.4(d)(1), which requires a telemarketer to "disclose truthfully, promptly, and in a clear and conspicuous manner" to the called party three things: the seller's identity; that the call's purpose is to sell goods or services; and the

Case 1:25-cv-01083-JPW    Document 20-2    Filed 11/04/25    Page 119 of 120

Worsham v. Travel Options, Inc., Not Reported in Fed. Supp. (2016)

nature of the goods or services. Worsham asserts that each of the four calls violated this regulation—the first three because the caller left no message at all (the Court presumes these calls went to an answering machine or to voicemail) and the fourth for reasons Worsham does not adequately allege. With regard to the first three calls, the FTC has stated that "telemarketers are not required to leave a recorded message on the answering machines of consumers who are not home to answer the telemarketer's call." Telemarketing Sales Rule, 68 Fed. Reg. at 4645. *See also* Rules and Regulations Implementing...(TCPA), 68 Fed. Reg. at 44,164 (FCC stating, "Calls that reach voicemail or an answering machine will not be considered 'answered' by the called party."). With that guidance from the relevant agencies, the Court concludes that the caller was not required to leave any message on Worsham's answering machine or voicemail for the first three calls and, therefore, not in violation of § 310.4(d)(1). As to the fourth call, Worsham alleged the caller identified himself as Jim Allison with Travel Options and then tried to sell a travel package to Worsham. The caller thus complied with § 310.4(d)(1). Worsham has failed to show he is entitled to relief in Counts 17 through 20.

### L. Count 21 through Count 24

Worsham's last four counts, also brought under the MTCPA, allege the four calls violated 16 C.F.R. § 310.4(a)(8) by failing to transmit to Worsham's Caller ID the caller's telephone number "and, when made available by the telemarketer's carrier, the name of the telemarketer." Certainly, Worsham has brought this case because his Caller ID *did* capture the caller's number on each of the four calls; so, the asserted violation based on a failure to transmit the caller's number clearly fails. As to the telemarketer's name, "when made available by the telemarketer's carrier," Worsham has made another bald allegation that the carrier for Travel Options made the caller's name available for Caller ID. Having failed to support Counts 21 through 24 with well-pleaded facts, Worsham's complaint fails to support his claimed entitlement to relief in those counts.

### M. Injunctive Relief

*9 In his complaint's prayer for relief, Worsham requests "an injunction prohibiting the Defendants or any person under their control from calling or assisting with calling any persons in Maryland in violation of the TCPA or FCC regulations." Both subsections *b* and *c* of the TCPA permit the award of injunctive relief "to enjoin such violation" of either subsection *b* or the regulations prescribed under subsection *b* or the regulations prescribed under subsection *c*. Because the authority for awarding injunctive relief in this case is statutory rather than common law, Worsham "need not plead and prove irreparable injury." *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 338 (4th Cir. 1983) (applying general rule to violations of 42 U.S.C. § 6901 *et seq.*).

The only "such violation[s]" of the TCPA established by Worsham's complaint are those pertaining to the four calls made to Worsham's number on the DNC list. So, injunctive relief will be awarded against Travel Options to bar any future violations of 47 C.F.R. § 64.1200(c) by it or anyone acting at its behest as to Worsham's numbers on the DNC list. Worsham's request for injunctive relief is aimed at calls by Travel Options to "any persons in Maryland." He has not, however, established an entitlement to serve in a representative capacity for "any persons in Maryland." Thus, the award will only be in regard to telephone numbers placed on the DNC list by Worsham.

### V. Conclusion

Worsham has established his entitlement to $6,000 in statutory damages, broken down as follows: $2,000 ($500 x 4 calls) for Count 1; $2,000 ($500 x 4 calls) for Count 5; and $2,000 ($500 per count) for Counts 9 through 12. A separate order will be entered awarding damages and injunctive relief and closing the case.

DATED this 1 st day of September, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4592373

---

**Footnotes**

1    In his motion, Worsham only pursues the statutory compensatory damages and does not seek the enhanced statutory damages for willful or knowing violation of the TCPA or FCC regulations.

2    Incorrectly cited as § 16.310.5(d)(1) in the complaint.

3    The Court notes the similarity between this part of the TSR and the FCC's rule in 47 C.F.R. § 64.1601(e), *see* *supra.*

4    One district court ruled the kind of allegations at issue here, which were made in that case "on information and belief," to be sufficient under Rule 8(a)(2). *Jackson v. Caribbean Cruise Line, Inc.,* 88 F. Supp. 3d 129, 139-40 (E.D.N.Y. 2015). The Court observes that the allegations made in *Twombly* "upon information and belief," which were comparable in alleging the elements of a cause of action, were judged by the Supreme Court to be insufficient under Rule 8(a)(2). 550 U.S. at 551, 564-65. Although "upon information and belief" may still be a legitimate form of pleading, it seems clear after *Twombly* that stating mere conclusions upon information and belief does not pass muster.

---

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   8