# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

BLAKE COOLEY,

     Plaintiff(s),

v.

FREEDOM FOREVER LLC, et al.,

     Defendant(s).

Case No.: 2:19-cv-00562-JCM-NJK

**Order**

[Docket No. 33]

     Pending before the Court is Plaintiff's motion to lift the stay of discovery as to the John Doe party. Docket No. 33. The Court has considered Plaintiff's motion, Defendant Freedom Forever's response, and Plaintiff's reply. Docket Nos. 33, 35, 36. The Court finds the motion is properly resolved without a hearing. *See* Local Rule 78-1.

     Plaintiff asks the Court to lift the stay of discovery with respect to the John Doe party only. Docket No. 33 at 2. Plaintiff additionally submits that he does not intend to seek discovery from Defendant Freedom Forever but, instead, that he wants to discover information in order to name the John Doe party prior to the August 9, 2019, deadline to comply with Federal Rule of Civil Procedure 4(m). *Id*. at 2-3. Plaintiff further submits that, in similar cases where discovery was stayed, multiple federal courts have authorized discovery into calling records related to Telephone Consumer Protection Act ("TCPA") claims. *Id*. at 2. Plaintiff submits that discovery into the John Doe party is necessary to identify the party and because the likelihood of destruction of relevant records increases with each passing day. *Id*. at 3.

In response, Defendant Freedom Forever LLC ("Defendant") submits that Plaintiff has failed to show good cause for his failure to serve the John Doe party. Docket No. 35 at 2-3. Defendant additionally submits that the John Doe party is not a true anonymous defendant, that there is no reason to believe that discovery would provide more information than Plaintiff already has about the John Doe party, and that there is nothing preventing Plaintiff from finding and serving Universal Energy without lifting the stay of discovery. *Id*. at 3.

In reply, Plaintiff submits that discovery was stayed pending Defendant's motion to dismiss; however, his claim against the John Doe party will remain whether Defendant's motion to dismiss is granted or denied. Docket No. 36 at 2. Plaintiff submits that Defendant's opposition does not provide a sufficient reason to deny his request and that he is not required to show good cause under Fed.R.Civ.P. 4(m) because he is not seeking to extend the 4(m) deadline at this time. *Id*. Plaintiff further submits that he previously undertook substantial efforts to identify the John Doe party, including issuing multiple subpoenas, and that he cannot meet the Court's deadline to identify and serve the John Doe party without discovery. *Id*. at 2-3.

For good cause shown, the Court **GRANTS** Plaintiff's motion, Docket No. 33, to lift the stay of discovery as to the John Doe party only.

IT IS SO ORDERED.

Dated: July 19, 2019

_____
Nancy J. Koppe
United States Magistrate Judge

Case 1:25-cv-01083-JPW    Document 28-1    Filed 11/21/25    Page 3 of 28
Levitt v. Fax.com, Not Reported in F.Supp.2d (2007)
2007 WL 3169078

KeyCite Yellow Flag

Disagreed With by A Fast Sign Co., Inc. v. American Home Services, Inc., Ga., November 5, 2012

2007 WL 3169078
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Bruce LEVITT, et al.

v.

FAX.COM, et al.

Civil No. WMN–05–949.
|
May 25, 2007.

**Attorneys and Law Firms**

Michael Craig Worsham, Law Office of Michael Craig Worsham, Forest Hill, MD, Stephen Howard Ring, Stephen H. Ring PC, Germantown, MD, for Bruce Levitt, et al.

Rodney E. Gould, Rubin Hay and Gould PC, Framingham, MA, Thomas S. Hood, Hood and Scholnick PA, Towson, MD, for Fax.Com, et al.

*MEMORANDUM*

WILLIAM M. NICKERSON, United States Senior District Judge.

**\*1** This suit arises out of three facsimile transmissions sent to Plaintiff Bruce Levitt in January and February of 2001. These transmissions advertised vacation packages offered by Defendant JD & T Enterprises, Inc. d/b/a Travel to Go (JD & T) and it is alleged that identical transmissions were sent, unsolicited, to thousands of Maryland residents. It is undisputed that the fax transmissions were actually sent by Defendant Fax.com. Furthermore, it is also undisputed that Fax.com was hired to send the faxes, not by JD & T directly, but by Creative Marketing Concepts (CMC), an independent marketing company hired by Defendant JD & T to market its vacation packages.

Plaintiff filed this action in the Circuit Court for Baltimore City on May 7, 2001, alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (TCPA). The TCPA makes it generally unlawful "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 42 U.S.C. § 227(b)(1)(C). Plaintiff initially named only Fax.com and JD & T as defendants.

On December 24, 2002, Judge Marcella Holland of the Baltimore City Circuit Court certified this suit as a class action. The class of plaintiffs was defined as:

> All persons, including business entities of any form, in Maryland, who received unsolicited advertisements transmitted by Fax .com, Inc, via facsimile promoting products and services offered for sale by or through JD & T Enterprises, Inc.

Order dated Dec. 24, 2002. Shortly thereafter, the Baltimore City Circuit Court granted a motion for summary judgment in favor of all defendants and dismissed the case. This dismissal was subsequently reversed by the Maryland Court of Appeals. *Levitt v. Fax.com, Inc .,* 857 A.2d 1089 (Md.2004). After the case was remanded to the Circuit Court, Plaintiff filed a "Second Amended Class Action Complaint" on February 23, 2005. This pleading added new defendants, including Creative Marketing Concepts, LLC and several individuals.

Two of the newly added individual defendants,[1] Matthew Buecler and Jeanette Bunn, removed the action to this Court on April 7, 2005, pursuant to provisions of the then recently enacted "Class Action Fairness Act of 2005," 28 U.S.C. 1332(d) (CAFA). On October 12, 2005, this Court denied Plaintiff's motion to remand and on December 1, 2005, this Court granted a motion to dismiss Buecler and Bunn.

During the period of time between the certification of the class action and the denial of Plaintiff's motion to remand, *Fax.com* apparently went out of business and ceased its participation in this litigation. Thus, the only remaining active defendant is Defendant JD & T. On January 12, 2007, Defendant JD & T filed a motion to decertify the class action. Paper No. 40. That motion is now ripe.

"Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *General Tel. Co. of the Southwest v. Falcon,* 457 U .S. 147, 160 (1982). In fact, a court "is duty bound to monitor [the] class decision and, where certification proves improvident, to decertify, subclassify, alter, or otherwise amend its class certification." *Chisolm v. TranSouth Financial Corp.* 194 F.R.D. 538, 544 (E.D.Va.2000). Like the decision to initially certify a class, a decision to decertify a class is

left to the court's discretion. *Doe v. Lally,* 467 F.Supp. 1339 (D.Md.1979).

**\*2** Defendant JD & T raises three arguments as to why this Court should decertify the class. First, it argues that, now that the case is in a federal court, certification must be re-evaluated under the federal class certification rule. Although Maryland's class certification rule, Md. R. 2–231, is patterned after federal rule, Fed.R.Civ.P. 23, Defendant contends that the presumptions and burdens applied in interpreting the two rules are not identical. Second, Defendant contends that changes in the posture of the case, specifically, the fact that Fax.com is no longer actively participating in the litigation, have rendered continued treatment of this case as a class action unmanageable. Fax.com, according to JD & T, was the only source of critical information regarding the identity of those who received the facsimile transmissions, as well as those that may have consented to the transmissions. Finally, JD & T argues that the state court's certification decision was simply wrong.

For the reasons explained below, the Court finds JD & T's second argument compelling. Under the current posture of this litigation, class certification is no longer appropriate under Rule 23. Thus, the Court need not reach the issue of whether the state court's certification decision was flawed or whether it would have been different under the federal rule.

Rule 23(a) sets out four threshold requirements that must be satisfied by the putative class before a class action can be certified. The class representative must establish that

1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four prerequisites are frequently referred to as "numerosity," "commonality," "typicality," and "adequacy of representation," respectively.

Once these four prerequisites are established, the plaintiff must still satisfy one of the three criteria of section (b) of Rule 23 before a class can be certified. Under 23(b) the potential class representative must show either that: 1) separate actions would result in inconsistent adjudications or the interests of non-parties would be substantially impaired; 2) final injunctive or declaratory relief is appropriate to the class as a whole; or 3) common questions of law or fact predominate

over any questions affected only individual members and a class action is the superior method of fairly and efficiently adjudicating the controversy. Here, Plaintiff asserted, and the state court found, that class certification was appropriate under the state rule equivalent of the third subparagraph of Rule 23(b). *See* Second Amend. Compl. ¶ 21 (citing Md. Rule 2–231(b)(3)). Defendant argues, and this Court agrees, that Plaintiff simply cannot establish the prerequisites of commonality or typicality, nor can he demonstrate that common questions predominate over questions affecting the individual class members.

**\*3** Commonality, by definition, requires that there are questions of law or fact that are "common" to the class. "A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees. A question is not common, by contrast, if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson–Pilot Life Ins. Co.,* 445 F.3d 311, 319 (4th Cir.2006) (internal quotations and citations omitted). The need for a case-by-case determination of a material issue for each class member's claim also denotes that the claims of the class representative are not "typical" of the claims of the individual class members. *See Stott v. Haworth,* 916 F.2d 134, 145 (4th Cir.1990).

In order to establish a claim under the TCPA, a plaintiff must have received a facsimile transmission that was "unsolicited." Under the statute, "unsolicited" means transmitted without the recipient's "prior express invitation or permission." 47 U.S.C. § 227(a)(5). The recipient's prior invitation or permission could have been given orally or in writing. *Id.* (stating that invitation or permission can be given "in writing or otherwise"); *see also Carnett's Inc. v. Hammond,* 610 S.E.2d 529, 531 (Ga.2005).

Under the Federal Communications Commission's (FCC's) TCPA implementing regulations in effect at the time Plaintiff received the fax transmissions from JD & T, "express permission [was] also deemed given by those recipients having an 'established business relationship' " with the sender of the fax transmission.[2] *Carnett,* 610 S.E.2d at 531. An "established business relationship" is defined as "a prior or existing relationship formed by a voluntary two-way communication ... with or without an exchange of consideration...." 47 C.F.R. § 64.1200(f)(3). "The FCC has opined that the established business relationship exemption is

broad and that you have an established business relationship with a person or entity if you have made an inquiry, application, purchase, or transaction regarding products of services offered by such person or entity." *Carnett,* 610 S.E.2d at 531–32 (internal citations omitted).[3]

It is this need to make a determination for each class member as to whether the facsimile transmission was unsolicited, both by the lack of express permission and by the absence of a prior business relationship, that makes class treatment of this action inappropriate and unmanageable. This determination of whether invitation or permission was given is, of necessity, highly individualized and would require a separate inquiry for each individual class member in light of their particular relationship or lack of relationship with each of the defendants. Under the current posture of this case, there is simply no available method for class-wide determination of this issue.

