# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHER BRONSTIN, individually and on behalf of all others similarly situated,<br><br><br>Plaintiff,<br><br>v.<br><br><br>HAPPY CABBAGE ANALYTICS, INC.<br><br><br>Defendant. | Case No.<br><br>**1:25-CV-01083-JPW**<br><br>**JURY TRIAL DEMANDED**<br><br>**(HON. JENNIFER P. WILSON)** |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
HAPPY CABBAGE ANALYTICS, INC.'S MOTION TO DISMISS**

I.    CONTENTS

**II.    Introduction** ..........................................................................................1

**III.   Questions Involved** ............................................................................1

**IV.    Factual Background** ...........................................................................2

**V.     Legal Standard** ...................................................................................2

**VI.    Argument** .............................................................................................3

   A.   The Complaint sufficiently alleges an injury traceable to the Defendant as the subscriber of the numbers used to contact him, and thus Plaintiff has standing. No platform liability analysis is required. ................................3

   B.   Section 227(c) of the TCPA provides a private right of action for text messages to cell phones, which are "calls." ...........................................8

      1.   The text of the TCPA confirms that the term "call" includes text messages. 9

      2.   *Neither* Loper Bright *nor* McLaughlin *change this analysis.* ...................15

   C.   There exists a private right of action for the internal Do Not Call regulations contained at 47 C.F.R. § 64.1200(d) under 47 U.S.C. § 227(c). ..........................17

   D.   Defendant's conduct was "unreasonable," which is a jury question..............19

**VII.  Conclusion**...........................................................................................21

**Cases**

*Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578 (M.D. Tenn. 2018)................ 20, 21

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ..............................................................3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).....................................................3

*Bosley v. A Bradley Hosp. LLC*, No. 25-CV-22336, 2025 WL 2686984 (S.D. Fla. Sept. 19, 2025)...........................................................................................10

*Bostock v. Clayton County*, 590 U.S. 644 (2020) .................................................10

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).......................................18

*Bradshaw v. CHW Grp., Inc.*, 763 F. Supp. 3d 641 (D.N.J. 2025) .........................19

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ..............................................10

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) .......................................................15

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) ..................................3

*Connor v. Servicequick Inc.*, No. 1:24-CV-02286, 2025 WL 2855393 (D. Colo. Oct. 8, 2025) ...........................................................................................................5, 6

*Coppell v. Hall*, 74 U.S. 542 (1868) .........................................................................5

*Cunningham v. Montes*, 378 F. Supp. 3d 741 (W.D. Wis. 2019) .............................8

*Davis v. Wells Fargo*, 824 F.3d 333 (3d Cir. 2016) ..................................................4

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980) .......................................................................................11

*Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025).......18

*Esquivel v. Mona Lee, Inc.*, No. 3:25-CV-00607, 2025 WL 3275607 (S.D. Cal. Nov. 24, 2025)...................................................................................................9, 13

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) ..................................9

*Gill v. Align Tech. Inc.*, No. 21-CV-631-JPS-JPS, 2022 WL 1540016 (E.D. Wis. May 16, 2022)................................................................................................. 20, 21

*Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) .....................................7

*Hulett v. EyeBuyDirect, Inc.*, No. 1:24-CV-996 (AMN/MJK), 2025 WL 1677071 (N.D.N.Y. June 13, 2025)....................................................................................21

*Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-CV-01569, 2024 WL 184449 (M.D. Pa. Jan. 17, 2024)..................................................................................9, 15

*Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991) ......................2

*Kline v. Advanced Ins. Underwriters, LLP*, No. 1:19-CV-00437, 2020 WL 14028040 (M.D. Pa. June 23, 2020)..................................................................19

*Kyllo v. United States*, 533 U.S. 27 (2001)..............................................................13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................16

*Lourie v. Papa John's Int'l, Inc.*, No. 1:23-CV-4320-MHC, 2024 WL 5497082,
(N.D. Ga. June 25, 2024)....................................................................................20

*Mujahid v. Newity, LLC*,
2025 WL 3140725 (N.D. Ill. 2025) .......................................................................9

*Nat'l Cable & Telecommunications Ass'n v. F.C.C.*, 567 F.3d 659 (D.C. Cir. 2009)
..............................................................................................................................12