**\*4** Numerous courts, citing the lack of commonality, typicality and predominance of common issues, have determined that TCPA claims cannot be brought as a class action. *See, e.g., Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403–04 (E.D.Pa.1995)(observing that "the essential question of fact that each potential plaintiff must prove is whether a specific transmission to its machine was without express invitation or permission on its part."); *Kenro, Inc. v. Fax Daily, Inc.,* 962 F.Supp. 1162, 1169–70 (S.D.Ind.1997) (noting that it would be required "to conduct individual inquiries with regard to each potential class member in order to determine whether each potential class member had invited or given permission for transmission of the challenged fax advertisements."); *Blitz v.. Xpress Image, Inc.,* Civ. No. 05–679, 2006 WL 2425573 (N.C.Super.Aug.23, 2006) (denying class certification upon the conclusion that "there is no avoiding an individualized inquiry into the facts and circumstances of each recipient's 'invitation and permission' should this matter proceed as a class action," as well as need for individualized determination of applicability of "established business relationship"); *Carnett's Inc. v. Hammond,* 610 S.E.2d 529, 532 (Ga.2005) (noting that while the predominate *question* of whether facsimiles were unsolicited was common to all class members, "a common question is not enough when the *answer* may vary with each class member and is determinative of whether the member is properly part of the class."); *Rondos v. Lincoln Prop. Co.,* 110 S.W.3d 716, 721–22 (Tex.Ct.App.2003) (reversing certification of class upon concluding that the predominant issue for litigation would be whether individual fax owners

gave permission to receive advertisements); *Livingston v. U .S. Bank, N.A.,* 58 P.3d 1088, 1091 (Colo.App.2002) (upholding trial court's determination that "the question whether any particular fax recipient gave 'prior express invitation or permission' would have to be decided on an individual basis and therefore would overwhelm, let alone predominate over, the common issues").

It is conceivable, while the actual transmitter of the facsimiles in question, Fax.com, was available to actively participate in this litigation, that these issues could have been resolved in some more global fashion. In moving to certify the class in the state court and in his pleadings opposing this motion to decertify, Plaintiff averred that Fax.com had a database and log of the transmissions at issue in this matter. *See* Aug. 7, 2002, Mem. in Support of Class Cert.;[4] Opp. at 14. Information that Fax.com might have as to the source of its databases might be instructive as to issues of consent: was the database constructed from customer lists provided by CMC, lists purchased from some third party, numbers generated by Fax.com computers randomly dialing and hunting for fax machines, or some combination thereof? Regardless of what insight *Fax.com* might have been able to provide, however, there is no evidence in the record that JD & T has, or ever had, any information regarding the content or construction of the databases used by Fax.com.

**\*5** This absence of available information about the database renders this case, in its present posture, readily distinguishable from at least some of the cases relied upon by Plaintiff where class certification of TCPA claims was found appropriate. For example, in *Kavu, Inc. v. Omnipak Corp.,* Civ. No. 06–109, 2007 WL 201093, (W .D.Wash. Jan. 23, 2007), the record before the certifying court included the identity of the specific third party supplier of the database that was used to send the offending faxes as well as an explanation of the particular method used by that third party to construct the database. The defendant, in fact, asserted in the litigation that the recipients' inclusion in that database demonstrated consent to receive facsimiles. *Id.* at \*3. Because the validity of that assertion could be tested on a class-wide basis, the Court distinguished the case before it from the more typical TCPA case: "whether the facsimile was 'unsolicited' appears to be more of a common issue in this case than in the cases that denied class certification .... [where] the issue of whether each potential class member gave permission to receive the facsimiles was key." *Id.; see also, Gene & Gene, LLC v. Biopay, LLC,* Civ. No. 05–121, 2006 WL 3933312 at \*2 (M.D.La. Dec. 20, 2006) (record before the court contained

2007 WL 3169078

database with names and contact information for the alleged unlawful facsimile transmissions).[5]

Implicitly acknowledging the importance of some means by which to identify those who received the offending facsimiles and those who may have consented to that receipt, Plaintiff devotes much of his opposition to an attempt to show that JD & T has or had possession of this information, or at least should have had possession of this information. In this attempt, however, Plaintiff seriously misconstrues the record. For example, Plaintiff declares that Jeannette Bunn, JD & T's president, "selected the geographic areas to be targeted" by the facsimile advertisements. Opp. at 6. This statement is presumably based upon a series of emails from JD & T to individuals associated with Fax.com and CMC. While Bunn makes geographic suggestions in these emails as to the *content* of the facsimile advertisements, *i.e.,* recommending the addition of particular vacation destinations,[6] there is nothing in these emails or elsewhere in the record to suggest that she had any input into the geographic areas to which those advertisement were to be sent.

Similarly, Plaintiff cites to a series of emails where complaints about the receipt of facsimiles are forwarded to Bunn and Bunn contacts the marketing company to have the telephone numbers removed from the call list. Plaintiff argues that these emails show that "JD & T thus helped 'maintain' the fax list" and "Bunn thus carelessly and recklessly proceeded to help in the deletion process, without taking the extra step of ascertaining whether prior consents were being obtained, and without implementing a policy to be sure they were obtained where needed." Opp. at 8, 9. While these emails might have relevance to issues of liability, they do not shed light on the propriety of class certification. If anything, they reinforce the fact that JD & T did not have immediate access to the database and thus had to relay the complaints elsewhere.

**\*6** In his opposition, Plaintiff asserts that he is attaching what he claims to be "3 representative pages" of "[t]he Fax.com database [which he] obtained through a former employee." Opp. at 8. Given the undisputed significance of this database, it is remarkable that Plaintiff mentions that it has come into his possession almost in passing. The Court surmises that Plaintiff's nonchalance with regard to this "evidence" is explained by Plaintiff's apparent inability to render it admissible. As JD & T observes, Plaintiff makes no effort, whatsoever, to authenticate this evidence. Furthermore, from the dates on the "representative pages," it appears this list is from a time period three years after the time relevant

to this action. Finally, there is nothing about these pages indicating that they contain telephone numbers to which JD & T advertisements were sent. As evidence in this action, these pages as presented are essentially worthless and the Court suspects from the offhanded way that they were introduced that Plaintiff's counsel realizes as much.

Plaintiff also cites a January 28, 2003, letter from counsel for JD & T to Plaintiff's counsel in which it is stated that 36,877 transmissions of the specific advertisement at issue in this action were sent to Maryland fax numbers during the relevant time period. Pl.'s Ex. 7. This letter, Plaintiff claims, demonstrates that JD & T "had a method to determine Maryland recipients of the specific unsolicited travel faxes at issue." Opp. at 12. The value of this letter as evidence relevant to issues of class certification, however, is also highly suspect. First, the letter clearly states that it is a "*CONFIDENTIAL SETTLEMENT COMMUNICATION PER JUDGE HOLLAND—NOT TO BE USED IN LITIGATION.*" That aside, the letter also clearly relates that the information is coming from Fax.com, not JD & T.[7] Furthermore, the letter explains that, because of the way that the database was encrypted to protect its contents from theft, there is no way to obtain the individual numbers that comprise the database.

Unable to provide any evidence that JD & T actually had access to the database used by Fax.com to send the advertisement, Plaintiff argues, in the alternative, that JD & T *should* have had that access. Plaintiff opines that "[i]f Fax.com represented that it had obtained prior consents, one would expect that JD & T would want to confirm this fact, and see some kind of evidence in support." Opp. at 16. Plaintiff argues that, based upon JD & T's inability to prove that consent was given, a finding of lack of consent "should apply uniformly, across the board, as to all class members." *Id.* at 15.

This argument is based upon an interpretation of the statute not supported by the language of the statute itself or by the case law. Plaintiff contends, without citation, that "[e]ven if a member of the class had given permission to Fax.com to send faxes ... any such permission would not extend to JD & T." Opp. at 17. If, hypothetically, a consumer requested that Fax.com send information about travel packages and Fax.com then sent that consumer a facsimile about travel packages offered by JD & T, it is hard to imagine how that transmission could be deemed "unsolicited." Under the statute, the term " 'unsolicited advertisement' means any material advertising the commercial availability or quality

of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). The statute does not designate to whom the permission must be given. If permission is given to the transmitter of the facsimile, the marketing company, or the provider of the advertized product or services, the statute would not be violated.

**\*7** Once all the smoke is blown away, it appears that Plaintiff's true position is that this action is amenable to class treatment because the class members do not actually need to prove that the facsimiles in question were "unsolicited" in order to make out a claim under the TCPA. In Plaintiff's "common sense" view, "[i]t is unfathomable that anyone would actually give consent to receive via facsimile a barrage of ads like those at issue in this action." Opp. at 15 n. 7.[8] Thus, it can simply be presumed, according to Plaintiff, that the transmissions were unsolicited.

The Court has no doubt that this assumption would hold true for a majority of consumers. Most consumers do not wish for their facsimile machines to be tied up or their toner and paper wasted receiving and printing faxed advertisements. Just because that is true of most, however, does not permit the Court to adopt a presumption that it is true of all. Again, if Fax.com had remained involved in this litigation, information regarding the sources of telephone numbers in its database might have allowed some global determinations of consent. But without Fax.com's participation, that is simply not possible.[9]

Plaintiff raises one additional argument that warrants brief mention. Plaintiff argues that CAFA, the Class Action Fairness Act, somehow "weighs in favor of certification." Opp. at 2. Plaintiff correctly observes that this Court has already held that, because CAFA allows for the aggregating of class member claims, " 'there is no dispute that the instant suit satisfies' " CAFA's jurisdictional criteria. Opp. at 17 (quoting Oct. 12, 2005 Mem. at 2). Because Plaintiff's individual damages would be below the requisite amount in controversy for diversity jurisdiction, Plaintiff opines that decertification

would divest this Court of subject matter jurisdiction of his claims. *Id.* at 18.

In the context of post-removal reduction of the amount in controversy under the general diversity jurisdiction statute, courts have uniformly held that "diversity jurisdiction is determined at the time the action commences, and a federal court is not divested of jurisdiction ... if the amount in controversy subsequently drops below the minimum jurisdictional level." *Hill v. Blind Indus. & Serv. of Md.,* 179 F.3d 754, 757 (9th Cir.1991). Because of the recentness of CAFA's enactment, few courts have considered the effect of post-removal certification or decertification decisions on continued federal jurisdiction. In the one decision of which this Court is aware that reached the issue, *Davis v. Homecomings Financial,* Civ. No. 05–1466, 2007 WL 905939 (W.D.Wash. March 22, 2007), the court held that a similar "time of removal" principle would apply.

In *Davis,* the plaintiff proposed a nation-wide class. After removal to federal court, the class was certified as state-wide class only which brought the amount in controversy under CAFA's requisite $5 million threshold. Nonetheless, following the principle that the amount in controversy is determined as of the time of the removal, the court concluded that it could retain jurisdiction over the now diminished class action. The court reasoned that Congress is presumed to be aware of the legal context in which it is legislating and, despite this presumed knowledge, "there is no indication that Congress intended to alter the established authority regarding subsequent changes to the amount in controversy." *Id.* at \* 1. This Court agrees with that reasoning and concludes that decertification of the class will not divest this Court of jurisdiction over Plaintiff's now lone claim.

**\*8** For the above stated reasons, the Court concludes that the class should be decertified. A separate order will issue.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 3169078

### Footnotes

1    There is no indication in the record that any of the other defendants added in the Second Amended Complaint were ever served with process.

2007 WL 3169078

2    Congress subsequently amended the TCPA to codify the "established business relationship" exception to TCPA liability in the facsimile context. 47 U.S.C. § 227(b)(1)(C)(i).

3    When Congress codified the "established business relationship" exception, it adopted by reference the FCC's definition of the term. 47 U.S.C. 227(a)(2) ("[t]he term 'established business relationship' for the purposes only of [ 47 U.S .C. § 227(b)(1)(C)(i) ] shall have the meaning given the term in [ 47 C.F.R. 64.1200 ]").

4    Defendant included quoted text from this memorandum in its motion, Mot. at 9, but the memorandum itself is not a part of record in this Court and Defendant did not supply it with its motion. As Plaintiff did not challenge Defendant's citation, the Court assumes its accuracy.