*New Prime, Inc. v. Oliveira*,
586 U.S. 105 (2019) ............................................................................... 9, 10, 12

*Paterson v. Weinberger*, 644 F.2d 521 (5th Cir. 1981) ...........................................2

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009)..............................................................................8, 9

*Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485
(E.D. Pa. Mar. 14, 2025) ...................................................................................5, 19

*Viggiano v. Lakeshore Equip. Co.*, No. 17-CV-00707, 2018 WL 11310868 (D.N.J.
Jan. 11, 2018)......................................................................................................21

*Wilson v. Medvidi*,
2025 WL 2856295 (N.D. Cal. 2025)...................................................................9, 11

*Wilson v. Skopos Fin.*, *LLC*, 2025 WL 2029274 (D. Or. 2025) ...............................9

**Statutes**

18 U.S.C. §2 ...............................................................................................................5

21 U.S.C. § 843(c) .....................................................................................................5

47 C.F.R. § 64.1200(c)............................................................................................6, 7

47 C.F.R. § 64.1200(d) .............................................................................................17

47 C.F.R. § 64.1200(e)..............................................................................................16

47 U.S.C. § 227(b) ................................................................. 11, 13

47 U.S.C. § 227(c) ................................................................. passim

47 U.S.C. § 227(d) ................................................................. 13, 17

47 U.S.C. § 227(e) .....................................................................13

Fed. R. Civ. P. 12(b)(1)........................................................ 2, 5, 8

**Other Authorities**

Black's Law Dictionary, 12th Ed. (2024).................................................14

Black's Law Dictionary, 6th Ed. (1991)..................................................14

Declaration of Asher Bronstin ..........................................................4

Defendant's Motion to Dismiss ("MTD") ................................. 9, 11, 12, 13

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CC
    Docket No. 92-90, Report and Order, 7 FCC Rcd. 8752 ....................................18

Plaintiff's Amended Complaint ("Compl.").................................................3

Webster's College Dictionary (1991) .....................................................14

Webster's Third New International Dictionary (2002) ............................................9

## II.    INTRODUCTION

Defendant Happy Cabbage Analytics, Inc's. jurisdictional motion to dismiss must be denied because evidence has been adduced showing that Defendant subscribed to the telephone numbers that called Plaintiff, meaning that Defendant initiated the calls under the plain meaning of the TCPA. Any factual disputes masquerading as jurisdictional ones should not be resolved now. Defendant's ordinary motion to dismiss should also fail, because text message calls are "calls" under the TCPA, and because there is a private right of action for the revocation claims, for which Defendant's conduct was unreasonable. Defendant's motion should therefore be denied in its entirety.

## III.    QUESTIONS INVOLVED

1.    Does the Complaint sufficiently allege an injury traceable to Defendant when Defendant was the subscriber of the numbers used to call him?

Suggested Answer: Yes.

2.    Is a text message call a "call" under the TCPA?

Suggested Answer: Yes.

3.    Is there a private right of action for the internal Do Not Call (DNC) rules?

Suggested Answer: Yes.

4.    Is calling someone after an acknowledged "STOP" request reasonable?

Suggested Answer: No.

1

## IV.    FACTUAL BACKGROUND

The Plaintiff brought this action alleging two causes of action arising from text message calls sent to his cell phone on the National Do Not Call Registry after Plaintiff replied "STOP." Plaintiff alleges that these messages were sent and initiated by Defendant because Defendant is the subscriber of the telephone numbers at issue. And Plaintiff alleges that this conduct, committed by the Defendant, injured him. Defendant has moved to dismiss on the basis that this conduct is not traceable to it and that there is no right of action for either of the two claims as a matter of law. This response follows.

## V.    LEGAL STANDARD

The standards for 12(b)(1) challenges for a lack of subject matter jurisdiction are well-settled. The exist two types of 12(b)(1) challenges: facial and factual challenges. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). In evaluating either 12(b)(1) challenge, the Court applies the Rule 12(b)(6) standard. *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1174 (3d Cir. 2024). To the extent that the motion does not properly address jurisdiction but instead sounds in the factual merits, such motion also ought to be denied and the case proceed. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. The Rules demand only a "short and plain

2

statement of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests," drawing on "judicial experience and common sense." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (cleaned up). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A complaint may be dismissed where it appears that there are not "enough facts to state a claim that is plausible on its face," not because the defendant proffers some contrary facts. *Twombly*, 550 U.S. at 570.