5    The court in *Gene & Gene,* did not base its decision on the availability of that database. Instead, after acknowledging that "federal courts have consistently denied class certification," 240 F.R.D. at 242, the court proceeded to examine "Fifth Circuit precedent in order to ascertain how a federal court within the Fifth Circuit should decide this matter." *Id.* Under its view of Fifth Circuit precedent, the court opined that the requirements of commonality and typically are "not demanding." *Id.* at 244. In contrast, the Fourth Circuit has held that, "in class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(b)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." *Lienhart v. Dryvit Systems, Inc.,* 255 F.3d 138, 147 n. 4 (4th Cir.2001) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609 (1997)). Thus, in the Fourth Circuit, "[t]he common questions must be dispositive and overshadow other issues." *Lienhart,* 255 F.3d at 146.

    In addition to distinguishable facts and law, all three of the cases relied upon by Plaintiff—*Kavu, Gene & Gene; and Lampkin v. GGH,* 146 P.3d 847 (Okla.Civ.App.2006), a recent decision from the intermediate appellate court of Oklahoma —endorsed what this Court views as a flawed class definition. The class definitions in all three actions, like the class definition approved by the state court in the instant action, required a determination of the merits in that all the definitions limit class membership to those who received "unsolicited" advertisements. *Kavu,* 2007 WL 201093 at * 2 (defining class as "[a]ll persons who received an unsolicited advertisement ..."); *Gene & Gene,* 240 F.R.D. at 241 (defining class as "all recipients of unsolicited telefacsimile messages and/or advertisements ..."); *Lampkin,* 146 P.3d at 851 (defining class as "[h]imself and all entities and persons ... who received unsolicited fax advertisements ..."); Dec. 24, 2002, Order (defining class as "[a]ll persons, including business entities of any form, in Maryland, who received unsolicited advertisements transmitted by Fax.com, Inc...."). Deciding the merits of individuals' claims in order to determine the members of the class is not appropriate. *See Eisen v. Carlisle v. Jacquelin,* 417 U.S. 156, 177 (1974); *See also, Forman,* 164 F.R .D. at 403; *Intratex Gas Co. v. Beeson,* 22 S.W.3d 398, 404–06 (Tex.2000) (collecting cases and explaining why a "fail-safe class," *i.e.,* a class whose definition includes a determination of the merits, is untenable).

6    *See, e.g.,* Opp. at 10 (" '... regarding adding some areas to the fax piece? I asked if you could add Sun Valley, ID as it is a popular destination for skiing and we have inventory there that is not moving at all.' ") (quoting Oct. 6, 2001 email from Bunn to Robin Posser).

7    For a brief period of time, early in this litigation, counsel for Fax.com also represented JD & T. At the time this letter was sent, Fax.com was clearly the main target of this litigation as evidenced by the fact that JD & T is mentioned nowhere in the letter.

8    Annoying as unsolicited facsimiles might be, the Court questions if three facsimiles can be fairly deemed "a barrage."

9    In an effort to compensate for Fax.com's absence from this litigation, Plaintiff submitted materials from other proceedings related to Fax.com. For example, Plaintiff submitted a portion of the testimony of Thomas Roth, one of Fax.com's officers, given in a January 31, 2003, hearing before the Securities and Exchange Commission. In his testimony, Mr. Roth states that some of the numbers in Fax.com's database were obtained by having computers randomly dial phone numbers fishing for facsimile machines. Faxes to these numbers, Roth acknowledged, would be unsolicited. But Roth also testified that *Fax.com* would purchase some numbers from list brokers. He made no representation in the testimony provided by Plaintiff that faxes sent to numbers on those purchased lists would be unsolicited. There is no testimony regarding the source of the database used to fax the JD & T material. Furthermore, as JD & T had no opportunity to cross examine Roth, this testimony is likely inadmissible in this action.

**Levitt v. Fax.com, Not Reported in F.Supp.2d (2007)**

2007 WL 3169078

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 980383
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

Emmanuel SANAAH, Plaintiff,

v.

Nurse Debb HOWELL, Warden Arellano,
Major Scott Grover, Life Safety Coordinator
and Maintenance Supervisor, and
Maintenance Worker Lt. Bosley, Defendants.

Civil Action No. 08–cv–02117–REB–KLM.
|
April 9, 2009.

**Attorneys and Law Firms**

Emmanuel Sanaah, Crowley, CO, pro se.

**ORDER**

KRISTEN L. MIX, United States Magistrate Judge.

 **\*1**  This matter is before the Court on Defendants' **Motion
to Stay Discovery** [Docket No. 33; Filed April 8, 2009] (the
"Motion"). The Court has reviewed the Motion, the entire
case file and applicable case law and is sufficiently advised
in the premises.

Defendants request that the above-captioned case be stayed
until resolution of their pending Motion to Dismiss [Docket
No. 32; Filed April 8, 2009]. *Motion* [# 33] at 1. As
grounds, Defendants argue that they have raised the defense
of qualified immunity in their Motion to Dismiss, and that
all discovery should be stayed until the Court makes a
legal determination on Defendants' entitlement to qualified
immunity. *Id.*

IT IS HEREBY **ORDERED** that the Motion is **DENIED** for
the reasons set forth below.

Stays are generally disfavored in this District. *See Wason
Ranch Corp. v. Hecla* (unpublished decision). However, a stay
may be appropriate in certain circumstances, and the Court
weighs several factors in making a determination regarding
the propriety of a stay. *See String Cheese Incident, LLC v.
Stylus Show, Inc.,* No. 02–cv–01934, 2006 WL 894955, at \*
2 (D.Colo. Mar. 30, 2006) (unpublished decision) (denoting a
five-part test). The Court considers (1) the interest of Plaintiff;
(2) the burden on Defendants in going forward; (3) the Court's
convenience; (4) the interest of nonparties, and (5) the public
interest in general. *Id.* Here, those factors weigh against entry
of a stay.

Although Plaintiff's position on this issue is not known, the
Court has generally found that with the passage of time, the
memories of the parties and other witnesses may fade,
witnesses may relocate or become unavailable, or documents
may become lost or inadvertently destroyed. As such, delay
may diminish Plaintiff's ability to proceed. By contrast,
Defendants do not suggest any undue burden in proceeding
with the case, other than the ordinary burdens associated with
defending a case. While Defendants do contend that their
assertion of a qualified immunity defense entitles them to a
stay, a review of the Motion to Dismiss reveals that success on
the merits of such a defense is not assured.[1] On balance, the
Court finds that the consideration of these two factors weighs
against the imposition of a stay in this case.

The Court also considers its own convenience, the interest of
nonparties, and the public interest in general. None of these
factors prompts the Court to reach a different result. The Court
is inconvenienced by an ill-advised stay because the delay
in prosecuting the case which results from imposition of a
stay makes the Court's docket less predictable and, hence,
less manageable. This is particularly true where there is a
pending Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6),
for which ultimate success is not guaranteed. While the Court
identifies no particular interest of persons not parties to the
litigation, the Court identifies a strong interest held by the
public in general regarding the prompt and efficient handling
of all litigation. Under these circumstances, the Court finds
that a stay of the case is not warranted.

 **\*2**  The parties are reminded of their obligation to comply
with my Order of February 11, 2009 [Docket No. 24] setting
a Preliminary Scheduling Conference in this matter for **April
21, 2009 at 10:30 a .m.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 980383

Case 1:25-cv-01083-JPW     Document 28-1     Filed 11/21/25     Page 11 of 28

Footnotes

1    The Court expresses no opinion about the merits of the Motions to Dismiss, but merely notes that Defendants' qualified
     immunity defense is not particularly well developed or compelling on its face.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S.
                                                       Government Works.

2025 WL 817485
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

James E. SHELTON, individually and
on behalf of all others similarly situated,

v.

PRO SOURCE LENDING GROUP
LLC, d/b/a Fast Fund Group, d/b/a
Fast Funds Group, and Brittney Wilson

CIVIL ACTION No. 24-4394
|
Signed March 14, 2025

**Attorneys and Law Firms**

Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for James E. Shelton.

Jeffrey N. Rosenthal, Thomas Cialino, Blank Rome LLP, Philadelphia, PA, for Pro Source Lending Group LLC.

Joseph R. Heffern, Lance Rogers, Rogers Counsel, Ardmore, PA, for Brittney Wilson.

**MEMORANDUM**

McHUGH, United States District Judge

 **\*1** Telemarketing calls are annoying to many consumers, leading Congress to enact the Telephone Consumer Protection Act ("TCPA"), which regulates telemarketing calls. The Act is partially enforced by two federal agencies, but also through provisions that create a private right of action rooted in strict liability imposing a monetary penalty for each violation.

For better or for worse, the availability of a private remedy draws both litigants and lawyers. In this case, James Shelton, a prolific plaintiff, and his counsel, Andrew Roman Perrong, equally prolific as a litigator under the TCPA, have joined forces to file a class complaint against Defendants Pro Source Lending Group LLC and Brittney Wilson, a Pro Source employee. Plaintiff alleges, on behalf of himself and others similarly situated, that Wilson impermissibly contacted him eight times over a 24-hour period on behalf of Pro Source, violating the TCPA. Both Defendants have moved to dismiss,

in part on substantive legal grounds, and in part on the basis that as a serial litigator Plaintiff falls outside the protection of statute. The legal arguments advanced by the defense are unpersuasive, and the outcome of Shelton's prior litigation does not warrant dismissal unless it binds him in this case, which it does not. The motions will therefore be denied.

**I. Facts as Pled**

*1. Plaintiff creates his phone number, and subsequently uses it for business purposes.*

In 2015, Plaintiff obtained his phone number and registered it on the National Do Not Call Registry ("NDNC"). Compl. ¶ 32, ECF 12; Pl.'s Decl. ¶ 2, ECF 22-1 ("Shelton Decl."). The phone number is a residential, non-commercial telephone number. Compl. ¶ 23. At the time when he got the number and registered it on the NDNC, Plaintiff contends that he used the number for personal and household purposes. Compl. ¶¶ 30-32. In 2016, however, Plaintiff formed his business, Final Verdict Solutions,[1] at which point he began using the phone number for both business and personal purposes. Shelton Decl. ¶ 7.

In 2018, Plaintiff sued Target Advance LLC, alleging violations of Section 227 of the TCPA. *See Shelton v. Target Advance LLC*, No. 18-2070, 2019 WL 1641353 (E.D. Pa. Apr. 16, 2019). Plaintiff alleged that his phone number, the same number at issue here, was properly registered on the NDNC, and that Target Advance contacted Plaintiff to solicit business in violation of the TCPA. *Id.* at *1-2. At the time Plaintiff sued Target Advance, the phone number at issue was listed on his business website, and Plaintiff admits that he used it for business purposes. Shelton Decl. ¶ 7. The Court dismissed Plaintiff's claim because Section 227 only provides a private right of action to "residential" numbers. *Target Advance*, 2019 WL 1641353 at *6. Judge Quiñones held that because his number was accurately categorized as mixed-use and because Plaintiff "held his phone number out to the world as a business phone number" he lacked standing under the TCPA on that claim. *Id.*

*2. Plaintiff resumes exclusive personal use of his phone number.*

 **\*2** Beginning in June 2019, Plaintiff purportedly ceased all business use of the phone number at issue. Shelton Decl. ¶¶

7-12. Plaintiff states that he obtained a separate number for exclusive business use, and began using the number at issue for only "personal, family, and household purposes." *Id.* ¶¶ 5-7. Plaintiff explains that he has not held the number at issue out to the public as a business number, nor has it appeared on any website since at least 2019. *Id.* ¶¶ 9-10.

In 2021, Plaintiff sued Pro Source Lending Group LLC,[2] a defendant in this case, for TCPA violations. Compl. ¶¶ 36-38. The parties settled and Plaintiff alleges he asked to be placed on Pro Source's internal do-not-call-list. Shelton Decl. ¶¶ 13-14. Plaintiff has never been a customer of Pro Source, nor has he ever consented to receive calls from them. Compl. ¶ 35.