## VI.    ARGUMENT

A.    *The Complaint sufficiently alleges an injury traceable to the Defendant as the subscriber of the numbers used to contact him, and thus Plaintiff has standing. No platform liability analysis is required.*

Mr. Bronstin alleges the facts necessary for a finding of traceability: that Defendant itself *directly* sent the calls at issue because they were sent from the Defendant's telephone numbers, for which it is the subscriber of record, and thus that Defendant was the ultimate party that sent the calls at issue. Compl. ¶ 32-33. Telnyx's records confirm that Defendant subscribed to the numbers. Exhibit A. Defendant admits in its declaration it is a company that advertises Schedule I controlled substances by text calls on behalf of its drug dealer clients by providing

them the telephone services to do so. These allegations are more than sufficient to trace the calls to the Defendant's conduct as the "initiator" of the calls, as confirmed by telephone company records, not some third party with unauthorized access (of which there's no evidence). And the Plaintiff's own declaration confirms traceability here. (*See generally* Bronstin Dec.)

Nothing more is required to plead traceability to the Defendant. Variations of the same strategy have been rejected by federal courts. "While that argument has some superficial appeal, it is wrong. [Defendant's] argument is better understood as a well-disguised challenge to the legal merits of [Plainitff's] case, not as a challenge to his standing to pursue it." *Davis v. Wells Fargo*, 824 F.3d 333, 347 (3d Cir. 2016). *Davis* is controlling. There, the Third Circuit reversed a jurisdictional dismissal that decided the merits under the guise of standing, exactly as Defendant attempts. When jurisdiction is "intertwined" with the merits, the proper course is to deny the Rule 12(b)(1) motion.

Moreover, Defendant's *own declaration* confirms that the very reason that the numbers were so registered is because *that is the Defendant's business model*: Defendant provides a messaging service that uses the telecommunications network and interstate wires to send advertisements for federally illegal drugs on dealers' behalf, instead of having the dealers send the calls from their own telephone accounts to which they subscribe themselves, risking account closure and

prosecution. This "advertising services" business model is also illegal and void because federal law makes it unlawful to make any written advertisement for a Schedule I controlled substance. 21 U.S.C. § 843(c)(1); *Coppell v. Hall*, 74 U.S. 542, 547 (1868) (contracts for illegal activities are void and unenforceable). So, to the extent that the Court does undertake an analysis of Defendant's involvement, it must also be cognizant of the fact that Defendant should not have been providing drug dealers a platform to send calls advertising Schedule I controlled substances in any manner, regardless of the message drafter. 18 U.S.C. §2 (criminalizing aiding and abetting). At minimum, Defendant is aiding and abetting violations of the Controlled Substances Act by providing the telephone accounts used to send calls advertising the same. In any event, questions surrounding Defendant's business model and who "initiated" the calls are for jury determination, not a factual issue masquerading as a 12(b)(1) dispute. *Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485, at *6 (E.D. Pa. Mar. 14, 2025).

Another court recently denied a substantially similar motion to dismiss in another case where a calling platform claimed it was not liable because another company used its services to advertise (legal) products. *Connor v. Servicequick Inc.*, No. 1:24-CV-02286, 2025 WL 2855393, at *3 (D. Colo. Oct. 8, 2025). In *Connor*, like here, the moving defendant, a marketing service, was listed in the telephone company's records as the subscriber. *Id.* And, the court agreed with the

plaintiff's allegation that the "platform" defendant was directly liable because it "physically sent the messages at issue" from its own phone number. *Id.* The *Connor* court went on to analyze the statute and determine that, because the defendant's telephone account was used to "initiate" the messages, the defendant could be held liable, as that is what the text of 47 C.F.R. § 64.1200(c)(2) requires. It reached this conclusion, despite it being undisputed that another company drafted the message content and provided the calling lists. *Id.*