*3. The July 2024 phone calls and texts.*

The calls and texts underlying the present action all occurred within the span of twenty-four hours. On July 22, 2024, Plaintiff alleges that he received a call on his personal phone number from Defendant Wilson, a Pro Source employee, seeking to sell him a loan. Compl. ¶¶ 42-44. Wilson contacted Plaintiff from her personal cell phone number. *Id.* ¶¶ 43-45. About ten minutes later, Plaintiff received an email with a proposed loan application that Plaintiff did not sign. *Id.* ¶ 50. Within five minutes, Wilson also sent Plaintiff a text stating that she was reaching out on behalf of Fast Funds Group and inviting Plaintiff to ask her questions about the loan process. *Id.* ¶ 51.

A few hours later, Plaintiff received two additional calls from Pro Source: one from an individual named "Sean," and another call from Wilson. *Id.* ¶ 52. Simultaneously, Plaintiff also received a text from Wilson asking him to call her about the loan application. *Id.* ¶ 53.

Calls and texts continued into the next day. At 10:03 AM, Wilson called Plaintiff again. *Id.* ¶ 54. Immediately after, Plaintiff emailed Wilson, stating "Hi Brittney please stop calling me thank you!" *Id.* ¶ 55. At 10:06 AM, Plaintiff received another text from Wilson, again asking him about the loan application. *Id.* ¶ 56. At 10:09 AM, Wilson responded to Plaintiff's email, stating "Will do, thank you." *Id.* ¶ 55. Later that day, Plaintiff received one final call from Pro Source. *Id.* ¶ 58.

Based on this batch of unwanted phone calls and texts, Plaintiff now brings suit on behalf of himself and a class of similarly situated individuals.

## II. Standard of Review

Defendants move for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. I construe the motion challenging subject matter jurisdiction under Rule 12(b)(1) as a facial attack, with the result that the analysis is identical for the arguments raised under both sections of the Rule. *Petruska v. Gannon Univ.*, 462 F.3d 294, 299 n.1 (3d Cir. 2006). The governing standard is set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

Plaintiff's class complaint contains two counts. In Count I, Plaintiff alleges that Defendants violated the TCPA by making telemarketing calls to him, despite his registration on the NDNC. 47 U.S.C. § 227(c); 47 C.F.R. 64.1200(c)(2). Count II asserts that Defendants also violated the Statute in failing to maintain statutorily adequate internal policies, including an internal do-not-call list. 47 U.S.C. § 227(c)(5); 47 C.F.R. 64.1200(d).

**\*3** Defendant Pro Source argues that Plaintiff's number is not properly registered on the NDNC, and that Plaintiff's frequent TCPA litigation places him beyond the statute's zone of interests, therein depriving him of standing. Defendant Wilson joins in those arguments, and separately argues that that individual liability is unavailable under the TCPA.

### A. Plaintiff states a claim under the Section 227(c) and Section 64.1200(c)(2).

Under Section 227 of the TCPA, an individual may register their residential telephone number[3] on a National Do Not Call Registry. A registration on the NDNC "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." 47 C.F.R. § 64.1200(c)(2). The FCC has explicitly "decline[d] to require that business and wireless numbers be removed from the Registry." Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 29 FCC Rcd. 9779, 9785 (June 17, 2008). Both Section 227 and its implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers on the NDNC and provide consumers with a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227 (c)(5); 47 C.F.R. § 64.1200(c)(2).

**\*4** Plaintiff purports to have registered his residential number on the NDNC in 2015, a full year prior to starting his business. Plaintiff also represents that he exclusively uses his number for personal purposes and has done so since at least 2019. Defendants have not presented any evidence to contradict Plaintiff's representation of his behavior over the past five years. Even if Plaintiff used his number for mixed purposes prior to 2019, NDNC registrations must be honored indefinitely, and the FCC has indicated that business numbers are not removed from the Registry. *See, e.g. National Do Not Call Registry FAQs*, FTC Consumer Advice, https://perma.cc/NVC5-ZNR5 ("No, your registration will never expire. The FTC will only remove your number from the Registry if it's disconnected and reassigned, or if you ask to remove it."). Given these regulations, Plaintiff's personal residential phone number is presumptively still on the NDNC.

Plaintiff therefore states a claim under Section 227(c): he alleges that he has a residential phone number on the NDNC, and that Defendants called Plaintiff on that phone number eight times over the span of 24 hours.[4]

*1. Plaintiff's prior litigation does not preclude this suit.*

Pro Source appears to argue that Plaintiff's claims are collaterally estopped, though this argument is advanced only in a footnote. Under the doctrine of collateral estoppel, a Plaintiff is precluded from relitigating a claim where (1) the identical issue was previously adjudicated, (2) that issue was actually litigated, (3) the previous determination was necessary to the decision, and (4) the party being precluded from relitigating the issue was fully represented in the prior action. *See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006).

In 2019, Plaintiff brought suit in this district alleging similar violations of Section 227 against a different entity. At that time, however, Plaintiff advertised his number on his business website and also used it for business purposes, rendering it a mixed-use number. *Target Advance*, 2019 WL 1641353 at \*6. The implementing regulations of Section 227 only prohibit telephone solicitations to "residential telephone subscriber[s]" on the NDNC. *See* 47 C.F.R. § 64.1200(c)(2). This led the Court to conclude that "because Plaintiff held the Phone number out to the world as a business phone number, he could not register it on the National Do Not Call Registry for purposes of avoiding business-to-business calls, such as

those giving rise to this action," and it dismissed Plaintiff's Section 227(c) claims for lack of standing. *Target Advance*, 2019 WL 1641353, at \*6.

As noted above, once registered, numbers are not removed from the NDNC, and five years have lapsed since the *Target* decision. In 2019, the phone number at issue was used for both business and personal purposes. In this action, filed in 2024, Plaintiff pleads that it is used exclusively for personal use, and has not been used for business purposes since 2019. In that respect, the issue here differs from the issue decided against Plaintiff in *Target*. And Defendants point to no legal authority supporting a conclusion that past commercial use of a number permanently eliminates standing where the number continues to be listed on the NDNC.[5] Conceptually, there is a temporal aspect to standing, as illustrated by the fact that in some cases standing is deemed not to exist because the injury alleged is hypothetical, and in other instances a case allowed to proceed is later dismissed as circumstances change.

*2. On the facts alleged, Plaintiff is not equitably estopped.*

**\*5** Pro Source argues that in modifying his usage of the number at issue since the Court ruled in 2019, Plaintiff placed Pro Source in a "gotcha" – making it impossible for Pro Source to discern when a cause of action that was previously declared unavailable became available yet again. Pro Source Mot. to Dismiss, ECF 17-1 at 13. Although once again the argument is not fully formed, I construe it as one asserting equitable estoppel. Grounded in common law, equitable estoppel prevents a party from enforcing a right against another party when the right was gained through misleading actions. The party asserting equitable estoppel must show "(1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." *U.S. v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987).

If Plaintiff took down the number from his business website and then immediately sued Pro Source or another marketer, I would be strongly inclined to find estoppel. But nearly five years have passed during which Plaintiff avers personal use only. Such a change in circumstance, if ultimately proven to be true, is not easily categorized as a misrepresentation. And it cannot be said that Pro Source could reasonably rely on how Plaintiff engaged with the public five years earlier. Legally, the onus is on Defendant to ensure that the number they are calling is not protected by the NDNC. With the number remaining on the NDNC, Pro Source could

have checked whether Plaintiff's number was still listed on business websites or on Google as affiliated with his business before proceeding. The passage of time weighs against a finding of estoppel.

**B. Plaintiff's serial litigation does not bar standing.**

For an individual to have standing under a "statutorily created cause of action," they must fall within the relevant statute's "zone of interest." *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). The "zone of interest" inquiry considers "the Congressional intent of the statute" and whether the "complainant's interests were 'among the sorts of interests' " the statute was specifically designed to protect. *Chem Serv., Inc. v. Envtl. Monitoring Sys. Lab.-Cincinnati of U.S. E.P.A.*, 12 F.3d 1256, 1262 (3d Cir. 1993).

Seeking to remove Plaintiff from within the TCPA's zone of protected interests, Pro Source compares Plaintiff here to the plaintiff in *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016). In *Stoops*, the plaintiff purchased at least thirty-five cellphones with the specific intent of receiving telemarketing calls so that she could bring lawsuits under the TCPA. *Id.* at 788. "In her deposition testimony, the plaintiff stated that she had a 'business suing offenders of the TCPA'; that she had specifically bought the cellphones in order to manufacture TCPA claims; and that she did not use the cellphones for any other purpose." *See Target Advance*, 2019 WL 1641353 at *4 (discussing *Stoops*, 197 F. Supp.3d at 799). The *Stoops* Court found that "because Plaintiff has admitted that her only purpose in using her cellphones is to file TCPA lawsuits, ... the calls did not constitute the 'nuisance, invasion of privacy, cost, and inconvenience' from which Congress intended to protect consumers," depriving the plaintiff of standing for lack of injury-in-fact. *Stoops*, 197 F. Supp. at 800.

Plaintiff here has two phone numbers, not thirty-five. Historically, there was a distinct line between personal and business numbers. That line is eroding, but not to the point where it can be presumed that the only purpose in maintaining two numbers is to bait companies into making telemarketing calls.[6] This is especially so where the record has not yet been developed, and at this stage, there is no evidence that Plaintiff advertises his personal phone number to make it more likely to receive telemarketing calls than any other standard residential phone number.

**\*6** If Defendant contacted Plaintiff eight times over the span of 24 hours, that would seem to be conduct the TCPA is intended to address. At this juncture I cannot rule as a matter of law that he falls outside the TCPA's "zone of interest" based solely on litigation history.[7]

**C. Plaintiff states a claim under Section 227(c)(5) and Section 64.1200(d).**

In addition to the NDNC, companies must also maintain an "Internal Do Not Call" policy. 47 C.F.R. § 64.1200(d). This written policy must be available upon demand, must explain the company's plans to maintain a do-not-call list and train telemarketing personnel on its use, and must record and honor "do-not-call" requests for at least five years after a request is made. *Id.* Where an individual makes a do-not-call request, that request must be honored within a reasonable amount of time once made, up to thirty days. *Id.*

Plaintiff alleges that in 2021, Plaintiff and Pro Source reached a settlement regarding a previous batch of unwanted calls. Compl. ¶ 37. Plaintiff avers that throughout the settlement process, Plaintiff made it unambiguously clear that he no longer wished to receive calls from Pro Source, and that Defendant therefore had notice of Plaintiff's do-not-call request for two and a half years prior to its July 2024 calls.

Defendant disregards the prior dispute between the parties, and identifies July 22, 2024 as the relevant date, when Plaintiff first asked Defendant Wilson to cease contacting him with regard to the present batch of calls. By that measure, the calls are not actionable, because Pro Source would have been permitted thirty days within which to accommodate that request.

At this stage, I am obligated to accept Plaintiff's representations about the content of conversations surrounding the 2021 Settlement. Taking those allegations as true, Plaintiff should have been on Pro Source's internal do-not-call list as of two and a half years ago. Allegations that Defendants contacted Plaintiff while he was listed on their internal do-not-call list are sufficient to state a claim for violation of Pro Source's obligations under § 64.1200(d).