A review of the authorities Defendant cites show that *none of them* dealt with the circumstances, as here, where the defendant was the *subscriber of record* for the telephone number. In *Sheski*, for example, plaintiff made no allegations that the defendant was involved in sending messages *at all*, alleging only that the platform allowed retailers to export phone numbers for inclusion on a list. And in *Linlor*, plaintiff attempted to sue a telephone company common carrier, akin to suing T-Mobile. Defendant is not a telephone company like T-Mobile; the telephone company here is Telnyx, and Telnyx's records show its subscriber was Defendant. And the system in *Upland* was analogous to the one in *Sheski*. And unlike here, where the phone numbers at issue were in registered in Defendant's name, and just like in *Sheski*, Upland had "no involvement" in sending messages. The cases are distinguishable on the facts *alone* based on proven lack of any involvement in the conduct *at summary judgment*.

6

But even to the extent that some of the cases Defendant cites advocate for a fact-based analysis of the degree of involvement necessary for so-called "platform liability," that's a red herring question. The scope of direct TCPA liability is determined by the statutory text, not FCC regulations; 47 C.F.R. § 64.1200(c)(2), prohibits "initiat[ing]" a call to any number on the National Do Not Call Registry. And anyone who "initiates" a call under the TCPA is subject to *direct*, not platform, TCPA liability without further analysis. *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 960 (8th Cir. 2019) ("Thus, to be held directly liable, the defendant must be the one who "initiates" the call."). That's the end of the analysis. *Golan*, 930 F.3d at 960. Because the Plaintiff alleges that the calls were sent from *Defendant's* telephone number and from *its own account* with the telephone company (and not The Spot's account), *precisely because that is Defendant's business model*, it follows that Defendant is *directly liable* for the calls it initiated. Defendant was the triggerman operating under the direction of literal drug dealers because it was the entity from whose account the calls were sent, and thus physically initiated them.

In any event, Plaintiff's facts suffice for traceability at this stage, even on a "platform" analysis, which is fact intensive and not appropriately resolved now. Defendant sent the calls here from its own account, to numbers on the DNC, without screening them to determine whether they were written advertisements for federally illegal controlled substances being transmitted through interstate wire

7

communication. Defendant also does not deny it was also responsible for handling any "STOP" or opt out requests on behalf of its federally-illegal marijuana dealer clients, as evidenced by its claims that it has no record of Plaintiff's request. So, its failure to screen for illegal content and failure to process STOP requests are evidentiary facts which may give rise to a finding of platform involvement. *Cunningham v. Montes*, 378 F. Supp. 3d 741, 748-49 (W.D. Wis. 2019). In any event, these issues are factual issues masquerading as merits issues. The Court should deny the 12(b)(1) motion as inappropriate at this stage.

B.    *Section 227(c) of the TCPA provides a private right of action for text messages to cell phones, which are "calls."*

Consider a 1991 law that bars "vehicles" from a park. That law applies equally to Cybertrucks and to sedans, even though the former didn't exist then. So, too, here: The TCPA prohibits sending text message calls to phone numbers on the DNC, just as it prohibits traditional voice calls. Of course, texting didn't exist when the TCPA was passed in 1991, so Congress didn't have SMS messages specifically in mind. But that is no matter: The plain meaning of the word "call" in the TCPA has long been understood to encompass any attempt to communicate by phone, "regardless of whether that call is communicated by voice or text." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003). And this Court, and the Third Circuit, have

already rejected both of Defendant's readings as textual matters, untethered to any agency interpretation. *Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-CV-01569, 2024 WL 184449, at *5 (M.D. Pa. Jan. 17, 2024); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013). A growing number of courts addressing the issues Defendant presents have concluded that the TCPA applies to text messages. *See, e.g.*, *Mujahid v. Newity, LLC*, 2025 WL 3140725, at *2–3 (N.D. Ill. 2025); *Wilson v. Medvidi*, 2025 WL 2856295, at *2–4 (N.D. Cal. 2025); *Wilson v. Skopos Fin.*, *LLC*, 2025 WL 2029274, at *4–5 (D. Or. 2025); *Esquivel v. Mona Lee, Inc.*, No. 3:25-CV-00607, 2025 WL 3275607, at *2 (S.D. Cal. Nov. 24, 2025).