**D. Defendant Wilson may be held individually liable.**

Defendant Wilson argues that she may not be held liable under the TCPA. But her position ignores the plain text of the statute. Section 217 of the TCPA states: "In construing and enforcing the provisions of this chapter, the act, omission, or failure of

any officer, agent, or other person acting for or *employed by* any common carrier or user, *acting within the scope of [her] employment*, shall in every case also be deemed to be the act, omission, or failure of such carrier or user *as well as of that person.*" (emphasis added). Plaintiff alleges that Ms. Wilson was directly involved in the communications with him, using her personal cell phone, a claim that falls within the literal terms of Section 217.

Citing a series of district court cases, the defense contends that the Third Circuit, in *City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154 (3d Cir. 2018), has called into doubt whether individual liability is permitted under the TCPA. Such a broad reading of *City Select* is untenable. There, the defendants were a business consulting company that sent a series of faxes, as well as the president and owner of the company. *Id.* at 156. There was conflicting evidence as to the personal involvement of the president, and the sole issue

on appeal was whether the trial court properly charged the jury about the standard for imposing liability on a corporate officer. *Id.* at 161-62. *City Select* simply did not address the type of claim raised here and certainly cannot be read as repealing the clear language of the statute that creates liability for direct personal involvement.[8]

**\*7** Plaintiff's claims against Wilson may therefore proceed.

**IV. Conclusion**

For the reasons set forth above, Defendants' Motions to Dismiss will be denied. An appropriate order follows.

**All Citations**

Slip Copy, 2025 WL 817485

Footnotes

1    Defendants contend that the business existed for the purpose of generating TCPA claims. Pro Source Mot. to Dismiss, ECF 17-1 at 6.

2    Pro Source also does business as "Fast Fund(s) Group" and sells loans. Compl. ¶¶ 5, 39.

3    The FCC has yet to issue definitive guidance on numbers with a history of mixed-use, stating only that "we will review such calls as they are brought to our attention to determine whether or not the call was made to a residential subscriber." In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 ("2005 TCPA Order"), 20 FCC Rcd. 3788, 3793 (2005). A majority of other district courts, as well as the Ninth Circuit (the only circuit court to rule on this question) have found that mixed-use numbers are not per-se excluded from the TCPA's protections when registered on the NDNC, and that such numbers require a case-by-case evaluation. *See Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1223-1226 (9th Cir. 2022); *see also Mattson v. New Penn Fin., LLC*, No. 18-990, 2020 WL 6270907, at *2 (D. Or. Oct. 25, 2020) ("Although [plaintiff's] use of a phone line for personal calls does not automatically transform it into a residential line for purposes of the TCPA, neither does his use of a personal line for business calls automatically transform it into a business line."); *Clements v. Porch.com, Inc.*, No. 20-3, 2020 WL 5739591, at *5 (D. Alaska Sept. 24, 2020) (holding that phones used for home-based businesses fall within the TCPA's zone of interest); *Smith v. Truman Rd. Dev., LLC*, No. 18-670, 2020 WL 2044730, at *12 (W.D. Mo. Apr. 28, 2020) (holding that a cell phone used at least 60 percent for personal purposes can be residential); *Blevins v. Premium Merch. Funding One, LLC*, No. 18-377, 2018 WL 5303973, at *2-3 (S.D. Ohio Oct. 25, 2018) ("[C]ourts have routinely looked at the facts and circumstances surrounding a particular case before deciding whether TCPA protection extended to a particular telephone number that was used for both business and residential purposes."). In *Target, supra*, a member of this Court concluded that mixed-use numbers are not residential, and therefore fall outside the Act.

I need not rule on this issue, because as this stage I must accept Plaintiff's allegation that during the relevant time frame, the phone was only used personally, and had been used exclusively so since June 2019.

4    Under the TCPA, text messages are considered "calls." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 153 (2016). I will therefore address the 5 calls and 3 texts at issue as an aggregate of 8 calls.

5    On the facts as pleaded, this is not a case where Plaintiff's number was clearly a business number at the time when he registered it on the NDNC in 2015, which may raise a question as to whether his registration was void *ab initio*. Plaintiff

2025 WL 817485

instead asserts that he created the number and registered it on the NDNC in 2015 as a "residential telephone subscriber," "years prior" to forming his business in 2016, making his registration presumably proper. Compl. ¶ 32; ECF 22 at 6.

6    In fact, Plaintiff explicitly refutes this accusation in his sworn declaration, stating, "I do nothing to precipitate the illegal calls and messages which are placed to me ... I have never proactively created or found TCPA claims nor entrapped businesses." Shelton Dec. ¶¶ 17-18.

7    Congress explicitly included a private right of action within the TCPA, signifying its intention that members of the public be tasked with the Statute's enforcement. In my view, absent abuse of the statute by a serial litigant such as *Stoops*, a court's inquiry should focus on the merits of the case before it.

8    It also bears mention that the discussion of personal liability of corporate officers was pure *dicta*, as the majority's opinion acknowledged when it observed that it was "neither litigated in the District Court nor fully briefed and argued on appeal," 885 F.3d at 161, a fact emphasized by Judge Shwartz in her concurrence. *Id.* at 163.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

2025 WL 2855393
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

Jay CONNOR, individually and on behalf
of all others similarly situated, Plaintiff,

v.

SERVICEQUICK INC., d/b/a Zing
Business Management Software,
and Woosender, INC. Defendants.

Civil Action No. 1:24-cv-02286-CNS-NRN
|
Signed October 8, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law, P.C., Hingham, MA, Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Philip Daniel Summa, Summa Law Firm LLC, Charleston, SC, for Defendant Servicequik Inc.

H. David Kraut, Timothy M. Knowles, Warren McGraw & Knowles LLC, for Defendant Woosender Inc.

**ORDER**

Charlotte N. Sweeney, United States District Judge

**\*1** Before the Court are Defendant ServiceQuik Inc. d/b/a/ Zing Business Management Software (ServiceQuik's) Motion to Dismiss, ECF No. 38, and Defendant Woosender Inc.'s (Woosender's) Motion to Dismiss Plaintiff's Second Amended Class Action Complaint Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), ECF No. 52. For the following reasons, the Court DENIES ServiceQuik's and Woosender's motions. In doing so, the Court presumes familiarity with the allegations contained in Plaintiff's Second Amended Class Action Complaint, ECF No. 35, as well as the legal standard governing the Court's analysis of the parties' dismissal motions, see, e.g., Clinton v. Sec. Benefit Life Ins. Co., 63 F.4th 1264, 1274–75 (10th Cir. 2023).

**I. ANALYSIS**

**A. ServiceQuik's Motion**
The core argument advanced in ServiceQuik's dismissal motion is that Plaintiff fails to state a claim for relief under Section 227(c) of the Telephone Consumer Protection Act (TCPA) because despite pleading that Plaintiff received two text messages from Defendants while his phone number was listed on the national Do-Not-Call (DNC) registry, Plaintiff actually received only one text message that was approximately 227 characters in length. ECF No. 38 at 3–5; see also ECF No. 35 (Second Amended Compl.) at 6 ¶¶ 30–31. ServiceQuik argues that Plaintiff's phone records reflect the receipt of two messages due to "invisible technical processes" used to transmit text messages that exceed the standard, 160-character limit for SMS messages.[1] Id. at 5. ServiceQuik contends that despite these back-end technological processes, Plaintiff's TCPA claim fails because only one message actually "appear[ed]" on Plaintiff's phone, as evidenced by a screenshot submitted by Plaintiff in a related state-court action.[2] ECF No. 38 at 5. In response, Plaintiff argues that even if his cell phone combined Defendants' messages "for the ease of reading," he has plainly alleged the receipt of more than one text message from Defendants within a twelve-month period in violation of 47 U.S.C. § 227(c)(5), as evidenced by the entries on Plaintiff's phone bill. ECF No. 47 at 14–16 (citing ECF No. 35 at 6, 7 ¶¶ 30–32). The Court agrees that Plaintiff sufficiently pleaded his TCPA claim.

**\*2** The TCPA provides a private right of action for "[a] person who has received more than one telephone call [or text message] within any 12-month period by or on behalf of the same entity," when that person's phone number is listed on the DNC registry. 47 U.S.C.A. § 227(c)(5).[3] Here, Plaintiff not only pleads allegations regarding the text contained in each of the two messages, ECF No. 35 at 6 ¶¶ 30, 31, Plaintiff's allegations are supported by an excerpt from his phone records, which reflect his receipt of two separate messages, id. at 7 ¶ 32. Other courts have relied on billing records in determining the number of contacts plaintiffs received when evaluating TCPA claims. See, e.g., Hinman v. M & M Rental Ctr., Inc., 596 F. Supp. 2d 1152, 1156 (N.D. Ill. 2009) (acknowledging that "billing records...provide some information about each job billed" and that "client invoices indicate how many faxes were sent"). While the screenshot of Plaintiff's phone appears to reflect one continuous message, see ECF No. 38-2, that does not necessarily refute or "utterly contradict[ ]" Plaintiff's allegation that he received two separate messages, particularly given Plaintiff's allegations

regarding his billing records and the complexities of the background technological processes at work. *See Flores v. City of Aurora*, No. 1:20-cv-00618-RBJ, 2021 WL 4033117, at *7 (D. Colo. Sept. 3, 2021) (citation omitted). At this stage, where Plaintiff is entitled to have his properly alleged facts accepted as true and enjoy all reasonable inferences drawn from those facts, these allegations are sufficient for Plaintiff's claim to survive. *See Est. of Hebert by & through Bourgeois v. Marinelli*, No. 1:22-cv-02582-CNS-STV, 2023 WL 4744927, at *12 (D. Colo. July 25, 2023) (denying a motion to dismiss even where it "[was] a close call" that plaintiff "alleged enough factual content" to set forth claim).

In addition to the above, ServiceQuik advances two additional arguments in support of its dismissal motion. At this stage, neither is persuasive. First, ServiceQuik argues that Plaintiff fails to state a claim under the TCPA because Plaintiff's allegation that he was contacted on a "residential telephone number" (as opposed to a business phone line which is not entitled to the same TCPA protections) is a "legal conclusion couched as a factual allegation" that the Court need not accept. ECF No. 38 at 6. The Court disagrees. ServiceQuik's contention that Plaintiff's phone number is "listed online as the main phone line of a business" on Google, ECF No. 38 at 6, raises a factual dispute—and not a legal one— that is inappropriate for the Court to analyze at this stage. Plaintiff has plainly alleged that he received the at-issue text messages on a "residential telephone number," ECF No. 35 at 5 ¶ 20, that he uses for "personal, residential, and household reasons," *id.* at 6 ¶ 25, and which he pays for with his "personal financial accounts," *id.* at 6 ¶ 24. Plaintiff also pleads that he "does not use [his] number for business reasons or business use and the number is not registered in the name of a business." *Id.* at 6 ¶ 26. Alleging that Plaintiff's phone number, which is listed "on the DNC" registry, "is not associated with a business and is used for personal purposes," is sufficient to establish that Plaintiff is a "residential telephone subscriber," and not a business, under the TCPA. *Tolumba v. SelectQuote Ins. Servs.*, No. 5:22-cv-00712, 2023 WL 6146644, at *5 (N.D. Ohio Sept. 20, 2023); *see also id.* ("Because Plaintiff's number is on the DNC Registry, the FCC's presumption that she is a residential telephone subscriber applies.").

Second, ServiceQuik argues that Plaintiff's TCPA claim should be dismissed pursuant to Rule 12(b)(1) for lack of Article III standing because by "fishing for telemarketing violations" and "effectively seeking TCPA lawsuits," Plaintiff "does not have the privacy interest that the TCPA is intended

to protect" and "has not suffered an injury in-fact." *See* ECF No. 38 at 6–7. In support of its argument, ServiceQuik contends that Plaintiff has previously "initiated hundreds of lawsuits in relation to telemarketing." *Id.* at 7; *see also id.* at 2 (citing ECF No. 38-4 (Ex. D)). This would perhaps be relevant if Plaintiff were alleging only a "generalized interest in punishing telemarketers," *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 323 (3d Cir.2015), or if Plaintiff had "admitted" that his "sole purpose" in purchasing his phone was to "receive more calls, thus enabling [him] to file TCPA lawsuits," *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 802 (W.D. Pa. 2016). However, that is not the case here.