1. The text of the TCPA confirms that the term "call" includes text messages.

Defendant insists no one describes text message calls as calls in ordinary conversation. (MTD at 19.) True as that may be, that's not how statutory interpretation works. Courts look to statutes' ordinary "meaning at the time of … adoption," referencing dictionaries of the era, to interpret them, not "modern intuition." *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 114 (2019). Modern parlance can be misleading as times change. *See id.* at 114-16. Text messages are "calls" under the TCPA, for the word "call" in its "ordinary, contemporary, common meaning" signifies "any attempt to communicate with another by means of the telephone," whether by voice or by written word. *Satterfield*, 569 F.3d at 953–54 & n.3 (quoting Webster's Third New International Dictionary (2002)).

Citing *Jones* and *Davis*, Defendant contends the TCPA could not possibly apply to text messages because those didn't exist in 1991. As an initial matter, the Supreme Court disagrees with Defendant's interpretation. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156, (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call'".). Relatedly, the Supreme Court's recent decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), all but precludes the analysis conducted in *Jones* and *Davis. Bostock* makes clear that the plain text controls, even if the Congress that passed the law *never intended* the law to be used so broadly. *Id.* at 652. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Id.* at 652-53. Those cases are thus unpersuasive because they rely on extratextual considerations. *Id.*

*Jones* and *Davis* get statutory interpretation wrong in two ways, as the another Court has observed. *Bosley v. A Bradley Hosp. LLC*, No. 25-CV-22336, 2025 WL 2686984, at *5 (S.D. Fla. Sept. 19, 2025) (citing multiple cases for the proposition that text messages constitute "calls" under the TCPA). *First*, as the Supreme Court has warned, "modern intuition" doesn't always match "evidence of a term's meaning at the time of [a statute]'s enactment." *New Prime*, 586 U.S. at 114. Statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315–16 (1980); *Bostock*, 590

U.S. at 652-53. Like a 1991 law that bars "vehicles" from a park, *Jones* and *Davis* went astray by reflexively applying extratextual modern intuitions about how people today discuss text messages to language from 1991, before the first text message was ever sent. But the 1991 meaning of "call", which "refers to both oral and written communications," is what matters. *Medvidi*, 2025 WL 2856295, at *2.

In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage." *Id.* Under that reasoning, the word "call" could not refer to a text message sent to a "paging service," which is explicitly protected. Similarly, 47 U.S.C. § 227(b)(1)(A), an autodialer provision, uses the word "call" several times to describe a prohibited transmission to both a "cellular telephone" and "a paging service." It's incongruous to refuse to apply this definition to text messages, which themselves are simply an evolved form of paging. *Jones* and *Davis* also rely on that same intuition, finding it impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the analysis "begins" and "ends" there. (MTD at 20-21.) No doubt most people wouldn't use "call" the way the TCPA does in casual conversation, especially nowadays, where we describe written messaging between phones as "texting."

But statutory interpretation does not turn on modern colloquial usage. To the

11

contrary, when language has evolved since a statute's enactment, current usage can be misleading. For example, in *New Prime*, the Supreme Court explained that the statutory term "contracts of employment" in the Federal Arbitration Act nowadays might exclude independent contractors. 586 U.S. 105, 114 (2019). But that "modern intuition" did not match the "evidence of the term's meaning at the time of the Act's adoption," which revealed that "'contract of employment' usually meant nothing more than an agreement to perform work." *Id*. The Supreme Court therefore held that the statutory exception at issue reached not just conventional "employees," as modern parlance might suggest, but also modern independent contractors, as definitions from the time of the statute's enactment showed. *See id*. at 114–16. *New Prime* illustrates the proper statutory interpretation to apply when a mismatch arises between current intuitions and the original meaning at the time of enactment: the latter controls—not (as Defendant's cases put it) how an "ordinary" person would think of a text message today, (MTD at 19.), or "today's American parlance." (MTD at 20.)