**\*3** Plaintiff has pleaded that he (i) received two text messages from Defendants, ECF No. 35 at 6 ¶¶ 29–32; (ii) never consented to receiving messages from Defendants, *id.* at 6 ¶ 27; and (iii) has never done business with Defendants, *id.* at 10 ¶ 52. Plaintiff also alleges that he personally placed his phone number on the DNC registry, *id.* at 5 ¶ 22, and that each message he received from Defendants was nonconsensual, *id.* at 9 ¶ 50. Taken together, Plaintiff's allegations are sufficient to meet his burden of establishing Article III standing because they establish that Plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Court further agrees with Plaintiff that ServiceQuik has offered no evidence to support its contention that Plaintiff uses his phone to run a TCPA litigation "business," as opposed to using it for personal and household use. ECF No. 47 at 13. Accordingly, the Court determines that Plaintiff's allegations are sufficient to bring him "within the zone of the privacy rights the TCPA protects" and establish Article III standing. *Barrett v. Vivint, Inc.*, No. 2:19-cv-00568-DBB-CMR, 2020 WL 2558231, at *5 (D. Utah May 20, 2020).

For the foregoing reasons, ServiceQuik's Motion to Dismiss, ECF No. 38, including its request for oral argument, ECF No. 58, is DENIED, along with its request that ServiceQuik's dismissal motion "be converted to a motion for summary judgment," *id.* at 7. The foregoing analysis of ServiceQuik's arguments makes clear that there are several factual disputes to be addressed during discovery. However, upon review of the docket and in light of the October 1, 2025 discovery deadline, *see* ECF No. 67, the parties should immediately review the Court's procedures for filing a summary judgment motion. *See* CNS Civ. Standing Order Regarding Federal Rule of Civil Procedure 56 Motions. Any party seeking to

file a motion for summary judgment must email Chambers, copying opposing counsel, to inform the Court of their intent to file such motion no later than October 14, 2025.

**B. Woosender's Motion**

In addition to joining and incorporating ServiceQuik's motion to dismiss, *see* ECF No. 52 at 8, the primary argument advanced in Woosender's dismissal motion is that Plaintiff's claims against Woosender should be dismissed because "Plaintiff does not allege that Defendant Woosender directly sent the text message at issue in this case," *id.* at 4. Woosender contends that Plaintiff's allegations acknowledge that the text messages at issue were "sent by ServiceQuik," *id.* (citing ECF No. 35 at 6, 7 ¶¶ 29, 34), and that Plaintiff merely alleges that "Woosender is liable as a platform for initiating the text message," because Woosender was " 'involved in the calling conduct,' " *id.* (citing ECF No. 35 at 9 ¶ 45). In response, Plaintiff contends that it has sufficiently alleged that Woosender is directly liable under the TCPA because, as a "third-party text messaging platform" utilized by ServiceQuik, ECF No. 35 at 7 ¶ 36, Woosender "physically sent the messages at issue" from Woosender's phone number, ECF No. 55 at 5, 6. The Court agrees with Plaintiff.

Pursuant to FCC regulation 47 C.F.R. § 64.1200(c)(2), under Section 227(c) of the TCPA, "no person or entity is permitted to '*initiate* any telephone solicitation...to any residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry.' " *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (Tcpa) Rules*, 28 F.C.C. Rcd. 6574, 6575 (2013) (citing 47 C.F.R. § 64.1200(c)(2)) (emphasis added). An entity directly "initiate[s]" a call or text message "when it takes the steps necessary to physically place a telephone call." *Id.* at 6583. Here, Plaintiff has sufficiently alleged that Woosender directly initiated the at-issue text messages. Plaintiff not only pleads that he received two texts messages "sent using [Woosender's] platform at Defendant ServiceQuik's direction," ECF No. 35 at 6 ¶ 29, he also alleges that Woosender's messaging service "goes [f]ar beyond merely providing the platform that enables them to send messages" and includes "actually setting up and providing intimate support for their customers' campaigns and strategies," *id.* at 8 ¶ 40. Plaintiff further alleges that ServiceQuik "used the services provided by Defendant [Woosender] to send out the text message blasts, such as the one Plaintiff received" *id.* at 8 ¶ 41, and that it was Woosender

that actually "sent" the texts at issue, *id.* at 8 ¶ 44. These allegations are sufficient to establish a "direct connection" between Woosender and the transmission of the at issue texts Plaintiff received. *In re Dish Network*, 28 F.C.C. Rcd. at 6575. Woosender's request to dismiss Plaintiff's TCPA claim is DENIED.

**\*4** In addition to seeking dismissal, Woosender's motion also requests that the Court strike Plaintiff's allegation regarding Woosender's use of "automated calling" software. *See* ECF No. 52 at 7–8 (citing ECF No. 35 at 7 ¶ 38). For the reasons outlined below, the court declines to do so. Under Rule 12(f) (which Woosender neglects to invoke in its motion), "[t]he court may strike from a pleading...any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike, however, are "viewed with disfavor," *Griffie v. Allstate Fire & Cas. Ins. Co.*, No. 19-cv-02647-PAB-MEH, 2020 WL 4474800, at \*2 (D. Colo. Aug. 3, 2020), and are "usually only granted when the allegations have no bearing on the controversy and the movant can show that he has been prejudiced," *Sierra Club v. Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070, 1086 (D. Colo. 2001). As such, the moving party's "burden of proof is a heavy one." *Holzberlein v. OM Fin. Life Ins. Co.*, No. 08-cv-02053-LTB, 2008 WL 5381503, at \*1 (D. Colo. Dec. 22, 2008).

Here, Woosender requests that the Court strike Plaintiff's allegation that "Defendant WooSender hosts all the requisite computer software to enable illegal automated calling." *See* ECF No. 52 at 7–8 (citing ECF No. 35 at 7 ¶ 38). However, Woosender does not argue that Plaintiff's allegation is redundant, immaterial, impertinent, scandalous, or prejudicial, or that it has no bearing on the instant controversy. Instead, Woosender contends that Plaintiff "provides no factual support for its bare assertion that Defendant Woosender used an automated system." *Id.* at 7. Even if true, without more, this is not sufficient to strike an allegation. *See, e.g.*, *Beltran v. InterExchange, Inc.*, No. 14-cv-03074-CMA-KMT, 2015 WL 7253286, at \*2 (D. Colo. Nov. 16, 2015) (denying a motion to strike where "no prejudice has been shown against the defendants merely by the inclusion of factual allegations in the Complaint" as those allegations "must ultimately be proved or disproved after the discovery period"); *Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.*, 173 F.R.D. 275, 285 (D. Colo. 1997) ("Even where the challenged allegations fall within the categories set forth in [Rule 12(f)], a party must usually make a showing of prejudice before the court will grant a

motion to strike."); *see also United States ex rel. Schroeder v. Medtronic, Inc.,* No. 17-2060-DDC-BGS, 2024 WL 1095664, at *4 (D. Kan. Mar. 13, 2024)* ("[A] rule 12(f) motion is not the appropriate method to challenge the factual support for an allegation."). Moreover, Plaintiff is not required to put up evidence in support of every allegation at the pleading stage. *See Cochran v. City of Wichita,* 771 F. App'x 466, 469 n.3 (10th Cir. 2019)* ("In a complaint[,] the plaintiff need not present evidence, but he or she must plead facts and cannot rely on conclusory allegations.") (citing *Tal v. Hogan,* 453 F.3d 1244, 1252 (10th Cir. 2006)). In light of its failure to explain how Paragraph 38 meets any of the bases for striking an allegation under Rule 12(f), Woosender's request to strike is DENIED.

## II. CONCLUSION

Consistent with the analysis above, Defendant ServiceQuik's Motion to Dismiss, ECF No. 38, and Defendant Woosender's Motion to Dismiss Plaintiff's Second Amended Class Action Complaint Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), ECF No. 52, are DENIED. Additionally, any party seeking to file a motion for summary judgment is instructed to immediately review the Court's procedures for filing a summary judgment motion and must email Chambers no later than October 14, 2025, copying opposing counsel, to inform the Court of their intent to file a summary judgment motion.

### All Citations

Slip Copy, 2025 WL 2855393

## Footnotes

1   ServiceQuik describes the technology likely used to transmit the text messages at issue:

SMS messages, when using the default GSM 7-bit character encoding, are technically limited to 160 characters per segment—a standard set in the 1980s when data transmission was less advanced. However, modern messaging technology makes this limit largely invisible to users. When a message exceeds 160 characters, devices and networks automatically split it into multiple segments using 'concatenated SMS,' which adds a small header to each segment so the recipient's device can seamlessly reassemble them. While each segment is transmitted separately, the end user sees only one continuous message, exactly as the sender intended.

ECF No. 38 at 3–4 (citations omitted).

2   In support of its dismissal motion, ServiceQuik attaches a screenshot purportedly showing Plaintiff's receipt of a single message on Plaintiff's phone. *See* ECF No. 38-2 (Ex. B). The Court is permitted to consider Exhibit B at this stage as it is part of a publicly filed court record central to Plaintiff's claims. *See Equal Emp. Opportunity Comm'n v. 'Murica, LLC,* 694 F. Supp. 3d 1356, 1365 (D. Colo. 2023) (when considering a motion to dismiss under Rule 12(b)(6), "the Court may consider documents incorporated by reference, documents referred to in the complaint that are central to the claims, and matters of which a court may take judicial notice," including "[p]ublicly filed court records.") (internal citations omitted).

3   The Federal Communications Commission (FCC), which has been delegated authority to implement the TCPA's requirements, has interpreted the TCPA's reference to a "telephone call" to include text messages. *See, e.g., Melito v. Experian Mktg. Sols., Inc.,* 923 F.3d 85, 88–89 (2d Cir. 2019) ("Although text messages are not explicitly covered under the TCPA, the FCC has interpreted the Act to cover them.") (citing *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 7 FCC Rcd. 14014, 14115 (July 3, 2003); *Campbell-Ewald Co. v. Gomez,* 136 S.Ct. 663, 667 (2016)).

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01083-JPW    Document 28-1    Filed 11/21/25    Page 22 of 28

Viggiano v. Lakeshore Equipment Company, Not Reported in Fed. Supp. (2018)

2018 WL 11310868

2018 WL 11310868
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Amy VIGGIANO Individually And On Behalf
Of All Others Similarly Situated, Plaintiff,

v.

LAKESHORE EQUIPMENT
COMPANY, Defendants.

Civil Action No. 17-cv-00707 (PGS)
|
Signed 01/10/2018
|
Filed 01/11/2018

**Attorneys and Law Firms**

Mark W. Morris, Clark Law Firm, Belmar, NJ, for Plaintiff.

Jason C. Gavejian, Jackson Lewis P.C., Berkeley Heights, NJ, for Defendants.

**MEMORANDUM AND ORDER**

SHERIDAN, U.S.D.J.

 **\*1**  This matter comes before the Court on Defendant Lakeshore Equipment Company's Motion to Dismiss Plaintiff Amy Viggiano's Complaint on four separate grounds: (1) lack of subject matter jurisdiction pursuant Federal Rule of Civil Procedure 12(b)(1); (2) failure to state a claim pursuant Federal Rule of Civil Procedure 12(b)(6); (3) to strike class allegations pursuant Federal Rule of Civil Procedure 12(f); and (4) to stay this case pending resolution of another matter by the Federal Circuit. The case arises from promotional text message which Plaintiff received about educational materials that Defendant sold. The parties dispute the reasonableness of Plaintiff's attempts to revoke her prior express consent and whether the device used to send text messages satisfies one of the elements of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (TCPA). For the reasons stated below, the Court denies Defendant's motions.