*Second*, it's irrelevant that Congress didn't have text messages specifically in mind in 1991 when it extended protections to "calls." Courts look to the meaning of the words Congress used, not the "particular manifestation of a problem" that would have been front of mind. *Nat'l Cable & Telecommunications Ass'n v. F.C.C.*, 567 F.3d 659, 665 (D.C. Cir. 2009). And in its mandate, Congress

articulated a broad intelligible principle untethered to technological developments. *Jones* and *Davis* say that in ordinary usage, it sounds odd to refer to a text message as a telephone call. But applying that same reasoning, it would be just as odd to use Defendant's restrictive interpretation in relation to other types of written telephone calls, such as pages and faxes, which are covered explicitly as "calls." *See, e.g.*, 47 U.S.C. § 227(b)(1)(A)(iii) (pager "calls"); *id.* § 227(b)(1)(C) (fax); *id.* § 227(d) (fax "communications").

Especially in this context, where Congress knows that telecommunications technology tends to evolve with time, courts should not lightly assume that Congress drew arbitrary lines based on the specific technology used, particularly in a section dealing with "consumer protections," Section 227(c). *Esquivel*, 2025 WL 3275607, at *3. Defendant's approach leaves telephone subscribers "at the mercy of advancing technology" and permits it to "erode the privacy guaranteed by the" TCPA, merely because call technology has advanced. *Kyllo v. United States*, 533 U.S. 27, 28 (2001) (extending Fourth Amendment protections to new technology). It is the meaning of those terms that governs, not the specific facts or technology that Congress would have had in mind in 1991.

Defendant concludes by noting a separate provision distinguishes between calls and text messages. (MTD at 20.) But, if anything, § 227(e)(8) shows the opposite: It reinforces that texts are calls, and it limits the definitions to the

13

"purposes of this subsection," confining its definitions *to subsection (e)*. To the extent there's an incongruity, Congress explicitly limited it. But not even this subsection is incongruous. It describes a "text message" as coming from a "caller," just like a voice call. The takeaway is that, by identifying two types of calls, both of which come from a "caller," both types require "caller identification." That reading accords with the meaning of "call" used elsewhere in the TCPA.

Defendant's final attempts at distinguishing "telephone solicitations" fare no better, because that definition explicitly *includes* "messages." The explicit definition of a "telephone solicitation is "the initiation of a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4). Text messages to cell phones fit that definition. First, to state the obvious, a cell phone is a "telephone." The word "message" suggests that Congress had no particular technology in mind: "Message" means "[a]ny notice, word, or communication, *no matter the mode and no matter how sent*, from one person to another." Black's Law Dictionary, 6th Ed. (1991) (emphasis added). Even a "call" is a "request, demand, or command." Black's Law Dictionary, 12th Ed. (2024). And Congress's use of the word "transmitted" also conveys no preference for wires: "Transmit" means "to send a signal *by radio waves or by wire*." Transmit, Webster's College Dictionary (1991) (emphasis added). So, a "telephone

14

solicitation" can be received on any kind of telephone in any manner.

    2. *Neither* Loper Bright *nor* McLaughlin *change this analysis.*

    Relatedly, Defendant claims that *Loper Bright* and *McLaughlin* no longer require deference to the FCC's interpretations. But, as the Plaintiff's above textualist analysis indicates, reading the word "call" to include text messages is the best, most textually informed reading of the statute. For that matter, that means that this Court should disregard Defendant's footnote calling into question this Court's *textualist* analysis in *Jackson*, which held that calls to cell phones are calls to residential numbers simply because, as a matter of good statutory construction, the word "residential" and "telephone" are both adjectives that modify "subscriber," and describe the type of subscribers protected, "residential" ones, regardless of the technologies they choose to use. *Jackson*, 2024 WL 184449, at *5. No part of *Jackson* relied on any FCC interpretation.