**Background**

Plaintiff brought this suit, on behalf of herself and similarly situated plaintiffs, alleging violations of the TCPA by Defendant. In this putative class action, Plaintiff alleges that in 2016 she consented to receiving automated commercial text messages from Defendant. According to the Complaint, Defendant used an "automatic telephone dialing system" (ATDS) to deliver these messages. (Complaint ["Compl."] at ¶ 12). The ATDS has the ability to store or produce telephone numbers using a random or sequential generator. (*Id.*). After initially enrolling in Defendant's text program, Plaintiff claims to have revoked her consent by indicating to Defendant the following messages: "Please take me off the list;" "Please don't send me these [texts] anymore;" and "I've had enough! This is your last warning! I've told you to stop several times and you haven't." (*Id.* at ¶ 13). Plaintiff alleges that Defendant refused to stop sending her text messages after she withdrew her consent. (*Id.* at ¶ 14). Defendant indicated to Plaintiff that the only way to withdraw her consent to receive unwanted text messages from Defendant was to text "STOP." (*Id.*).

Defendant, in opposition, sets forth additional facts by way of an affidavit from Ray Palmer, Defendant's Vice President of Business Processes. (ECF No. 6-2, "Palmer Declaration"). These allegations focus on whether Plaintiff adequately followed directions to "opt-out" or whether she intentionally disregarded instructions in order to manufacture an injury. The Palmer Declaration alleges the following. Defendant is in the business of creating educational materials and provides its in-store and online customers the opportunity to enroll in Lakeshore offers and news by texting the word "JOIN" to a program's short code. (*Id.* at ¶¶ 2-3). This program advises consumers that by enrolling they will receive, via text message, promotional offers and notifications; it also includes an electronic link to the Terms & Conditions that control. (*Id.* at ¶ 4). When customers visit Defendant's website and click on "Sign Up" for exclusive text offers and deals, they are presented with the following information:

 **\*2**
**How do I unsubscribe/opt out?**

Simply text STOP to 39714.

(*Id.* at ¶ 5). Additionally, the terms and conditions state, "By texting JOIN to 39714, you are agreeing to receive promotional offers and notifications from Lakeshore Learning Materials." (*Id.*). After a consumer sends a text containing the keyword JOIN, he or she then receives the following message from Defendant:

Case 1:25-cv-01083-JPW    Document 28-1    Filed 11/21/25    Page 23 of 28

Viggiano v. Lakeshore Equipment Company, Not Reported in Fed. Supp. (2018)

2018 WL 11310868

Reply Yes to get 10 autodialed marketing msgs/month @ this #. Text opt-in not required for purchase. Msg&Data rates may apply. Bit.ly/MobileTC

(*Id.* at ¶ 7). After the consumer sends a "Yes" text response, he or she will immediately receive the following message:

Thank you for joining Lakeshore Promo Alerts! Stay tuned for great deals. Reply HELP 4 help. Reply STOP 2 cancel.

(*Id.* at ¶ 8). Once enrolled, each promotional message sent to the enrolled customer, ends with the following message: "ToCancelReplySTOP." (*Id.* at ¶ 9). Defendant's automated system also accepts the following messages to cancel future texts from Defendant: "CANCEL," "DO NOT," "DON'T," "END," "NO," "NO MORE," "OPT OUT," "QUIT," REMOVE," "TERMINATE," and "UNSUBSCRIBE." (*Id.* at ¶ 10). If, at any time, a consumer sends a text with an unrecognized word, or an invalid response, he or she will receive the following message:

Sorry, we don't recognize that word. Reply w/your keyword to opt-in. Reply HELP 4 help. Reply STOP 2 cancel. Msg&Data rates may apply. bit.ly/MobileTC

(*Id.* at ¶ 11)

According to Defendant's records, on November 18, 2016 at 8:21 p.m., Lakeshore received an inbound text message containing the keyword "JOIN" from plaintiff's phone number. (*Id.* at ¶ 14). In response to the inbound text message, Defendant's system sent the following message to Plaintiff:

Reply Yes to get 10 autodialed marketing msgs/month @ this #. Text opt-in not required for purchase. Msg&Data rates may apply. Bit.ly/MobileTC

(*Id.* at ¶ 15). Immediately thereafter, Defendant received an inbound text message from Plaintiff's number that said "Yes." The system then sent the following:

Thank you for joining Lakeshore Promo Alerts! Stay tuned for great deals. Reply HELP 4 help. Reply STOP 2 cancel.

(*Id.* at ¶¶ 16-17). On multiple occasions, Lakeshore messages advised Plaintiff that she could unsubscribe from the text-messaging program simply by texting "STOP" as a return text message. (*Id.* at ¶ 20).

Three days after enrolling, on November 21, 2016, Defendant received the following message from Plaintiff, "I've changed my mind and don't want to receive these anymore." (*Id.* at ¶ 21). The system did not recognize this message from Plaintiff, and immediately responded saying:

Sorry, we don't recognize that word. Reply w/your keyword to opt-in. Reply HELP 4 help. Reply STOP 2 cancel. Msg&Data rates may apply. bit.ly/MobileTC

(*Id.* at ¶ 22). Five days later, Defendant received another inbound text message from Plaintiff, "Please take me off this list." (*Id.* at ¶ 23). Again, the system responded with the same, "we don't recognize that word," message that also included the instruction "Reply STOP 2 cancel." (*Id.* at ¶ 24). On November 29, 2016, Lakeshore received another inbound text message from plaintiff, indicating: "Please do not send me these anymore." Again, the system responded in the manner indicating that it did not recognize the message containing the instruction, and noted to reply "STOP" to unsubscribe. (*Id.* at ¶¶ 25-26).

**\*3** Finally, on December 1, 2016, Defendant received the following inbound text message from plaintiff's number, "I've had enough! This is your last warning! I've told you to stop several times and you haven't." (*Id.* at ¶ 27). Once again the same messages followed by Defendant to Plaintiff, instructing plaintiff to reply "STOP" to unsubscribe. (*Id.* at ¶ 28). Lakeshore never received the message "STOP" from plaintiff and no other messages were sent by Plaintiff before initiating this suit. (*Id.* at ¶¶ 29-30).

**Analysis**

I. Rule 12(b)(1) Subject Matter Jurisdiction

Defendant asserts that Plaintiff's Complaint should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) because Plaintiff has not established standing to warrant federal court jurisdiction. Specifically, Defendant alleges that Plaintiff has failed to allege any concrete injury. (Def.'s Br. at 22-23). In response, Plaintiff argues that the Supreme Court in *Spokeo, Inc. v. Robins*, ―― U.S. ――, 136 S.Ct. 1540, 1549, 194 L.Ed.2d 635 (2016) recognized intangible injuries as actionable. Moreover, since a cause of action under the TCPA is essentially an intangible injury, Plaintiff claims the Court has subject matter jurisdiction. With reservation, the Court agrees.

Under Federal Rules of Civil Procedure 12(b)(1) a claim can be dismissed for "lack of jurisdiction over the subject matter." This motion to dismiss may be asserted at any time in a case. *In re Kaiser Group Int'l, Inc.*, 399 F.3d 558, 565 (3d Cir. 2005). In a motion to dismiss based on subject matter jurisdiction, "the standard ... is much more demanding

Viggiano v. Lakeshore Equipment Company, Not Reported in Fed. Supp. (2018)

2018 WL 11310868

[than the standard under 12(b)(6)].” ‘When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion.’ ” *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

If the defendant's attack is facial, the court may take all allegations in the complaint as true and “may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction.” *Liu v. Gonzales*, No. 07-1797, 2007 WL 2916511, at *3, 2007 U.S. Dist. LEXIS 74611, at *7 (D.N.J. Oct. 5, 2007). The standard of review differs substantially when the challenge is factual. Then, there is no presumption of truthfulness to a plaintiff's claims in the complaint. *RLR Invs., LLC v. Town of Kearny*, No. 06-4257, 2007 WL 1797658, at *3, 2007 U.S. Dist. LEXIS 44703, at *8 (D.N.J. June 20, 2007) (citations omitted).

Thus, consideration of the motion does not have to be limited; conflicting evidence may be considered so that the court can decide factual issues that may bear on its jurisdiction. *Id.* Furthermore, “[w]hen resolving a factual challenge, the court may consult materials outside the pleadings, and the burden of proving jurisdiction rests with the plaintiff.” *Med. Soc'y of N.J. v. Herr*, 191 F. Supp. 2d 574, 578 (D.N.J. 2002) (citing *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000)). However, “[w]here an attack on jurisdiction implicates the merits of plaintiff's [f]ederal cause of action, the district court's role in judging the facts may be more limited.” *RLR Invs., LLC*, 2007 WL 1797658, at *3, 2007 U.S. Dist. LEXIS 44703, at *9 (internal citations omitted).

The Court finds Defendant's Rule 12(b)(1) arguments unpersuasive, since the present cause of action arises under a federal statute. Moreover, the Third Circuit in *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017), expressly held that a concrete injury has been pled when the complaint asserts the “very harm that Congress sought to prevent.” (internal quotation marks and citation omitted). Here, the Complaint is predicated on receiving unsolicited advertisements text messages from an automatic telephone dialing system, after Plaintiff revoked consent to receive such calls, which is “prototypical conduct proscribed by the TCPA.” *Id.*; *see also* 47 U.S.C. § 227 (b)(1)(C).

**\*4** Additionally, the allegations set forth in the Palmer Declaration are fact issues as to whether Plaintiff adequately revoked her consent. This is a defense to whether Plaintiff has demonstrated a concrete harm under *Susinno*. Defendant may re-open the issue if the evidence shows that Plaintiff manufactured her injury. That is, according to the Palmer Declaration, the present matter was manufactured by Plaintiff and that the “TCPA was not enacted to protect individuals from their own nefarious conduct.” (Def.'s Reply Br. at 1); *see also Stoops v. wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 801 (W.D. Pa. 2016) (“It is well settled that a plaintiff ‘cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending.” (internal quotation marks and citations omitted)). More specifically, “Congress passed the TCPA to protect individual consumers from receiving intrusive and unwanted calls.” *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 268 (3d Cir. 2013); *see also* 47 U.S.C. § 227. Here, it is undisputed that Plaintiff purposefully joined Defendant's program by texting J-O-I-N, and then Y-E-S to confirm. However, Defendant contends that Plaintiff, in attempting to revoke consent, intentionally chose to text long complicated sentences, instead of texting S-T-O-P, so that she could bring this lawsuit. (Def.'s Reply Br. at 4). However, as noted above, in order to decide whether Plaintiff manufactured her claim requires a factual determination that can only be determined after discovery, at which point the credibility of witnesses and the reasonableness of Plaintiff's attempts to unsubscribe can be adequately assessed.[1] As such, the Court dismisses Defendant's 12(b)(1) motion without prejudice and the parties may re-open the manufactured injury issue, if appropriate, after discovery has commenced. However, for the present motion, since Plaintiff's Complaint is grounded upon the TCPA, the Court has subject matter jurisdiction. *See* 28 U.S.C. § 1331.