    The fresh look authorized by *Loper Bright* confirms that the FCC's longstanding positions adhere to the ordinary, contemporary meaning of the terms Congress used in the TCPA's Do Not Call List provision, § 227(c). It also comports with the FCC's 2023 statutory regulations, which remain unaffected after *Loper Bright* and *McLaughlin*, and which have the "force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 282 (1979) (holding substantive agency regulations, like 47 C.F.R. § 64.1200(e), have the "force and effect of law.") That

instant regulation makes clear that "[t]he rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing *calls or text messages to wireless telephone numbers*." 47 C.F.R. § 64.1200(e)

That conclusion follows from § 227(c)'s broad definition of a prohibited "telephone solicitation," an informed dictionary definition of the word "call" that does not confine itself to whether or not a voice is used, and a functional definition of a "residential telephone subscriber" that focuses on the *use* of a phone, not its physical characteristics or location. And all this shows that Congress expressly delegated this question to the FCC to regulate. So, either way, the FCC's statutory regulations "effectuate the will of Congress." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 371 (2024). Sometimes, "the best reading of a statute is that it delegates discretionary authority to an agency." *Id.* at 395. Simply put, Plaintiff relies on an informed textualst reading that aligns with the statute, not any regulation, which in any event, is entirely consistent with the statutory text. After *Loper Bright*, there are many cases where agencies' reasonable decisions are no longer entitled to deference, but this is not one of them. That being the case, there is no good reason to read the statute to exclude text messages sent to residential cellular telephone subscribers.

16

C.    *There exists a private right of action for the internal Do Not Call*
      *regulations contained at 47 C.F.R. § 64.1200(d) under 47 U.S.C. § 227(c).*

Defendant contends that no private right of action exists for the violations of

the internal Do Not Call regulations, which are codified at 47 C.F.R. §

64.1200(d)(3), because Defendant contends that they were promulgated under 47

U.S.C. § 227(d). Defendant is wrong both historically and textually.

Case law and legislative history confirm that the instant regulation at issue

here was promulgated under 47 U.S.C. § 227(c), which contains a private right of

action, and *not* 47 U.S.C. § 227(d) as Defendant claims, which addresses not

"procedural standards" generally, as claimed, but rather *specific procedural*

*standards* with specific respect to *robocalls* and *fax machines*, not telemarketing

calls. To see why, begin with an analysis of the statute's history.

The instant regulation, 47 C.F.R. § 64.1200(d)(3), was promulgated as a

result of the TCPA's mandate, at 47 U.S.C. § 227(c)(1), that required the FCC to

"initiate a rulemaking proceeding concerning the need to protect residential

telephone subscribers' privacy rights to avoid receiving telephone solicitations to

which they object." It came about as a result of that *very proceeding* that Congress

explicitly required. In fact, in implementing these company-specific internal DNC

regulations, the FCC remarked that "company-specific do-not-call lists" were the

"most effective alternative to protect residential subscribers from unwanted live

and artificial or prerecorded voice message solicitations," at the time, thereby

protecting consumers' privacy. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd. 8752, 8757. The FCC made clear it was issuing the instant regulation pursuant to the mandate Congress articulated in 47 U.S.C. § 227(c)(2). *Id.* at 8756.

This express recognition of delegation also makes sense in context. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). In this regard, only a handful of subsections of the TCPA allow for the promulgation of regulations:

    • § 227(b)(2) authorizes the FCC to implement requirements that relate to the use of prerecorded voices and automatic telephone dialing systems;
    • § 227(c) authorizes the FCC to promulgate rules relating to the "need to protect residential telephone subscribers' privacy rights";
    • § 227(d)(1)–(3) allow regulations relating to technical and procedural standards related to fax machines, automatic telephone dialing systems, and "systems that are used to transmit any artificial or prerecorded voice message";
    • § 227(e)(3) provides for regulations relating to misleading or inaccurate caller ID; and
    • § 227(i) allows for the FCC to promulgate regulations to streamline information sharing with the FCC related to violations

    *Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373, 376 (E.D. Mich. 2025). As the Court observed in *Dobronski*, all but § 227(c) are quickly eliminated as not even remotely applicable to the statutory provision here. The statutory provision at issue here could not have been promulgated pursuant to §227(d), because that relates only to *technical* standards for technical *devices*, fax machines

18

and automatic telephone dialling systems, not to technical standards for telemarketing calls in general, just as §227(b), which is inapplicable for identical reasons. Section 227(e)(3), was enacted *after* the instant regulation, so that's out. And, finally, company-specific DNC rules have nothing to do with information sharing with the FCC contained in Section 227(i). *Id.*