## II. Rule 12(b)(6) Failure to State a Claim

Defendant next seeks dismissal of Plaintiff's TCPA claims, since she has failed to state a claim for which relief can be granted. Specifically, because Defendant provided a reasonable means for revoking consent to receive promotional test messages and did not use an ATDS, Defendant contends that Plaintiff lacks any basis for asserting claims under the TCPA. The Court disagrees, since these issues are factual disputes that are ordinarily reviewed on summary judgment, as opposed to a motion to dismiss.

On a motion to dismiss for failure to state a claim, the Court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to

Case 1:25-cv-01083-JPW    Document 28-1    Filed 11/21/25    Page 25 of 28

Viggiano v. Lakeshore Equipment Company, Not Reported in Fed. Supp. (2018)

2018 WL 11310868

view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal,* 556 U.S. at 678-79, 129 S.Ct. 1937; *see also Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir. 1997). A complaint should be dismissed only if the well-pleaded alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397-98 (3d Cir. 2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir. 2001).

"The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost v. Kozakewicz,* 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (2d ed. 1990)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* As noted above, the allegations set forth in the Palmer Declaration are not asserted in the Complaint and are not documents integral to the Court's disposition of the present motion. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) (noting that a district court may consider extraneous documents, without converting a motion to dismiss into one for summary judgment, when the document is deemed "integral to or explicitly relied upon in the complaint").

**\*5** To sustain a claim under the TCPA, a plaintiff must establish three elements: "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1043 (9th Cir. 2012) (citing 47 U.S.C. § 227(b)(1)). While it is undisputed that Plaintiff initially provided express consent, Plaintiff alleges she attempted to revoke consent, but the automated dialing system would not accept her revocation. (Pl's Br. 4-5). As such, the Court limits its focus on whether Plaintiff satisfies elements two and three.

### 1. Revocation of Express Consent

Turning to element three, Defendant, relying on the Palmer Declaration, contends that Plaintiff's attempt to revoke consent was unreasonable. In this motion, the Court focuses on the allegations of the Complaint and may not rely on integral documents. The Palmer Declaration does not fall within that standard and it is not considered.

In its 2015 Declaratory Ruling and Order, the FCC clarified how consumers may revoke consent. *See In re Rules & Regulations Implementing the TCPA of 1991,* 30 F.C.C. Rcd. 7961 (July 10, 2015) (hereinafter, "2015 Order"). The 2015 Order explained, "consumers have a right to revoke consent, using any reasonable method including orally or in writing." *Id.* at 7996 ¶ 64. The FCC also provided guidance for courts seeking to determine the reasonableness of a consumer's revocation:

> When assessing whether any particular means of revocation used by a consumer was reasonable, we will look to the facts and circumstances surrounding that specific situation, including, for example, whether the consumer had a reasonable expectation that he or she could effectively communicate his or her request for revocation ...

*Id.* at 7996 ¶ 64 n.233. Here, Defendant contends that Plaintiff's efforts to revoke consent were patently unreasonable. However, at this juncture, to determine whether Plaintiff's revocation was reasonable is beyond the scope of a Rule 12(b)(6) motion because at this stage, the review is to determine if there is a plausible claim.

### 2. Defendant's Use of an ATDS

Defendant next contends that Plaintiff's TCPA claim fails, since the Complaint does not allege sufficient facts to support her assertion that Defendant utilizes an ATDS system.

Case 1:25-cv-01083-JPW    Document 28-1    Filed 11/21/25    Page 26 of 28

Viggiano v. Lakeshore Equipment Company, Not Reported in Fed. Supp. (2018)

2018 WL 11310868

Specifically, Defendant argues that Plaintiff has failed to state a claim since the device utilized was an "mGage," which two district courts have held is not an ATDS. *See Jenkins v. MGage, LLC*, No. 14-2791, 2016 WL 4263937, 2016 U.S. Dist. LEXIS 106769 (N.D. Ga. Aug. 12, 2016); *Dominguez v. Yahoo!, Inc.*, No. 13-1887, 2017 WL 390267, 2017 U.S. Dist. LEXIS 11346 (E.D. Pa. Jan. 27, 2017). Plaintiff maintains that the Complaint sufficiently alleged Defendant's use of an ATDS. Plaintiff focuses on the TCPA's prohibition on calls for advertising using *any* automatic telephone dialing system. (Pl.'s Br. 9) (emphasis added).

According to the TCPA, an ATDS is defined as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. § 227(a)(l). The TCPA's prohibition on ATDSs has expanded to include "both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) (quoting *In re Rules and regulations Implementing the TCPA of 1991*, 18 F.C.C. Rcrd. 14014, 14115 (July 3, 2003) (hereinafter, "2003 Order"). "The FCC orders make clear that it is the capacity of the equipment, not its present use, that is the relevant inquiry." *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 725-27 (N.D. Ill. 2011).

**\*6** Here, for purposes of this motion, the Court is satisfied that the Complaint adequately alleges Defendant's use of an ATDS. In her Complaint, Plaintiff specifically claims that Defendant has utilized an ATDS, in conflict with the TCPA regulations. While Defendant asserts that it utilizes an mGage, rather than an ATDS, that is an assertion beyond the scope of the Complaint and not appropriate for purposes of this motion. Moreover, the issue of whether the use of an mGage platform, which randomly dials and sends promotions through an automated and non-human system, falls within TCPA's prohibition is better suited to be addressed on summary judgment. Accordingly, the Court determines that the Complaint sets forth a claim upon which relief may be granted.

In sum, the Court finds that the Complaint survives Defendant's Rule 12(b)(6) Motion to Dismiss. Plaintiff's Complaint recites a short and plain statement of the claim, showing that the pleader is entitled to relief. As the Court held in *Twombly*, the pleading does not require "detailed factual allegations," but it demands more than an unadorned, the-Defendant-unlawfully-harmed-me accusation. *Twombly*, 550

U.S. at 555, 127 S.Ct. 1955. Here, the Complaint is grounded in federal statute, the TCPA, and sets forth the facts directed to the violation of this statute. That is, the Complaint sets forth the fact that Plaintiff signed up for or consented to receive advertisement offers from Defendant by texting "JOIN" to a number owned by Defendant. Three days later, Plaintiff texted the same number, indicating that she did not wish to receive additional advertisement offers, and in effect wished to unsubscribe or revoke her consent.

### III. Rule 12(f) Motion to Strike Plaintiff's Class Allegations

Defendant next seeks for the Court to strike Plaintiff's class claims since she fails to satisfy the requirements of Rule 23. Plaintiff contends Defendant's motion is premature. The Court agrees.

"In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001). When evaluating a motion to strike allegations of a complaint, the court must accept as true all factual allegations in the complaint and view all reasonable inferences in the light most favorable to plaintiffs, just as on a motion to dismiss pursuant to Rule 12(b)(6). *Smikle v. Coca-Cola Enterprises, Inc.*, No. 03-1431, 2004 U.S. Dist. LEXIS 32028, at \*8 (D.N.J. May 17, 2004). "Generally courts do not consider whether a proposed class meets the Rule 23 class requirements until after Plaintiffs move for class certification." *6803 Blvd. E., LLC v. DIRECTV, Inc.*, No. 12-2657, 2012 WL 3133680, 2012 U.S. Dist. LEXIS 106548 (D.N.J. July 31, 2012). However, a Defendant may move to strike class action allegations prior to discovery in rare cases "where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Landsman & Funk PC v. Skinder-Strauss Associates*, 640 F.3d 72, 93 n.30 (3d Cir. 2011).

In *Korman v. The Walking Co.*, 502 F. Supp. 2d 755, 762-63 (E.D. Pa. 2007), the court held that a motion to strike class allegations is premature when a Plaintiff has failed to file a motion for class certification. The court reasoned that a motion to strike class allegations under Rule 23 is, "for all practical purposes, identical to an opposition to a motion for class certification," and that "[i]t would be improper to allow Defendants to slip through the backdoor what is essentially an opposition to a motion for class certification before Plaintiffs have made such a motion and when discovery on the issue is still ongoing." *Id.* at 762; *see also Bell v. Money Resource*

Viggiano v. Lakeshore Equipment Company, Not Reported in Fed. Supp. (2018)

2018 WL 11310868

*Corp.*, No. 08-639, 2009 WL 382478, at *3 (E.D. Pa. Feb. 13, 2009).

**\*7** Defendant relies on this court's decision in *In re Paulsboro Derailment Cases.*, No. 13-784, 2014 WL 1371712 at *3, 2014 U.S. Dist. LEXIS 48209 at *14 (D.N.J. Apr. 8, 2014) for support of its contention that Plaintiff's class allegations should be stricken. In *Paulsboro*, the court held, "[a] court should grant a motion to strike class allegations only if the inappropriateness of class treatment is evident from the face of the complaint and from incontrovertible facts." *Id.* Here, the Court determines that motion to strike class allegations is premature at the current stage of the litigation. There are so many factual issues to be determine prior to considering class certification such as (a) whether Plaintiff manufactured her cause of action; (b) whether the S-T-O-P revocation process is reasonable under the FCC 2015 Order; and (c) whether Defendants utilized an ATDS. As such, the Court sees no reason to strike Plaintiff's class allegations pursuant Rule 12(f) at this stage of litigation.

IV. Defendant's Request to Stay

Lastly, Defendant argues that the Court should stay this case while the D.C. Circuit Court of Appeals reviews the issue of revocation of consent in *ACA International v. Federal Communications Commission*, No. 15-1211, 2015 WL 6447283, 2015 U.S. App. LEXIS 18554 (D.C. Cir. July 13, 2015). Defendant summarizes that if this Court were to allow this case to proceed, "a key issue will be whether [Defendant's] system may require a specific, reasonable means (*i.e.*, a 'STOP' response to the automated system) for an individual to revoke consent previously given. (Def.'s Br. at 32).

"The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 708, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *see also* *Landis v. North American Co.*, 299 U.S.

248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). In determining whether to grant a stay, courts should consider the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether denial of the stay would create 'a clear case of hardship or inequity' for the moving party; (3) whether a stay would simplify the issues and the trial of the case[,]; and (4) whether discovery is complete and/or a trial date has been set." *Akishev v. Kapustin*, 23 F. Supp. 3d 440, 446 (D.N.J. 2014) (internal quotation marks and citations omitted).

Here, the Court sees no reason to grant Defendant's request for a stay. As discussed above, there are a number of factual issues that may be crystalized through discovery. Indeed, once discovery has completed, the Court will be better suited to determine whether the pending[2] D.C. Circuit decision is dispositive of the present matter. However, in light of the competing interests of this case, Defendant's motion to stay is denied.

**Order**

It is on this 10TH day of January, 2018,

ORDERED that Defendant's Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) (ECF No. 6) are DENIED; and it is further;

ORDERED that Defendant's Motion to Strike the Class Allegations is DENIED; and it is further;

ORDERED that Defendant's Motion to Stay is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 11310868

Footnotes

1    In a supplemental brief, Defendant relies on Judge Martinotti's recent decision in *Viggiano v. Kohl's Dep't Stores, Inc.*, No. 17-0243, 2017 WL 5668000, 2017 U.S. Dist. LEXIS 193999 (D.N.J. Nov. 27, 2017), wherein the court dismissed the plaintiff's complaint with prejudice, after concluding that she failed to state a claim under the TCPA, since her attempts to revoke consent were unreasonable. *Id.* at *4, 2017 U.S. Dist. LEXIS 193999 at *9-10. However, as discussed above, at this stage of litigation, the Court finds any determination on the reasonableness of Plaintiff's revocation to be premature, and better addressed after reasonable discovery has been conducted.

**Viggiano v. Lakeshore Equipment Company, Not Reported in Fed. Supp. (2018)**

2018 WL 11310868

2    As of the date of this memorandum and order, the D.C. Circuit has yet to decide *ACA International v. Federal Communications Commission*.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.