Adopting this well-reasoned authority, every single court to have considered this issue in this Circuit has concluded that the company-specific DNC rules were promulgated under authority present in 47 U.S.C. § 227(c), for which there exists a private right of action. *E.g.*, *Bradshaw v. CHW Grp., Inc.*, 763 F. Supp. 3d 641, 649 (D.N.J. 2025) (conducting same historical analysis)); *Shelton*, 2025 WL 817485, at *6 ; *Kline v. Advanced Ins. Underwriters, LLP*, No. 1:19-CV-00437, 2020 WL 14028040, at *3 (M.D. Pa. June 23, 2020). This Court should hold the same as it did in *Kline*, in line with *Bradshaw*.

D.     *Defendant's conduct was "unreasonable," which is a jury question.*

Defendant also argues that, even if there is a private right of action for the company-specific internal DNC policies, calling the Plaintiff a second time more than a week later, was "reasonable." However, this ignores the fact that courts have almost uniformly held that the "reasonability" of time in which a DNC request is honored is a factual question, and that the thirty-day window is a strict *outer limit* that may be limited, particularly where, as here, *Defendant immediately*

*acknowledged the Plaintiff's "STOP" call*, and explicitly promised "you will not receive any more messages."

Defendant's own authorities belie its contention that calling the Plaintiff, not only after he called "STOP," but after it *explicitly acknowledged that his number had been removed*, and thus that his request was purportedly "honored," when in reality, it was not, was at all "reasonable." Both *Simmons* and *Orsatti* relied on *vocal* revocations of consent during voice calls, not automated, computerized revocations during text message calls. Courts recognize that "reasonability" warrants a totality of the circumstances approach and must be considered by a jury, including timing and capabilities of the systems involved. *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 600 (M.D. Tenn. 2018).

Indeed, it is patently *unreasonable* for the Plaintiff to continue to receive calls after he received confirmation they would stop, as confirmed by multiple courts. *See, e.g.*, *Lourie v. Papa John's Int'l, Inc.*, No. 1:23-CV-4320-MHC, 2024 WL 5497082, at *4 (N.D. Ga. June 25, 2024) ("[T]he Court must infer that Defendant could have immediately complied with the request prior to the transmittal of the two telemarketing text messages in the week following Lourie's request."); *Gill v. Align Tech. Inc.*, No. 21-CV-631-JPS-JPS, 2022 WL 1540016, at *4 (E.D. Wis. May 16, 2022) (describing calls one hour after a confirmed opt out). Those same authorities also make clear that the allegations like those the Plaintiff

here makes at the pleadings stage are similarly sufficient. *Id.* To the extent issues remain on reasonability, they can't be adjudicated here and must be adjudicated by a jury. "[W]hether a defendant honored a do-not-call request within a reasonable period is a question of fact best left to the jury in most circumstances where the period is less than 30 days." *Hulett v. EyeBuyDirect, Inc.*, No. 1:24-CV-996 (AMN/MJK), 2025 WL 1677071, at *6 (N.D.N.Y. June 13, 2025); *accord Viggiano v. Lakeshore Equip. Co.*, No. 17-CV-00707, 2018 WL 11310868, at *5 (D.N.J. Jan. 11, 2018); *Ammons*, 326 F. Supp. 3d at 600.

## VII.    CONCLUSION

This Court must deny Defendant's motion to dismiss or permit amendment, as appropriate.

Dated: December 5, 2025

>*/s/ Andrew Roman Perrong*
>Andrew Roman Perrong, Esq.
>Perrong Law LLC
>2657 Mount Carmel Avenue
>Glenside, Pennsylvania 19038
>Phone: 215-225-5529 (CALL-LAW)
>Facsimile: 888-329-0305
>a@perronglaw.com

## **CERTIFICATE OF WORD COUNT**

Pursuant to Local Rule 7.8(b)(2), I hereby certify that this brief contains 4,999 words.

DATED this December 5, 2025.

*/s/ Andrew Roman Perrong*

Andrew Roman Perrong, Esq.

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

December 5, 2025

*/s/ Andrew Roman Perrong*

Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com